1  DANIEL JOHNSON, JR. (SBN 574090)
   RITA E. TAUTKUS (SBN 162090)
2  MORGAN, LEWIS & BOCKIUS LLP
   One Market, Spear Street Tower
3  San Francisco CA 94105
   Telephone:  (415) 442-1000
4  Facsimile:  (415) 442-1001
   Email:  djjohnson@morganlewis.com
5  Email:  rtautkus@morganlewis.com

6  Attorneys for Plaintiff
   UNIVERSITY OF PITTSBURGH

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10              SAN FRANCISCO DIVISION

11
                                        Case No. CV 08-02973 MMC
12  UNIVERSITY OF PITTSBURGH OF THE
    COMMONWEALTH SYSTEM OF HIGHER
    EDUCATION d/b/a UNIVERSITY OF           **DECLARATION OF RITA E. TAUTKUS
13  PITTSBURGH                              IN SUPPORT OF UNIVERSITY OF
                                            PITTSBURGH'S OPPOSITION TO
14         Plaintiff,                       MOTION TO TRANSFER BY VARIAN
                                            MEDICAL SYSTEMS, INC.**
15      v.
                                            Date:  August 29, 2008
16  VARIAN MEDICAL SYSTEMS, INC.            Time:  9:00 a.m.
                                            Courtroom 7, 19th Floor
17         Defendant.

18

19         I, Rita E. Tautkus, declare and state as follows:

20         1.      I am Of Counsel with the law firm of Morgan, Lewis & Bockius LLP, attorneys of

21  record for Plaintiff University of Pittsburgh ("UPitt").  I am licensed to practice law before the

22  Courts for the State of California.  I have direct and personal knowledge of the facts set forth in my

23  Declaration and, if called and sworn as a witness, I would competently testify to these facts.

24         2.      Attached hereto as Exhibit 1 is a true and correct copy of a page from Varian Medical

25  Systems, Inc.'s ("Varian") website (*available at* http://varian.com/us/corporate/contact) that was

26  printed on June 30, 2008.

27

28

3.     Attached hereto as Exhibit 2 is a true and correct copy of Varian's Initial Disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1) that were made in the Western District of Pennsylvania action, Case No. 07-0491.

4.     Attached hereto as Exhibit 3 is a true and correct copy of excerpts from the transcript of the deposition of Sam David Castellino, which was taken on October 16, 2007 in the Western District of Pennsylvania action, Case No. 07-0491.  **[FILED UNDER SEAL]**

5.     Attached hereto as Exhibit 4 is a true and correct copy of excerpts from the transcript of the deposition of Michael Sing Chen, which was taken on October 16, 2007 in the Western District of Pennsylvania action, Case No. 07-0491.  **[FILED UNDER SEAL]**

6.     Attached hereto as Exhibit 5 is a true and correct copy of excerpts from the transcript of the deposition of Martin J. Kandes, which was taken on September 28, 2007 in the Western District of Pennsylvania action, Case No. 07-0491.  **[FILED UNDER SEAL]**

7.     Attached hereto as Exhibit 6 is a true and correct copy of excerpts from the transcript of the deposition of Stanley Mansfield, which was taken on October 17, 2007 in the Western District of Pennsylvania action, Case No. 07-0491.  **[FILED UNDER SEAL]**

8.     Attached hereto as Exhibit 7 is a true and correct copy of excerpts from the transcript of the deposition of Richard Morse, which was taken on October 2, 2007 in the Western District of Pennsylvania action, Case No. 07-0491.  **[FILED UNDER SEAL]**

9.     Attached hereto as Exhibit 8 is a true and correct copy of excerpts from the transcript of the deposition of Hassan Mostafavi, which was taken on September 21, 2007 in the Western District of Pennsylvania action, Case No. 07-0491.  **[FILED UNDER SEAL]**

10.     Attached hereto as Exhibit 9 is a true and correct copy of excerpts from the transcript of the deposition of George Zdasiuk, which was taken on October 4, 2007 in the Western District of Pennsylvania action, Case No. 07-0491.  **[FILED UNDER SEAL]**

11.     Attached hereto as Exhibit 10 is a true and correct copy of excerpts from the transcript of the deposition of Majid Riaziat, which was taken on October 5, 2007 in the Western District of Pennsylvania action, Case No. 07-0491.  **[FILED UNDER SEAL]**

12.     Attached hereto as Exhibit 11 is a true and correct copy of the opinion from *United States v. Leonard A. Pelullo Pintler Creek Range, Inc.*, No. 02-2249, 2003 U.S. App. LEXIS 6863 (3rd Cir. Apr. 4, 2004).

13.     Attached hereto as Exhibit 12 is a true and correct copy of the opinion from *Boswell v. Baton*, No. 91-CV-1475, 1993 U.S. Dist. LEXIS 10898 (N.D.N.Y. Aug. 4, 1993).

14.     Attached hereto as Exhibit 13 is a true and correct copy of the opinion from *Baird v. California Faculty Association*, No. C-00-0628-VRW, 2000 WL 516378 (N.D. Cal. Apr. 24, 2000).

15.     Attached hereto as Exhibit 14 is a true and correct copy of the opinion from *Advanced Semiconductor Materials America, Inc. v. Applied Materials, Inc.*, No. CIV 93-0066-PHX-SMM, 1993 U.S. Dist. LEXIS 20045 (D. Ariz. Sept. 15, 1993).

16.     Attached hereto as Exhibit 15 is a true and correct copy of the opinion from *Ray v. Bluehippo Funding, LLC*, No. C06-01807 JSW, 2007 U.S. Dist. LEXIS 91060 (N.D. Cal. Dec. 4, 2007).

17.     Attached hereto as Exhibit 16 is a true and correct copy of the Order Denying Motion to Transfer and Granting Motions to Dismiss from *SNK Corp. of Amer. v. Atlus Dream Entertainment Co.*, Case No. C 98-21035 (N.D. Cal. Feb. 24, 1999).

18.     Attached hereto as Exhibit 17 is a true and correct copy of the opinion from *Sykes v. Eckankar*, No. C98-0858 SI, 1998 U.S. Dist. LEXIS 8203 (N.D. Cal. May 29, 1998).

19.     Attached hereto as Exhibit 18 is a true and correct copy of a letter from Zheng Liu, Esq., counsel of record for Varian, to Darcy A. Paul, Esq., counsel of record for UPitt, dated February 27, 2008.

20.     Attached hereto as Exhibit 19 is a true and correct copy of a letter from Zheng Liu, Esq., counsel of record for Varian, to Mitchell M. Blakely, Esq., counsel of record for UPitt, dated March 13, 2008.

21.     Attached hereto as Exhibit 20 is a true and correct copy of a document produced in the Western District of Pennsylvania action, Case No. 07-0491, by Majid Riaziat with bates number MR00000073, marked as Exhibit 12 at the deposition of Majid Riaziat on October 5, 2007.  **[FILED UNDER SEAL]**

DECLARATION OF RITA E. TAUTKUS ISO PLAINTIFF'S OPPOSITION TO MOTION TO TRANSFER
(Case No. CV 08-02973 MMC)
DB2/20755868.2

3

22.     Attached hereto as Exhibit 21 is a true and correct copy of a document produced in the Western District of Pennsylvania action, Case No. 07-0491, by Varian with bates numbers VAR00330305-313, and marked as Exhibit 13 at the deposition of Majid Riaziat on October 5, 2007.  **[FILED UNDER SEAL]**

23.     Attached hereto as Exhibit 22 is a true and correct copy of a letter from Matthew H. Poppe, Esq., counsel of record for Varian, to Rita E. Tautkus, Esq., counsel of record for UPitt, dated February 4, 2008.

24.     Attached hereto as Exhibit 23 is a true and correct copy of excerpts from the transcript of the deposition of Karun B. Shimoga, which was taken on August 31, 2007 in the Western District of Pennsylvania action, Case No. 07-0491.  **[FILED UNDER SEAL]**

25.     Attached hereto as Exhibit 24 is a true and correct copy of the Expert Report of Dr. Steve B. Jiang, which was filed on August 15, 2007 (Docket No. 52) in the Western District of Pennsylvania action, Case No. 07-0491.

26.     Attached hereto as Exhibit 25 is a true and correct copy of a letter from Zheng Liu, Esq., counsel of record for Varian, to Rita E. Tautkus, Esq., counsel of record for UPitt, dated April 18, 2008, and the enclosed curriculum vitae of Bruce L. McFarlane and the enclosed signed Confidentiality Agreement for Expert, Consultant or Employees of Any Party.

27.     Attached hereto as Exhibit 26 is a true and correct copy of a letter from Rita E. Tautkus, Esq., counsel of record for UPitt, to Matthew H. Poppe, Esq., counsel of record for UPitt, dated August 10, 2007, and the enclosed curriculum vitae of Paul K. Meyer.

28.     Attached hereto as Exhibit 27 is a true and correct copy of the Confidentiality Agreement for Expert, Consultant or Employees of Any Party, executed by Barbara Frederiksen on May 25, 2007, for the Western District of Pennsylvania action, Case No. 07-0491.

29.     Attached hereto as Exhibit 28 is a true and correct copy of an email from Matthew H. Poppe, Esq., counsel of record for Varian, to Rita E. Tautkus, Esq., counsel of record for UPitt, dated June 19, 2007.

1    30.    Attached hereto as Exhibit 29 is a true and correct copy of the opinion from

2  *Accelinear Service Co. v. Varian Associates, Inc.*, No. 3:96 CV 01275 (WWE), 1996 U.S. Dist.

3  LEXIS 22675 (D. Conn. Oct. 16, 1996).

4    I declare under penalty of perjury under the laws of the United States of America that the

5  foregoing is true and correct and that this declaration was executed this 11th day of July, 2008, at

6  San Francisco, California.

7    By: /s/ Rita E. Tautkus
8       Rita E. Tautkus

DECLARATION OF RITA E. TAUTKUS ISO PLAINTIFF'S OPPOSITION TO MOTION TO TRANSFER
(Case No. CV 08-02973 MMC)
DB2/20755868.2

5

# EXHIBIT 1

**VARÍAN** | A partner for **life**
medical systems

Contact Information
Contact Us

# Contact Us

To send inquiries, feedback, or requests for information, please use our Feedback and Inquiries form.

## Corporate Headquarters

Varian Medical Systems, Inc.
3100 Hansen Way
Palo Alto, CA 94304-1038

Telephone: 1.650.493.4000
Toll Free: 800.544.4636

## North America

## USA

### California

Corona, CA
Tel: 951.280.4401

Milpitas, CA (Customer Support Headquarters, USA)
Tel: 408.321.9400

Ginzton Technology Center
Mountain View, CA
Tel: 650.623.1200

### Georgia

Marietta, GA
Tel: 770.955.1367

### Illinois

Des Plaines, IL
Tel: 847.321.6801

### Massachusetts

Holliston, MA

Tel: 508.893.7000

**Nevada**

Security and Inspection Products
Las Vegas, NV
Tel: 702.938.4700

**New Jersey**

Clark, NJ
Tel: 732.340.9346

**South Carolina**

Varian X-ray Products Interay
North Charleston, SC
Tel: 843.767.3005

**Utah**

Varian X-ray Products Headquarters
Salt Lake City, UT
Tel: 801.972.5000

**Virginia**

Varian BrachyTherapy
Charlottesville, VA
Tel: 434.977.8495

## Europe, Middle East, India & Africa Headquarters (EMEA)

Varian Medical Systems
International AG
Zug, Switzerland
Tel: 41.41.749.8844

**Austria**

Varian Medical Systems
Gesellschaft m.b.H.
Voesendorf, Austria
Tel: 43.1.698.56.56

**Bahrain**

Varian Medical Systems
No. 8, Gate 1581
Budaiya Highway
Abu Saiba 473

Bahrain
Tel: 973.17.59.8900

**Belgium**

Varian Medical Systems
Belgium N.V./S.A.
Diegem, Belgium
Tel: 32.2.720.1008

**Denmark/Scandinavia**

Varian Medical Systems
Denmark, AS
Herlev, Denmark
Tel: 45.44.500.100

**Finland**

Varian Medical Systems
Finland Oy
Helsinki, Finland
Tel: 358.9.430.771

**France**

Varian Medical Systems France
Buc, France
Tel: 33.1.30.83.83.83

Varian Medical Systems France
Ramonville Saint-Agne, France
Tel: 33.5.62.19.31.00

**Germany**

Varian-ACCEL
Bergisch Gladbach, Germany
Tel: 49.22.04.84.2500

Varian Medical Systems GmbH
Deutschland GmbH
Darmstadt, Germany
Tel: 49.61.51.73130

Varian Medical Systems
Haan GmbH
Haan, Germany
Tel: 49.2129.551.0

Varian Medical Systems GmbH

Contact Information

Willich, Germany
Tel: 49.2154.92.49.80

**India**

Varian Medical Systems
India Pvt Ltd., Chennai
Tel: 91.44.2829.59.60/70

Varian Medical Systems
India Pvt Ltd., Mumbai
Tel: 91.22.616.2301-4

**Italy**

Varian Medical Systems
Italia, S.p.A.
Cernusco s/N (MI), Italy
Tel: 39.02.921.351

**Netherlands**

Varian Medical Systems
Netherlands B.V.
Houten, Netherlands
Tel: 31.30.634.0506

**Russia**

Varian Medical Systems
Moscow
Tel: 7.495.204.44.23

**Saudi Arabia**

Varian Medical Systems
Saudi Arabia, Riyadh
Tel: 966.127.72126

**Spain/Portugal**

Varian Medical Systems
Plaza Joan Cornudella, 6
Barcelona, Spain
Tel: 34.91.33.44.800

Varian Medical Systems
Ibérica, S.L.
Madrid, Spain
Tel: 34.91.33.44.800

**Switzerland**

Varian Medical Systems Imaging
Laboratory GmbH
Baden-Daettwil, Switzerland
Tel: 41.56.203.0404

Varian Medical Systems
International AG
Zug, Switzerland
Tel: 41.41.749.8844

**United Kingdom**

Varian Medical Systems UK Ltd.
Crawley, West Sussex, UK
Tel: 44.1293.531.244

# ASIA PACIFIC

## Asia Headquarters

Varian Medical Systems
Pacific, Inc.
Kowloon, Hong Kong
Tel: 85.22.724.2836

**China**

Varian Medical Systems
China Ltd.
Beijing, P.R. China
Tel: 8610.6512.7169

**India**

Varian Medical Systems
India Pvt Ltd., Chennai
Tel: 91.44.829.59.60

Varian Medical Systems
India Pvt Ltd., Mumbai
Tel: 91.22.616.2301-4

**Japan**

Varian Medical Systems K.K.
Chuo-ku, Tokyo, Japan
Tel: 81.3.3639.9700

**Malaysia**

Kuala Lumpur Office
Tel: 60.3.2282.9989

**Singapore**

Varian Medical Systems
Pacific, Inc.
Tel: 65.6887.0028

**Thailand**

Bangkok Office
Tel: 66.2.513.6113

## LATIN AMERICA HEADQUARTERS

Varian Medical Systems
Florida Office
Miami, FL USA
Tel: 305.929.1970

**Brazil**

Varian Medical Systems
Brasil Ltda.
São Paulo, Brazil
Tel: 55.11.3457.2655

## AUSTRALIA HEADQUARTERS

Varian Medical Systems
Australasia Pty Ltd.
Sydney, Australia
Tel: 61.2.9485.0100

varian / us / corporate / contact

© 1999-2008 Varian Medical Systems, Inc. All rights reserved
Production of any of the material contained herein in any format or media without the express written permi

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WESTERN PENNSYLVANIA

| | | |
|---|---|---|
| UNIVERSITY OF PITTSBURGH | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 2:07-cv-00491-AJS |
| v. | ) | |
| | ) | Judge Arthur J. Schwab |
| VARIAN MEDICAL SYSTEMS, INC. | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT AND COUNTER-PLAINTIFF VARIAN MEDICAL SYSTEMS, INC.'S RULE 26(a)(1) INITIAL DISCLOSURE

Pursuant to Fed. R. Civ. Proc. 26(a)(l), Defendant and Counterplaintiff Varian Medical Systems, Inc. ("Varian") hereby makes its initial disclosures to Plaintiff University of Pittsburgh ("Plaintiff"). These disclosures are based on information reasonably and currently available to Varian. Varian reserves the right to make further disclosures based on information developed in the course of this lawsuit through discovery or additional factual investigation.

## I.    Disclosure Pursuant to Fed. R. Civ. P. (26)(a)(1)(A)

The following is a list of individuals likely to have discoverable information that Varian may use to support its counterclaims or defenses and the subjects of the information believed to be known by those individuals. Any individuals who are identified as being associated with Varian should not be contacted directly but should only be contacted through Varian's counsel of record in this action.

| Name and Contact Information | Subject Matter |
| --- | --- |
| Andre M. Kalend<br>University of West Virginia<br>Radiology<br>Morgantown, WV 26506-8150 | The invention(s) claimed in the '554 and '431 patents |
| Joel Greenberger<br>Contact currently unknown | The invention(s) claimed in the '554 and '431 patents |
| Karun B. Shimoga<br>Contact currently unknown | The invention(s) claimed in the '554 and '431 patents |
| Charalambos N. Athanassiou<br>Contact currently unknown | The invention(s) claimed in the '554 and '431 patents |
| Takeo Kanade<br>Contact currently unknown | The invention(s) claimed in the '554 and '431 patents |
| Hassan Mostafavi<br>Varian Medical Systems, Inc.<br>2599 Garcia Ave.<br>Mountain View, CA 94043<br>(650) 493-4000 | Technology of the Accused Varian Products |
| Mika Miettinen<br>Varian Medical Systems, Inc.<br>3100 Hansen Way<br>Palo Alto, CA 94304<br>(650) 493-4000 | Technology of the Accused Varian Products<br><br>Marketing and sales of the Accused Varian Products |
| Wilton Wong<br>Varian Medical Systems, Inc.<br>3100 Hansen Way<br>Palo Alto, CA 94304<br>(650) 493-4000 | Technology of the Accused Varian Products<br><br>Marketing and sales of the Accused Varian Products |
| Reto Glettig<br>Varian Medical Systems International AG<br>Täfernstrasse 7 CH-5405 Baden - Dättwil.<br>Switzerland | Technology of the Accused Varian Products |
| Karla Knott<br>Varian Medical Systems, Inc.<br>3100 Hansen Way<br>Palo Alto, CA 94304<br>(650) 493-4000 | Marketing and sales of the Accused Varian Products |
| Michael Chen<br>Varian Medical Systems, Inc.<br>3100 Hansen Way<br>Palo Alto, CA 94304<br>(650) 493-4000 | Finance and accounting of the Accused Varian Products |

| | |
|---|---|
| Leigh Scott ("Scott") Johnson<br>Varian Medical Systems, Inc.<br>3100 Hansen Way<br>Palo Alto, CA 94304<br>(650) 493-4000 | Licensing negotiation with University of Pittsburgh |
| Richard Morse<br>201 Westview Dr.<br>Mechanicsburg, PA 17055<br>(717) 697-0903 | Licensing negotiation with University of Pittsburgh |
| Jeff Shogun<br>University of Pittsburgh Medical Center | Licensing negotiation with University of Pittsburgh |
| Alex Ducuret<br>University of Pittsburgh | Licensing negotiation with University of Pittsburgh |
| Richard V. Westerhoff<br>Eckert Seamans Cherin & Mellot, LLC<br>U.S. Steel Tower<br>600 Grant Street, 44th Floor<br>Pittsburgh, PA 15219-2788<br>(412) 566-6090 | The invention(s) claimed in the '554 and '431 patents |

## II.    Disclosure Pursuant to Fed. R. Civ. P. 26(a)(1)(B)

Varian identifies the following categories of documents in its possession, custody or control which may be used to support the positions Varian has taken or is reasonably likely to take in this case in connection with its counterclaims or defenses:

1.    Documents reflecting communications between Plaintiff and Varian, relating to alleged infringement of the asserted Plaintiff Patents-In-Suit.

2.    Documents relating to the marketing of the Accused Varian products.

3.    Documents reflecting sales of Accused Varian products, including but not limited to sales to the U.S. government, foreign sales, and sales to Plaintiff and Plaintiff licensees (if any).

4.    Documents describing the technical characteristics of the Accused Varian Products, including but not limited to, code, schematics, manuals, operational guides, functional specifications, and development documents.

Varian does not own or have access to all the source code that is used on Varian's products. Third party contractors were used to generate source code for part of the Varian system. To the best of Varian's knowledge, one of the contractors is Mirada Solutions Ltd., a wholly owned subsidiary of CTI Molecular Imaging. CTI Molecular Imaging was later acquired by Siemens. At this moment, it is unclear which Siemens entity is in possession of the source code. Another contractor is NKI-AVL, Netherlands Cancer Institute-Antoni van Leeuwenhoek Ziekenhuis. The address is Het Nederlands Kanker Instituut - Antoni van Leeuwenhoek Ziekenhuis, Plesmanlaan 121, 1066 CX Amsterdam.

5.    Prior art against the Patents-In-Suit.

6.    Plaintiff Patents-In-Suit, file histories, and cited materials.

The documents within the listed categories are located at the office of Varian's counsel, including Orrick, Herrington, & Sutcliffe LLP at 1000 Marsh Road, Menlo Park, CA 94025. To the extent any such documents are confidential, Varian will produce or make available for inspection such documents pursuant to the protective order filed on May 24, 2007, in accordance with Rule 3.1 of the Patent Local Rules of the District Court for the Western District of Pennsylvania. Varian also believes documents in the possession, custody, or control of Plaintiff and/or third parties may be relevant to the issues in this case.

Varian makes this disclosure without any admission as to the relevance, discoverability, or admissibility of any documents within the listed document categories and without a waiver of

-4-

its right to withhold the production of any documents or information on the basis of any claim of privilege or other immunity.

### III.    Disclosure Pursuant to Fed. R. Civ. P. 26(a)(1)(C)

At this early stage in the litigation, Varian has not had the opportunity to formulate a calculation of damages relating to this action. At a minimum, however, those damages include, without limitation, an award of Varian's attorneys' fees and costs incurred in the defense of Plaintiff's claims. Varian reserves the right to supplement its calculation, explanation, and identification of damages once discovery and further investigation are made.

### IV.    Disclosure Pursuant to Fed. R. Civ. P. 26(a)(1)(D)

Varian is currently unaware of any insurance agreement or policy that may be involved to satisfy part or all of a judgment that may be entered in this action or to indemnify or reimburse Varian for payments made to satisfy that judgment.

By making the above disclosures, Varian does not represent that it has identified every document, tangible thing or witness possibly relevant to this lawsuit. Nor does Varian waive its right to object to production of any document or tangible thing described in these disclosures on the basis of privilege, the work product doctrine, relevance, undue burden or any other valid objection. Varian reserves the right to supplement or correct these disclosures upon continuing investigation and discovery.


Respectfully submitted,

PICADIO SNEATH MILLER & NORTON P.C.


-5-

/s/ Henry M. Sneath

Henry M. Sneath (PA 40559)
Shannon M. Clougherty (PA 88586)
4710 U.S. Steel Tower
600 Grant Street
Pittsburgh, Pennsylvania 15219-2702
Tel:  412-288-4000
Fax:  412-288-2405
hsneath@psmn.com
sclougherty@psmn.com
*Attorneys for Defendant Varian Medical Systems,
Inc.*

William L. Anthony (CA 106908)
Matthew H. Poppe (CA 177854)
Zheng Liu (CA 229311)
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, California  94025
Tel: 650-614-7400
Fax: 650-614-7401
wanthony@orrick.com
mpoppe@orrick.com
jenliu@orrick.com

Veronica Mullally (Admitted to NY Bar September 23, 1997)
Eileen M. O'Connor (Admitted to NY Bar March 29, 2005)
Orrick, Herrington & Sutcliffe LLP
666 5th Ave.
New York, NY 10103-0001
Tel: 212-506-5000
Fax: 212-506-5151
vmullally@orrick.com
eoconnor@orrick.com

Dated:  May 30, 2007

OHS West:260229830.1

# EXHIBIT 3
# FILED UNDER SEAL

# EXHIBIT 4
# FILED UNDER SEAL

# EXHIBIT 5
# FILED UNDER SEAL

# EXHIBIT 6
# FILED UNDER SEAL

# EXHIBIT 7
# FILED UNDER SEAL

# EXHIBIT 8
# FILED UNDER SEAL

# EXHIBIT 9
# FILED UNDER SEAL

# EXHIBIT 10
# FILED UNDER SEAL

# EXHIBIT 11

LEXSEE 2003 U.S. APP. LEXIS 6863

**UNITED STATES OF AMERICA v. LEONARD A. PELULLO PINTLER CREEK RANGE, INC., Appellant**

**No. 02-2249**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*65 Fed. Appx. 766; 2003 U.S. App. LEXIS 6863*

**March 31, 2003, Submitted Under Third Circuit LAR 34.1(a)**
**April 4, 2003, Opinion Filed**

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Related proceeding at *Pelullo v. Nat'l Union Fire Ins. Co., 2004 U.S. Dist. LEXIS 9138 (E.D. Pa., May 17, 2004)*

**PRIOR HISTORY:** On Appeal From The United States District Court For The Eastern District of Pennsylvania. D.C. No. 91-cr-00060. District Judge: The Honorable Robert F. Kelly.
*United States v. Pelullo, 144 F. Supp. 2d 369, 2001 U.S. Dist. LEXIS 5056 (E.D. Pa., 2001)*

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant company appealed the judgment of the United States District Court for the Eastern District of Pennsylvania which required appellant individual to forfeit his property in Montana on the grounds that the district court lacked subject matter jurisdiction.

**OVERVIEW:** The individual had been convicted by a jury of racketeering in violation of *18 U.S.C.S. § 1962(c)*. The jury also returned a special verdict of forfeiture in which they found that the individual obtained real property in Montana as the result of his racketeering activity. The district court ordered the individual to forfeit his interest in the Montana property pursuant to *18*

*U.S.C.S. § 1963*. The court of appeals found that whether an attorney had authority to act on the individual's behalf was unrelated to the district court's subject matter jurisdiction. The district court clearly had subject matter jurisdiction over the criminal proceeding pursuant to *18 U.S.C.S. § 3231* and over the forfeiture proceeding under *18 U.S.C.S. § 1963(l)*. In addition, since the attorney appeared as counsel for another person, who had passed away, and the company, and because the company did not introduce any evidence that the attorney was without authority to do so, her signature on the stipulation was binding as to both the company and the other person's estate.

**OUTCOME:** The judgment was affirmed.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > General Overview*
*Constitutional Law > The Judiciary > Congressional Limits*
*Criminal Law & Procedure > Jurisdiction & Venue > Jurisdiction*
[HN1] Subject matter jurisdiction is a function of the judicial power of the federal courts under U.S. Const. art. III and the authorizing legislation of Congress.

**COUNSEL:** For United States of America, Appellee: Frank A. Labor, III, Office of United States Attorney, Philadelphia, PA.

Leonard A. Pelullo, Participant.

65 Fed. Appx. 766, *; 2003 U.S. App. LEXIS 6863, **1

For Pintler Creek Range, Appellant: Thomas D. Schneider, Philadelphia, PA.

**JUDGES:** Before: McKEE, SMITH and COWEN, Circuit Judges.

**OPINION BY:** D. Brooks Smith

**OPINION**

[*767] SMITH, Circuit Judge

I.

In this case Pintler Creek Range, Inc., ("Pintler") appeals from the District Court's order requiring Leonard Pelullo to forfeit his property in Montana, arguing that the District Court lacked subject matter jurisdiction. Pintler's counsel also attempts to make arguments on behalf of Mary Louise Jalilvand despite the fact that Jalilvand was the appellant in a separate suit which was dismissed for lack of standing. Because the District Court had subject matter jurisdiction over the forfeiture proceeding, and Pintler [**2] offers no other reason why it would be entitled to set aside the forfeiture, the order of the District Court will be affirmed.

II.

On January 27, 1995, Leonard Pelullo was convicted by a jury in the United States District Court for the Eastern District of Pennsylvania of racketeering in violation of *18 U.S.C. § 1962(c)*. The jury also returned a special verdict of forfeiture in which they found that Pelullo obtained real property in Montana as the result of his racketeering activity.

In September of 1995, the District Court ordered Pelullo to forfeit his interest in the Montana property pursuant to *18 U.S.C. § 1963*. The government then began an ancillary forfeiture proceeding in accordance with *18 U.S.C. § 1963(l)* to adjudicate third party claims to the Montana property. Susan Gehrke filed a petition asserting an ownership interest in the property on behalf of herself and her minor daughter, Arianna Pelullo. Pintler Creek Range, Inc., ("Pintler") also filed a petition asserting a claim to the property. Attorney Anne M. Dixon appeared as counsel of record for both Pintler and Gehrke.

In February of 1997, Susan [**3] Gehrke passed

away. Initially, Forrest Gehrke, Jane Gehrke, Russell Gehrke, Michelle Gehrke and Leonard Pelullo were given joint legal custody of Arianna. On June 1, 1998, the Gehrkes relinquished legal and physical custody of Arianna to Mary Louise Jalilvand.

On September 29, 1998, Forrest Gehrke purported to enter into a stipulation with the government to withdraw Susan Gehrke's petition on behalf of Arianna. In the same document, Dixon, on behalf of Pintler and Susan Gehrke, executed a stipulation providing that Pintler and Gehrke withdrew their forfeiture petitions and consented to the entry of final order and judgment of forfeiture. The District Court approved the stipulation by order dated March 1, 2002. On March 5, 2002, the District Court entered the final order and judgment of forfeiture.

[*768] Mary Louise Jalilvand and Pintler each filed appeals which were consolidated on July 17, 2002. On July 30, the appeal by Jalilvand was dismissed without prejudice to her right to file her claim on behalf of Arianna in the District Court, because Jalilvand was not a party to the original forfeiture proceeding and did not have standing to appeal. Pintler's appeal remains.

III.

Counsel argues [**4] that forfeiture was improper because the District Court did not have subject matter jurisdiction to enter its order extinguishing Pintler's rights in the Montana property since Anne Dixon was not Pintler's counsel. Dixon's authority to act on Pintler's behalf is unrelated to the District Court's subject matter jurisdiction. *See Insurance Corp. of Ireland v. Compagnie Des Bauxites De Guinee, 456 U.S. 694, 702, 72 L. Ed. 2d 492, 102 S. Ct. 2099 (1982)* (explaining that [HN1] subject matter jurisdiction is a function of the judicial power of the federal courts under Article III of the Constitution and the authorizing legislation of Congress). The District Court clearly had subject matter jurisdiction over the criminal proceeding pursuant to *18 U.S.C. § 3231* and over the forfeiture proceeding under *18 U.S.C. § 1963(l)*. In addition, since Anne Dixon appeared as counsel for Gehrke and Pintler, and because Pintler does not introduce any evidence that Dixon was without authority to do so, her signature on the stipulation was binding as to both Pintler and Gehrke's estate.

Counsel also puts forth the argument that because Forrest Gehrke [**5] was not Arianna's legal guardian at

65 Fed. Appx. 766, *768; 2003 U.S. App. LEXIS 6863, **5

the time he signed the stipulation, he did not have authority nor the capacity to waive her rights to the property. Since Jalilvand's appeal on behalf of Arianna was dismissed for lack of standing, we cannot reach the merits of this claim.

IV. CONCLUSION

We affirm the order of the District Court.

/s/ D. Brooks Smith

Circuit Judge

# EXHIBIT 12

LEXSEE 1993 U.S. DIST. LEXIS 10898

**THOMAS C. BOSWELL AND DIANE M. BOSWELL, Individually and as Husband and Wife, Plaintiffs, v. MICHELLE R. BATON and THOMAS S. OVERTON, Defendants.**

**91-CV-1475**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK**

*1993 U.S. Dist. LEXIS 10898*

**August 4, 1993, Decided**
**August 4, 1993, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, husband and wife, filed suit against defendants, drivers of car one and two, alleging negligence for injuries suffered by them as a result of a three vehicle accident. Before the court was the second car driver's motion pursuant to *Fed. R. Civ. P. 12(b)(2)* to dismiss the complaint as against him for lack of personal jurisdiction. Also before the court were the parties' cross-motions to transfer the case to a Connecticut federal court.

**OVERVIEW:** According to the complaint, the driver of car one struck the vehicle driven by the second car driver, which in turn struck the husband's vehicle. The wife was a passenger in the car. The husband and wife alleged that they sustained bodily injuries due to the other drivers' negligence. The husband and wife were residents of New York, and the other two drivers were residents of Connecticut. In his motion to dismiss, the second car driver argued that the court lacked personal jurisdiction over him because his actions with regard to the accident did not subject him to the jurisdiction of New York courts under any of the provisions of New York State's long arm statute, *N.Y. C.P.L.R. 302*. The court granted the motion to dismiss on the ground that the husband and wife conceded that the court lacked personal jurisdiction over the second car driver. Even thought the court lacked personal jurisdiction over the second car driver, the court denied the parties' motion to transfer under *28 U.S.C.S. § 1631*, holding that *§ 1631* only applied to cases in which the transferor court lacked subject matter jurisdiction.

Transfer was also inappropriate under *28 U.S.C.S. §§ 1405, 1404(a)*.

**OUTCOME:** In a personal injury action brought by the husband and wife, the court granted the second car driver's motion to dismiss for want of personal jurisdiction. The court further declined to grant the parties' cross-motions to transfer.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Challenges*
[HN1] Once a court's personal jurisdiction is challenged, the plaintiff has the responsibility of demonstrating that jurisdiction in fact exists.

*Civil Procedure > Venue > Federal Venue Transfers > Jurisdictional Transfers*
[HN2] *28 U.S.C.S. § 1631* provides, in part: Whenever a civil action is filed in a court and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it was transferred on the date upon which it was actually filed or noticed for the court from which it was transferred.

Case 3:08-cv-02973-MMC    Document 34-3    Filed 07/11/2008    Page 7 of 24

Page 2
1993 U.S. Dist. LEXIS 10898, *

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Civil Procedure > Venue > Federal Venue Transfers > Jurisdictional Transfers*
[HN3] *28 U.S.C.S. § 1631* only intends to apply to cases in which the transferor court lacks subject matter jurisdiction.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN4] *28 U.S.C.S. § 1405* states: Actions or proceedings pending at the time of the creation of a new district or division or transfer of a county or territory from one division or district to another may be tried in the district or division as it existed at the institution of the action or proceeding, or in the district or division so created or to which the county or territory is so transferred as the parties shall agree or the court direct.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN5] *28 U.S.C.S. § 1404(a)* provides: For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought. The goal of *§ 1404(a)* is to prevent waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense. The inquiry on such a motion to transfer is two-fold: First, whether the action sought to be transferred is one that might have been brought in the district court which the movant seeks to have the case litigated, that is, the "transferee" court. If so, second, whether, considering the convenience of parties and witnesses and the interest of justice, a transfer to the proposed district is appropriate. On such a motion to transfer, the movant bears the burden to "clearly" establish that a transfer is appropriate and that the motion should be granted.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN6] The threshold question on a motion to transfer pursuant to *28 U.S.C.S. § 1404(a)* is whether the action could have been brought in the district to which transfer is sought.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Procedure > Statutes of Limitations > General Overview*
[HN7] In New York, the statute of limitations for negligence claims is three years. *N.Y. C.P.L.R. 302.*

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Procedure > Statutes of Limitations > General Overview*
[HN8] Connecticut has a two year statute of limitations for negligence claims. *Conn. Gen. Stat. Ann. § 52-584.*

*Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview*
*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
*Governments > Legislation > Statutes of Limitations > General Overview*
[HN9] In deciding which statute of limitations would apply, a federal court is bound to apply the laws of the state in which it sits.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN10] In addition to the issue of whether transfer would be in the interest of justice, the second prong of the *28 U.S.C.S. § 1404(a)* test involves an analysis of the following factors: (1) the convenience to parties; (2) the convenience of witnesses; (3) the relative ease of access to sources of proof; (4) the availability of process to compel attendance of unwilling witnesses; (5) the cost of obtaining willing witnesses; (6) and practical problems that make trial of a case easy, expeditious, and inexpensive.

*Civil Procedure > Jurisdiction > General Overview*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Procedure > Statutes of Limitations > General Overview*
[HN11] Where a plaintiff moves to transfer a case based on diversity of citizenship from one federal trial court to another to cure a defect in personal jurisdiction over the

Case 3:08-cv-02973-MMC    Document 34-3    Filed 07/11/2008    Page 8 of 24

· Page 3
1993 U.S. Dist. LEXIS 10898, *

defendant, the state law of the transferee forum governs the action for purposes of statute of limitation. This rule ensures that a plaintiff does not forum shop by filing an action in a court where the law is more favorable, but which lacks jurisdiction, and then requests a transfer to the proper forum hoping to capture the advantageous law of the transferor forum.

*Civil Procedure > Settlements > General Overview*
*Governments > Legislation > Statutes of Limitations >*
*Equitable Estoppel*
*Governments > Legislation > Statutes of Limitations >*
*Pleading & Proof*
[HN12] The doctrine of equitable estoppel has been utilized by New York courts to prevent a defendant from raising a time bar in two types of situations. First, when the plaintiff has been induced to postpone bringing a cause of action by the defendant's conduct or verbal communication, such as an offer of settlement. Second, courts have applied equitable estoppel in cases where the plaintiff has shown that it justifiably relied upon the defendant's intentional misrepresentation, and then the plaintiff prosecuted the claim with due diligence after learning of the concealment.

**COUNSEL:** [*1] For Plaintiffs: DE LORENZO, GORDON, PASQUARIELLO, WEISKOPF & HARDING, P.C., 201 Nott Terrace, Schenectady, New York 12307, OF COUNSEL: SUSAN BEAUDOIN, ESQ.

For Defendants: ROCHE, CORRIGAN, McCOY & BUSH, The William Van Zandt Building, 36 South Pearl Street, Albany, New York 12207, OF COUNSEL: PETER J. CORRIGAN, ESQ.

**JUDGES:** Munson

**OPINION BY:** HOWARD G. MUNSON

**OPINION**

HOWARD G. MUNSON, S.J.

*MEMORANDUM-DECISION AND ORDER*

Presently before the court is defendant Thomas Overton's motion pursuant to *Fed.R.Civ.P. 12(b)(2)* to dismiss the complaint as against him for lack of personal jurisdiction, or in the alternative, to transfer the case to

the United States District Court for the District of Connecticut pursuant to *28 U.S.C. § 1404(a).* Plaintiffs cross-move to transfer this case to the District Court of Connecticut pursuant to *28 U.S.C. §§ 1404(a), 1405,* or *1631.* For the reasons set forth below, the court grants defendant's motion to dismiss the complaint for lack of personal jurisdiction.

I. BACKGROUND

This lawsuit arose from a three vehicle accident which occurred on September 3, 1989 in Stonington, Connecticut. According to the complaint [*2] filed on December 31, 1991, defendant Michelle Baton's vehicle struck the vehicle driven by Overton, which in turn struck plaintiff Thomas Boswell's vehicle. Plaintiff Diane Boswell was a passenger in the car. Plaintiffs allege that they sustained bodily injuries due to defendants' negligence and seek $ 600,000.00 in damages. Plaintiffs are residents of New York and defendants are residents of Connecticut. Jurisdiction is premised on the diversity of citizenship between the parties. *28 U.S.C. § 1332.*

Defendant Overton filed his answer on January 24, 1992; defendant Baton did not file an answer or otherwise respond to the complaint. On April 20, 1992, defendant Overton brought the present motion to dismiss the complaint for lack of personal jurisdiction, or in the alternative, to transfer the case to the District of Connecticut. Defendant contends that the court lacks personal jurisdiction over him because his actions with regard to the accident do not subject him to the jurisdiction of New York courts under any of the provisions of New York State's long arm statute. *See N.Y. Civ. Prac. L. & R. § 302.* In particular, defendant contends that he [*3] does not own, use, or possess real property within the State of New York, *§ 302(a)(4),* does not transact any business within the State, *§ 302(a)(1),* nor contract anywhere to supply goods or services in the state, *§ 302(a)(1).* Further, defendant asserts that the tortious act which gives rise to the present lawsuit did not occur in New York State, *§ 302(a)(2),* and he does not do business or engage in any other persistent course of conduct in New York, *§ 302(a)(3).* In the alternative, defendant moves pursuant to *28 U.S.C. § 1404(a)* to transfer the case to the District of Connecticut for the convenience of the parties and witnesses and in the interest of justice.

Plaintiffs concede that defendant Overton has insufficient contact with the State of New York to permit

1993 U.S. Dist. LEXIS 10898, *3

this court to exercise personal jurisdiction over him. Plaintiff's Memorandum of Law, Document ("Doc.") 7, at 1. Nevertheless, plaintiffs seek to have this case transferred to the District of Connecticut pursuant to either *28 U.S.C. § 1631, § 1405, or § 1404(a)*.

## II. DISCUSSION

The law is well-settled that [HN1] once a court's personal jurisdiction is challenged, [*4] the plaintiff has the responsibility of demonstrating that jurisdiction in fact exists. *Cutco Industries v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986)*. Because plaintiffs in this case have conceded that the court lacks personal jurisdiction over defendant Overton, plaintiffs have failed to satisfy their burden under *Cutco Industries*. As such, the court concludes that it lacks personal jurisdiction over defendant. This does not, however, conclude the court's analysis. As discussed below, this court may still decide to transfer the case to the District of Connecticut even though it lacks personal jurisdiction over defendant.

Plaintiffs' seek to transfer the case to the District of Connecticut pursuant to *28 U.S.C. § 1631*. [HN2] *Section 1631* provides, in relevant part:

> Whenever a civil action is filed in a court . . . and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if [*5] it had been filed in or noticed for the court to which it was transferred on the date upon which it was actually filed or noticed for the court from which it was transferred.

*28 U.S.C. § 1631*. Although some courts have interpreted *§ 1631* to apply to cases such as the present one where personal jurisdiction is lacking in the transferor court, courts in this circuit have ruled that neither the legislative history accompanying the statute nor case precedent construing the statute support such an interpretation. *See Levy v. Pyramid Co. of Ithaca, 687 F. Supp. 48, 51 (N.D.N.Y. 1988)* (McCurn, J.), *aff'd, 871 F.2d 9 (2d Cir. 1989); accord, Mortensen v. Wheel Horse Products, Inc., 772 F. Supp. 85, 89 (N.D.N.Y. 1991)* (Munson, S.J.). In

*Levy*, District Judge Neil P. McCurn thoroughly analyzed the legislative history of *§ 1631* and concluded that the [HN3] "statute was only intended to apply to cases in which the transferor court lacks *subject matter* jurisdiction." *Levy, 687 F. Supp. at 51* (emphasis original and added). Judge McCurn [*6] cited several portions of legislative history to support his conclusion, including a Senate report stating:

> In recent years, much confusion has been engendered by provisions of existing law that leave unclear which of two or more federal courts—including courts at both the trial and appellate level—have *subject matter jurisdiction* over certain categories of civil actions.

S. Rep. No. 97-275, 97th Cong., 2d Sess. 11, *reprinted in* 1982 U.S. Code Cong. & Admin. News 11, 21. The Senate report also states that:

> Section 301 adds a new chapter to title 28 that would authorize the court in which a case is improperly filed to transfer it to a court where *subject matter jurisdiction* is proper.

1982 U.S. Code Cong. & Admin. News at 40. In addition to the legislative history, the *Levy* court analyzed cases which relied upon *§ 1631* and concluded that the majority of courts which transferred cases pursuant to that statute did so as a result of legislation expressly granting *subject matter* jurisdiction to particular federal courts. *Levy, 687 F. Supp. at 51* (emphasis original and added, citations omitted). In the case at bar, plaintiffs [*7] seek a transfer to the District of Connecticut not to cure a defect in subject matter jurisdiction, but rather to cure a defect in personal jurisdiction. Because this court does not interpret *§ 1631* to authorize such a transfer, plaintiffs' request to transfer this case pursuant to that statute is denied.

The court next turns to plaintiff's request to transfer this case pursuant to *28 U.S.C. § 1405*. [HN4] *Section 1405* states:

> Actions or proceedings pending at the time of the creation of a new district or division or transfer of a county or territory from one division or district to another may be tried in the district or division as it existed at the institution of the action or

proceeding, or in the district or division so created or to which the county or territory is so transferred as the parties shall agree or the court direct.

The court is somewhat baffled by plaintiff's reliance on § 1405 in seeking to transfer this case to the District of Connecticut. The clear purpose of § 1405 is to permit transfer when a new district, county, or territory is formed and confusion exists as to which is the proper forum for claims arising within the new [*8] district. See Technograph Printed Circuits Ltd. v. Packard Bell Electronics Corp., 290 F. Supp. 308 (C.D.Cal. 1968) (§ 1405 invoked to bar transfer to newly created district). The case presently before the court was brought in the Northern District of New York, which is not a newly formed district, county, or territory. Plaintiffs seek transfer to the District Court of Connecticut, which is also not a new district, division, county, or territory. Consequently, this court fails to comprehend how § 1405 is applicable to this case. Plaintiffs offer no case law to support their argument that § 1405 applies to this case, and the court can find none. In short, the court finds no authority to transfer this case pursuant to § 1405 and denies plaintiffs' motion in this regard.

The court will next consider whether transfer is appropriate under 28 U.S.C. § 1404(a). [HN5] Section 1404(a) provides:

> For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

The goal of § 1404(a) "is to prevent waste [*9] 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense'" Van Dusen v. Barrack, 376 U.S. 612, 616, 11 L. Ed. 2d 945, 84 S. Ct. 805 (1964) (quoting Continental Grain Co. v. Barge FBL-585, 364 U.S. 19, 26-27, 4 L. Ed. 2d 1540, 80 S. Ct. 1470 (1960)). The inquiry on such a motion to transfer is two-fold: First, whether the action sought to be transferred is one that "might have been brought" in the district court which the movant seeks to have the case litigated, i.e., the "transferee" court. If so, second, whether, considering "the convenience of parties and witnesses" and the

interest of justice", a transfer to the proposed district is appropriate. Hernandez v. Graebel Van Lines, 761 F. Supp. 983, 986 (S.D.N.Y. 1991). On such a motion to transfer, the movant bears the burden to "clearly" establish that a transfer is appropriate and that the motion should be granted. See Factors Etc., Inc. v. Pro Arts, Inc., 579 F.2d 215, 218-19 (2d Cir. 1978), cert. denied, 440 U.S. 908, 59 L. Ed. 2d 455, 99 S. Ct. 1215 (1979).

Thus, [HN6] the threshold question on a motion to [*10] transfer pursuant to § 1404(a) is whether the action could have been brought in the district to which transfer is sought. In order to satisfy this requirement, plaintiffs at bar must show that their lawsuit would have been brought within the relevant statute of limitations period. Plaintiffs filed their complaint on December 31, 1991, over two years after the cause of action arose on September 3, 1989. [HN7] In New York, the statute of limitations for negligence claims is three years. N.Y. Civ. Prac. L. & R. § 302. [HN8] Connecticut, on the other hand, has a two year statute of limitations for negligence claims. Conn. Gen. Stat. Ann. § 52-584.

[HN9] In deciding which statute of limitations would apply, a federal court is bound to apply the laws of the state in which it sits. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941); Erie Railroad Co. v. Tompkins, 304 U.S. 64, 82 L. Ed. 1188, 58 S. Ct. 817 (1938). Thus, were this case initially brought in the District of Connecticut, that court would have had to apply the substantive law of Connecticut. Since the Connecticut statute of limitations for negligence cases is two years, and this lawsuit was filed [*11] over two years after the cause of action accrued, the case "could not have been brought" in the transferee court. Consequently, the first prong of the test for deciding whether transfer under § 1404(a) is appropriate is not satisfied.

The court also concludes that plaintiffs have failed to satisfy the second prong of the test, namely that transfer to the District of Connecticut would be in the "the interest of justice." [1] First, allowing transfer of this case would reward plaintiffs for their lack of diligence in choosing a proper forum. In Nichols v. G.D. Searle & Co., the Fourth Circuit found that the interests of justice were not served by allowing transfer from the District of Maryland to the Northern District of Illinois of a class action suit where an attorney committed an obvious error filing the plaintiff's action in the wrong court. 991 F.2d 1195, 1201

Case 3:08-cv-02973-MMC    Document 34-3    Filed 07/11/2008    Page 11 of 24

Page 6
1993 U.S. Dist. LEXIS 10898, *11

*(4th Cir. 1993)*. The court held that plaintiffs' attorney should have foreseen the Maryland District Court lacked personal jurisdiction over the defendant. *Nichols*, 991 F.2d at 1200-1201. [2] Similarly, plaintiffs at bar should have foreseen that the Northern District [*12] of New York is not the proper forum. Defendant has no contacts with the State of New York which would indicate that he is subject to long-arm jurisdiction. Indeed, plaintiffs readily concede that the court lacks personal jurisdiction over defendant.

1    [HN10] In addition to the issue of whether transfer would be in the interest of justice, the second prong of the § 1404(a) test involves an analysis of the following factors: (1) the convenience to parties; (2) the convenience of witnesses; (3) the relative ease of access to sources of proof; (4) the availability of process to compel attendance of unwilling witnesses; (5) the cost of obtaining willing witnesses; (6) and practical problems that make trial of a case easy, expeditious, and inexpensive. *See Pellegrino v. Stratton Corp., 679 F. Supp. 1164, 1166-67 (N.D.N.Y. 1988)* (McCurn,J.). However, because the court finds that it would not be in the interest of justice to transfer this case to the District of Connecticut, it does not address these additional factors.

2    The *Nichols* court dismissed the class action even though it comprised 116 plaintiffs. In the case at bar, only two plaintiffs are involved and therefore dismissal here is not of the same magnitude as in *Nichols*.

[*13] Further, the court finds that it would not be in the interest of justice to transfer this case because once transferred, the lawsuit would be dismissed by the District of Connecticut based upon application of Connecticut's two-year statute of limitations for negligence actions. This is because the Connecticut court would be compelled to follow the law of this circuit which holds: [HN11] "where a plaintiff moves to transfer a case based on diversity of citizenship from one federal trial court to another to cure a defect in personal jurisdiction over the defendant, the state law of the transferee forum governs the action for purposes of statute of limitation. " *Levy*, 871 F.2d at 10. [3] This rule ensures that a plaintiff does not forum shop by filing an action in a court where the law is more favorable, but which lacks jurisdiction, and then requests a transfer to

the proper forum hoping to capture the advantageous law of the transferor forum. *Levy, 687 F. Supp. at 52.*

3    Although it was defendant who initially moved to transfer this lawsuit under § 1404(a), he did so not to cure a defect in personal jurisdiction, but rather as an alternative to his motion to dismiss for lack of personal jurisdiction. It was plaintiffs who adopted defendant's argument in support of their cross-motion to transfer under § 1404(a), after conceding that plaintiffs have chosen a defective forum. *See* Plaintiffs' Memorandum of Law, Doc. 7, at 1. Therefore, the court considers plaintiffs to be the parties moving to transfer this case to cure a defect in personal jurisdiction over defendant.

[*14] This case is analogous to *Levy*. There, plaintiffs filed a diversity action for breach of contract in the District of Maryland. *Id. at 50*. Plaintiffs subsequently moved to transfer the case to the Northern District of New York under either § 1404(a) or § 1406(a). In its motion, plaintiffs conceded that the Maryland court lacked personal jurisdiction over defendants. *Id. at 52.* The motion to transfer was granted. Once transferred, defendants moved for summary judgment on the ground that the action was barred by New York's statute of limitations. In opposition, plaintiffs argued that the Maryland statute of limitations applied. Judge McCurn ruled that the law of the transferee forum, New York, applied to the case, since the claim was not filed in a permissible original forum. *Id. at 53.* Judge McCurn thereupon granted defendants' motion for summary judgment, which was affirmed by the Second Circuit. *Levy v. Pyramid*, 871 F.2d at 10.

As in *Levy*, plaintiffs at bar concede that this case was filed in a forum which lacks personal jurisdiction over defendant. [*15] As such, if the case was transferred, the District of Connecticut would be required to apply the two-year Connecticut statute of limitations. Anticipating this occurrence, plaintiffs ask this court to equitably estop defendant from asserting the Connecticut statute of limitations as an affirmative defense if and when transfer is accomplished. *See* Plaintiff's Supplemental Memorandum of Law, Doc. 11, at 2. [HN12] The doctrine of equitable estoppel has been utilized by New York courts to prevent a defendant from raising a time bar in two types of situations. *See* Weinstein, Korn, & Miller, *CPLR Manual § 2.06*, at

2-12-13. First, when the plaintiff has been induced to postpone bringing a cause of action by the defendant's conduct or verbal communication, such as an offer of settlement. *Albino Linoleum & Carpet Service, Inc. v. Utica Fire Insurance Co., 33 A.D.2d 638, 305 N.Y.S.2d 120, 122* (4th Dep't 1969). Second, courts have applied equitable estoppel in cases where the plaintiff has shown that it justifiably relied upon the defendant's intentional misrepresentation, and then the plaintiff prosecuted the claim with due diligence after learning of the concealment. *Drysdale v. City of New York, 182 A.D.2d 566, 582 N.Y.S.2d 716, 717* [*16] (2d Dep't 1992); *Krol v. Valone, 80 A.D.2d 997, 437 N.Y.S.2d 485, 486* (4th Dep't 1981).

In the present case, plaintiffs have not alleged that defendant attempted to delay plaintiffs in pursuing their claim, that defendant is guilty of fraudulent conduct, or that plaintiffs have justifiably relied upon defendant's conduct to their detriment. Therefore, this court finds no basis for applying the doctrine of equitable estoppel to prevent defendant from asserting the Connecticut statute of limitations as an affirmative defense.

Based upon the preceding findings that transfer to the District of Connecticut is inappropriate under *28 U.S.C. §§ 1404(a), 1405*, and *1631*, and that the doctrine of equitable estoppel does not apply to this case, the court hereby grants defendant Overton's motion to dismiss this case as against him for lack of personal jurisdiction.

III. CONCLUSION

In summary, the defendant Thomas S. Overton's motion to dismiss the complaint against him for lack of personal jurisdiction is hereby granted. The Clerk of the Court is directed to dismiss the complaint against defendant Overton.

It is So Ordered.

Dated: August 4, [*17] 1993

Syracuse, New York

Howard G. Munson

Senior United States District Judge

# EXHIBIT 13

Westlaw.

Not Reported in F.Supp.2d                                              Page 1
Not Reported in F.Supp.2d, 2000 WL 516378 (N.D.Cal.), 140 Lab.Cas. P 58,926
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 516378 (N.D.Cal.))**

c

Baird v. California Faculty Ass'n
N.D.Cal.,2000.

United States District Court, N.D. California.
Charles BAIRD, et al., Plaintiffs,
v.
CALIFORNIA FACULTY ASSOCIATION, et al.,
Defendants.
**No. C-00-0628-VRW.**

April 24, 2000.

ORDER.

WALKER, J.

*1 In this action plaintiffs challenge the constitutional validity of California Government Code § 3583.5, a recent amendment to the Higher Education Employer-Employee Relations Act that permits the collection of "fair share" fees from represented employees who are not union members. Cal Gov Code § 3583.5. Before the court are motions by defendants California Faculty Association and the California Public Employment Relations Board to transfer this action to the Eastern District of California pursuant to 28 USC § 1404(a). For the reasons stated below, the motion to transfer is GRANTED.

"For the convenience of the parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought."28 USC § 1404(a). It is undisputed that this action could have been filed in the Eastern District. The court has broad discretion to assess the remaining factors (convenience of the parties, convenience of witnesses and the interests of justice) within the facts of the particular case. *E. & J. Gallo Winery v. F. & P. S.P.A.,* 899 F Supp 465, 466 (ED Cal 1994).

Defendants' primary argument for transfer is judicial economy. An earlier action, in which plaintiffs' counsel also purports to represent a class of state university employees challenging section 3583.5, is pending before Judge Shubb in the Eastern District. See *Friedman, et al. v California State Employees Association, et al.,* C-00-0101-WBS (*Friedman* Compl) (attached as Exh 1 to Def PERB's Mtn for Transfer). The constitutional claims under the Equal Protection Clause and the First Amendment appear almost verbatim in the complaints of both cases. Compare *Friedman* Compl ¶ 67 with *Baird* Compl ¶ 45 (Equal Protection claim) and *Friedman* Compl ¶ 70 with *Baird* Compl ¶ 48 (First Amendment claim).

The existence of the *Friedman* case weighs in favor of transfer in two important respects. First, a major consideration in the interests of justice analysis is the desire to avoid duplicative litigation and prevent waste of time and money. 1 Schwarzer et al., Federal Civil Procedure Before Trial § 4:271 (citing *Van Dusen v. Barrack,* 376 U.S. 612, 616 (1964). Resolution of related claims in the same forum can also avoid inconsistent results. See *Nieves v. American Airlines,* 700 F Supp 769, 773 (SDNY 1988). Therefore, "[r]elated litigation pending in the proposed transferee forum is a factor that weighs heavily in favor of transfer."*Coultman v National RR Passenger Corp.,* 857 F Supp 231, 235 (E.D.N.Y.1994).

Second, and on a related note, transfer is desirable to facilitate consolidation with another action pending elsewhere. See Schwarzer at ¶ 4:274 (citing *In re Eastern Dist Repetitive Stress Injury Litigation,* 850 F Supp 188, 196 (E.D.N.Y.1994). Defendants seek consolidation of this action with *Friedman,* and while the court expresses no opinion whether consolidation is appropriate, transfer will provide the transferee court the opportunity to consider consolidation as further enhancement of judicial economy.

*2 In addition, the court concludes that the convenience of the parties and expected witnesses fa-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 516378 (N.D.Cal.), 140 Lab.Cas. P 58,926
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 516378 (N.D.Cal.))**

vors transfer to the Eastern District. All three of the defendants are headquartered in Sacramento. And to the extent that evidence about the legislative process that led to the enactment of the challenged provision is required, such evidence will be most easily accessible to a court located in same district as the seat of state government.

Plaintiffs' opposition relies almost entirely on the traditional rule that plaintiff's choice of forum should be granted substantial deference. See, for example, *Securities Investor Protection Corp. v Vigman,* 764 F.2d 1309, 1317 (9th Cir1985). But mechanistic adherence to this rule is inappropriate in a class action in which plaintiffs are dispersed throughout the state. See *IBJ Schroder Bank & Trust Co. v Mellon Bank,* 730 F Supp 1278, 1282 (SDNY 1990).

Finally, the relationship between the forum and the underlying cause of action is tenuous, a fact that further reduces the importance of plaintiffs' choice of forum. See *Chrysler Capital Corp. v. Woehling,* 663 F Supp 478 (D Del 1987).

It is therefore the judgment of the court that the convenience of parties and witnesses and the interests of justice will be served by transfer of this action to the Eastern District of California pursuant to 28 USC § 1404(a). Defendants' motion is GRANTED. All matters presently scheduled for hearing are VACATED and must be renoticed in the Eastern District. The clerk shall transmit the file to the clerk in that district pursuant to Civil LR 3-15.

IT IS SO ORDERED.

N.D.Cal.,2000.
Baird v. California Faculty Ass'n
Not Reported in F.Supp.2d, 2000 WL 516378 (N.D.Cal.), 140 Lab.Cas. P 58,926

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 14

LEXSEE 1993 U.S. DIST. LEXIS 20045

**ADVANCED SEMICONDUCTOR MATERIALS AMERICA, INC., Plaintiffs, v. APPLIED MATERIALS, INC., Defendant.**

**No. CIV 93-0066-PHX-SMM**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA**

*1993 U.S. Dist. LEXIS 20045; 30 U.S.P.Q.2D (BNA) 1553*

**September 14, 1993, Decided**
**September 15, 1993, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant filed a motion for change of venue in plaintiff's action that alleged that plaintiff did not commit patent infringement.

**OVERVIEW:** Plaintiff filed a suit regarding plaintiff's alleged infringement of defendant's patents. Defendant filed motion to transfer venue pursuant to *28 U.S.C.S. § 1400(b)*. The court reviewed the convenience of the parties and witnesses, and the interests of justice. The court found the parties were involved in pending, related cases in another jurisdiction. The other lawsuits involved the same parties, the same technology, competing products in the same markets, and patents arising out of the same development program. Since witnesses, issues, prior art, and documents would overlap, transfer of venue was proper. Defendant was not required to produce a list of witnesses and summaries of expected testimony. It was in the interests of both parties to have the case transferred since the evidence regarding the patents was more likely found in the other forum and the parties already had counsel in the other forum.

**OUTCOME:** The motion for a change of venue was granted because it was in the interests of both parties to have the case transferred and because it was judicially economical to transfer the case to the forum in which there were other lawsuits pending involving the same parties, technology, and patents.

**LexisNexis(R) Headnotes**

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
*Civil Procedure > Venue > Special Venue*
*Copyright Law > Civil Infringement Actions > Jurisdiction & Venue > General Overview*
[HN1] The decision to transfer a case on venue grounds is largely a discretionary issue. The court exercises its discretion within the guidelines of *28 U.S.C.S. §§ 1400(b), 1404(a)*.

*Civil Procedure > Venue > Motions to Transfer > Convenience of Parties*
*Civil Procedure > Venue > Motions to Transfer > Convenience of Witnesses*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN2] *28 U.S.C.S. § 1400(b)* governs the venue for patent infringement actions. It provides that any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business. Factors to be considered by a court in exercising its discretion in a change of venue motion include the convenience of the parties, the convenience of the witnesses, and the interests of justice, such as judicial economy.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > General Overview*
*Civil Procedure > Venue > Multiparty Litigation*
*Patent Law > Jurisdiction & Review > Personal Jurisdiction & Venue > General Overview*
[HN3] A defendant "resides" in any judicial district in

Page 2

1993 U.S. Dist. LEXIS 20045, *; 30 U.S.P.Q.2D (BNA) 1553

which it is subject to personal jurisdiction.

*Civil Procedure > Jurisdiction > General Overview*
*Civil Procedure > Venue > Corporations*
*Civil Procedure > Venue > Federal Venue Transfers >*
*Convenience Transfers*
[HN4] The court may, in its discretion, transfer a case to another district where it might have been brought, for the convenience of parties and witnesses or if in the interest of justice. *28 U.S.C.S. § 1404(a).*

*Civil Procedure > Venue > Federal Venue Transfers >*
*General Overview*
[HN5] As a general rule, cases should be transferred to districts where related actions are pending.

**JUDGES:** [*1] McNamee

**OPINION BY:** STEPHEN M. MCNAMEE

**OPINION**

**MEMORANDUM OF DECISION AND ORDER**

Defendant Applied Materials, Inc. filed a motion for change of venue which is opposed Plaintiff Advanced Semiconductor Materials America, Inc. ("ASMA").

**BACKGROUND**

The present lawsuit involves allegations of infringement of two of the Defendant's patents. The Defendant-movant is based in Santa Clara, California. It makes and sells capital equipment for the global semiconductor industry. Plaintiff ASMA is also involved in the global semiconductor industry and is based in Tempe, Arizona.

**STANDARD OF REVIEW**

[HN1] The decision to transfer a case on venue grounds is largely a discretionary issue. *28 U.S.C. § 1404(a); Hatch v. Reliance Ins. Co., 758 F.2d 409, 414 (9th Cir.), cert. denied, 474 U.S. 1021, 88 L. Ed. 2d 555, 106 S. Ct. 571 (1985).* The Court exercises its discretion within the guidelines of *sections 1400(b)* and *1404(a)* [*2] *of Title 28 of the United States Code.*

*Section 1400(b)* of Title 28 [HN2] governs the venue

for patent infringement actions. It provides that "any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." *Id.* Factors to be considered by a court in exercising its discretion in a change of venue motion include the convenience of the parties, the convenience of the witnesses, and the interests of justice, such as judicial economy. *Hatch v. Reliance Ins. Co., 758 F.2d at 414.*

**ANALYSIS**

[HN3] A defendant "resides" in any judicial district in which it is subject to personal jurisdiction. *28 U.S.C. § 1391(b)-(c); VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574, 1576-77, 16 U.S.P.Q.2d 1614 (Fed. Cir. 1990), cert. denied, 499 U.S. 922, 111 S. Ct. 1315, 113 L. Ed. 2d 248 (1991).* since Defendant Applied Materials in based in Santa Clara, it is subject to personal [*3] jurisdiction in the Northern District of California. Venue is therefore proper in the Northern District of California. Thus, this action could have originally been brought in that District.

Venue, however, is also proper in the District of Arizona, as the plaintiff resides in Arizona, and the Defendant is a corporation who does not contest that it is subject to personal jurisdiction in Arizona. Still, in the interest of justice, [HN4] the Court may, in its discretion, transfer this case to another district where it might have been brought, "for the convenience of parties and witnesses" or if "in the interest of justice." *28 U.S.C. § 1404(a); Hatch v. Reliance Ins. Co., 758 F.2d at 414.*

*Factors to be Considered*

1. The Parties are Involved in Pending Related Cases

The present case is related to two other patent cases between the same two parties currently before the United States District Court in the Northern District of California. [HN5] "As a general rule, cases should be transferred to districts where related actions are pending." *Impra Inc. v. Quinton Instruments Co., 17 U.S.P.Q.2d 1890, 1891,* [*4] *1990 W.L. 284713 (D. Ariz. 1990).* While the dispute in this case does involve different patents from those at issue in the two cases now pending between the parties in California, all three lawsuits involve the same parties, the same technology, and competing products in the same relevant markets. Since

Page 3

1993 U.S. Dist. LEXIS 20045, *4; 30 U.S.P.Q.2D (BNA) 1553

"the patents involved in this case arose out of the development program for the accused device in the California cases," there will likely be much overlap of issues, witnesses, prior art, and documents. Defendant's Reply Memorandum In Support or Defendant's Motion for Transfer of Venue at 5 [hereinafter "Defendant's Reply Memo"].

Defendant argues that the Court should adopt the reasoning applied in a District Court case from the District of Columbia, *Smiths Industrial Medical Systems v. Ballard Medical Products, Inc., 728 F. Supp. 6 (D.D.C. 1989)*. In *Smith,* the Court transferred a trademark action from one district to another where the same parties had been litigating a patent dispute for over two years. In this case, the facts are more compelling for transfer as the three cases at issue all regard infringement of related patents; *Smith* dealt [*5] with one patent case and one trademark case. The interrelatedness of the three patent actions strongly, indicates that it is in the interest of judicial economy to grant the Defendant's motion for transfer of venue to the Northern District of California where the Court has greater experience with the parties' dispute. *Cf. PacesetterSystems, Inc. v Medtronic, Inc., 678 F.2d 93 (9th Cir. 1982)* (upholding dismissal of patent suit on grounds of forum non conveniens when another suit involving sane parties and issues was pending in another jurisdiction).

2. Convenience of the Witnesses

The Plaintiffs contend that "the moving party cannot rely on vague generalizations and is obligated to identify key witnesses and to present a generalized statement of their expected testimony." Plaintiff's Memorandum in Opposition to Defendant's Motion to Transfer at 5 [hereinafter "Plaintiff's Memo"] (citing *Heller Financial Inc., v. MidWhey Powder Co., 883 F.2d 1286, 1293 (7th Cir. 1989))*. *Heller* concerned a motion for change of venue in which (1) the suit had been filed in the district contractually agreed upon in a valid forum selection [*6] clause; and (2) the subject matter of the lawsuit dealt with a dispute of leased property located within the district in which the suit was originally filed. To overcome such burdensome facts that weighed against transfer of venue, the movant had to establish who their witnesses would be and the materiality of their testimony. *Id.* Such factors are clearly not at issue in the present case. Given the early stage of this litigation and the stay of discovery in the case due to the pending California cases, it is

unreasonable to require that the Defendants produce a list of witnesses and summaries of said witnesses expected testimony.

It is clear that there will be witnesses from both the state of California and the state of Arizona. Five of the eight inventors of the patents involved in the present case reside in Arizona; a sixth resides in both Arizona and California. Plaintiff's Memo at 8. The two attorneys who prosecuted the ASMA patents in question in the suit also reside in Arizona. On the other hand, seven of eight experts in the two cases now before the Northern District of California are from California. Defendant's Memo at 6. While the Plaintiff challenges whether all seven [*7] of the expert witnesses will be needed in the present case, the Defendant has stated it plans to use some of these same experts in the present case. Defendant's Reply Memo at 4-5. Moreover, the Plaintiff has not expressed an expectation to retain any Arizona expert witnesses. Since the patents at issue in the case at bar were researched and developed in California, it is likely that other percipient witnesses will come from California.

In addition to the witnesses from California and Arizona, there are many other people who are likely to be witnesses in the present case. Such individuals are spread out across the country (i.e., Utah, Pennsylvania, Ohio, New Jersey, and, Minnesota), and at least one does not reside in the United States. It therefore appears that the overall inconvenience to the witnesses of testifying in either district is roughly comparable; even ASMA concedes this point by stating, "just as many percipient witnesses will be inconvenienced by a trial in California as may be inconvenienced by a trial [in Arizona]." Plaintiff's Memo at 9. The convenience of the witnesses is therefore an equally neutral factor in deciding the motion for change of venue.

3. Convenience [*8] to Parties

The Plaintiff and the Defendant in both the present case and the two cases now before the Court in the Northern District of California are and have been represented by legal counsel located in California, not Arizona. Because this goes directly to the cost borne by the parties, such as attorney time and travel, it is directly in the interest of both parties to have the case litigated in California.

4. Situs of Alleged Infringement

Page 4

1993 U.S. Dist. LEXIS 20045, *8; 30 U.S.P.Q.2D (BNA) 1553

The patents at issue in this case were researched and developed in California. Much of the activity that goes to the heart of infringement, therefore, probably took place in California, not Arizona. Given this fact, evidence regarding the development of the patents in question is likely to be found in California, not Arizona. As the costs of conducting interstate discovery and transferring documents between California and Arizona may be minimized by litigating the case in California, it is in the interest of the parties that the motion to transfer venue to California be granted.

## CONCLUSION AND ORDER

The Northern District of California is already, familiar with the parties and many of the facts and circumstances surrounding the patents at issue [*9] in the present case by way of the two patent suits now pending between the parties in that District. For this reason, and for those, stated above, the Court finds the requirements of *28 U.S.C. §§ 1400(b)* and *1404(a)* to have been satisfied, and that it would serve the interests of justice to transfer the case to the Northern District of California.

**IT IS THEREFORE ORDERED** that the Defendant Applied Material's Motion for Change of Venue be **GRANTED**.

**IT IS FURTHER ORDERED** that the oral argument set for September 27, 1993 at 4:00 p.m. be **VACATED**.

DATED this 14th day of September, 1993.

Stephen M. McNamee

United States District Court Judge

# EXHIBIT 15

LEXSEE 2007 U.S. DIST. LEXIS 91060

**ROYLENE RAY and KELLY CANNON, individually and on behalf of other similarly situated, Plaintiffs, v. BLUEHIPPO FUNDING, LLC, Defendant.**

**No. C 06-01807 JSW**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2007 U.S. Dist. LEXIS 91060*

**December 4, 2007, Decided**
**December 4, 2007, Filed**

**COUNSEL:** [*1] For Roylene Ray, Kelly Cannon, individually and on behalf of others similarly situated, Plaintiffs: David John Marshall, LEAD ATTORNEY, Katz, Marshall & Banks, LLP, Washington, DC; Debra S. Katz, LEAD ATTORNEY, Katz, Marshall & Banks, Washington, DC; James C. Sturdevant, Monique Olivier, LEAD ATTORNEYS, The Sturdevant Law Firm, San Francisco, CA; Gary Peller, Washington, DC.

For Bluehippo Funding, LLC, Defendant: Edward Patrick Sangster, LEAD ATTORNEY, Ramiz I. Rafeedie, Kirkpatrick & Lockhart Preston Gates Ellis LLP, San Francisco, CA.

**JUDGES:** JEFFREY S. WHITE, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** JEFFREY S. WHITE

**OPINION**

**ORDER GRANTING MOTION FOR LEAVE TO AMEND FIRST AMENDED COMPLAINT AND DENYING MOTION TO TRANSFER**

Now before the Court is Plaintiffs' motion for leave to amend the first amended complaint and Defendant BlueHippo Funding, LLC ("BlueHippo")'s motion to transfer this action to the District Court of Maryland. The Court finds that these matters are fully briefed and appropriate for disposition without oral argument and are hereby deemed submitted. *See* Civ. L.R. 7-1(b). Accordingly, the hearing set for December 7, 2007 is HEREBY VACATED. Having carefully considered the motions and the relevant legal [*2] authority, the Court hereby DENIES Defendant's motion to transfer and GRANTS Plaintiffs' motion for leave to amend the first amended complaint.

As the parties are familiar with the facts and procedural history of this case, there is no need to recite them here, except where useful in reaching the disposition.

**ANALYSIS**

**A. Legal Standard Applicable to Motions to Amend.**

*Federal Rule of Civil Procedure 15(a)* allows a plaintiff to amend its complaint, after a responsive pleading has been served, by leave of court or by consent of the adverse party. *Rule 15(a)* provides that leave to amend "shall be freely given." *See Fed. R. Civ. Proc. 15(a).* The Ninth Circuit has stated that "[r]ule 15's policy of favoring amendments to pleadings should be applied with 'extreme liberality.'" *United States v. Webb, 655 F.2d 977, 979 (9th Cir. 1981).* Four factors are considered to determine whether a motion for leave to file an amended complaint should be granted. *DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 186 (9th Cir. 1987).* These factors are: bad faith, undue delay, prejudice to the opposing party, and futility of amendment. *Id.* While these "factors are usually used as criteria to determine the propriety [*3] of a motion for leave to amend ... the crucial factor is the resulting prejudice to the opposing party." *Howey v. United States, 481 F.2d 1187, 1190 (9th Cir. 1973).*

## B. Plaintiffs Shall Be Given Leave to Amend.

BlueHippo argues that Plaintiffs have brought their amendment in bad faith. In order for a court to find that a moving party filed for leave to amend in bad faith, the adverse party must proffer evidence that shows "wrongful motive" on the part of the moving party. *See DCD Programs, 833 F.2d at 187.* BlueHippo contends that Plaintiffs seek to amend their complaint to, among other things, add two additional California defendants for the sole purpose of defeating BlueHippo's pending motion to transfer. First, notwithstanding the addition of the two new California parties, the Court will deny the motion to transfer. Second, there is nothing in the record that supports a finding of bad faith. Accordingly, this factor weighs in favor of granting the motion for leave to amend.

Next, a moving party may be precluded from asserting an amendment on the basis of undue delay where the matters asserted in the amendment were known to them from the beginning of the suit. *Komie v. Buehler Corp., 449 F.2d 644, 648 (9th Cir. 1971)* [*4] (finding that where the moving party filed a motion to amend the pleadings 31 months after the answer was filed, the trial court did not abuse its discretion in denying leave to amend). While undue delay is a factor for denying leave to amend, "[u]ndue delay by itself is insufficient to justify denying a motion to amend." *Bowles v. Reade, 198 F.3d 752, 757-58 (9th Cir. 1999).* The Court concludes that Plaintiffs' did not unduly delay in filing this motion. This suit is in an early stage because, although filed some time ago, it has been stayed by order of this Court. BlueHippo does not contend that it will suffer any prejudice and the Court finds none. Accordingly, this factor weighs in favor of granting the motion.

Finally, BlueHippo contends that the portions of the proposed amendments are futile. Leave to amend is properly denied where the amendment would be futile. *DeSoto v. Yellow Freight Sys., Inc., 957 F.2d 655, 658 (9th Cir. 1992).* However, the Court finds that the amendments would not be futile as a matter of law at this procedural stage. The claims may not be legally sufficient in part due to named plaintiffs' lack of standing but because of the factual disputes in that regard, [*5] that is a matter more properly addressed by a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(1).* Furthermore, to the extent there are disputed facts regarding the leal sufficiency of the claims, those are

properly matters to be adjudicated at the summary judgment stage.

## C. Motion to Transfer.

BlueHippo moves to transfer this action under principles of federal comity or, in the alternative, pursuant to *28 U.S.C. § 1404(a).* The Court finds neither argument persuasive.

First, the Court finds that the interests of comity are not served as the Maryland action is not currently active. The Maryland court granted voluntary dismissals without prejudice to those plaintiffs who had not signed BlueHippo's mandatory arbitration provision and class action waivers. The court compelled the sole signatory to arbitrate his claims. The case was "STAYED and ADMINISTRATIVELY CLOSED pending resolution of the compelled arbitration." (Opp. Br., Ex. 1 at PP 1, 6.) [1] The Fourth Circuit summarily dismissed BlueHippo's appeal from the district court's order. (Opp. Br., Ex. 2.)

> 1    Although the cited documents were not properly submitted to the Court, they are subject to judicial notice and have [*6] been reviewed. *See Fed. R. Evid. 201(b).*

In addition, in the two other cases in which lawsuits against BlueHippo are currently pending and in which BlueHippo has moved to transfer the actions to the District Court in Maryland, the courts have also determined that, for all practical purposes the Maryland case is not active, and have declined to transfer those actions to Maryland. The District Court for the Northern District of Oklahoma in *Robbins et al. v. BlueHippo Funding LLC, et al.,* 07-cv-145TCK-SAG (N.D. Ok.), denied the motion to transfer as it found the Maryland case "no longer pending" and that "there is no danger of having duplicative causes of action." (Opp. Br., Ex. 11 at 5.) The District Court for the Eastern District of Arkansas in *Williams et al. v. BlueHippo Funding et al.,* Civil Case No. 04:07-00662-SSW (E.D. Ak.), determined not to transfer that action to the Maryland court in part because it found that the action is "stayed and administratively closed." [*7] (Notice of Filing of Additional Authorities, Order at 10.) This Court finds those cases persuasive and similarly holds that the pending motion to transfer to Maryland for the sake of judicial comity is not well-taken.

BlueHippo also moves to transfer pursuant to *28*

*U.S.C. § 1404(a)*. A district court may transfer a civil action to any district where the case could have been filed originally for the convenience of the parties and witnesses and in the interest of justice. A motion to transfer venue under *§ 1404(a)* requires the court to weigh multiple factors in its determination of whether transfer is appropriate in a particular case. For example, the court may consider: (1) the plaintiff's choice of forum; (2) the convenience of witnesses and the parties; (3) the familiarity of the forum with the applicable law; (4) the ease of access to evidence; and (5) the relative court congestion and time of trial in each forum. *See, e.g., Jones v. GNC Franchising, Inc., 211 F.3d 495, 498-99 (9th Cir. 2000)*. The general rule is that the plaintiff's choice of forum is to be given substantial weight. *Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d 834, 843 (9th Cir. 1986)*. However, a plaintiff's [*8] choice of forum is less significant where they propose to represent a nationwide class. *Lou v. Belzberg, 834 F.2d 730, 739 (9th Cir. 1987)*. The burden is on the moving party to demonstrate that the action should be transferred. *Commodity Futures Trading Commission v. Savage, 611 F.2d 270, 279 (9th Cir. 1979)*.

Given the general rule that the plaintiff's choice of forum is to be given substantial weight even though diminished by virtue of this being a purported class action, and BlueHippo's failure to demonstrate that the convenience of witnesses and the parties, the forum's familiarity with the law, the ease of access to evidence or the relative congestion of the courts tips in favor of transferring the case to Maryland, the Court concludes that BlueHippo has failed to meet its burden to show that this case should be transferred. Accordingly, the Court DENIES BlueHippo's motion to transfer.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Plaintiffs' motion for leave to file a second amended complaint. The Court ORDERS Plaintiffs to file their amended complaint by no later than December 7, 2007. Defendant's responsive paper or motion shall be filed 20 days after they are served with [*9] the second amended complaint. The Court DENIES BlueHippo's motion to transfer.

**IT IS SO ORDERED.**

Dated: December 4, 2007

/s/ Jeffrey S. White

JEFFREY S. WHITE

UNITED STATES DISTRICT JUDGE

# EXHIBIT 16

NOT FOR PUBLICATION

**FILED**

FEB 24 1999

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SNK CORPORATION OF AMERICA, et al., | Case No. C 98 21035 JF EAI |
| Plaintiffs, | ORDER[1] DENYING MOTION TO TRANSFER AND GRANTING MOTIONS TO DISMISS |
| v. | |
| ATLUS DREAM ENTERTAINMENT CO. LTD., et al., | |
| Defendants. | |

Defendants Atlus Dream Entertainment Co. Ltd. and Atlus Co. Ltd. (collectively "Atlus") have moved to transfer this action to the Central District of California. Atlus has also moved to dismiss. Defendant ImageWare Software, Inc. has filed a separate motion to dismiss and also joins in Atlus' motion to dismiss. The motions were heard on February 22, 1999. For the following reasons, the motion to transfer will be denied and the motions to dismiss will be granted, with leave to amend.

---

[1] This disposition is not appropriate for publication and may not be cited.

ORDER DENYING MOTION TO TRANSFER AND GRANTING MOTIONS TO DISMISS
Case No. C 98 21035 JF EAI                                              (3)

## I. BACKGROUND

1
2     Plaintiff SNK Corporation of America and its Japanese
3  parent, plaintiff SNK Corporation, (collectively "SNK") are in
4  the business of manufacturing and selling, among other things,
5  "photosticker" machines.   These devices are coin operated, self
6  service, photobooths which print users' photos and frame designs
7  onto sheets of stickers.
8      Atlus manufactures and sells competing photosticker
9  machines. Atlus' market share in Japan exceeds 50%. SNK's
10  machines are "popular" in Japan but its market share is
11  "significantly less" than that of Atlus.   In late 1996, SNK
12  entered the United States market.   In October 1997, Atlus
13  publicly announced it intended to enter the United States market.
14      Defendant ImageWare was founded by Pamela Barber, the
15  inventor of a device somewhat similar to photosticker machines.
16  Barber obtained a patent (the "Barber patent") which she
17  apparently assigned to ImageWare.   ImageWare and Atlus entered
18  into a written agreement whereby ImageWare licensed Atlus to use
19  the Barber patent technology.
20      Shortly after announcing its plans to enter the United
21  States market, Atlus filed suit against SNK (and another company)
22  alleging infringement of the Barber patent. Atlus also issued a
23  press release announcing the suit. SNK contends that at the time,
24  Atlus and ImageWare both knew or should have known that ImageWare
25  had marketed its machine more than one year before the Barber
26  patent application was filed, and that therefore the Barber
27  patent was invalid under 35 U.S.C. § 102 (b) (commonly referred
28  to as the "on-sale bar"). SNK also contends that defendants knew

2

1  or should have known that there was no infringement even if the

2  Barber patent were valid.  Finally, SNK contends defendants knew

3  or should have known that Atlus could not bring the suit because

4  it was not an exclusive licensee of the Barber patent.

5     The infringement suit was assigned to Senior Judge Rea of

6  the Central District. After approximately five months, Atlus

7  decided to dismiss its infringement claims. Atlus filed a

8  covenant not sue for infringement of the Barber patent, and then

9  moved to dismiss its infringement claims and SNK's declaratory

10  relief counterclaim as moot.  SNK opposed, arguing that there

11  were ongoing issues as to ownership and validity of the Barber

12  patent.  Judge Rea granted the motion.  The parties then settled

13  the remaining claims without prejudice to SNK's right to reassert

14  the claims it has alleged in this action.  The action was then

15  dismissed in its entirety.[2]

16     In this action SNK alleges that Atlus and ImageWare

17  conspired to bring a meritless infringement action against SNK,

18  for competitive purposes.  SNK asserts claims under federal and

19  state antitrust law, as well as state law claims for malicious

20  institution of civil proceedings, interference with prospective

21  economic advantage, unfair competition, defamation, and

22  negligence.

23

24

_____

25     [2] At the time of the dismissal, SNK had pending a motion to
26  amend its counterclaims to include some of the bad faith filing
    claims it asserts in this action.  That motion had been taken off
27  calendar while Atlus' dismissal motion was heard and for reasons
    which are unclear was never decided. Atlus had opposed that
28  motion.

3

1

## II. DISCUSSION

2 **A.   The motion to transfer**

3     The thrust of Atlus' motion to transfer is that Judge Rea is

4 uniquely qualified to hear this case given his involvement in the

5 underlying proceedings, and that therefore it is in "the

6 interests of justice" to transfer the action to the Central

7 District.[3]

8     The parties dispute how much actual involvement Judge Rea

9 had in the prior action and how much he learned therefrom.  Even

10 assuming Judge Rea has extensive familiarity with the prior

11 proceedings, this Court concludes that does not warrant a

12 transfer.  The merits of SNK's claims in this action must be

13 judged by the Court or jury based on evidence introduced in this

14 action.  Judge Rea very well may have *independent* knowledge going

15 to the merits of SNK's claims in this action, based on his

16 personal observations during the underlying actions.  Were this

17 action transferred to him, though, he would not be free to base

18 any ruling in this action upon any such independent knowledge;

19 rather, he would be limited to making evaluations based on

20 evidence actually introduced in this action.[4]

21

22     [3]  This Court lacks authority to transfer the action to any
particular judge.  Presumably Atlus believes it could have the
23 matter transferred to Judge Rea in the event it was randomly
assigned to another Central District judge following any transfer
24 from this District.

25     [4] It is possible, of course, that Judge Rea's *general*
26 knowledge of the underlying facts might have resulted in some
slight saving of judicial resources had this matter been filed in
27 the Central district and assigned to him, but in preparing for
this motion alone this Court likely already has acquired
28 comparable general knowledge of the allegations and disputes.

4

1    Transfers often are made "in the interest of justice" where
2    related litigation is still *pending* in the transferee district.
3    *See, e.g., London and Hull Maritime Insurance Company Ltd v.*
4    *Eagle Pacific Insurance Company*, 1996 WL 479013 (N.D.Cal. 1996).
5    The conservation of resources and other advantages of transfer is
6    such situations is manifest.  No similar interests weigh in favor
7    of transfer here.[5]

8    **B.    The motion to dismiss**

9        <u>1. Federal antitrust claims</u>

10       Plaintiffs' first claim for relief alleges attempted
11   monopolization in violation of section 2 of the Sherman act
12   against Atlus.  Plaintiffs' second claim for relief alleges
13   conspiracy to monopolize against Atlus and ImageWare.[6]
14   Plaintiffs' third claim for relief asserts that defendants'
15   alleged conduct constituted an combination or conspiracy in

16   _____

17       [5]  Atlus has pointed to one case in which related litigation
     in the transferee court was concluded but nevertheless was
18   identified as a factor favoring transfer. *See Sykes v.*
     *Eckankar*, 1998 WL 296368 (N.D.Cal. 1998) (transferee court well
19   suited to determine whether prior related case operated as *res*
     *judicata*).  In *Sykes*, however, virtually every other factor also
20   supported transfer.

21       [6]  Although this claim is entitled "conspiracy to
     monopolize," as ImageWare points out, the charging allegations
22   refer to a "conspiracy . . . to *attempt* to monopolize" (emphasis
     added).  In opposition, plaintiffs do not challenge ImageWare's
23   argument and authorities that no claim exists for conspiracy to
     "attempt" monopolization; instead plaintiffs argue the claim is
24   one for conspiracy to monopolize notwithstanding the use of the
     word "attempt." In any amended complaint, plaintiffs can avoid
25   the issue by eliminating the word "attempt."  The complaint will
     then be sufficient (on this point) for pleading purposes,
26   although given the nature of the factual allegations, if this
     action proceeds plaintiffs may have difficulty establishing on
27   dispositive motion or at trial that more than an "attempt"
     occurred.
28

                                    5

1  restraint of trade, in violation of Section 1 of the Sherman Act.

2  Defendants make a number of related arguments in attempting to

3  show that plaintiffs have failed to plead the requisite elements

4  for any of these claims.

5      a) Section 2 claims

6      There are at least three elements to a claim for attempted

7  monopolization under Section 2 of the Sherman act: 1) the

8  defendant had a specific intent to control prices or destroy

9  competition, 2) anticompetitive conduct directed at accomplishing

10  that purpose, and 3) a dangerous probability of achieving

11  monopoly power. *See Spectrum Sports v. McQuillan*, 506 U.S. 447,

12  113 S.Ct. 884, 890-91 (1993). Defendants argue that plaintiffs

13  have failed to plead facts showing wrongful intent or

14  anticompetitive conduct, relying on cases which suggest that harm

15  to a single competitor is not necessarily synonymous with harm to

16  *competition. See, e.g., Les Shockley Racing, Inc. v. National Hot*

17  *Rod Association*, 884 F. 2d. 504, 508 (9th Cir. 1989) (elimination

18  of "one or more competitors need not equate with injury to

19  competition.").

20      While it may not be possible to harmonize fully all existing

21  lines of precedent, defendants' argument fails in the context of

22  the alleged attempt to enforce a patent with knowledge of its

23  invalidity. *See Handgards, Inc. v. Ethicon, Inc.,* 743 F. 2d 1282,

24  1288 n.9, 1293 (findings of anticompetitive intent and conduct

25  supported by bad faith prosecution of infringement suit).

26  Indeed, an article submitted by Atlus in support of its reply

27  asserts that these two elements "may be established through proof

28  . . . that the patent owner, in bad faith, attempted to enforce a

6

1  patent that he knew was invalid . . . ." 449 PLI/Pat 457, 468.

2      Defendants concede that the allegations of the complaint are

3  sufficient, if proven, to defeat defendants' potential immunity

4  under *Noerr-Pennington* doctrine.  Defendants correctly argue that

5  does not mean plaintiffs need not plead the elements of an

6  antitrust claim.  *See Professional Real Estate Investors, Inc. v.*

7  *Columbia Pictures Industries, Inc.* 508 U.S. 49, 61, 113 S.Ct.

8  1920, 1928 (1993) ("[o]f course, even a plaintiff who defeats the

9  defendant's claim to *Noerr* immunity by demonstrating . . . a sham

10  must still prove a substantive antitrust violation.  Proof of a

11  sham merely deprives the defendant of immunity; it does not

12  relieve the plaintiff of the obligation to establish all other

13  elements of his claim.") As *Handgards* and Atlus' secondary

14  authority show, though, a bad faith patent claim not only will

15  defeat *Noerr* immunity, it also will fulfill the first two

16  elements of an attempted monopolization claim.

17      Turning to the third element, however, the Court finds that

18  plaintiffs have not pled sufficient facts[7] to show a "dangerous

19  probability of success."  The complaint alleges a relevant market

20  of the United States and Japan.[8]  Atlas is alleged to have a

21  market share in Japan which may be substantial, but which does

---

23     [7]  The Court is mindful of F.R.C.P. 8 and the generally
liberal requirements of notice pleading.  Bare legal conclusions,
24  however, are not a "short and plain statement of the claim
*showing that the pleader is entitled to relief." See also TV*
25  *Communication Network v. Turner Network* 964 F. 2d 1022, 1024
(10th Cir. 1992) ("[a]lthough modern pleading requirements are
26  quite liberal, a plaintiff must do more than cite relevant
antitrust language to state a claim for relief.)

27
   [8]  Defendants' contentions that such a market is illogical
28  are discussed separately below.

7

1  not give rise to an overwhelmingly strong presumption of market

2  power.  No specific allegations of Atlus' United States market

3  share are made, but it is reasonable to infer that at the time

4  the infringement action was filed, Atlus's United States market

5  share was close to zero, since it had just announced its

6  intention to enter the United States market.  Therefore, the

7  allegations of the complaint imply that Atlus' share of the

8  "combined" U.S.- Japan market may not even have reached 50%.

9       The complaint is devoid of other allegations which would

10 tend to show that Atlus' alleged conduct created a dangerous

11 probability of success.  There is no information regarding other

12 competitors (or a lack thereof) or regarding barriers to market

13 entry.  There are no allegations regarding the importance of the

14 Barber patent, if not invalid, to the field.[9]

15      Taking the allegations as a whole, the Court cannot conclude

16 that plaintiffs have alleged more than a bare conclusion that the

17 infringement lawsuit and associated press release created a

18 dangerous probability that Atlus would obtain monopoly power in

19 the combined U.S.- Japan market.

20      Finally, the Court notes there is some authority for a

21 fourth element to an attempted monopolization claim -- that

22 _____

23      [9]  Actually, SNK alleges its product would not have
   infringed even if the patent were valid.  While the economic
24 costs of defending infringement claims may damage competitors and
   competition, there is little probability a patent holder will
25 succeed in obtaining a judicial decree directly preventing
   competition by non-infringers.

26
         At oral argument plaintiffs did offer some additional
27 information regarding the market, competitors, and the patent.
   Those factual assertions, however, were not pled in the
28 complaint.

8

ORDER DENYING MOTION TO TRANSFER AND GRANTING MOTIONS TO DISMISS
Case No. C 98 21035 JF EAI                                          (3)

1  defendant's conduct "caused antitrust injury." *See Columbia*

2  *Pictures Industries, Inc. v. Professional Real Estate Inventors,*

3  *Inc.*, 944 F. 2d 1525 (9th Cir. 1991) (*cert. granted and aff'd as*

4  *to other issues*).  Ninth Circuit precedent, however, seems to

5  establish that the costs of defending an infringement action

6  suffice as causal antitrust injury. *See Handgards*, 743 F.2d. At

7  1297.[10]

8      Having failed to plead an *attempted* monopolization claim,

9  plaintiffs cannot rely on the same facts (plus the alleged

10  cooperation of defendant ImageWare) to state a claim for

11  conspiracy to monopolize.  Accordingly both the first and second

12  claims for relief will be dismissed, with leave to amend.

13      b) Section 1 claim

14      A claim under section 1 of the Sherman Act requires an

15  injury to competition, and nothing in *Handgards* or the article

16  cited by Atlus would appear to eliminate that requirement.  In

17  certain limited types  of case, courts will apply a "per se" rule

18  and *presume* that an agreement is anticompetitive. *See Nynex*

19  *Corporation* v. *Discon, Incorporated,* __ U.S. __ , 119 S. Ct. 493,

20  497 (reviewing types of agreements held per se illegal).

21  Plaintiffs argue that the question of whether a per se rule

22  applies here is thus an evidentiary question, not ripe for

23  resolution on a motion to dismiss.  The problem with plaintiffs'

24  argument is that unless a per se rule applies, then injury to

25  competition is an *element* of plaintiffs' case, and at least some

26  _____

27      [10]  It is unclear whether this principle can be reconciled
   with the general principle that injury to one competitor is not
28  necessarily injury to competition.

9

1 | facts must be pled which show that injury to competition exists.
2 | The Court concludes that the agreement alleged here is *not* one as
3 | to which the per se rule would apply, as it does not fall into
4 | any of the categories as to which a per se rule traditionally has
5 | been applied. *See id.*

6 | The Court further concludes that plaintiffs have failed to
7 | plead facts showing injury to competition. It is true that
8 | injury to even a single competitor *may* constitute injury to
9 | competition, depending on the circumstances. *See Les Shockley*,
10 | 884 F. 2d 508, 509. Here, plaintiffs have made vague assertions
11 | in their brief regarding the number of competitors and market
12 | conditions which, if amplified and pled in the complaint, might
13 | be sufficient to show injury to competition.[11] At this point,
14 | though, the complaint is insufficient. Accordingly, the third
15 | claim for relief will be dismissed with leave to amend.

16 | c) Geographical market

17 | The Court has not based its ruling on defendants' argument
18 | that the alleged market is unreasonably or implausibly defined.
19 | First, despite significant differences in consumer tastes and
20 | other cultural matters between the United States and Japan,
21 | because of relatively high income levels and some shared tastes
22 | it is at least conceivable that the most promising markets for
23 | certain products are those two countries. Plaintiffs argue that
24 | they will be able to introduce expert opinion to show cross-
25 | elasticity of demand and other evidence supporting their alleged
26 | market definition. Thus, defendants' argument that it makes no

---

27 |
28 | [11] Again, at oral argument, plaintiffs provided further detail.

ORDER DENYING MOTION TO TRANSFER AND GRANTING MOTIONS TO DISMISS
Case No. C 98 21035 JF EAI                                    (3)

1    sense to exclude various other parts of the world is not

2    conclusive. Second, proper market definition is fundamentally a

3    factual issue which cannot be resolved on a motion to dismiss.

4        2. State law claims

5        In the interest of judicial economy, the Court declines to

6    adjudicate the sufficiency of the pleading as to the state law

7    claims until and unless viable federal claims are stated.  It is

8    the intent of the Court that if it subsequently were to dismiss

9    the federal claims without leave to amend, it would decline to

10   retain jurisdiction over the state claims, and would dismiss them

11   without prejudice at that time.  If a future motion to dismiss is

12   denied as to the federal claims, the Court will address the state

13   claims at that time.

14       In any future motions to dismiss, the parties shall not re-

15   brief the issues as to the state claims, except that any party

16   may describe concisely any relevant legal authority which may

17   emerge in the interim.

18                        **III. ORDER**

19       The motion to transfer venue is denied.

20       The motions to dismiss claims 1, 2, and 3, is granted, with

21   leave to file an amended complaint within 30 days of this order.

22   The balance of the motions is deferred.

23

24

25   DATED: _____2-22-95_____

26

27

28                    JEREMY FOGEL
                      United States District Judge

11

# EXHIBIT 17

LEXSEE 1998 U.S. DIST. LEXIS 8203

**JOSEPH N. SYKES, Plaintiff, v. ECKANKAR, BOARD OF TRUSTEES OF
ECKANKAR, HAROLD KLEMP, PHILIP MORIMITSU, CAROL MORIMITSU,
JACK HEYL, and MARY CARROLL MOORE, Defendants.**

No. C 98-0858 SI

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA**

*1998 U.S. Dist. LEXIS 8203*

**May 29, 1998, Decided
June 1, 1998, Filed; June 3, 1998, Entered in Civil Docket**

**DISPOSITION:**    [*1] Defendants' motion to transfer
GRANTED. Case transferred.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants filed a motion
to transfer the action to a federal district court in
Minnesota, or in the alternative, to dismiss the action.
Plaintiff did not appear for the hearing, and a motion
seeking a continuance had been rejected as untimely.

**OVERVIEW:** The court concluded that most of the
factors for determining whether a transfer should be
granted pursuant to *28 U.S.C.S. § 1404(a)* weighed in
favor of defendants. Plaintiff was a resident of England,
and thus there were apparently no relative benefits of
convenience to litigating the case in California as
opposed to the District of Minnesota. One defendant's
principal place of business was in Minnesota, and most of
the individual defendants resided and worked in
Minnesota. None resided in California. The court further
concluded that the interests of justice also suggested that
the case be transferred, as defendants had made a
colorable claim that the principles of res judicata applied
to plaintiff's action based on a recently dismissed case
also filed by plaintiff with similar facts. The court
acknowledged that plaintiff's choice of forum was
entitled to some deference; however, in light of the
inconvenience for defendants and the lack of convenience
for plaintiff to litigate in the court's district, as well as the
interests of justice in having defendants' claim of res
judicata decided by a judge with knowledge of the

previous litigation, a transfer was warranted.

**OUTCOME:** The court granted defendant's motion to
transfer the action to the District of Minnesota.

**LexisNexis(R) Headnotes**

*Civil Procedure > Venue > Federal Venue Transfers >
Convenience Transfers*
[HN1] *28 U.S.C.S. § 1404(a)* provides that for the
convenience of parties and witnesses, in the interest of
justice, a district court may transfer any civil action to
any other district or division where it might have been
brought. In making a determination under this statute, the
court considers: (1) the relative convenience of the
selected forum and the proposed forum; (2) the possible
hardship to the plaintiff if the court grants the motion; (3)
the interests of justice; and (4) the deference to be
accorded the plaintiffs' choice of forum.

**COUNSEL:** JOSEPH N. SYKES, Plaintiff, Pro se,
England, London.

For ECKANKAR, defendant: Thomas A. Ackley,
Titchell Maltzman Mark & Ohleyer, San Francisco, CA.

For ECKANKAR, defendant: Alan L. Kildow, Marcy R.
Frost, Larkin Hoffman Daly & Lindgren, Ltd.,
Bloomington, MN.

1998 U.S. Dist. LEXIS 8203, *1

**JUDGES:** SUSAN ILLSTON, United States District Judge.

**OPINION BY:** SUSAN ILLSTON

**OPINION**

**ORDER GRANTING DEFENDANTS' MOTION TO TRANSFER TO THE DISTRICT OF MINNESOTA**

On May 29, 1998, the Court held a hearing on defendants' motion to transfer or, in the alternative, to dismiss. Plaintiff did not appear for the hearing. [1] Having considered the papers submitted by the parties, the Court hereby GRANTS defendants' motion to transfer.

> 1 Plaintiff did telephone the Court immediately before the hearing to request that the hearing be continued to some later date. The Court denied that request as untimely. The Court also notes that the issue of transfer was one appropriately submitted without oral argument.

[*2] [HN1] 28 U.S.C. § 1404(a) provides that "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." In making a determination under this statute, the Court considers (1) the relative convenience of the selected forum and the proposed forum; (2) the possible hardship to the plaintiff if the court grants the motion; (3) the interests of justice; and (4) the deference to be accorded the plaintiffs' choice of forum. *See Jacobson v. Hughes Aircraft Co., 105 F.3d 1288, 1302 (9th Cir. 1997).*

In the present case, factors (1), (2), and (3) clearly weigh in favor of transfer. Plaintiff is a resident of England, and thus there appear to be no relative benefits of convenience to litigating the case in this district as opposed to the District of Minnesota. In fact, plaintiff has failed to inform the Court of any elements of convenience associated with this district. Additionally, defendant Eckankar's principal place of business is in Minnesota, and all but two of the individual defendants reside and work in Minnesota. None reside in California.

The interests of justice [*3] also suggest that the case be transferred. Defendants have made a colorable claim that the principles of res judicata apply to plaintiff's present action, based on a recently-dismissed case, also filed by plaintiff, with similar facts. The Court has taken judicial notice of that case, *Sykes v. Kunin et al.*, Civ. No. 97-1222 (D. Mn. 1998), and attaches the memorandum opinion and order. Even though plaintiff's choice of forum is entitled to some deference, the Court concludes that in light of the inconvenience to defendants (and little if any convenience to plaintiff) of litigation in the Northern District of California, as well as the interests of justice in having defendants' claim of res judicata decided by a judge with knowledge of the previous litigation between the parties, the Court GRANTS defendants' motion to transfer.

The case is transferred to the United States District Court for the District of Minnesota.

**IT IS SO ORDERED.**

Dated: May 29, 1998

SUSAN ILLSTON

United States District Judge

# EXHIBIT 18



**ORRICK**

ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 MARSH ROAD
MENLO PARK, CALIFORNIA 94025

tel 650-614-7400
fax 650-614-7401
WWW.ORRICK.COM

February 27, 2008

Zheng Liu
(650) 614-7699
jenliu@orrick.com

*VIA E-MAIL DPAUL@MORGANLEWIS.COM*

Darcy A. Paul, Esq.
Morgan, Lewis & Bockius LLP
2 Palo Alto Square
3000 El Camino Real, Suite 700
Palo Alto, CA 94306

Re:    *University of Pittsburgh v. Varian Medical Systems, Inc.*

Dear Darcy:

This letter responds to your letter to Matthew Poppe dated February 22, 2008, which we received last Friday after the close of business.

As we stated earlier, UPitt waited more than three months to raise the issue of the depositions of Hassan Mostafavi and Majid Riaziat based on the Tau documents produced on November 14, 2007. The request was far from timely and Varian has no obligation to provide any witness. We only offered Dr. Mostafavi in good faith to resolve the issue. The offer was conditioned upon UPitt's agreement that Dr. Riaziat not be deposed and that the subject matter of the deposition be limited to the Tau documents produced on November 14, 2007. Upon UPitt's agreement to these conditions, we will provide a date for Dr. Mostafavi's deposition.

We have produced all documents in the Varian's Trilogy Marketing Kits for 2006 and 2007. RPM is not a part of the Trilogy System. There is no reason why documents relating to RPM would be included in the Trilogy Marketing Kit. Furthermore, documents relating to the RPM product were produced well before the close of discovery, more than four months ago. Varian does not intend to produce any additional documents in response to UPitt's latest tardy request.

Varian also does not agree to your other request. Varian produced to UPitt many documents prepared for customers, such "user manuals," "instructions to use," and other manuals, as early as last May, well before the close of discovery. However, Varian never agreed to produce training materials that it provides to its customers, if any such documents even exist. Varian served its objections and responses to UPitt's three sets of document requests on June 14, September 7, and October 5, respectively. If UPitt had an issue with Varian's responses, it could have raised it months ago. It is now more than four months after the close of discovery and UPitt



ORRICK

Darcy Paul, Esq.
February 27, 2008
Page 2

is raising this issue for the first time.  Accordingly, the request is untimely.  Varian does not
agree that it should be burdened with any additional document production at this time.

Very truly yours,

Zheng Liu

cc:  Rita E. Tautkus

# EXHIBIT 19



**ORRICK**

ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 MARSH ROAD
MENLO PARK, CALIFORNIA 94025

*tel* 650-614-7400
*fax* 650-614-7401
WWW.ORRICK.COM

March 13, 2008

Zheng Liu
(650) 614-7699
jenliu@orrick.com

*VIA E-MAIL MBLAKELY@MORGANLEWIS.COM*

Mitchell M. Blakely, Esq.
Morgan, Lewis & Bockius LLP
2 Palo Alto Square
3000 El Camino Real, Suite 700
Palo Alto, CA 94306

Re:     *University of Pittsburgh v. Varian Medical Systems, Inc.*

Dear Mitchell:

This letter responds to your letter to me dated March 7, 2008 regarding additional depositions.

In my previous letter addressed to you dated February 27, 2008, I noted specifically that due to the untimeliness of UPitt's request, Varian should not be burden with additional depositions at such a late time.  To resolve this issue in good faith, we agreed to provide Hassan Mostafavi under the conditions that 1) his total deposition time be limited to three hours, regardless of whether UPitt wants to treat it as a Rule 30(b) deposition or a personal deposition; 2) the deposition be limited to the Tau documents produced on November 14, 2007; and 3) Majid Riaziat will not be deposed.

Your letter dated March 7 did not completely agree to the above three conditions.  You insisted on the possibility of re-taking the deposition of Dr. Riaziat.  Dr. Riaziat is a third party with no stake in this litigation.  He should not be burdened with an additional deposition at such a late stage. Please verify that UPitt agrees to Varian's conditions.  Once this agreement is received, we will provide the availability of Dr. Mostafavi promptly.

Very truly yours,

Zheng Liu

cc:  Rita E. Tautkus

# EXHIBIT 20
# FILED UNDER SEAL

# EXHIBIT 21
# FILED UNDER SEAL

# EXHIBIT 22



# ORRICK

February 4, 2008

**Matthew H. Poppe**
(650) 614-7431
mpoppe@orrick.com

**VIA EMAIL**

Rita E. Tautkus, Esq.
Morgan, Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, CA  94105

Re:     *University of Pittsburgh v. Varian Medical Systems, Inc.*
        U.S.D.C. Western Dist. of Penn., Case No. 2:07-cv-00491-AJS

Dear Rita:

You claimed in a recent letter that the parties are at an impasse regarding the length of time for the upcoming depositions. To my knowledge, UPitt has never made a specific proposal regarding the length of the depositions. Thus, I do not see how the parties can be at an impasse.

In addition, should UPitt file a motion on this issue, we intend to point out to the Court that our ability to predict the length of depositions has been hampered by a lack of compliance with the Court's Order requiring that Dr. Kalend re-produce his documents. Jen Liu was told that the documents were re-ordered by UPitt's attorneys, not by Dr. Kalend as required by the Order. You were quite explicit during the meet-and-confer process and in the opposition to Varian's motion to compel that UPitt's counsel lacked the knowledge needed to accurately re-order Dr. Kalend's documents. That lack of knowledge was reflected in the manner in which they were re-ordered—a process that provided Varian with very little meaningful information.

You have inquired whether Varian intends to proceed with topics 21-22 of the 30(b)(6) notice, which was a subject of the Court's Order granting in part Varian's motion for additional depositions. UPitt's late document production included many documents related to UPitt's licensing discussions with Varian and its internal decision-making process associated with those discussions. We intend to ask questions about those documents and expect that a UPitt witness will be prepared to give testimony on that subject pursuant to topics 21-22 and 39.

You have also inquired about topics 5-8 of Varian's 30(b)(6) notice, which are also addressed in the Court's Order. We do not perceive any inconsistency in the Order. Pursuant to Rule 30(b)(6) and the Order, UPitt is required to provide "one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf" and who are prepared adequately to testify "as to matters known or reasonably available to" UPitt. We are certain that if Mr. Westerhoff is unwilling to attend a deposition himself as UPitt's designee to explain why he failed to disclose material prior



**ORRICK**

Rita E. Tautkus, Esq.
February 4, 2008
Page 2

art to the Patent Office, that he will provide responsive information to UPitt's alternative designee. Alternatively, we would be happy to discuss ways to accommodate the fact that Mr. Westerhoff now resides in Florida, such as taking the deposition on topics 5-8 in Florida or by videoconference.

On another matter, Varian will agree to a limited deposition of Hassan Mostafavi on the subject of the documents related to Tau Corporation that were produced after his first deposition, provided that (1) the parties are able to agree on the length of the deposition and (2) UPitt does not seek any additional depositions. Since UPitt's position is that all future depositions should be subject to specific time limits, please tell us your proposed length for this deposition. We will also expect UPitt to prepare a stipulation to be submitted to the Court, since no further discovery is allowed to take place without Court approval. Majid Riaziat does not agree to be deposed. He is a third party without any stake in this litigation (unlike the inventors), and he should not be subjected to another deposition—particularly when UPitt waited months to raise this issue and in fact appears to have done so only in response to Varian's motion for additional depositions. Dr. Mostafavi should be able to provide adequate information related to the documents in question.

Very truly yours,

Matthew H. Poppe

cc:    Henry M. Sneath, Esq. (via email)

# EXHIBIT 23
# FILED UNDER SEAL

# EXHIBIT 24

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNIVERSITY OF PITTSBURGH, | ) | Civil Action No. 2:07-cv-00491-AJS |
| | ) | |
| Plaintiff, | ) | Judge Arthur J. Schwab |
| | ) | |
| v. | ) | |
| | ) | |
| VARIAN MEDICAL SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

## EXPERT OF REPORT OF DR. STEVE B. JIANG

My name is Steve B. Jiang. I have been retained by Varian Medical Systems. Inc.
("Varian") to review U.S. Patent No. 5,727,554 (the "'554 patent") (attached as Exhibit B) and
other related materials and render my professional opinion on the meaning of certain terms and
phrases as they would be understood by a person of ordinary skill in the relevant art. This report
sets forth those opinions, as well as the evidence and reasoning on which they are based.

## I.    IDENTIFICATION AND QUALIFICATIONS

I am a tenured Associate Professor in Medical Physics and the Director of Research in
the Department of Radiation Oncology, School of Medicine, University of California. San
Diego. My business address is Department of Radiation Oncology, University of California, San
Diego, Moores Cancer Center, Room 3334, 3855 Health Sciences Dr. #0843, La Jolla, CA
92093-0843. My business phone number is 858-822-5129.

I have about 17 years of research experience in the field of radiation oncology physics. I
have a Ph.D. degree in radiotherapy medical physics and received my postdoctoral training at
Stanford University. From September 2000 to March 2007, I was an Assistant Professor at
Harvard Medical School.

During my career I have received many awards and honors. In 2000, I received two national research awards: the Post-doctoral Traineeship Award from US Department of Defense Breast Cancer Research Program and the Resident Clinical/Basic Science Research Award from The American Society for Therapeutic Radiology and Oncology. I also received the prestigious Whitaker Foundation Biomedical Engineering Research Grant, and several industrial and NIH grants. In 2004, I became a Fellow of The Institute of Physics. I have published more than 50 research articles in peer-reviewed scientific journals and given numerous invited talks to colleagues in other universities and hospitals.

Since 2000, my research has been focused on the management of moving tumors in radiotherapy, mainly using techniques such as image guidance and respiratory gating. In this particular field, I have successfully acquired more than 5 research grants, published more than 20 articles on peer-reviewed journal, and given more than 40 invited talks worldwide. Last year, I taught the Summer School of American Association of Physicists in Medicine with a course titled "Management of Moving Targets in Radiotherapy", and also wrote two review articles on the same topic, one named "Technical Aspects of Image-Guided Respiration-Gated Radiation Therapy" and the other titled "Radiotherapy of Mobile Tumors."

My research focus since 2000 has been image guided radiation therapy (IGRT), which involves the application of a lot of computer vision techniques to radiotherapy. I have conducted extensive research on tumor and fiducial tracking, using techniques very similar to those used in the patent. I also have supervised postdoctoral fellows with Ph.D. degrees in computer vision or image processing as well as graduate students in computer science or electric engineering to work on tumor and fiducial tracking, in collaboration with professors in the field of computer vision. Through my research, I have acquired substantial experience in the field of computer vision.

Based on my experience in radiotherapy research, I believe I qualify as an expert on radiotherapy of mobile tumors using image guidance and respiratory gating techniques. My full curriculum vitae is attached as Exhibit A.

## II.    COMPENSATION

I am being compensated for my time in preparing for and testifying in this case at my standard consulting rate of $450.00 an hour. I have no interest in the outcome of this case. I am paid the same regardless of my opinion.

## III.    DOCUMENTS RELIED UPON

- '554 patent

- '554 file history

- Finnish Patent Application No. 861,600 (English translation)

- S. Peltola, "Gated radiotherapy to compensate for patient breathing," Proceedings of the Eleventh Varian Users Meeting; Marco Island, Florida; May 11-13 (1986)

- H.D. Kubo and B.C. Hill, "Respiration gated radiotherapy treatment: a technical study," Phys. Med. Biol. 41 (1996)

- K. Ohara et al, "Irradiation Synchronized with Respiration Gate"    International Journal of Radiation Oncology Biol. Phys. Vol. 17 pp. 853-857 (1989)

## IV.    PUBLICATIONS AND TESTIMONY

I have published more than 50 research articles in peer-reviewed scientific journals and given numerous invited talks to colleagues in other universities and hospitals. Among them, more than 20 articles are in the field of image guided radiation therapy and respiratory gating. Please see my attached curriculum vitae for a complete list of my publications.

I have not testified before in any cases.

## V.    OPINIONS TO BE EXPRESSED AND THE BASIS FOR THEM

### 1.    LEVEL OF ORDINARY SKILL IN THE ART

The '554 patent relates to the fields of medical physics and computer vision. A person of ordinary skill in the art would be a person with a combination of the following training and professional experience in the fields of medical physics and computer vision. There are two types of people falling in this category: 1) a person with at least a master's degree in medical physics and at least five years of professional experience in the field of computer vision; 2) a person with at least a bachelor's degree in Electrical Engineering or Computer Science and at least five years of professional experience in the field of medical physics. My declaration below is given from the perspective of what a person of ordinary skill in the art in September 1996 would have known and understood from the '554 patent.

### 2.    BACKGROUND OF THE TECHNOLOGY

Technological advances in radiation therapy, such as intensity-modulated radiation therapy (IMRT), provide radiation oncologists with the capability of delivering a highly conformal radiation dose distribution to a complex static target. Nevertheless, treatment errors related to internal organ motion may greatly degrade the effectiveness of conformal radiotherapy for the management of thoracic and abdominal tumors.

Organ motion during the treatment is caused mainly by patient respiration, sometimes also by movement of the skeletal muscular, cardiac, or gastrointestinal systems. A major category of the methods accounting for respiratory motion in radiation therapy is respiratory gating, which limits radiation exposure to the portion of the breathing cycle when the tumor is in the path of the beam. In an ideal gated treatment, tumor position should be directly monitored and the delivery of radiation is only allowed when the tumor is at the correct position. Direct detection of the tumor mass in a real-time fashion during the treatment is, however, often very difficult. Various surrogates whose motion is in synchrony with the tumor motion are then used

to indicate the tumor position. For example, a fiducial on the patient's chest can be used as a surrogate for detecting tumor motion. One or more attributes associated with the surrogate, such as its position in physical space, can be converted into digital signal(s) and processed by computers.

An important concept for the gated treatment is called gate or gating window. A gating window is a range of the signal(s) representing the motion of the surrogate(s). When the surrogate signal falls within the range, i.e., the gating window, the gating signal is 1 and the treatment machine should be turned on; otherwise it is 0 and the treatment machine should be turned off. Therefore, the gating window converts the surrogate signal into gating signal and the gating signal can be sent to the display and/or used to control the treatment machine. The gating signal is always one dimensional while the surrogate signal can be multi-dimensional, depending on what and how many surrogates are used. For each dimension of the surrogate signal, there are two values that define the boundary of the gating window in that dimension.

Respiratory gating can also be, and should be, applied to patient imaging during patient pre-treatment simulation and daily setup, in addition to the treatment delivery. Because the treatment is delivered only to a particular portion of patient breathing cycle (gating window), the patient/tumor geometry corresponding to the gating window should be used for treatment planning and patient alignment. Throughout the entire treatment course, maintaining the consistency of patient/tumor geometry is extremely important. It is very difficult to achieve this consistency for gating with surrogates on the patient's body (external surrogates) due to the variations of the correlation between internal tumor position and external surrogates. It is essential to re-establish the correlation for each treatment and to check the correlation during the treatment.

Respiratory gating was first developed and implemented in magnetic resonance imaging (MRI) in the 1980s to reduce the motion artifacts caused by patient respiration. In 1986, Seppo Peltola in South Saimaa Central Hospital, Lappeenranta, Finland, first brought respiratory gating into radiotherapy, to my knowledge (see Appendix A and D). In Peltola's implementation,

patient breathing was monitored by tracking with a video camera the motion of a laser line
projected on the patient's chest and the gating signal was then generated to control a Varian
treatment machine. In 1989, Kiyoshi Ohara and colleagues in University of Tsukuba, Japan,
developed a respiratory gating technique for radiotherapy of tumors with respiratory motion (see
Appendix B). In their implementation, a combination of airbag and strain gauge taped on the
patient's abdomen or back (for prone treatments) was used to monitor patient breathing and to
generate a gating signal for the control of the treatment machine. To my knowledge, a paper
submitted in 1995 and published in 1996 describes the first introduction of gated radiotherapy
technique into the United States by Hideo Kubo at the University of California, Davis and Bruce
Hill at the University of California, San Francisco (see Appendix C). They implemented gating
on a Varian treatment machine and evaluated various external surrogate signals (thermistors,
thermocouples, strain gauge and a pneumotachograph) to monitor respiratory motion and to
generate a gating signal.

In summary, by September 1996, the concept of respiratory gating had been introduced to
radiotherapy and the technology had been implemented and tested in clinical environments.
Various techniques for monitoring patient breathing and generating gating signals had already
been developed at that time and more such techniques have been developed since then. The
teaching of the '554 patent must be evaluated in this context. It is merely one of many techniques
for monitoring patient breathing and generating gating signals.

### 3.     INTERPRETATION OF CLAIMS

A person of ordinary skill in the art, reviewing the '554 patent in September 1996, would
have understood the patent to be directed to the introduction of a particular respiratory gating
technique where the external surrogates are the 3-dimensional movement of at least one natural
or artificial fiducial marker on the patient chest and tracked by a video camera.

More specifically, a person of ordinary skill in the art, when examining the '554 patent in September 1996, would have understood the following terms, as used in the patent, to have the following meanings.

I have received a summary of law on claim construction from counsel for Varian. It is my understanding that claim terms should normally be given their ordinary meanings, unless patentee gives them special meaning, in the relevant technical field, as they would be understood by a person of ordinary skill in the art at the time of the patent filing. The first place to look for the meaning of a claim term is the claim language itself. Specification and figures also provide important insight to what a claim term means. Claim language, specification, figures and prosecution history are parts of a patent and are considered intrinsic evidence. Articles, dictionaries, treatises etc. are extrinsic evidence and are considered only when the meaning of a claim term cannot be ascertained using intrinsic evidence alone and are only used to help explain the meaning of the terms not to contradict the meaning projected by the intrinsic evidence.

I understand that normally a claim term is not limited to the examples (embodiments) described in the specification. Means-plus-function claims, however, are treated differently. Means-plus-function claims describe a structure through its function, and the structures are those that can perform the function. The structures are limited to the embodiments described in the specification and their equivalents. For means-plus-function claims in software, the structure corresponding to the function is limited by the algorithm illustrated in the flow charts that are part of the specification. For each means-plus-function claim term, Varian's counsel has identified the function associated with each term to me, and I have reviewed the patent and other relevant material to determine the structure corresponding to each function.

A.    **"camera means generating digital image signals representative of an image of said patient" in Claim 20**

This sentence would be understood by one of ordinary skill in the art to mean a camera that captures a two dimensional image of the patient relying on visible light and then converts

that image into digital image signals by a digitizer of unspecified structure. As described in column 3, lines 35-55, column 5, lines 4-13, and column 7, lines 44-46 of the '554 patent,[1] the camera is a regular video camera, such as a charge coupled device (CCD) camera, which passively receives visible light reflected from a non-illuminative object, such as a patient, to form a two dimensional image of that object.

The specification describes two types of fiducials used as surrogates. One is natural fiducial such as scars and the other is an artificial fiducial in sphere shape with a lambertian surface (column 3, lines 55-64). The first type has to be viewed under visible light. The second type is the preferred fiducial (column 3, line 58). The specification describes situations where the fiducial is lost or not visible due to adverse lighting conditions and specific software routines are implemented to solve this problem (column 1, lines 43-44; column 5, lines 4-12; figures 6 and 14). From these descriptions, it is clear that the camera relies upon visible light to capture the image of the patient, which may include the natural or artificial fiducial on the patient.

The patent does not describe any structure associated with the digitizer 45 illustrated in figure 4.

**B.    "digital image signals representative of an image of said patient" in Claim 20**

A two-dimensional image of the patient can be converted to corresponding digital image signals. As described in column 4, lines 7-13, and figure 4, the image captured by the camera is digitized by digitizer 45 to generate digital image signals which are 0 to 255 gray scale signals for each camera pixel. As discussed above, the technique used to convert the patient image into digital image signals is not described in the patent.

I understand the "image of said patient" to refer to the image of the body of the patient. An image of the patient is part of an image captured by the camera that may include additional

---

[1] All the citations to column, line numbers and figures in this document refer to those of Exhibit B, the '554 Patent.

objects such as artificial fiducials, the treatment machine, and the patient positioning assembly, etc (see column 3, lines 55-64; figure 5).

**C.**    **"processing means" in Claim 20**

Software routines are used to determine patient movement and to produce gating signals. Based on column 4, lines 13-47, column 10, lines 46-51, and figure 4, a patient motion detector 47 detects and identifies natural and artificial fiducials 39 in the digital image signals and then tracks their movement. The movement within a specified narrow range is acceptable, while large movements are unacceptable. The treatment machine is turned off by a gating signal generator 61 and/or a warning signal is displayed when large movements happen. In particular, the patient motion detector 47 can track patient breathing and extract such quasi-periodic motion from random patient motion. Gating is synchronized with patient breathing.

**D.**    **"means determining movement of said patient from said digital image signals, including movement associated with breathing by said patient" in Claim 20**

I have been instructed by the attorneys for Varian that the function associated with this phrase is "determining movement of the patient from the digital image signals of the patient's body, including movement associated with breathing by the patient". I have been asked to identify the structure described in the patent that corresponds to this function.

In theory, the movement of the patient can be determined *without* fiducials on the patient skin, either natural or artificial, by using the variation of the gray scale information of the whole patient image. However, the patent describes tracking using fiducials on the patient skin, which is much more robust. In the patent, only techniques for fiducial tracking are described, with corresponding structure (software subroutines) outlined in figures 6-16 and described in column 5 to column 8. The major steps of the software algorithms are outlined in figure 6 and elaborated in figures 7-16.

The **first step** is to detect the fiducials on the patient's body in the current camera image (figures 6, box 110, and figure 7, and column 5, lines 16-19, column 5, line 40 to column 6, line 11). This procedure is performed every time before starting to track the fiducials. The current camera image should be the first image of a tracking session. For a specific tracking session, the fiducials in the image may have different locations, appearance, and size, due to specific patient attributes and environmental conditions (lighting conditions, distance between camera and patient, etc). The purpose of this procedure is then to find the positions and attributes (appearance and size) of the fiducials in the current camera image.

A template matching method is used to find the positions of the fiducials. A template is a reference image that indicates how the fiducial should look like in the camera images. Template matching method computes the similarity between the template and a camera image. If the similarity is great, it means the fiducial is detected at a position corresponding to the position of the reference fiducial in the template; otherwise, the fiducial position in the camera image is different from that in the template.

As shown in figure 7 and described in column 5, lines 49-59, the patent proposes to start with two types of *initial* templates: idealized image templates and pre-stored image templates. The idealized image templates can be used for know-shape artificial fiducials. The pre-stored image templates are usually obtained from the previous tracking sessions and can be used for natural fiducials such as scars. The localization of the fiducial positions in the current image can then be done using the template matching method with the idealized and/or pre-stored image templates in a multi-resolution manner (column 5, lines 64-66).

Matches are made using a normalized correlation (column 6, lines 3-4), which is a similarity measure, between the template and the image. Matches are done first in low resolution (figure 8, column 5, line 6, to column 6, line 52). Two methods can be used to initially identify the locations of the fiducials in the current image. One is to do raster scanning using sparse sampling (figure 8, box 114.1), and the other is to do raster scanning using interest operators

(figure 8, box 114.2). Raster scanning means to scan the image line by line from top down and for each line to scan from left to right pixel by pixel (column 6, lines 14-18). Sparse sampling means instead of scanning line by line, the scan can be done every few lines and thus the scanning of the whole image can be done in a much shorter time (column 6, lines 14-18). Interest operators are simple gray scale pattern that can be used to roughly and quickly characterize fiducials in the images, which also allows fast scanning of the whole image to generate initial estimates of the fiducial positions in the images (column 6, lines 18-30). Some fiducial-like features in the image may be selected by the interest operators as fiducial candidates (column 6, lines 30-35).

Therefore a thresholding procedure is performed to remove extra candidate points (column 6, lines 30-35). For each remaining candidate points, a template matching is performed using a normalized correlation, between the image and the idealized or pre-stored image templates (column 6, lines 36-37). A further thresholding procedure is performed to remove unwanted candidate points according to the normalized correlation value (column 6, lines 37-41). Bracketing and interpolating are then used to localize the remaining candidate points (column 6, lines 41-53). The candidate points localized in low resolution are verified in high resolution using bracketing and minima suppression, as shown in figure 9 and described in column 6, lines 53-62.

Afterwards, the best matches of the same number of the fiducials on the patient's body are selected as the most possible candidates of the detected fiducials (column 6, lines 6-8). This result can also be achieved by interactively clicking on the center of a fiducial in the image by users. Then, users can manually edit the detected fiducial locations (column 5, lines 60-63).

Both idealized and pre-stored image templates are only approximations to the true images of the fiducials for a specific tracking session. Therefore, the **second** major step of the software algorithms is to build more realistic templates by fine-tuning the templates using current camera image for a specific tracking session, as shown in figures 6 and 10 and described from column 6, line 63, to column 7, line 13. When there are several fiducials of the same type detected in the

current camera image, the one with median match based on the normalized correlation value is selected as the new template for this type of fiducials. Compared to the initial templates (idealized or pre-stored), the new template represents the actual conditions for the specific tracking session. Using the new template, the positions, the interest operator value and normalized correlation value for all candidate points are recorded. The spatial relationship (pattern) of the detected fiducials in the current camera image is also recorded (column 7, lines 7-13).

Now the software is ready to for the **third** major step, i.e., tracking fiducials in new camera images, as shown in figures 11, 12, 13, and described in column 7, lines 14-46. The new position of a fiducial in a new image can be estimated using its velocity (estimated from previous images) and the time interval between two neighboring images (column 7, lines 16-18). Around the estimated new positions, the positions of the fiducials can be detected in low resolution and then verified in high resolution, using same techniques as in the first step, such as raster scanning using sparse sampling, raster scanning using interest operators, normalized correlation, bracketing and interpolating, etc, as shown in figures 12 an 13, and described in column 7, lines 18-46. When the reflected visible light captured by a charge coupled device (CCD) camera is used to form an image of the object, image noise exists and needs to be filtered out using a low pass filter, as stated in column 7, lines 44-46.

The **fourth** major step is to see if the tracking of a fiducial in the new image is lost, as shown in figure 14 and described in column 7, lines 47-61. First, if no fiducial is found in a specified image window, then the fiducial is considered lost. Second, even if the fiducial is found in the image window, it still needs to pass a set of constancy tests before it is confirmed as a true fiducial. The constancy tests include, but not limit to, the constancy of normalized correlation value and interest operator value as well as the position (column 7, lines 50-56). For example, if the position of the detected fiducial is too far from its position in the previous image, as estimated using its velocity and time interval between two images, it is considered lost.

The **fifth** major step is to try to re-acquire a fiducial when it is identified as lost in the

image, as shown figure 15 and described from column 7, line 62, to column 8, line 6. The new position of the fiducial is estimated using a larger search window and using the same method as in the third step. Then the position of fiducial is detected with sub-pixel accuracy using the same techniques as used in the first and third steps, such as raster scanning using sparse sampling, bracketing, normalized correlation, interest operators, interpolation, etc.

The software routines described above are important and necessary elements of the invention due to the specific setup of the camera systems and the fiducial system in the patent. In particular, the patent explains that the camera system and the fiducial system can be affected by variation in lighting conditions and other environmental conditions. It was to solve this problem that inventors described such techniques as template matching, raster scanning using sparse sampling, raster scanning using interest operators, normalized correlation, bracketing and interpolating, etc, as important steps in tracking patient movement. For the above reasons, I believe this element must incorporate the software routines described in the specification and the figures.

I will be prepared to explain these algorithms in more detail at a later time, such as the claim construction hearing in this matter.

E.    **"gating means generating gating signals synchronized with said movement associated with breathing by said patient." in Claim 20**

The purpose of the "gating means" as described in the patent is to produce alarm and gating signals based on the detected fiducial positions, as shown in figure 16 and described in column 8, lines 7-19. Taking system latency into account, the direction and distance traveled by the fiducial since the detection step is estimated. The spatial relationship (pattern) of the fiducials is compared with the initial patterns or previous patterns. Using past data analysis, any quasi-periodic motion of the fiducials and/or the spatial pattern, such as caused by patient breathing, is detected. The alarm warnings, alarm states and gating signals are then computed as shown in the box 204 of figure 16. Box 204 is lack of specific information to teach a person of ordinary skill

in the art to generate gating signals based on the detected quasi-periodic motion.

Software routines are used to generate gating signals based on the movement associated with breathing of the patient. However, how this is done specifically, as mentioned in column 8, lines 7-19, or box 204 of figure 16, is very vague to a person of ordinary skill in the art. Based on figure 5, a person of ordinary skill in the art would believe that, corresponding to the extent of fiducial movement, different section of a traffic light-like display will be lighted (column 4, line 48, to column 5, line 3).

(1) If the fiducials move outside a first specified tolerance range, display yellow section of the traffic light as warning.

(2) If the fiducials move outside a second specified tolerance range, display red section of the traffic light and generate and transmit signals to the connected equipment to turn the radiation beam off.

(3) If the fiducials move back within the specified tolerance range, display green section of the traffic light and generate and transmit signals to the connected equipment to turn the radiation beam back on.

## F.    "fiducial" in Claim 21

Either a natural distinctive feature, such as a scar, on the body of the patient, or an artificial object on the patient skin with a distinctive shape and/or surface material that can be recognized by the software routines to determine movement (column 3, lines 55-64; figure 5).

## G.    "on said patient" in Claim 21

Fiducials are attached directly to the body of the patient, without a rigid spatial relationship with one other (column 1, lines 50-53; column 3, line 55, to column 4, line 6; column 5, lines 15-18). The patent discusses the use of one fiducial as an example and contemplates the use of multiple fiducials. Both types of the fiducials, either natural fiducials such as scars, or artificial fiducials attached to the body, may move relative to other fiducials.

For example, two scars on the patient body, one the chest and the other on the abdomen, may have a position shift against each other when the patient breathes. As another example, multiple artificial fiducials affixed to patient chest can move away from one other when patient breathes in and chest expands. *See* figure 5.

Moreover, the specification contains software routines aiming at estimating the quasi-periodic motion associated with breathing by utilizing the change of the spatial relationship of the fiducials (figure 16, and column 8, lines 11-15). For example, box 202 of figure 16 describes comparing the spatial pattern of the actively tracked fiducials with the initial pattern and previous patterns. The preferred fiducials in this patent as well as natural fiducials may move against one other, thus changing the spatial pattern of the fiducials. The described software routines are used to solve the problem that the fiducials may move relative to one another. For the above reasons, I believe this element must incorporate the software routines described in this specification and figures.

**H.    "means determining movement of said at least one fiducial" in Claim 21**

A person of ordinary skill in the art should understand this element as with the function of determining movement of at least one fiducial on the patient. Software routines are used to determine movement of at least one fiducial on the patient. Detailed steps for tracking fiducials are discussed above in section D.

**I.    "means generating said gating signals synchronized to actuate said beam generator in synchronism with patient breathing" in Claim 22**

The purpose of the "means generating said gating signal synchronized to actuate said bean generator in synchronism with patient breathing" as described in the patent is to produce gating signals based on the detected fiducial positions, as shown in figure 16 and described in column 8, lines 7-19. Taking system latency into account, the direction and distance traveled by the fiducial since the detection step is estimated. The spatial relationship (pattern) of the fiducials is compared with the initial patterns or previous patterns. Using past data analysis, any quasi-periodic motion of the fiducials and/or the spatial pattern, such as caused by patient breathing, is detected. The gating signals are then computed as shown in the box 204 of figure 16. Box 204

lacks specific information to teach a person of ordinary skill in the art to generate gating signals based on the detected quasi-periodic motion.

Software routines are used to generate gating signals based on the movement associated with breathing of the patient. However, how this is done specifically, as mentioned in column 8, lines 7-19, or box 204 of figure 16, is very vague to a person of ordinary skill in the art.


I declare under penalty of perjury that the foregoing is true and correct.

DATED:  August 15, 2007

_____
Dr. Steve B. Jiang

# EXHIBIT 25



**ORRICK**

ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 MARSH ROAD
MENLO PARK, CALIFORNIA 94025-1015

*tel* +1-650-614-7400
*fax* +1-650-614-7401

WWW.ORRICK.COM

April 18, 2008

Zheng Liu
(650) 614-7699
jenliu@orrick.com

*VIA EMAIL*

Rita E. Tautkus, Esq.
Morgan, Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, CA 94105

Re:    *University of Pittsburgh v. Varian Medical Systems, Inc.*
       U.S.D.C. Western Dist. of Penn., Case No. 2:07-cv-00491-AJS

Dear Rita:

        Defendant Varian Medical Systems, Inc. ("Varian") discloses the following individual pursuant to ¶ 13 of the Protective Order entered in this matter. The requirements of ¶ 13 are satisfied as follows:

1.    We have enclosed a copy of the curriculum vitae that include the required information for the following individual:

        Bruce L. McFarlane

2.    We have enclosed a copy of signed undertakings in the form of Exhibit A for the following individuals:

        Bruce L. McFarlane

        Pursuant to  ¶ 13, information described in the Protective Order and "Exhibit A" will be provided to the listed individuals ten business days from the date of this letter. Please contact me with any questions.

Very truly yours,

Zheng Liu

cc:    Henry M. Sneath, Esq. (via email)

OHS West:260422144.1

# CURRICULUM VITAE
## BRUCE L. McFARLANE

**POSITION**  Managing Director / CEO, LitiNomics  (January 2007 to Present)

**EDUCATION**  B.A., Business Administration (Accounting), University of Washington (1984)

**PROFESSIONAL AFFILIATIONS (current)**
Certified Public Accountant (Oregon, California)
Certified Management Accountant
Member, American Institute of Certified Public Accountants
　　Business Valuation and Litigation Services Section Member
Member, California Society of CPAs
　　Litigation Section Member
Member, Intellectual Property Owners Association

**PROFESSIONAL AFFILIATIONS (past)**
Certified Management Consultant
Member, Oregon Society of Certified Public Accountants Litigation Services Committee
Member, Washington Society of CPAs Litigation Services Committee
Member, Institute of Management Consultants
Member, Licensing Executive Society
Oregon Society of CPAs Litigation Services Committee (Chair, 1992; Vice Chair, 1991)
Chair, Oregon Society of CPAs Litigation Services Conference Committee (1991)
National Institute of Trial Advocacy, Faculty Expert Witness
Senior Consultant, CRA International
Licensing Executive Society
Member, Institute of Management Accountants

**RANGE OF EXPERIENCE**
Experience includes testimony and consulting services in accounting, financial, economic and business issues related to commercial litigation and intellectual property related transactions.

**PROFESSIONAL AND BUSINESS HISTORY**
Independent Consultant February 2004–December 2006
InteCap, Inc. (Mountain View, California)
　　Managing Director, October 1999–February 2004
PHB Hagler Bailly, Inc. (Portland, Oregon; Palo Alto, California):
　　Principal, January 1996–September 1999
　　Associate, January 1993–December 1995
Price Waterhouse (Portland, Oregon):
　　Manager, July 1990–December 1992
　　Senior Consultant, July 1988–June 1990
　　Staff Consultant, November 1987–June 1988
Arthur Andersen (Portland, Oregon):
　　Staff Accountant, June 1986–October 1987
Peterson & Company (San Francisco, CA):
　　Staff Consultant, January 1985–May 1986

**PUBLICATIONS**
"Intellectual Property/Equipment," Litigation Support Report Writing, 2003 (co-authored with Lilian Quah).

"10 Largest Trade Secrets Damages Awards" InteCap ReCap, Spring 2003

"10 Largest Patent Damages Awards" InteCap ReCap, Fall 2002

"Court Expands Lost Profits Damages From Patent Infringement," CPA Expert, Summer 1996 (co-authored with Michael J. Wagner).

**PUBLICATIONS**     "The Implications of Changes in the Federal Rules of Civil Procedure for CPA—Expert
**(continued)**      Witnesses," The CPA Management Consultant, Newsletter of the AICPA Management
Consultant Division (Spring 1994) (co-authored with Michael J. Wagner).

"The Revised Federal Rules of Civil Procedures That Apply to Expert Witnesses," CPA Litigation Services Counselor, Volume 1994 Issues 2 .3. Harcourt Brace (February and March 1994) (co-authored with Michael J. Wagner).

"Opportunities in Litigation Services," Journal of Accountancy (June 1992) (co-authored with Michael J. Wagner).

"The Role of the CPA in Commercial Litigation," The Oregon Certified Public Accountant (September 1991) (co-authored with Michael J. Wagner).

"Using CPAs in Your Law Practice," The Seattle-King County Bar Bulletin (February 1991) (co-authored with Michael J. Wagner).

**SPEECHES**      "Valuation of Intellectual Property For Computer Related Technologies" Computer Law Association, Palo Alto, CA June 4, 2003.

"Damages Strategies for Infringement of Intellectual Property Rights" Computer Law Association, Palo Alto, CA, May 14, 2003; Intellectual Property Society, Los Altos, CA, August 13, 2003.

"Extracting Value from Your IP Litigation" Tomlinson, Zisko, Morosoli‗Maser's "Chautauqua" Series, Palo Alto, CA, September 25, 2002.

"Perspectives on Value Extraction Models for Intellectual Capital Assets: Lessons Learned from the Trenches" The Intellectual Property Society, Santa Clara, CA, August 22, 2002.

"Litigating Trade Secrets" Licensing Executive Society, 2002 Winter Conference, Las Vegas, NV, February 14, 2002.

"Patent Damages 101: From Novice to Expert in Under Two Hours" Santa Clara University Law School, February 8, 2002.

"IP Valuation Issues in Litigation: Hot Topics," San Francisco Intellectual Property Lawyers Association, San Francisco, California, November 14, 2000; Gray Cary Ware Freidenrich, Palo Alto, California, February 1, 2001.

"Case Studies in the Application of Regression Analysis," American Institute of CPAs Advanced Litigation Services Conference, Beverly Hills, California, October 17, 2000.

"Quantifying Damages in Environmental Disaster Litigation," Oregon State Bar Convention, Seaside, Oregon, September 29, 1995

"Issues in Risk Rate Selection Regarding Prejudgment Interest Rates," California Society of CPAs' Litigation Advanced Forum, San Diego, April 28, 1995.

"The Revised Federal Rules of Civil Procedure as They Apply to Expert Witnesses," various law firms in the Pacific Northwest, October 1993–March 1994.

"Common Mistakes Made by Damage Experts," Oregon Trial Lawyers Association Annual Conference, Sun River, Oregon, August 12, 1993.

**SPEECHES**
**(continued)**

"Damages Arising From Business and Commercial Claims," Oregon State Bar Continuing Legal Education Seminar, Portland, February 12, 1993.

"Improving Expert Witness Effectiveness," 1992 OSCPA Litigation Services Conference, Portland, September 25, 1992.

"Calculating a Reasonable Royalty," Price Waterhouse 1992 Litigation Managers Group Seminar, New Orleans, July 13–15, 1992.

"Damages Including Loss of Earnings," 1991 OSCPA Litigation Support Services Conference, Portland, September 27, 1991.

"Calculating a Reasonable Royalty," Price Waterhouse 1991 Litigation Managers Group Seminar, Denver, July 18–20, 1991.

## BRUCE L. McFARLANE
## CONSULTING AND TESTIMONY CASE LISTING

| | Lawsuit | Type | Testimony Dep | T | Dec | Court | Law Firm | Work Performed |
|---|---------|------|-----|---|-----|-------|----------|----------------|
| 1 | Cadence Design Systems, Inc. v. IMI Telecommunications, Inc. | P | Alter Ego | ☐ | ☐ | ☐ | U.S. District Court, Northern District of California; Case No. C 00-20430 JF/EAI (2001) | Cooley Godward/Melina Patterson | Analysis of financial factors applicable to doctrine of alter ego. |
| 2 | Comdisco, Inc. v. SocialNet, Inc., Match-Net, Inc., et al. | P | Alter Ego | ☐ | ☐ | ☐ | California Superior Court, Santa Clara County; Case No. CV 800 611 (2004) | Winston & Strawn | Alter ego analysis. |
| 3 | Atlas Electric, et al. v. National Association of Electrical Contractors | D | Antitrust | ☐ | ☐ | ☐ | U.S. District Court, Oregon (1993) | Lane Powell Spears Lubersky/Milo Petranovich | Damages analysis. |
| 4 | Flying J, Inc. v. Comdata Network, Inc. | D | Antitrust | ☐ | ☐ | ☐ | U.S. District Court, District of Utah Northern Division; Civil No. 1:96CV0066K (2000) | Giauque, Crockett, Bendinger & Peterson/Gary Bendinger, John Bogart | Analysis of lost profits damages in the trucker fuel card industry due to Comdata's violations of antitrust laws. |
| 5 | In re Currency Conversion Fee Antitrust Litigation | P | Antitrust | ☑ | ☐ | ☐ | US District Court; Southern District of New York; MDL Docket No. 1409 | Schrag & Baum/Tom Schrag; Steyer Lowenthal Boodrookas Alvarez & Smith/Allan Steyer; Lerach Coughlin Stioa & Robbins/Chris Burke | Respond to defendants' expert's analysis of defendant banks' net incremental cost to provide international credit card transactions. |
| 6 | Knutson Towboat, Inc. v. Coos Bay Pilots Association | P | Antitrust | ☑ | ☐ | ☐ | U.S. District Court, Oregon (1988) | Ragen, Tremaine, Krieger, Schmeer & Neil/John McGrory, Fred Aibe | Market share analysis; calculate plaintiff's lost profits. |
| 7 | Peace Northwest Corp. v. Merle West Medical Center | P | Antitrust | ☐ | ☐ | ☐ | U.S. District Court, Oregon (1988) | Perkins Coie/Michael Simon | Business valuation. |
| 8 | Patricia Vanderpool, et al. v. Allstate Insurance Company, et al. | P | Bad faith | ☐ | ☐ | ☐ | California Superior Court, Sacramento County; Case No. 02-AS01532 | Kershaw, Cutter, Ratinoff & York / Brooks Cutter | Analysis of auto premium overcharges due to improper mileage rating. |
| 9 | Black v. Finkelstein | P | Bankruptcy | ☐ | ☐ | ☐ | U.S. Bankruptcy Court, Central District of California (1988) | Ball, Janik & Novack/Ken Novack | Forensic accounting. |
| 10 | Continental Casualty Insurance Co. v. Lincoln Property Management Co. | P | Bankruptcy | ☐ | ☐ | ☐ | Pre-litigation (1990) | Chapman & Cutler | Forensic accounting. |
| 11 | First Interstate Bank of Oregon v. Latitude Marines, Inc. | P | Bankruptcy | ☐ | ☑ | ☐ | U.S. Bankruptcy Court, Oregon (1988) | Stoel, Rives, Boley, Jones & Grey/Bennett Goldstein | Forensic accounting; calculation of earnings. |
| 12 | State of California v. Rosendin, et al. | P | Bid rigging | ☐ | ☐ | ☐ | California Superior Court, Sacramento County (1992) | California State Attorney General/Tom Greene | Statistical analysis of bid data regarding electrical construction contracts. |
| 13 | State of California v. Sherwin, et al. | P | Bid rigging | ☐ | ☐ | ☐ | Sacramento County Superior Court; Case No. 95F00913 (1997) | California State Attorney General/Molly Alden | Statistical analysis of bid data regarding contracts to provide food services to state prisons. |

## BRUCE L. McFARLANE
## CONSULTING AND TESTIMONY CASE LISTING

| | Lawsuit | Type | | Testimony Dep | T | Dec | Court | Law Firm | Work Performed |
|---|---------|------|---|---|---|---|-------|----------|----------------|
| 14 | 3CX, Inc. v. Global Strategic Investment, Inc. | P | Breach of contract | ☐ | ☐ | ☐ | Pre-litigation | Werner & Burke/Ryan Werner | Determine value of 3CX shares pursuant to buy-out provision in shareholder agreement. |
| t5 | A.P.J. Associates, Inc. v. North American Phlips Corporation and Signetis Company | D | Breach of contract | ☐ | ☐ | ☐ | U.S. District Court, Eastern District of Michigan; Case No. 98-74911 | Banchero & Associates/Jeff Banchero | Determine compensation due plaintiff in connection with defendants' sales of microprocessors. |
| 16 | Advanced Business Telecommunications v. Pac Bell | D | Breach of Contract | ☐ | ☐ | ☐ | U.S. District Court, Central District of California (1993) | Orrick Herrington/Tom Gray | Respond to plaintiff's analysis of lost profits. |
| 17 | Bank One, Oklahoma, N.A. et al. v. Trammell Crow Services, Inc., et al. | D | Breach of Contract | ☐ | ☐ | ☐ | U.S. District Court, Northern District of Illinois, Eastern Division; Case No. 03 C 3624 | Jenner & Block / David Sanders | Analysis of Bank One's damages due to alleged errors contained in Trammel Crow's financial analysis of a real estate investment. |
| 18 | Brown v. Pacific Northwest Bell | D | Breach of contract | ☐ | ☑ | ☐ | American Arbitration Association (1988) | Schwabe, Williamson & Wyatt/Jay Waldron | Calculate plaintiff's damages due to breach of contract involving error in yellow page advertising. |
| 19 | Children's Hospital & Regional Medical Center v. Eclipsys Corporation | D | Breach of contract | ☐ | ☐ | ☐ | Superior Court of Washington For King County; Case No. 02-02-02361-1SEA (2003) | Richard Johnston, Lisa Cameron/Hale & Dorr | Determine plaintiff's damages due to defendant's alleged breach of contract to install a Clinical Information System at plaintiff's hospital. |
| 20 | CIAL v. Venture Imaging | D | Breach of contract | ☐ | ☐ | ☐ | Oregon Circuit Court, Multnomah County (1988) | Perkins Coie/Michael Simon | Damages analysis. |
| 21 | Cleghorn Bar Enterprises, et al. v. Museum Parc Partners, L.P., et al. | P | Breach of contract | ☐ | ☑ | ☐ | Arbitration; Case No. 74 180 00754 (San Francisco, 2002) | Banchero & Associates/Jeff Banchero, Nance Becker | Forensic accounting. Analysis of amounts due limited partners in San Francisco retail space limited partnership. |
| 22 | Computer Business Applications, Inc. v. Computer Development, Inc. | P | Breach of contract | ☐ | ☐ | ☐ | U.S. District Court, Central District of California (1994) | Perkins Coie/Doug Thorpe, Dan Johnson | Valuation of intellectual property. |
| 23 | Convergence Associates v. NaviSite, Inc. | P | Breach of contract | ☑ | ☑ | ☐ | Arbitration; JAMS Case No. 1100040436 | Russo & Hale/Jack Russo, Tim Hale, Mike Risch | Determine Convergence's earnout revenues absent NaviSite's alleged breach of purchase agreement. |
| 24 | David McDonald v. Silicon Valley Expert Witness Group, et al. | D | Breach of contract | ☑ | ☐ | ☐ | Superior Court of California; Santa Clara County; Case No. CV 809 162 | Russo & Hale/Jack Russo, Tim Hale, Mike Risch | Calculation of share value per terms of shareholder agreement. |
| 25 | Deutsch Technology Research v. OrCAD, Inc. | D | Breach of contract | ☐ | ☐ | ☐ | American Arbitration Association; Case No. 74 Y 117 01319 98 (1998) | Ater Wynne/Steve Blackhurst | Rebut plaintiff's damages analysis regarding breach of software distribution agreement. |
| 26 | DP-TEK Development Company v. Integrated Device Technology, Inc. | P | Breach of contract | ☐ | ☐ | ☐ | U.S. District Court, District of Kansas; Case No. 97-1541-JTM (1998) | Gibson, Dunn & Crutcher/Charles Ivie | Calculate plaintiff's damages resulting from defendant's breach of contract re software development. |

## BRUCE L. McFARLANE
## CONSULTING AND TESTIMONY CASE LISTING

| | Lawsuit | | Type | Testimony | | | Court | Law Firm | Work Performed |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Dep | T | Dec | | | |
| 27 | Eastman Kodak Company v. Calcomp Techology, Inc., et al. | D | Breach of contract | ☐ | ☐ | ☐ | Superior Court of California; County of Orange (2000) | Irell & Manella/Ken Heitz | Determine plaintiff's damages due to defendant's failure to develop inkjet printer technology. |
| 28 | F. M. Nicholas Co., Inc. v. AMP, Inc. | P | Breach of contract | ☐ | ☐ | ☐ | U.S. District Court, Northern District of California; Case No. C 00 2731 MEJ (2000) | Banchero & Associates/Jeff Banchero | Analysis of plaintiff's damages due to defendant's breach of distributor agreement. |
| 29 | fourthchannel, inc. v. Pivotal Corporation | D | Breach of contract | ☐ | ☐ | ☐ | American Arbitration Association; Case No. 50 T 133 00200 (2001) | Dorsey & Whitney/Peter Sipkins | Analysis of plaintiff's damages due to defendant's breach of software development and license agreement re internet commerce software. |
| 30 | Fred Meyer v. A.T. Kearney | D | Breach of contract | ☐ | ☐ | ☐ | Oregon Circuit Court, Multnomah County (1992) | Bullivant, Houser, Baily Pendergrass & Hoffman/ Doug Houser, Dan Lindahl | Damages analysis related to failed computer system installation. |
| 31 | Glass & Associates v. Factory Mutual Insurance Company | P | Breach of contract | ☐ | ☐ | ☐ | U.S. District Court, District of Oregon; Civil No. 99-6105-HO (2000) | Ball Janik/Rick Stone | Determine damages to plaintiff's plywood mill due to insurance company's bad faith in settlement of business interruption claim. |
| 32 | Green Hills Software, Inc. v. Integrated Software, Inc. | P | Breach of contract | ☐ | ☐ | ☐ | Arbitration; Case No. 72 117 01213 97 | Munger Tolles & Olson/Greg Stone, Kelly Klaus | Calculate plaintiff's damages resulting from defendant's breach of software license agreement. |
| 33 | Hifn, Inc. v. Intel Corporation | P | Breach of Contract | ☑ | ☐ | ☐ | Superior Court for the State of Delaware, County of New Castle. Case No. 05C-06-052-PLA | Tom Moore Law Group / Tom Moore | Calculate damages due to Intel's breach of technology license and purchase agreement. |
| 34 | Honey Baked Ham, Inc., et al. v. Pilgrim's Pride Corporation | P | Breach of contract | ☐ | ☐ | ☐ | U.S. District Court, Central District of California (Santa Ana); Case No. SACV 04-01158 | Peterson, Weyand & Martin / Kurt Peterson | Calculation of lost profits due to Pilgrim's failure to timely deliver food products. |
| 35 | Honey Baked Hams, Inc. v. Towne, Inc. | P | Breach of contract | ☐ | ☐ | ☐ | Superior Court of the State of California, County of Orange (2002) | Peterson Weyand & Martin/Kurt Peterson | Determine Honey Baked Hams' damages due to printing of incorrect telephone number in mailing catalog. |
| 36 | Ion Beam Applications, Inc. v. Outrigger Systems, Inc., et al. | D | Breach of Contract | ☐ | ☐ | ☐ | California Superior Court, Santa Clara County; Case No. 1-03-CV-006620 | Orrick Herrington & Sutcliffe/Matt Poppe | Analysis of balance due on promissory notes. |
| 37 | Kaiser Aerospace & Electronics v. Teledyne Industries | P | Breach of contract | ☑ | ☐ | ☐ | 11th Judicial Circuit Miami - Dade County, Florida; Civil Action No. 95-05288-CA-15 (2001) | Weil Gotshal & Manges/Ed Soto, Oscar Cantu, Gina Dombosch | Determine damages due to defendant's breach of contract to jointly acquire Piper Aircraft Corporation's assets out of bankruptcy. Business valuation. |

**BRUCE L. McFARLANE**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | Type | Testimony Dep | T | Dec | Court | Law Firm | Work Performed |
|---|---|---|---|---|---|---|---|---|
| 38 | Legacy Health Hospitals v. Aramark Corporation | P | Breach of contract | ☐ | ☐ | ☐ | Oregon Circuit Court, Multnomah County (1999) | Ball Janik/Rick Stone, Bruce Conn | Determine damages to Legacy Health Hospitals resulting from Aramark's breach of Management Services Agreement. |
| 39 | Market Transport, Inc. v. Wackenhut Corp. | P | Breach of contract | ☐ | ☐ | ☐ | Oregon Circuit Court, Multnomah County (1990) | Markowitz, Herbold, Stafford & Glade/Burt Stafford | Damages/business interruption analysis. |
| 40 | Micky Novak v. Seiko Corp., et al. | P | Breach of contract | ☐ | ☐ | ☐ | U.S. District Court, Oregon; Case No. CV 99 1022 RE (2000) | Elliott & Park/Dennis Elliott | Determine reasonable compensation for plaintiffs role regarding defendants' sales of sport watches to Nike. |
| 41 | Moving Media, Inc. v. Speck Cab Company. | P | Breach of contract | ☐ | ☑ | ☐ | Superior Court of California, County of San Francisco; Case No. 978740 (2001) | Werner & Burke/Ryan Werner | Analysis of damages due to defendant's breach of advertising contract. |
| 42 | Oregon Metallurgical Corp. v. Burlington Northern & Santa Fe Railway Company, CSX Transportation Company | P | Breach of contract | ☑ | ☑ | ☐ | US District Court, District of Oregon; Case No. 01-1052-HA (2001) | Lane Powell Spears Lubersky/Met Wilson, Milo Petranovich | Analysis of damages due to late railcar deliveries of raw material used in manufacture of titanium sponge. |
| 43 | Ostex International, Inc. v. Boehringer Mannheim | P | Breach of contract | ☐ | ☐ | ☐ | American Arbitration Association; Case No. 79T184 00192 95 (1996) | Mundt, MacGregor, Happel, Falconer, Zulauf & Hall/Jay Zulauf | Determine damages due to defendant's breach of contact to promote plaintiff's osteoporosis testing technology. |
| 44 | PC Designs, Inc. v. GN Hello Direct | P | Breach of contract | ☐ | ☐ | ☐ | Arbitration (Florida) | Andrews & Galatis / Ted Galatis | Determine additional royalties due per license agreement. |
| 45 | Polo Ralph Lauren L.P. v. The Magnin Company, Inc. | D | Breach of contract | ☐ | ☐ | ☐ | American Arbitration Association   (1997) | Browne & Woods/Eddie Woods | Determine damages due to defendant's breach of franchise agreement by not allowing plaintiff to open a Polo Ralph Lauren store at LAX International Airport. |
| 46 | Prestige Card, Inc. v. Bank One, et al. | D | Breach of contract | ☐ | ☑ | ☐ | Arbitration  (1998) | Lane Powell Spears Lubersky/Met Wilson | Analysis of lost profits due to defendant's breach of contract to develop affinity credit card program. |
| 47 | Pyramed, Inc. v. Caremark, Inc. | D | Breach of contract | ☐ | ☐ | ☐ | American Arbitration Association (1989) | Spears, Lubersky, Bledsoe, Anderson, Young & Hilliard/Bob Maloney | Damages analysis. |
| 48 | Raikow v. Frontier Jeep Eagle | D | Breach of contract | ☐ | ☑ | ☐ | Arbitration (1991) | Betts, Patterson & Mines/James Nelson, Lori Guzzo; Stoll, Stoll, Berne & Lokting/Rob Shlachter | Forensic accounting; determine profit earned by auto dealership. |
| 49 | Retail Distributor v. Wholesale Manufacturer (disclosure of parties precluded by settlement agreement) | P | Breach of Contract | ☐ | ☐ | ☐ | Disclosure precluded by settlement agreement | Henniley & Grossfeld / Orlando Cabanday, Ryan Jike | Analysis of plaintiff's lost profits due to alleged breach of contract regarding allocation of product among retail distributors. |

**BRUCE L. McFARLANE**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | Type | Testimony Dep | T | Dec | Court | Law Firm | Work Performed |
|---|---|---|---|---|---|---|---|---|
| 50 | Seer Systems, Inc. v. Creative Technology, Ltd. | P Breach of contract | ☐ | ☐ | ☐ | Superior Court of California, County of Santa Clara, Case No. CV 793916 | Peterson Weyand & Martin/Alex Weyand | Determine lost profits due to defendant's breach of technology licensing agreement. |
| 51 | Seymon v. EASI, Inc., et al. | P Breach of contract | ☐ | ☑ | ☐ | Superior Court of California, County of San Joaquin; Case No. CV010303 (2001) | Chadeayne, Burns & Leachman/Ron Leachman | Valuation of goodwill value of EASI, Inc. |
| 52 | SMS Automotive v. Allied Signal | D Breach of contract | ☐ | ☐ | ☐ | U.S. District Court, Pennsylvania (1992) | Duane, Morris & Hecksher | Damages analysis/ business valuation. |
| 53 | Tarkington, O'Connor & O'Neill v. Fireman's Fund Insurance Companies | D Breach of contract | ☐ | ☐ | ☐ | California Superior Court; County of San Francisco; Case No. 958950 (1996) | Rice, Fowler, Booth & Banning/Kurt Micklow | Analysis of factors contributing to plaintiff's financial decline. |
| 54 | TRW, Inc. v. Talley Industries, Inc., et al. | D Breach of contract | ☐ | ☐ | ☐ | U.S. District Court, District of Arizona; Civil Action 94-0350-PHX-PGR (1995) | Donovan, Leisure, Newton & Irving/Jeff Conciatori | Calculate defendant's damages resulting from plaintiff's breach of contract regarding sales of air bag technology. |
| 55 | Ultratech Stepper v. Dynamic Automated Systems, Inc. | P Breach of contract | ☐ | ☐ | ☐ | Arbitration (San Francisco; 2001) | Russo & Hale/John Kelley, Mike Risch | Determine plaintiff's damages due to defendant's breach of contract to develop high speed material handler used in semiconductor manufacturing. |
| 56 | United Computer Systems, Inc. v. AT&T | D Breach of contract | ☐ | ☐ | ☐ | American Arbitration Association; No. 72 117 1362 9t (1998) | Orrick Herrington & Sutcliff/Bob Freitas | Rebut plaintiff's lost profits damages analysis re breach of software development contract. |
| 57 | Wolfgang Brox v. Andreas Peneder | P Breach of contract | ☐ | ☑ | ☐ | California Superior Court, County of Napa; Case No. 26-25972 | Kastner Banchero / Jeff Banchero | Determine damages from operation and sale of partnership that owned The Candlelight Inn in Napa, CA. |
| 58 | WSI v. Port of Portland | P Breach of contract | ☐ | ☐ | ☐ | Oregon Circuit Court, Multnomah County (1991) | Bogle & Gates/Dave Canary | Determine damages due to defendant's breach of contract to repair dry dock ship repair facilities. |
| 59 | insureon.com v. Philadelphia Indemnity Insurance Company, et al. | P Breach of contract, bad faith | ☑ | ☐ | ☐ | Superior Court of California, County of Alameda (2002) | Werner & Burke/Ryan Werner, Joe Burke | Analysis of damages due to defendants failure to fund defense of trademark infringement suit filed against insureon. |
| 60 | LASVN#2, et. al. v. Vann Ness and Sperry, et. al. | P Breach of contract, breach of fiduciary duty | ☐ | ☐ | ☐ | Los Angeles Superior Court, California; Case No. BC 206251 (2002) | Krane & Smith/Marc Smith | Determine plaintiff's damages due to wrongful termination of commercial real estate brokerage. |
| 61 | Ainslie, et al. v. First Interstate Bank of Oregon | D Breach of fiduciary duty | ☐ | ☐ | ☐ | Oregon Circuit Court, Multnomah County (1993) | Lane Powell Spears Lubersky/Met Wilson | Analysis of defendant's compliance with terms of escrow agreement. |

**BRUCE L. McFARLANE**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | Type | Testimony Dep | Testimony T | Testimony Dec | Court | Law Firm | Work Performed |
|---|---|---|---|---|---|---|---|---|
| 62 | Huntington Bank, Inc. v. Gilchrist Timber Company | D | Breach of fiduciary duty | ☐ | ☐ | ☐ | U.S. District Court, Oregon; (1993) | Ater, Wynn, Hewitt, Dodson & Skerritt/Steve Blackhurst | Financial analysis. Business valuation. |
| 63 | Ingersoll-Rand Financial Corp. v. First Interstate Bank of Oregon | D | Breach of fiduciary duty | ☐ | ☐ | ☐ | U.S. District Court, Oregon (1993) | Lane Powell Spears Lubersky/Met Wilson, Tim Harmon | Analysis of defendant's compliance with terms of escrow agreement. |
| 64 | Oregon Dental Association v. United States National Bank | P | Breach of fiduciary duty | ☐ | ☐ | ☐ | U.S. District Court, Oregon (1988) | Perkins Coie/Michael Simon | Jury award distribution analysis. |
| 65 | Supra Corporation v. D.L. Horton Enterprises, Inc. | P | Breach of fiduciary duty | ☐ | ☐ | ☐ | Superior Court of California, County of Los Angeles; Case No. BC 093085 (1995) | Stradling, Yocca, Carlson & Rauth/Julie McCoy Akins | Calculate plaintiff's lost profits due to business interruption. |
| 66 | Bernhart v. Johnson | P | Breach of franchise agreement | ☐ | ☐ | ☐ | Washington State Superior Court, King County (1994) | Preston, Gates & Ellis/Carol Arnold | Calculate damages due to alleged wrongful termination of real estate franchise agreement |
| 67 | The Commissioner of Insurance of the State of Michigan v. Harris Trust and Savings Bank, et al. | D | Breach of trust | ☐ | ☐ | ☐ | Michigan Circuit Court, Ingham County (1996) | Winston & Strawn/Mark Rotert, Carloyn McNiven | Transactional analysis of trust account activity; damages analysis. |
| 68 | Emerson Radio Corp. v. G&C Distributing | P | Breach of warranty | ☑ | ☐ | ☐ | American Arbitration Association (1988) | Ball, Janik & Novack/Ken Novack | Analysis of defendant's sales, calculate lost profits. |
| 69 | General Chemical v. Nisshin Gulf Coast, Inc. | P | Breach of warranty | ☐ | ☐ | ☐ | California Superior Court, County of San Francisco; Case No. 306072 (2000) | Banchero & Associates/Jeff Banchero, Nance Becker | Calculate plaintiff's damages caused by failure of defendant's equipment used in the manufacture of high purity sulfuric acids. |
| 70 | I. B. Fischer v. Foodmaker, Inc. | P | Breach of warranty | ☐ | ☐ | ☐ | N/A (1993) | Milbank, Tweed, Hadley & McCloy/Rick Stone, Betsy Lear | Determine damages due to defendant's provision of e coli tainted meat to Jack in The Box franchisee. |
| 71 | Lewis River Golf Course v. Scott Seed Company, Inc. | D | Breach of warranty | ☐ | ☐ | ☐ | U.S. District Court, Western District of Washington (1988) | Schwabe, Williamson & Wyatt/Donald Joe Willis | Determine damages due to defendant's provision of incorrect grass seed. |
| 72 | LHS Communications Systems, Inc. v. Pacific Bell Mobile Services. | D | Breach of warranty | ☑ | ☑ | ☐ | Arbitration; Case No. 30 Y 181 00786 99 (San Francisco, 2001) | Orrick, Herrington & Sutcliffe/Matt Poppe, Chris Ottenweller | Prepare counterclaim damages analysis regarding failure of plaintiff's billing software program. |
| 73 | Virtual Silicon Technology, Inc. v. Library Technologies, Inc. | P | Breach of warranty | ☐ | ☐ | ☐ | American Arbitration Association (San Francisco, 2003) | Russo & Hale/Tim Hale, John Kelley, Mike Risch | Analysis of damages due to alleged deficiencies in defendant's standard cell library software. |
| 74 | Ball, Ball, Brosamer, Inc. v. Myles Lorentz, Inc. | P | Business devastation | ☐ | ☐ | ☐ | District Court, City and County of Denver, Colorado; Civil Action #93 CV 1234 (1995) | Holland & Hart/Robert Benson, Ian Karpel | Analysis of factors contributing to defendant's bankruptcy. |

**BRUCE L. McFARLANE**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | Type | Dep | T | Dec | Court | Law Firm | Work Performed |
|---|---|---|---|---|---|---|---|---|
| | | | Testimony | | | | | |
| 75 | Adam Schwartz v. VISA International Corp., MasterCard International, Inc. et al. | P | California Business & Professions Code § 17200 | ☑ | ☑ | | Superior Court of California, County of Alameda; Case No. 822404-4 (2001) | Schrag & Baum/Tom Schrag; Steyer Lowenthal Boodrookas Alvarez & Smith/Allan Steyer; Millberg Weiss/Chris Burke | Prepare cost and profitability analysis of multicurrency conversion settlement system. |
| 76 | Lussier Subaru, et al v. Subaru of New England, Inc., et al. | P | Class Action | ☐ | ☐ | ☐ | U.S. District Court, District of New Hampshire; Case No. C-99-109-B (2000) | Kronick, Moskovitz, Tiedemann & Girard/Bill Kershaw; Wiggin & Nourie/Rich McNamara | Determine damages to class of Subaru dealers due to over accessorization of cars. |
| 77 | Cleghorn Bar Enterprises, et al. v. Garlock, et al. | P | Complaint for Indemnity | | ☑ | | California Superior Court, County of San Francisco; Case No. CGC 04-432322 (2005) | Kastner Banchero / Jeff Banchero | Forensic accouting analysis. Determine amounts owing plaintiffs. |
| 78 | Yield Dynamics v. Macrovision, et al. | P | Copyright infringement | ☐ | ☐ | ☐ | United States District Court, Northern District of California (2003) | Russo & Hale/Tim Hale | Analysis of plaintiff's damages due to defendants alleged use of plaintiff's software code. |
| 79 | Bayshore Ford Truck Sales, Inc. et al. v. Ford Motor Company | P | Dealer termination | ☐ | ☐ | ☐ | U.S. District Court, District of New Jersey; Case No. 99 cv 741 (JCL) | Kronick, Moskovitz, Tiedemann & Girard/Bill Kershaw, Lyle Cook, Jonathan Renner | Calculate damages for class of truck dealers regarding Ford's sale of its heavy duty truck business to Freightliner. |
| 80 | Blount v. Oregon Tractor | D | Dealer termination | | | | Oregon Circuit Court, Multnomah County (1992) | Perkins Coie/Chris Angius | Determine damages due to plaintiff's alleged wrongful termination of franchise agreement. |
| 81 | Lusk v. Jiffy Lube | D | Dealer termination | ☐ | ☐ | ☐ | California Superior Court, Sacramento County (1992) | Porter, Scott, Weibert & Delehart | Analysis of plaintiff's damages due to termination of franchise agreement. |
| 82 | Meyers v. UNOCAL | P | Dealer termination | ☐ | ☐ | ☐ | U.S. District Court, Oregon (1991) | James, Denecke & Harris/Roger Harris | Analysis of plaintiff's damages due to termination of franchise agreement. Business valuation. |
| 83 | The Communications Group v. GTE Mobilnet | D | Dealer termination | | | | Oregon Circuit Court, Multnomah County (1992) | Lane Powell Spears Lubersky/Met Wilson, George Kirkland | Analysis of plaintiff's damages due to termination of franchise agreement. |
| 84 | Benchmark Designs of California v. D.W. Industries, Inc., et al. | P | Dissenting minority shareholder | | | | Oregon Circuit Court, Multnomah County; Case No. 9408-05328 (1995) | Larry Sokol & Associates/ Larry Sokol | Valuation of minority shareholder interest. |
| 85 | State of California v. Bio-Rad | D | Eminent domain | ☐ | ☐ | ☐ | Alameda Superior Court, California (1992) | Law offices of James Whitaker/Jim Whitaker | Determine damages resulting from state of California seizing defendant's land through eminent domain in connection with construction of highway. |
| 86 | General Electric | P | Environmental contamination | ☐ | ☐ | ☐ | N/A (1995) | GE in-house counsel | Estimate costs to remediate contaminated sites. |

**BRUCE L. McFARLANE**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | Type | Testimony Dep | T | Dec | Court | Law Firm | Work Performed |
|---|---|---|---|---|---|---|---|---|
| 87 | Lowe's Home Centers, Inc. v. General Electric Company | D | Environment al contamination | ☐ | ☐ | ☐ | U.S. District Court, Northern District of Georgia; Case No. 4:98-CV-0028-HLM (2000) | Williams & Connolly/Steve Kuney, Bob Shaughnessy | Rebut plaintiff's lost profits damages analysis regarding lost opportunity to open a Lowes superstore in Rome, GA. |
| 88 | NEC Technologies v. Samsung | P | False advertising / Lanham Act | ☐ | ☐ | ☐ | U.S. District Court, Northern District of Illinois (2001) | Bates & Carey/Richard Nicolaides | Analysis of plaintiff's damages due to defendant's false advertisements re flat panel pc monitors. |
| 89 | Damerow Ford v. Prebble | P | Fraud | ☐ | ☐ | ☐ | Oregon Circuit Court, Multnomah County (1989) | Schwabe, Williamson & Wyatt/Tom Dulcich, Peter Ozanne | Forensic accounting. Investigation of possible fraud by operating partner of auto dealership. |
| 90 | Eulrich v. Snap-On Tools Corp. | D | Fraud | ☐ | ☐ | ☐ | Oregon Circuit Court, Linn County  (1990) | Spears, Lubersky, Bledsoe, Anderson, Young & Hilliard/Milo Petranovich | Determine damages due to defendant's alleged wrongful termination of franchise agreement. |
| 91 | First Interstate Bank of Oregon v. C&B Livestock, Inc. | P | Fraud | ☐ | ☐ | ☐ | N/A (1991) | Weiss, Jensen, Ellis & Botteri/Charlie Starkey | Forensic accounting. Analysis of defendant's financial reporting. |
| 92 | Hammersmith v. Taco Bell Corp. | D | Fraud | ☐ | ☐ | ☐ | U.S. District Court, Oregon (1990) | Skadden, Arps, Slate, Meagher & Flom | Determine damages due to defendant's alleged wrongful termination of franchise agreement. |
| 93 | PG&E v. Satrap | P | Fraud | ☐ | ☐ | ☐ | Pre-litigation (1989) | PG&E's Internal Audit Department | Forensic accounting. Analysis of terms of natural gas contracts PG&E entered into  with gas suppliers. |
| 94 | Pioneer Liquidating Corporation v. San Diego Trust & Savings Bank, et al. | D | Fraud | ☐ | ☐ | ☐ | United States District Court, Southern District of California; Case No. 94-361 (1995) | Post, Kirby, Noonan & Sweat/David Noonan, Steve Sanchez | Analysis of check kiting scheme.  Analyze and respond to plaintiff's damages theories and calculations. |
| 95 | State of Oregon v. Vendu Services, Inc. | P | Fraud | ☐ | ☐ | ☐ | Oregon Circuit Court, Marion County (1993) | Oregon State Attorney General/Gene Ebersole | Forensic accounting; calculation of defendant's unreported sales revenue. |
| 96 | Jo Edward Enterprises, Inc. v. Ball, Ball, Brosamer, Inc., et al. | D | Fraud, breach of contract | ☐ | ☐ | ☐ | District Court, City and County of Denver, Colorado; Civil Action #9 CV 4495 (1995) | Holland & Hart/Robert Benson, Todd Miller | Forensic accounting. Analysis of invoice and payment transactions. |
| 97 | Paul Miller v. Bank of America | D | Fraud, Unfair Business Practices | ☑ | ☑ | ☐ | Superior Court of California; San Francisco County; Case No. 301917 | The Sturdevant Law Firm/Jim Sturdevant, Mark Johnson, Jesper Rasmussen | Determine NSF fees charged to class. Profitability analysis. |
| 98 | Dorothee Dary, et al. v. William and Lee Ann Gilbert, et al. | D | Fraudulent transfer | ☑ | ☐ | ☐ | Superior Court of California; San Mateo County; Case No. 406876 | Werner & Burke/Ryan Werner, Joe Burke | Determine goodwill value of saloon. |

**BRUCE L. McFARLANE**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | Type | Testimony Dep | T | Dec | Court | Law Firm | Work Performed |
|---|---|---|---|---|---|---|---|---|
| 99 | Christensen Yachts v. New Hampshire Insurance | P | Insurance claim | ☐ | ☐ | ☐ | Arbitration (1992) | N/A | Determine economic impact on yacht manufacturer following destruction of manufacturing facility by fire. |
| 100 | Virgin Vision, Ltd. v. The Samuel Goldwyn Co. | P | Intellectual property | ☐ | ☐ | ☐ | California State Superior Court, Los Angeles County; No. BC-013701 (1994) | Law Offices of James P. Tierney/Susan Cleary | Determine damages due to defendant's failure to post listing in film credits. |
| 101 | Phase Metrics, Inc. v. Magnetic Recording Solutions, Inc., et al. | D | Intentional interference with prospective business advantage | ☐ | ☐ | ☐ | U.S. District Court, Northern District of California; Case No. C-98-1799-CAL | Hoge, Fenton, Jones & Appel/Howard Lloyd, Bill Bretschneider | Calculate plaintiff's damages resulting from defendant's interfering with plaintiff's contract with third party concerning sale of hard disk drive testing equipment manufacturer. |
| 102 | Collegenet, Inc. v. Embark.com, Inc. | D | Lanham Act | ☐ | ☐ | ☐ | U.S. District Court, Oregon; Case No. CV 00 981 ST | Stoll, Stoll, Berne, Lokting & Shlachter/Robert Stoll | Determine plaintiff's damages due to alleged false statements by defendants regarding online college application website service. |
| 103 | Monogram Aerospace Fasteners, Inc. v. The Fairchild Corporation | D | Lanham Act | ☑ | ☐ | ☐ | Los Angeles Superior Court (2001) | Irell & Manella/Tom Foley, Mike Ermer | Determine plaintiff's damages due to wrongful termination notice. |
| 104 | Southland Sod Farms v. Stover Seed Company, et al. | P | Lanham Act | ☐ | ☐ | ☐ | U.S. District Court, Central District of California; Civil No. 92-4894-JMI (1994) | Nordman, Cormony, Hair & Compton/Bob Compton | Determine damages due to defendant's alleged false advertising regarding proprietary grass seed. |
| 105 | Tube Forgings, Inc. v. Weldbend, Inc. | D | Lanham Act | ☐ | ☐ | ☐ | U.S. District Court, Oregon (1992) | Mayer, Brown & Platt/Tom McNeill | Determine damages due to defendant's alleged false advertising regarding carbon steel butt-weld pipe fittings. |
| 106 | Chain Tool Co. v. Workman, Nydegger & Jensen, et al. | P | Legal malpractice | ☐ | ☐ | ☐ | Third District Court, Utah (1990) | Wilkins, Oritt & Headman/Jeff Oritt | Determine damages due to defendant law firm's failure to procure foreign patent protection for U.S. patented chain tool device. |
| 107 | Dr. Magda Botez v. Herzfeld & Rubin, International Housing Systems, Inc. | P | Legal malpractice | ☐ | ☐ | ☐ | Superior Court of the State of California, County of Los Angeles; Case No. BC 192893 | Green, Broillet, Taylor, Wheeler & Panish/Bruce Broillet, Scott Carr | Prepare valuation analysis of hotel/spa opportunity in Romania. |
| 108 | First Interstate Bank of Oregon v. Haynes & Waldon Farms, Inc. | P | Lender liability | ☐ | ☐ | ☐ | Oregon Circuit Court, Deschutes County (1989) | Marceau, Karnopp, Peterson, Noteboom & Hubel/Martin Hansen | Forensic accounting. Determine cause of failure of defendant's potato farming operation. |
| 109 | Hrebec Properties, Inc. v. First Interstate Bank of California | D | Lender liability | ☐ | ☐ | ☐ | Oregon Circuit Court, Multnomah County (1991) | Lane Powell Spears Lubersky/Bob Maloney | Calculate damages due to defendant's alleged breach of contract to provide funding for construction of apartment complex. |

**BRUCE L. McFARLANE**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | Type | Testimony Dep | T | Dec | Court | Law Firm | Work Performed |
|---|---|---|---|---|---|---|---|---|
| 110 | JRS Products v. Network Office Systems | P | Libel | ☐ | ☐ | ☐ | Sacramento County Superior Court, California; Case No. 95 AS 04411 (1997) | Law Offices of Richard Hart/ Richard Hart | Compute plaintiff's lost profits. |
| 111 | McCaw v. McCaw | P | Marital dissolution | ☐ | ☐ | ☐ | King County Superior Court, Washington; Case No. 95-3-07235-0 SEA (1997) | Perkins Coie; Danielson, Harrigan & Tollefson; Kinzel, Allan, Skone & Searing; Law Offices of Gordon Wilcox | Investigatory accounting regarding divorce. |
| 112 | Orem v. Orem | P | Marital dissolution | ☐ | ☐ | ☐ | Oregon Circuit Court, Klamath County (1993) | Jemes, Denecke & Harris/Richard Urrutie | Business valuation; valuation of marital estate. |
| 113 | Sohn v. Sohn | P | Marital dissolution | ☐ | ☐ | ☐ | Oregon Circuit Court, Douglas County (1991) | Hutchinson, Anderson, Cox, Parrish & Coons | Business valuation. |
| 114 | E. L. Hamm & Associates, Inc. v. American Management Systems, Inc., et al. | D | Misappropriation of intangible assets | ☐ | ☐ | ☐ | U.S. District Court, Eastern District of Virginia, Norfolk Division; Case No. 2:98cv1046 | Shaw Pittman Potts & Trowbridge/Ralph Taylor; Kaufman & Canoles/Steve Noona | Rebut plaintiff's damages analysis regarding valuation of computer graphics marketing material. |
| 115 | Franklin v. Johnny Limbo & The Lugnuts | P | Partnership dissolution | ☐ | ☐ | ☐ | Oregon Circuit Court, Multnomah County (1994) | Jolles, Sokol & Berstein/Bernie Jolles | Prepare valuation analysis of band member's interest in partnership. |
| 116 | Advanced Video Graphics v Microsoft | P | Patent Infringement | ☐ | ☐ | ☐ | US District Court, Eastern District of Texas; Case No. 6:05cv006 LED | McKool & Smith / Chris Harrington | Calculation of damages due to Microsoft's infringement of patents regarding pre-emptive multitasking in a computer operating system. |
| 117 | Altana Pharma, AG and Wyeth v. Teva Pharmaceuticals USA, Inc. and Teva Pharmaceuticals, Ltd. | D | Patent Infringement | ☐ | ☐ | ☑ | U.S. District Court, District of New Jersey | Merchant & Gould / Chris Sorenson | ANDA case. Provide declaration testimony regarding methodologies and ability to quantify patent infringement damages allegedly resulting from introduction of generic version of Protonix (Pantoprazole). |
| 118 | Apple Computer, Inc. v. Burst.com, Inc. | D | Patent Infringement | ☐ | ☐ | ☑ | U.S. District Court, Northern District of California; Case No. 06-CV-00019 MHP | Susman Godfrey / Floyd Short | Analysis of reasonable royalty damages due to Apple's alleged infringement of Burst.com's patents related audio and video data storage and tramission. |
| 119 | Atari Corporation v. Sega of America, Inc. | P | Patent Infringement | ☐ | ☐ | ☐ | U.S. District Court, Northern District of California (1994) | Flehr, Hohbach, Test, Albritton & Gerbert/Richard Doyle, Jr. | Calculate reasonable royalty damages related to patented video game technology. |
| 120 | Atari v. Nintendo | P | Patent Infringement | ☐ | ☐ | ☐ | U.S. District Court, Northern California (1992) | Knobbe, Martens, Olson & Bear | Calculate reasonable royalty damages related to patented video game technology. |
| 121 | Avia v. Nike, Inc. | D | Patent Infringement | ☐ | ☐ | ☐ | U.S. District Court, Oregon (1992) | Baker & Botts/Scott Partridge, Tim Durst | Calculate reasonable royalty damages regarding air sole shoe technology. |

**BRUCE L. McFARLANE**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | Type | Testimony Dep | T | Dec | Court | Law Firm | Work Performed |
|---|---|---|---|---|---|---|---|---|
| 122 | Brent Townshend v. Rockwell Semiconductor Systems, Inc., et al. | P | Patent Infringement | ☐ ☐ | ☐ | Superior Court of California, County of San Mateo (1998) | Wilson Sonsini Goodrich & Rosati/Ken Wilson, Betsy Lear | Calculate lost profits and reasonable royalty damages due to Rockwell's infringement of Townshend's patents regarding 56k modem technology. |
| 123 | Cylink Corporation v. RSA Data Security, Inc. | D | Patent Infringement | ☐ ☐ | ☐ | U.S. District Court, Northern District of California (1995) | Tomlinson, Zisko, Morosoli & Maser/Jim Busselle, Tom Moore | Calculate reasonable royalty damages regarding data encryption technology. |
| 124 | Datascape, Inc. v. Kyocera Wireless Corp., Inc. | P | Patent Infringement | ☐ ☐ | ☐ | U.S. District Court, Northern District of Georgia. Civil Action No. 1:05-CV-1651-CC | Robins Kaplan Miller & Ciresi / Steve Risley, Scott Culpepper | Determine reasonable royalty damages due to Kyocera's infringment of portfolio of patents related to WAP enabled cellular telephones. |
| 125 | Datascape, Inc. v. Sony Ericsson Mobile Communications, Inc. | P | Patent Infringement | ☐ ☐ | ☐ | U.S. District Court, Northern District of Georgia. Case No. f:05-CV-3317-CC | Robins Kaplan Miller & Ciresi / Steve Risley, Scott Culpepper | Determine reasonable royalty damages due to Sony Ericsson's infringment of portfolio of patents related to WAP enabled cellular telephones. |
| 126 | Datascape, Inc. v. UTStarcom, Inc. | P | Patent Infringement | ☐ ☐ | ☐ | U.S. District Court, Northern District of Georgia. Case No. 1:05-CV-3164-CC | Robins Kaplan Miller & Ciresi / Steve Risley, Scott Culpepper | Determine reasonable royalty damages due to UTStarcom's infringment of portfolio of patents related to WAP enabled cellular telephones. |
| 127 | Eastman Kodak Company v. Sony Corporation | P | Patent Infringement | ☐ ☐ | ☐ | U.S. District Court, Eastern District of Texas (1993) | Jones, Day, Reavis & Pogue/Jim Wamsley, Leo Aggazino | Calculate reasonable royalty damages regarding microgap camcorder technology. |
| 128 | Elantech Devices Corporation v. Synaptics, Inc. | D | Patent Infringement | ☐ ☐ | ☐ | U.S. District Court, Northern District of California, Case No. C 06-01839 | Morrison & Foerster / Karl Kramer | Analysis of lost profits and reasonable royalty damages due to Synaptics's alleged infringement of Elantech's patents related to touch sensor pads. |
| 129 | Electro Scientific Industries, Inc. v. Dynamic Details, Inc., GSI Lumonics, Inc. | D | Patent Infringement | ☐ ☐ | ☐ | U.S. District Court, Central District of California; No. SACV00-272 AHS (2001) | Knobbe, Martens, Olson & Bear/Don Martens, Paul Stewart | Rebut patentee's lost profits and reasonable royalty damages analysis re patent for microvia laser drilling system. |
| 130 | Elk Industries, Inc. v. Glenayre Electronics, Inc. | P | Patent Infringement | ☐ ☐ | ☐ | U.S. District Court, Southern District of Florida (1993) | Christensen O'Connor Johnson Kindness/Jim Uhlir | Calculate reasonable royalty damages regarding electronic aviation technology. |
| 131 | Engineered Products Co., v. Donaldson Company, Incorporated. | D | Patent Infringement | ☐ ☐ | ☐ | U.S. District Court, Northern District of Iowa; Case No. 98-2106MJM (2000) | Robins, Kaplan, Miller & Ciresi/Annamarie Daley, Ken Hall | Rebut plaintiff's lost profits and reasonable royalty analysis re air restriction indicators. |

**BRUCE L. McFARLANE**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | Type | Testimony Dep | T | Dec | Court | Law Firm | Work Performed |
|---|---|---|---|---|---|---|---|---|
| 132 | GraphOn Corp. v. Autotrader.com, Inc. | P Patent Infringement | ☑ | ☐ | ☐ | U.S. District Court, Eastern District of Texas. Civil Action No. 2:05-CV-530 (JTW) | Watson Rounds / Michael Rounds | Determine reasonable royalty damages due to Autotrader's alleged infringement of GraphOn patents related to automated online service and directory technology. |
| 133 | HPD Laboratories, Inc. v. The Clorox Company | D Patent Infringement | ☐ | ☐ | ☐ | US District Court; Northern District of California (2001) | Morrison & Foerster/Mike Carlson, Brooks Beard | Determine lost profits and reasonable royalty damages due to defendants infringement of patents regarding toilet bowl cleaner technology. |
| 134 | Huse v. Stratagene | P Patent Infringement | ☐ | ☐ | ☐ | California Superior Court, San Diego County (1991) | Pillsbury, Madison & Sutro/Ina Risman | Calculate reasonable royalty damages regarding cloning technology. |
| 135 | Intergraph Corporation v. Intel Corporation. | P Patent Infringement | ☑ | ☐ | ☐ | U.S. District Court, Northern District of Alabama; Case No. CV 97-N-3023-NE (1999) | Townsend, Townsend & Crew/Bill Jaeger, Bill Bohler | Reasonable royalty analysis of RAID and graphics patents. |
| 136 | Intergraph Hardware Technologies Company v. Hewlett-Packard Company, et al. | P Patent Infringement | ☐ | ☐ | ☐ | U.S. District Court Eastern District of Texas Marshall Division; Case No. 2-02CV-312 TJW (2004) | Robins Kaplan Miller & Ciresi / Bill Manning, Jim Anderson, Eric Jackson, Bill Marino | Determine reasonable royalty damages for Intergraph's Clipper patents related to multiple caching strategies. |
| 137 | Japan Cash Machine Co., Ltd, JCM American Corporation v. MEI, Inc. | P Patent Infringement | ☐ | ☐ | ☐ | U.S. District Court, District of Nevada; Civil Action No. 2:05-cv-01433 (RCJ) | Watson Rounds / Mike Rounds; DLA Piper / David Abet | Analysis of plaintiffs' damages due to MEI's alleged infringement of plaintiffs' patents pertaining to bill validators used in casino gaming devices. |
| 138 | Johnson v. Anderson | D Patent Infringement | ☐ | ☐ | ☐ | California Superior Court, San Francisco County (1993). | Walter Moeller/Bill Caspari | Calculate reasonable royalty regarding wood stove design technology. |
| 139 | K2 Corporation v. Salomon S.A., et al. | P Patent Infringement | ☐ | ☐ | ☐ | U.S. District Court, Western District of Washington; Case No. C98-1781 WD (1999) | Christensen O'Connor Johnson Kindness/Ross Boundy; Black, Lowe & Graham/Larry Graham | Calculate lost profits and reasonable royalty damages due to Salomon's infringement of K2's patents regarding inline skates. |
| 140 | McKesson Information Solutions LLC v. The Trizetto Group, Inc. | P Patent Infringement | ☐ | ☐ | ☐ | U.S. District Court Northern District of Delaware; Case No. 04-1258 (2005) | Skadden Arps Slate Meagher & Flom | Patent infringement damages analysis. |
| 141 | Monticelli v. Pacific Gas & Electric | D Patent Infringement | ☐ | ☐ | ☐ | U.S. District Court, Northern District of California; Case No. C94 1754 (1995) | PG&E in-house counsel/ Adam Chodorow | Calculate reasonable royalty regarding cooling tower construction design. |

## BRUCE L. McFARLANE
## CONSULTING AND TESTIMONY CASE LISTING

| | Lawsuit | Type | | Testimony | | Court | Law Firm | Work Performed |
|---|---|---|---|---|---|---|---|---|
| | | | Dep | T | Dec | | | |
| 142 | Nichia Corporation v. Seoul Semiconductor, Co., Ltd., Seoul Semiconductor, Inc. | D | Patent Infringement | ☑ | ☐ | ☑ | United States District Court, Northern District of California. Case No. 3:06-CV-0162 MMC | Bingham McCutchen / Beth Parker, Monte Agarwal | Analysis of Nichia's damages resulting from Seoul Semiconductor's alleged infringement of Nichia's design patents regarding high brightness, white side-view LEDs. |
| 143 | Nova Measuring Instruments, Ltd. v. Nanometrics, Inc. | D | Patent Infringement | ☑ | ☐ | ☐ | U.S. District Court, Northern District of California, San Francisco Division; Case No. C05 00986 MMC (BZ) | Beck, Ross, Bismonte & Finley | Analysis of lost profits and reasonable royalty damages as a result of Nanometrics alleged infringment of patent pertaining to integrated metrology used in semiconductor manufacturing. |
| 144 | Orlaford Limited, et al. V. BBC International, et al. | P | Patent Infringement | ☐ | ☐ | ☐ | U.S. District Court Western District of Wisconsin; Civil Action No. 97-C-0540-S (1998) | Foley & Lardner | Calculate patent infringement damages due to defendant's alleged infringement of patents regarding lights in heels of childrens' shoes. |
| 145 | Pactiv Corporation v. S.C. Johnson | P | Patent Infringement | ☐ | ☐ | ☐ | U.S. District Court, Northern District of Illinois; Case No. 98C-2679 (2000) | Jenner & Block/Jim Benak, Andrew Jacobs | Calculate plaintiff's lost profits and reasonable royalty damages due to defendant's infringement of plaintiff's patent regarding slider zipper food storage bags. |
| 146 | Petrosky v. Nike, Inc. | D | Patent Infringement | ☐ | ☐ | ☐ | U.S. District Court, Virginia (1991) | Banner, Birch, McKie & Beckett/Roger Tate, Alan Kantor | Calculate reasonable royalty damages regarding air sole shoe technology. |
| 147 | Pitney Bowes v. Stamps.com | D | Patent Infringement | ☐ | ☐ | ☐ | U.S. District Court, District of Delaware; Case No. 02-042 JJF (2002) | Irell & Manella/Elliott Brown, Ben Hattenbach | Determine reasonable royalty damages due to Stamps' infringement of Pitney patents regarding internet postage. |
| 148 | Pitney Bowes, Inc. v. Hewlett Packard | D | Patent Infringement | ☐ | ☐ | ☐ | U.S. District Court, District of Connecticut; Civil Action No. 395CV01764 (1997) | Pennie & Edmonds/Jack Lauter, Steve Harbulak, Garland Stephens | Calculate reasonable royalty regarding resolution enhancement technology for laser printers. |
| 149 | Precor v. Weider Health & Fitness, Inc. | P | Patent Infringement | ☐ | ☐ | ☐ | U.S. District Court, Western District of Washington; Civil No. C91-1743Z (1993) | Christensen, O'Connor, Johnson & Kindness/Jim Uhlir, Tom Theisen | Lost profits/reasonable royalty calculation regarding exercise equipment. |
| 150 | RealSource, Inc. v. Best Buy Company, Inc. | D | Patent Infringement | ☐ | ☐ | ☐ | U.S. District Court, Western District of Texas, Austin Division, Case No. A0 4CA77 t LY | Robins Kaplan Miller & Ciresi / Eric Jackson | Determine reasonable royalty for patented technology related to gift cards. |
| 151 | Seer Systems Inc. v. Yamaha Corporation | P | Patent Infringement | ☐ | ☐ | ☐ | U.S. District Court, Northern District of California; No. C 06--07736 WHA | Peterson, Weyand & Martin / Alex Weyand | Determine reasonable royalty damages due to Yamaha's alleged infringement of Seer's patent regarding audio data storage and playback technology. |

**BRUCE L. McFARLANE**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | Type | Testimony | | | Court | Law Firm | Work Performed |
|---|---|---|---|---|---|---|---|---|
| | | | Dep | T | Dec | | | |
| 152 | Seer Systems, Inc. v. Beatnik, Inc., Microsoft Corporation | P | Patent Infringement | ☐ | ☐ | ☐ | U.S. District Court, Northern District of California; Case No. C 03 4636 JSW (EDL) | Peterson, Weyand & Martin / Alex Weyand | Determine reasonable royalty rate for Seer patents related to audio data storage and playback. |
| 153 | Silicon Graphics, Inc. v. ATI Technologies, Inc., et al. | D | Patent Infringement | ☐ | ☐ | ☐ | U.S. District Court, Western District of Wisconsin; Civil Action No. 06-C-0611-C | Robins Kaplan Miller & Ciresi / Bill Manning, Eric Jackson | Determine reasonable royalty damages due to ATI's alleged infringement of SGI's patents related to computer graphics technology. |
| 154 | Snyder Industries v. The Heil Company | D | Patent Infringement | ☐ | ☐ | ☐ | U.S. District Court, Wisconsin (1991) | Banner, Birch, McKie & Beckett/Roger Tate, Chris McKie | Calculate damages due to defendant's alleged infringement of patents regarding refuse container design. |
| 155 | St. Clair Intellectual Property Licensing, Inc. v. Fuji Photo Film Co. Ltd, Fuji Photo File USA, Inc., and Fujifilm America, Inc., Canon Inc. and Canon USA, Inc. | P | Patent Infringement | ☐ | ☐ | ☐ | U.S. District Court, District of Delaware; Case No. 03-241-JJF (2004) | Robins Kaplan Miller & Ciresi / Ron Schutz, Jake Holdreith, Becky Thorson, Carrie Lambert | Determine reasonable royalty for St. Clair patents related to multiple file format capability in digital cameras. |
| 156 | True Fitness Technologies, Inc. v. Precor Incorporated | D | Patent Infringement | ☐ | ☐ | ☐ | U.S. District Court, Eastern District of Missouri; Case No. 4:99 CV1306-DJS (2000) | Christensen O'Connor Johnson Kindness/Ross Boundy, Steve Fricke | Analysis of reasonable royalty damages due to True Fitness' infringement of patent regarding elliptical trainers. |
| 157 | Unisys Corporation v. Actel Corporation and Quicklogic Corporation | P | Patent Infringement | ☐ | ☐ | ☐ | U.S. District Court, Northern District of California; Case No. C-00-01114 SBA | Pillsbury Winthrup/Bill Abrams, Brian Beatus | Determine reasonable royalty damages due to Quicklogic's infringement of patent regarding architecture of Field Programmable Gate Arrays (FPGAs). |
| 158 | Vita Zahnfabrik H. Rauter GMBH & Co. v. Dentsply International, Inc. | D | Patent Infringement | ☑ | ☐ | ☐ | US District Court, Central District of California; Case No. SA CV 04-729 | Morgan Lewis & Bockius / Doug Rawles, Andrew Gray | Calculation of patent infringement damages due to infringement of patents related to dental color indicator devices. |
| 159 | UniRam Technology, Inc. v. Monolithic System Technology, Taiwan Semiconductor Manufacturing Company, Ltd., TSMC North America | P | Patent infringement, Theft of trade secret | ☑ | ☑ | ☑ | U.S. District Court, Northern District of California. Case No. CV-04-01268-VRW | Susman Godfery / Joe Grinstein, Ian Crosby, Jay Neukom; Heim, Payne & Chorush / Russ Chorush | Determine lost profits and reasonable royalty damages due to defendants' infringement of patented technology regarding DRAM semiconductors. Calculate damages due to theft of trade secret. |
| 160 | Precor Incorporated v. Life Fitness | P | Patent infringement; unfair competition | ☐ | ☐ | ☐ | U.S. District Court, Western District of Washington; Case No. C94-1586C (1995) | Christensen O'Connor Johnson Kindness/Jim Uhlir, Ross Boundy | Determine lost profits and reasonable royalty due to Precor's alleged infringement of patents re treadmills. Determine Precor's damages due to false statements by Life Fitness. |

# BRUCE L. McFARLANE
## CONSULTING AND TESTIMONY CASE LISTING

| | Lawsuit | Type | Testimony Dep | Testimony T | Testimony Dec | Court | Law Firm | Work Performed |
|---|---|---|---|---|---|---|---|---|
| 161 | Bridget Bray v. TSP Hotels, Inc., et al. | P | Personal injury | ☐ | ☐ | ☐ | Superior Court of California, County of Alameda; Case No. 406526 (2004) | Banchero Law Firm/Jeff Banchero | Calculation of lost earnings. |
| 162 | Khouri v. Roberts | P | Personal injury | ☐ | ☐ | ☐ | Oregon Circuit Court, Washington County (1993) | James, Denecke & Harris/Roger Harris | Calculation of lost earnings. |
| 163 | State of Hawaii v. USX | D | Product liability | ☐ | ☐ | ☐ | First Circuit Court, Hawaii (t992) | Berman, Paley, Goldstein & Berman/Tony Berman | Damages analysis regarding alleged failure of Corten steel used to construct stadium. |
| 164 | In re: America Honda Motor Co., Dealerships Relations Litigation | P | RICO | ☐ | ☐ | ☐ | U.S. District Court, District of Maryland; MDL Case No. 1069 | Rapazzini & Graham/Mark Rapazzini, Beth Graham | Calculate Honda dealers' lost profits from misallocation of new Honda automobiles. |
| 165 | Collins v. Tetra Pak, Inc. | P | Securities fraud | ☐ | ☑ | ☐ | Oregon Circuit Court, Multnomah County (1991) | James, Denecke & Harris/Roger Harris, Chris Martin | Business valuation and calculation of plaintiff's damages. |
| 166 | Newman, et al. v. Comprehensive Care Corp. | P | Securities fraud | ☐ | ☐ | ☐ | U.S. District Court, Oregon (1993) | Ball, Janik & Novack/Sara Ryan | Damages analysis. |
| 167 | The Equitable Life Assurance Society of the United States, et al. v. David S. Shapira, et al. | P | Securities fraud | ☐ | ☐ | ☐ | U. S. District Court, Western District of Pennsylvania; Civil Action #93 063 t (1994) | Zelle & Larson/Rick Stone, Betsy Lear | Calculate damages suffered by plaintiff note holders. |
| 168 | Bartells Co. v. A.P. Green Industries | D | Securities laws violations | ☐ | ☐ | ☐ | King County Superior Court, Washington (1992) | Thompson & Mitchell | Damages analysis. |
| 169 | In re: Information Resources, Inc. | | Securities laws violations | ☐ | ☐ | ☐ | U.S. District Court, Northern District of Illinois; Civil Action 89C 3712 (1994) | Freeborn & Peters; Katten, Muchin & Zavis | Determine securities damages to class. |
| 170 | DJ&J Software Corporation, dba Egghead Software v. Software House International, Inc. | P | Theft of trade secret | ☐ | ☑ | ☐ | Superior Court of California, County of Los Angeles; Case No. BC 097126 (1994) | Perkins Coie/David Biderman, Colleen Reagan, Michael Sorochinsky | Calculate plaintiff's damages due to theft of trade secrets involving customer data. |
| t71 | Evanite Fiber Corporation v. Lauschaer Glaswerk GmbH, et al. | P | Theft of trade secret | ☐ | ☐ | ☐ | U.S. District Court, District of South Carolina, Charleston Division; Civil Action No. 2: 96-3525-18 (1998) | Farleigh, Wada & Witt/Al Bannon, Karen Saul | Calculate plaintiff's damages resulting from defendant's alleged theft of trade secret regarding manufacture of fiberglass. |
| 172 | FundsXpress, Inc. v Digital Insight, Inc. | D | Theft of trade secret | ☐ | ☐ | ☐ | U.S. District Court, Western District of Texas, Austin Division; Case No. A-02-CA-14 tSS (2002) | Cotton & Gundzik/John Cotton, Aaron Gundzik | Determine damages due to Digital Insight's theft of FundsXpress' trade secret information (customer list, pricing data) |
| 173 | Gerber Radio Supply Co., Inc. v. Philips Semiconductors, Inc., et al. | D | Theft of trade secret | ☐ | ☐ | ☐ | U.S. District Court, Massachusetts (1996) | Banchero & Lasater/Jeff Banchero | Valuation of trade secret; rebut plaintiff's damages calculation. |

**BRUCE L. McFARLANE**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | Type | | Testimony | | Court | Law Firm | Work Performed |
|---|---|---|---|---|---|---|---|---|
| | | | Dep | T | Dec | | | |
| 174 | Thomas & Betts Corporation v. Panduit Corp. | P | Theft of trade secret | ☐ | ☐ | ☐ | U.S. District Court, Northern District of Illinois, Eastern Division (1997) | McBride, Baker & Coles/Robert Queeney, George Sanders | Determine damages due to defendant's theft of trade secrets (customer data). |
| 175 | Yield Dynamics, Inc. v. Cypress Semiconductor Corporation | P | Theft of trade secret | ☑ | ☑ | ☐ | American Arbitration Association (2006); Case No. 74 133 00508 06 0MTH | Russo & Hale / Jack Russo, John Kelley, Chris Sargent | Analysis of YDI's damages due to Cypress Semiconductor's alleged unlicensed use of YDI's yield enhancement software. |
| 176 | Yield Dynamics, Inc. v. Lumileds Lighting U.S., LLC. | P | Theft of trade secret | ☑ | ☐ | ☐ | Superior Court for the State of California, Santa Clara County. Case No. 1-05-CV-037009 | Russo & Hale / Michael Risch | Determine damages due to Lumileds' theft of trade secrets relating to yield enhancement software. |
| 177 | JCM American Corporation v. Mars Electronics International, Inc., Thomas P. Nugent | P | Theft of trade secrets | ☑ | ☐ | ☐ | Nevada District Court, Clark County; Case No. A507304 | Watson Rounds / Michael Rounds | Determine damages due to theft of trade secrets related to manufacture of currency validators. |
| 178 | The Profit Recovery Group v. Loder, et al. | P | Theft of trade secrets | ☑ | ☐ | ☐ | US District Court; Central District of California, Western Division; Civil Action No. CV 01-6200 GHK (2001) | Knobbe, Martens, Olson & Bear/Vito Canuso, John Holcomb, Linda Zadra-Symes | Analysis to determine whether defendants practiced plaintiff's claimed trade secrets and whether claimed trade secrets possessed independent economic value. |
| 179 | Affinity Network, Inc. v. AT&T | D | Trademark infringement | ☐ | ☐ | ☐ | U.S. District Court, Central District of California (1994) | Jeffer, Mangels, Butler & Marmaro/Stan Gibson | Damages analysis. |
| 180 | Pacific Electricord Company v. Paige Manufacturing Corp. | D | Trademark infringement | ☐ | ☐ | ☐ | California Superior Court, Los Angeles County; Case No. BC157514 (1998) | Werner & Burke/Joe Burke | Calculate defendant's damages in cross-complaint against plaintiff for trademark infringement. |
| 181 | SalesMark, Inc. v. American Management Group, Inc. | D | Trademark infringement | ☐ | ☐ | ☐ | U. S. District Court, Northern District of California; Civil Action No. C-98-0177 (1998) | Thelen, Reid & Priest/Robert Weikert | Analysis of reasonable royalty, lost profits and unjust enrichment damages. |
| 182 | Snelling and Snelling, Inc. v. MacLeod Investments, Inc., et al. | D | Trademark infringement | ☐ | ☐ | ☐ | U. S. District Court, Northern District of California; Civil Action No. C-97 20156 (1997) | Margolis & Morin/Michael Morin | Calculate plaintiff's damages resulting from defendant's trademark infringement. |
| 183 | Altitude Capital Partners - TPL Group Due Diligence | na | Transaction | ☐ | ☐ | ☐ | n/a | n/a | Provide economic due diligence analysis in connection with IP investment opportunity. |
| 184 | Eastman Kodak Company v. St. Clair Intellectual Property Consultants, Inc., et al. | D | Unfair competition | ☐ | ☐ | ☐ | Superior Court of California, Santa Clara County; Case No.: 1-05-CV-039164 | Robins, Kaplan, Miller & Ciresi / Ron Shutz, Becky Thorson, Carrie Lambert | Analysis of plaintiff's damages analysis regarding St. Clair's alleged unfair competition with respect to intellectual property (patents) regarding digital camera technology. |

**BRUCE L. McFARLANE**
**CONSULTING AND TESTIMONY CASE LISTING**

| | Lawsuit | | Type | Dep | T | Dec | Court | Law Firm | Work Performed |
|---|---|---|---|---|---|---|---|---|---|
| | | | | **Testimony** | | | | | |
| 185 | e-Cards v. Larry Joe King, et al. | P | Unfair competition (Lanham Act) | ☐ | ☐ | ☐ | U. S. District Court, Northern District of California (2000) | Williams & Connolly/Paul Gaffney | Valuation of internet site e-cards.com. |
| 186 | Galaxy Networks, Inc. v. Kenan Systems Corp. | D | Unjust enrichment, Quantum meruit | ☐ | ☐ | ☐ | U.S. District Court, Central District of California; Civil Action No. CV-95-5568 DDP (1997) | Irell & Manella/Morgan Chu, Richard Birnholz, Peter Wilcox | Rebut plaintiff's valuation of services performed. |
| 187 | Arizona Corporation Commission v. U.S. West | D | Utility rate hearing | ☐ | ☐ | ☐ | Arizona Corporation Commission Rate Hearings (1988) | U.S. West in-house counsel | Prudence review. |
| 188 | Adams, et al. v. California State Automobile Association, et al. | D | Various business torts | ☐ | ☐ | ☐ | San Francisco Superior Court, California; No. 916163 (1994) | Thelen, Marrin, Johnson & Bridges/Bob Blum | Cost allocation study. |
| 189 | USA v. Amlani, et al. | D | Wire fraud | ☐ | ☐ | ☐ | U.S. District Court, Central District of California (1993) | Howarth & Smith | Financial analysis. |
| 190 | Walker v. Mitchell | P | Wrongful death | ☐ | ☐ | ☐ | Oregon Circuit Court, Yamhill County (1993) | James, Denecke & Harris/Richard Urrutia | Calculation of lost earnings. |
| 191 | Hill v. Bank of America, et al. | D | Wrongful eviction | ☑ | ☐ | ☐ | Superior Court of California, County of San Francisco; Case No. 959840 (1995) | Bank of America in-house counsel/Scott McMillen | Analysis of plaintiff's damages due to wrongful eviction. |
| 192 | Heiner v. PacifiCorp | P | Wrongful termination | ☐ | ☐ | ☐ | Oregon Circuit Court, Multnomah County (1994) | Davis Wright Tremaine/Mike Reiss | Financial analysis; calculation of lost earnings. |
| 193 | Petrusich v. Russell | D | Wrongful termination | ☐ | ☐ | ☐ | Oregon Circuit Court, Multnomah County (1987) | Lindsay, Hart, Neil & Weigler/Carol Hewitt | Lost earnings analysis. |
| 194 | Robert Frisbee v. Enron Corp., FirstPoint, Inc. | P | Wrongful termination | ☐ | ☐ | ☐ | Arbitration; Case No. 74 J 160 00360 98 | Ball Janik/Jacob Tanzer | Value plaintiff's equity participation plan. |
| 195 | Tengler v. Spare, Tengler, Kaplan & Bischel, et al. | P | Wrongful termination | ☐ | ☐ | ☐ | California Superior Court; County of San Francisco; Case No. 963822 (1996) | Cooley Godward Castro Huddleson & Tatum/Karin Kubin, Kristina Cordoza | Valuation analysis of plaintiff's minority interest in defendant-asset management firm. |

## BRUCE L. McFARLANE
## CONSULTING AND TESTIMONY CASE LISTING

| Lawsuit | Type | Testimony | | | Court | Law Firm | Work Performed |
|---------|------|-----------|---|-----|-------|----------|----------------|
|         |      | Dep | T | Dec |       |          |                |

**Summary Statistics**

**Testimony:**

| | |
|---|---|
| Number of cases in which deposition testimony was given | 25 |
| Number of cases in which trial testimony was given | 18 |
| Number of cases in which declaration testimony was given | 4 |
| Number of cases in which testimony was given | 38 |

**Party Retained By:**

| | | |
|---|---|---|
| Number of cases retained on behalf of plaintiff | 1t4 | 59% |
| Number of cases retained on behalf of defendant | 80 | 41% |
| Number of non-litigation related projects | f | |
| Total number of cases / projects | 195 | |

**Intellectual Property Cases:**

| | |
|---|---|
| Patent infringement cases | 45 |
| Trade secret cases | 10 |
| Trademark cases | 4 |
| Copyright cases | 1 |
| Other IP cases | 1 |

Data current as of  2/8/2008

**Exhibit A**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNIVERSITY OF PITTSBURGH, | : | |
| | : | ELECTRONICALLY FILED |
| Plaintiff, | : | Civil Action No. 2:07-cv-00491-AJS |
| v. | : | Judge Arthur J. Schwab |
| VARIAN MEDICAL SYSTEMS, INC., | : | |
| Defendant. | : | |

### CONFIDENTIALITY AGREEMENT FOR EXPERT,
### CONSULTANT OR EMPLOYEES OF ANY PARTY

I hereby affirm that:

Information, including documents and things, designated as "Confidential Information,," "Confidential Attorney Eyes Only Information," or "Confidential Attorney Eyes Only - Source Code" as defined in the Protective Order entered in the above-captioned action (hereinafter "Protective Order"), is being provided to me pursuant to the terms and restrictions of the Protective Order.

I have been given a copy of and have read the Protective Order.

I am familiar with the terms of the Protective Order and I agree to comply with and to be bound by such terms.

I submit to the jurisdiction of this Court for enforcement of the Protective Order.

I agree not to use any Confidential Information, Confidential Attorney Eyes Only Information or Confidential Attorney Eyes Only - Source Code Information disclosed to me pursuant to the Protective Order except for purposes of the above-captioned litigation and not to disclose any such information to persons other than those specifically authorized by said

Protective Order, without the express written consent of the party who designated such information as confidential or by order of this Court. I also agree to notify any stenographic, clerical or technical personnel who are required to assist me of the terms of this Protective Order and of its binding effect on them and me.

I understand that I am to retain all documents or materials designated as or containing Confidential Information, Confidential Attorney Eyes Only Information or Confidential Attorney Eyes Only - Source Code Information in a secure manner, and that all such documents and materials are to remain in my personal custody until the completion of my assigned duties in this matter, whereupon all such documents and materials, including all copies thereof, and any writings prepared by me containing any Confidential Information, Confidential Attorney Eyes Only Information or Confidential Attorney Eyes Only - Source Code Information are to be returned to counsel who provided me with such documents and materials.

I declare under penalty of perjury that the foregoing is true and correct and that this Exhibit A was executed this _18th_ day of _April_ , 200_8_ at _Mountain View, CA_

Bruce McFarlane

15

# EXHIBIT 26

Morgan, Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, CA 94105
Tel: 415.442.1000
Fax: 415.442.1001
www.morganlewis.com



**Rita E. Tautkus**
Of Counsel
415.442.1357
rtautkus@morganlewis.com

August 10, 2007

**VIA E-MAIL AND U.S. MAIL**

Matthew H. Poppe
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA  94025

Re:   *University of Pittsburgh v. Varian Medical Systems, Inc.*
      <u>USDC Western District of Pennsylvania, Case No. 2:07-cv-00491-AJS</u>

Dear Matt:

Plaintiff University of Pittsburgh ("UPitt") discloses the following individuals pursuant to ¶ 13 of the Protective Order entered in this matter.  The requirements of ¶ 13 are satisfied as follows:

A copy of the curriculum vitae that reflects the required information is enclosed for each of the following individuals:

> Jennifer R. Cady
> Elizabeth A. Dean
> John L. Hansen
> Paul K. Meyer

A copy of a signed undertaking in the form of Exhibit A is enclosed for each of the following individuals:

> Jennifer R. Cady
> Elizabeth A. Dean
> John L. Hansen
> Paul K. Meyer

Pursuant to ¶ 13, information described in the Protective Order and "Exhibit A" will be provided to the listed individuals ten business days from the date of this letter.  Should you have any questions, please contact me.

Sincerely,

Rita E. Tautkus
Enclosures

1-SF/7587397.1



# Paul K. Meyer

Paul K. Meyer
Managing Director

Navigant Consulting
One Market Street,
Spear Street Tower – 12th Floor
San Francisco, CA 94105
Tel: 415-399-2107
Fax: 415-399-2187

pmeyer@navigantconsulting.com

**Professional History**

- Navigant Consulting - 2004 to present
- TUCKER ALAN INC. - 1994 to 2004
- Peterson Consulting L.P. & Peterson & Co. - 1981 and 1994
- Arthur Andersen LLP - 1979 to 1981

**Education**

- Bachelor of Science, Commerce; McIntire School of Commerce, University of Virginia, 1979

**Professional Associations and Certifications**

- Consulting Professor at Stanford University, Department of Civil Engineering, School of Engineering (1994 – Present)
- Member of Advisory Board, McIntire School of Commerce, University of Virginia
- Certified Public Accountant licensed in Virginia and California
- Certified Fraud Examiner (CFE)
- Accredited in Business Valuation (CPA – ABV)
- Member of Licensing Executive Society and INTA

**Honors and Fellowships**

- Recipient of "2003 Alumnus of the Year" Award, McIntire School of Commerce

Mr. Meyer is a Managing Director with Navigant Consulting and co-leader of the Litigation and Investigations practice area. Mr. Meyer was previously the President and co-founder of Tucker Alan. He is a Certified Public Accountant and Certified Fraud Examiner as well as Accredited in Business Valuation (CPA-ABV). As a Consulting Professor, Paul teaches a graduate course at Stanford University's School of Engineering. Additionally, he frequently lectures on damages issues, including presentations given at conferences for the Licensing Executives Society (LES), the Practicing Law Institute (PLI), Law Seminars International (LSI), USC Intellectual Property Institute, and the Sedona Patent Conference. Mr. Meyer has 25 years of experience consulting on financial, accounting, economic and damages matters, as well as significant testimony experience and credentials. He has testified in over 100 depositions and approximately 60 trials and major arbitrations, including over 25 jury trials.

## Professional Experience

### Intellectual Property, including Patent Infringement

Analyzed the impacts due to alleged intellectual property infringements and misappropriation, including patents, trademarks, copyrights, trade secrets, trade dress and confidential information.

Analyzed lost profits related to lost sales, price erosion and convoyed sales. Evaluated and analyzed markets and potential, market share, historical and projected sales, ability to achieve projected sales, company and product profitability, revenue sources and trends, nature of costs and cost allocations, product pricing issues and cost of capital considerations.

Analyzed sales and profits, product features and other factors, production capacity, sales and distribution capacity, capital expenditures and resources required to bring products to market.

Analyzed and determined reasonable royalties. Determined reasonable royalties using a hypothetical negotiation approach. Considered cost savings and enhanced earnings related to licensing technology, licensing history and other license agreements, design-around considerations, head start advantages and avoided product development costs. Mr. Meyer has experience in the analysis of the Georgia-Pacific factors to determine reasonable royalties in numerous industries. Mr. Meyer has analyzed hundreds of license arrangements, bringing a broad perspective to determining reasonable royalty damages.



**Paul K. Meyer**

Analyzed the value of intellectual property related to its transfer and disposition. Valuation of technology transferred between holding companies and subsidiaries. Analyzed technology sharing agreements, including joint product development agreements and software development projects. Mr. Meyer has been in charge of valuation projects related to patents. Mr. Meyer has participated in licensing negotiations.

Analyzed and investigated licensing and royalty disputes. Investigated sales reported, guaranteed minimums, deductions from revenue such as returns and volume discounts, and compliance with contractual limitations.

Analyses have related to a variety of industries, including high technology products including computer hardware and software, file and data systems, integrated circuits, consumer goods, eye care, cosmetics, apparel, office products, frozen foods, dental technology, spinal implants, utility partitioning software, e-commerce networking technology, telecommunications equipment, web-conferencing, light emitting diodes (LEDS), liquid crystal displays, optical networking, biotechnology, computer maintenance and servicing, hospitality, cellular communications, energy, aircraft, flash memory, disc drives, CD-ROM controllers, nutritional supplements, software, video games, resettable fuses, knee braces, sports merchandise, laser measuring devices, PDA's, sporting goods, VCR's, architectural plans, risk microprocessors, toys and games, and automotive diagnostic equipment, as examples. Analysis of pharmaceutical drug sales and market issues. Analysis of computer sales, cost and financial issues related to MAC clones and related manufacturing and supply issues.

Analysis of a variety of technology found in PC's and notebook computers including CPU's, memory devices, inverter controllers, hard drive partitioning, keyboard, graphic and audio acceleration, and locking devices, as examples.

Analysis of financial, economic and royalty rate issues to graphic accelerators and audio acceleration technology. Technology addressed on chip data memory utilization to accomplish acceleration, as an example. Analyses of market issues, product refreshening, development costs, incremental margins earned and reasonable royalty rates.

Analysis of intellectual property damage issues related to emulator software allowing Playstation games to be played on MAC and Windows' platforms. Analyses of sales, costs, market and other issues. Analysis of video game sales on various platforms. Analysis of MAC emulator software allowing for Windows' utility software to be used on MAC platforms.

Mr. Meyer has analyzed the financial and economic impacts of alleged trade secret misappropriation. He has determined the cost of the development of proprietary technologies and valued the economic impact of trade secret misappropriation.

Analyzed trademark value and alleged diminution in trademark value in matters involving consumer goods, entertainment, food and high technology, as examples. Analyzed corrective advertising issues, including the nature and amount of advertising, marketing, and selling expenditures, customer data, distribution and sales channels, and geographic considerations.



**Paul K. Meyer**

**Economic, Financial Condition, Damage and Valuation Analyses**

Analyzed the financial condition of corporations, partnerships and individuals under a variety of circumstances including lost profits claims, business interruption, business valuation, reduced profitability, troubled loan and bankruptcy, insolvency, reorganization, business failures and various fraudulent activities.

Analyzed numerous lost profits and "loss of use" claims including economic analyses of past sales, future projections, costs of goods sold, relevant cost allocations, interest rates, and discount rates.

Business analysis and business valuation in a variety of circumstances, including business interruption, lender liability, consumer class action, and other disputes. Industries include: seafood, ship repair, high technology, aquaculture, biotechnology, oil, automotive repair, wine, automotive sales, computer resellers, restaurants, service, e-commerce, and retail, as examples. Such valuations have involved extensive analysis of past operating results, future projections, comparable companies, capitalization multiples and market risk.

Analyzed the variable costs, indirect and overhead costs, and revenues of companies alleging loss of market share and revenue impact. Analyses of product pricing and discount issues including high technology, biotechnology, sporting goods, superstores, and insurance. Financial analyses of companies in industries including pharmaceutical, computer and equipment leasing, semiconductor, retail, maritime, automotive, service, agriculture, e-commerce, e-procurement, manufacturing, and high technology, as examples. Analyses of hotel and resort property financial operations and profitability.

Analysis of damages and other financial and economic issues in various class action matters.

Prepared asset, economic benefit **and** business valuations, including the following:

- Electric and Gas Utility Asset Transfers, Including Intellectual Property
- Software Development Company
- High Capacity Disk Drive Development Joint Venture
- Wholesale Nursery
- Aquaculture Operation
- Life Sciences/Bio Marker Research
- Contract Research Organization
- Environmental Remediation Company/ Environmental Permits
- Concession and Merchandise Contract (NASCAR Speedway Venue)
- Numerous Retail Businesses, Including Restaurants and Stores
- Office Equipment Distributor
- E-procurement
- Professional Services



**Financial Institution, Bankruptcy, Workout, Alter Ego, General Management and Accounting Consulting**

Performed general consulting on accounting, economic, financial, management and business operations matters. Analyzed accounting issues and treatment under a variety of consulting circumstances. Analysis of revenue recognition and accounting for long-term projects. Experience in accounting issues related to high technology companies, including software sales, installation and support revenue recognition.

Performed compliance reviews, and determined the propriety of financial summaries and reports based upon the investigation of the underlying source documentation for a variety of industries and companies, including insurance, financial institutions, and Fortune 500 companies.

Performed detailed reviews of the "sources" and "uses" of cash and funds flow, which uncovered and documented check kiting, various investor "ponzi-type" schemes, fraudulent invoices, and other activities involving the misuse of an entity's assets. Assisted in financial statement audits of banks and other financial institutions.

Consulted to banks and federal government agencies on management procedures and controls, lender liability matters, troubled loan analyses, bankruptcy issues, compliance with policies and procedures, funds flow reviews and assessment of allegations of impropriety such as check kiting.

Significant experience in bankruptcy matters involving solvency analysis, review of reorganization and liquidation plans, reviews for preference items and fraudulent transfers, and analysis of claims.

Assisted corporations and other entities on management reviews of corporate departments and functions, merger and acquisition matters, cost determination studies, financial statement analyses, ability to pay analyses, avoiding or reducing the impact of disputes, cost competitiveness, financial statement disclosure and contract administration issues.

Significant experience in the analysis of the relationship and operations of companies addressing alter ego issues and single entity theory.

Reviews and analyses related to special purpose studies including the verification of account activity, transactions and licensing arrangements.

Consulting to companies on a variety of issues including profitability analysis, transfer pricing, accounting systems, internal controls, account segregation and affiliate issues, as examples.

Experience in the review and analysis of licenses, related business documents and records involving the licensing of intellectual property. This experience includes a variety of industries including athletic wear, consumer goods, household products, sports merchandising and memorabilia, high technology, biotechnology, telecommunications and entertainment, as examples.



Paul K. Meyer

Review and analysis of hundreds of talent contracts for actors, producers, directors and providers of rights in motion picture deals. Review and analysis of business and financial data in a variety of matters involving consumer issues and alleged unfair business practices.

Experience in the review and analysis of compensation arrangements including contingent and commission structure consideration. Experience includes distributors and salespersons in industries such as high technology, oil and gas, retail, entertainment and financial services.

Teach accounting and financial issues at Stanford University in the School of Engineering (15 years).

### Securities and Related Analyses

Performed a variety of analyses in securities and securities-related matters including: forensic accounting in connection with criminal investigations and litigation; review and assessment of joint venture activities; analysis of complex related party transactions piercing the corporate veil; study of alleged departures from generally accepted accounting principles; funds tracing; asset valuation analyses; debt service analyses; real estate portfolio analyses; special reviews to assess insolvency and related issues; investigation of preference transactions and/or fraudulent conveyances in bankruptcy matters; evaluation of disclosures in financial statements and SEC filings; analysis of restitution damages and forensic analyses of why entities have not met planned and/or projected results.

Performed analyses of mutual fund trading activities in a variety of funds over an extended period of time. Documented and analyzed timing and nature of trades. Considered specific mutual fund investing objectives and investor prospectus.

### Antitrust

Experience on antitrust matters related to monopolization, tying arrangements, price maintenance and below cost pricing. Analyses of damages as well as studies of costs related to product pricing. Cost determination including the review of direct, indirect and overhead costs. Analysis of product and competitors' revenues, market shares, market issues, prices, costs and profits. Experience in various industries including computer hardware, software, diagnostics, spare parts, and documentation. Additional experience in wine, motion picture, sporting goods, insurance, oil and gas, pharmaceutical, construction, electronics and retail industries, as examples. Experience in class action matters requiring detailed forensic analysis of prices, price changes and costs.

### Forensic And Record Reconstruction

Significant experience in tracing and in financial and cost record reconstruction engagements. Analyses have included detailed reconstruction and record reconciliation in a variety of industries under different circumstances, including: bank trust accounts, gas well production and mineral rights, general liability insurance policies (dating back to the mid 1930's), incurred cost history of



**Paul K. Meyer**

Nuclear Power plants, and intellectual property disputes involving audits of historical royalties due. These assignments have required various analyses and comparisons of historical production, trends, asset valuations and detailed transaction reviews. In some instances, third party information has been relied upon in efforts to gain an understanding of missing data, e.g. various third party disclosures, annual financial filings with regulators, insurance brokers files, beneficiaries portfolio listings, published industry data, and the like.

Significant experience in fraud and transactions reviews related to check kiting schemes, other asset transfers, fraudulent invoice schemes and alter ego analyses. Testimony given in Federal Court on the results of tracing and reconstruction. Northern California engagement required six days of trial testimony (Judge Illston, Northern District Court of California, San Francisco).

Certified Fraud Examiner

### Entertainment, Sports and Related Assignments

Consulting experience in entertainment and related industries, including motion picture, concert merchandising, and sporting goods. Analyses of licensing issues related to sports merchandising.

Analysis of producer and director compensation related to the release of major motion pictures by a leading studio. Analysis of front-end compensation as well as various forms of contingent compensation.

Analysis of financial results and changes in financial condition of National Football League Member Club. Analysis of revenue trends including ticket sales, suite income, concessions, parking, merchandising and TV and radio revenue sources. Comparisons to other NFL club local revenues. Review of entity capitalization over time.

Analyses of Major League Baseball memorabilia license contracts and the use of former player "names, likeness, and signature." Analyses of license deals, royalty statements and royalty payments. Analysis of trademark and other property in the NFL member club trust in conjunction with lawsuit brought by the Oakland Raiders. Allegations were made related to diminution in the value of "Raiders Property" including team logos and the colors "Silver and Black".

Research and analyses related to sales, markets, and damages related to videogames, video chips and underlying alleged proprietary technology. Issues related to the accused products of a market leader in the supply of performance 3D graphics processors for enhanced PC game performance, as an example. Study of distribution channels including board suppliers, OEM sales and retail sales. Consideration of products features. Analysis of economic and financial issues related to Creative's Soundblaster Live!™ audio card.

As part of special purpose assignment, analysis of advertising expenditures related to a large pizza franchise operation. Study of costs of producing ad campaign, including TV, radio and print campaigns, and in-store displays and giveaways. Analysis of production costs including talent contracts. Review of media placement costs and media placement. Review of Ad Fund collections and reserves related to franchisee contributions.



Analyses of athletic footwear market and sales issues related to a raw material supplier dispute and midsole shoe technology. Issues included the consideration of alternate design technology, athletic footwear market trends, and the specific cost structure and facilities of the supplier.

Analysis of concessions and merchandise operations and contracts at Sears Point Raceway. Analyses of sales, costs and profits related to events such as Kragen 350 NASCAR Winston Cup and NHRA FRAM/Autolite National drag races, as examples.

Analyses related to major motion picture merchandising tie-in deals. Analyses related to design mark issues concerning a major entertainment company and an internet search engine.



## Testimony And Alternative Dispute Resolution Experience

**Testimony Experience**

Testimony in arbitration, civil court, federal bankruptcy court and International Trade Commisssion.

Testimony has covered lost profits, business interruption, business value, employee compensation, increased costs, cost allocations, the nature of costs, intellectual property, insurance coverage, the cost of capital and the financial operations and relationship of companies.

Presentation of damage analysis in mediation.

Served as an arbitrator on damage issues.

Testimony, depositions and declarations in civil court and arbitration, as follows:

| The United States District Courts for: | Superior Courts for The State of California in the City and Counties of: |
|---|---|
| • The Northern District Of California | • San Francisco |
| • The District Of Delaware | • San Mateo |
| • The Eastern District Of Texas | • Santa Clara |
| • The Eastern District Of Massachusetts | • Sacramento |
| • The Eastern District Of Virginia | • Sonoma |
| • The District Of Colorado | • Alameda |
| • The Eastern District Of California | • Napa |
| • The Central District Of California | • Stanislaus |
| • The District Of Montana | • Tulare |
| • The Northern District Of Illinois | • Contra Costa |
| • The Central District Of Illinois | • Sutter |
| • The Southern District Of Texas | • Santa Cruz |
| • The Territory Of Guam | • Martinez |
| • The Eastern District Of Wisconsin | • Monterey |
| | • San Luis Obispo |
| | • Los Angeles |
| | • Orange |
| | • Ventura |



**Paul K. Meyer**

| | |
|---|---|
| **Federal Bankruptcy Court:** | **Arbitration:** |
| • Mississippi | • California |
| • California | • Hawaii |

**International Trade Commission
(Washington D.C.)**

**Alternative Dispute Resolution Experience**

Consulted to companies and law firms on techniques to avoid disputes and to minimize the impact of existing disputes.

Participated in numerous mediations and settlement negotiations presenting accounting, economic and business operations analyses, and assisting in developing alternative methods to resolve disputes.

Selected by mediators to assist in mediating financial issues between the parties in dispute.

Performed ability to pay analyses in the context of mediations and settlement discussions by analyzing financial statements, cash flows and other accounting and business records.

## Representative Topics Covered In Lectures And Speaking Assignments

Intellectual property; technology valuation; trademark valuation; intellectual property damages and economics; accounting theory and application; finance and economics; financial statement analysis; construction accounting issues; analysis of construction claims and long term contract claims; preparation and analysis of financial and economic damage claims; alternative dispute resolution; cost of capital; insurance coverage; antitrust economic and financial issues; and employee compensation, including stock options.

## Selected Speaking Assignments

Stanford University Construction Executive Program (1984-1986)

Western Council of Construction Consumers

Stanford in Business / Economics and Damages

Hastings College of the Law/Economic Damages (1988, 1989, 1992)

Stanford University, Graduate Program of Construction Management

Public Contract Section of American Bar Association Trial Advocacy Program (1983-1985)



San Francisco Chapter of Casualty Insurance Adjusters

Fidelity and Surety Claims Association of Northern California

Institute of Management Accountants (formerly, National Association of Accountants) – Diablo Valley Chapter

Construction SuperConference (New York City, 1992)

Intellectual Property Section of the State Bar of California -- Valuation of Business Technology

Trademark Valuation (Los Angeles, 1993)

Intellectual Property Section of the State Bar of California – 19th Annual Intellectual Property Law Institute (Palm Springs, California, 1994)

San Francisco Barristers Group, Intellectual Property Damages (1994)

Intellectual Property Section of the State Bar of Arizona (1995)

American Bar Association Corporate Counsel Committee Workshop (1995)

Intellectual Property Section of the Washington, D.C. Bar, Intellectual Property Damages (1995)

University of California at Berkeley, Graduate School of Engineering, Damages and Case Study (1995, 1996)

Computer Software and Semiconductor Chip Infringement Cases, Computer Litigation Section of the American Bar Association, Damage Theories and Approaches (San Francisco, California, 1995)

Continuing Legal Education, Economic, Financial and Damage Topics, various law firms (1993, 1994, 1995, 1996, 1997, 1998, 1999, 2001, 2002, 2003)

Intellectual Property Section of the State Bar of California – 21st Annual Intellectual Property Law Institute (San Jose, California, 1996)

Alternative Dispute Resolution SuperConference -- Intellectual Property Alternative Dispute Resolution (Washington, DC, 1997)

Sacramento Intellectual Property Section (Sacramento, California, 1999)

Intellectual Property Section of the State Bar of California – 24th Annual Intellectual Property Law Institute (Santa Monica, California, 1999)

Bar Association of Colorado, Denver Securities Litigation Subcommittee, Analyses Related To Securities Litigation (Denver, Colorado, 2001)

Practicing Law Institute, Protecting Your Intellectual Property Assets, Valuing Intellectual Property (Palo Alto, California, 2001)

Licensing Executive Society -- 2001 Annual Meeting, Patent Infringement Damages (Palm Springs, California, 2001)



Manatt, Phelps & Phillips, LLP --- "Strategies For Using Intellectual Property Risk Management As Leverage, Valuing Intellectual Property," (Palo Alto, California, 2002)

International Trademark Association's 124th Annual Meeting --- "Point / Counterpoint: Global Trademark Valuation Issues," (Washington, DC, 2002)

Practicing Law Institute, Protecting Your Intellectual Property Assets, Valuing Intellectual Property (Palo Alto, California, 2002)

Law Seminars International --- "Calculating and Proving Intellectual Property Damages," (San Francisco, California, January 2003)

Law Seminars International – "Calculating And Proving Intellectual Property Damages: Determining Reasonable And Nondiscriminatory Royalties," (McLean, Virginia, July 2003)

Stanford University, Center for Professional Development – "Analysis of Business Performance – Key Concepts And Analyses," (Palo Alto, California, 2003)

Abbott Laboratories, "Valuation of Patent Damages", (Abbott Park, Illinois, September 2003)

Kraft Foods – "Valuation of Trademark Damages", (Northfield, Illinois, September 2003)

Sun Microsystems – "Patent Valuation and Damages Issues", (Menlo Park, CA, March 2004)

Stanford University, Center for Professional Development – "Analysis of Business Performance – Key Concepts And Analyses," (Palo Alto, California, 2005)

Sedona Conference On Patent Litigation -- Faculty Member, (Sedona, AZ, October 2005)

Foley & Lardner LLP, "Recent Developments in Patent Damages", (Palo Alto, CA, January 2006)

Santa Clara University, "Recent Developments in Patent Damages", (Santa Clara, CA, March 2006)

American Bar Association ("ABA") Section of Litigation Annual Conference, (Los Angeles, CA, April 2006)

McDermott Will & Emery LLP, "Recent Developments in Patent Damages", (Palo Alto, CA, May 2006)

Sedona Conference On Patent Litigation -- Faculty Member, (Sedona, AZ, October 2006)

USC Gould School of Law, Intellectual Property Institute, "Patent Rights in the Post-eBay Era: What You Need To Know To Survive", (Los Angeles, CA, March 2007)

# EXHIBIT 27

**Exhibit A**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNIVERSITY OF PITTSBURGH,

                        Plaintiff,

      v.

VARIAN MEDICAL SYSTEMS, INC.,

                     Defendant.

ELECTRONICALLY FILED

Civil Action No. 2:07-cv-00491-AJS

Judge Arthur J. Schwab

**CONFIDENTIALITY AGREEMENT FOR EXPERT,
CONSULTANT OR EMPLOYEES OF ANY PARTY**

I hereby affirm that:

Information, including documents and things, designated as "Confidential Information,," "Confidential Attorney Eyes Only Information," or "Confidential Attorney Eyes Only - Source Code" as defined in the Protective Order entered in the above-captioned action (hereinafter "Protective Order"), is being provided to me pursuant to the terms and restrictions of the Protective Order.

    I have been given a copy of and have read the Protective Order.

    I am familiar with the terms of the Protective Order and I agree to comply with and to be bound by such terms.

    I submit to the jurisdiction of this Court for enforcement of the Protective Order.

    I agree not to use any Confidential Information, Confidential Attorney Eyes Only Information or Confidential Attorney Eyes Only - Source Code Information disclosed to me pursuant to the Protective Order except for purposes of the above-captioned litigation and not to disclose any such information to persons other than those specifically authorized by said

Protective Order, without the express written consent of the party who designated such information as confidential or by order of this Court. I also agree to notify any stenographic, clerical or technical personnel who are required to assist me of the terms of this Protective Order and of its binding effect on them and me.

I understand that I am to retain all documents or materials designated as or containing Confidential Information, Confidential Attorney Eyes Only Information or Confidential Attorney Eyes Only - Source Code Information in a secure manner, and that all such documents and materials are to remain in my personal custody until the completion of my assigned duties in this matter, whereupon all such documents and materials, including all copies thereof, and any writings prepared by me containing any Confidential Information, Confidential Attorney Eyes Only Information or Confidential Attorney Eyes Only - Source Code Information are to be returned to counsel who provided me with such documents and materials.

I declare under penalty of perjury that the foregoing is true and correct and that this Exhibit A was executed this _25_ day of _May_____, 2007 at _____.

_Barbara Dickerson_

# EXHIBIT 28



"Poppe, Matt"
<mpoppe@orrick.com>
06/19/2007 11:50 AM

To rtautkus@morganlewis.com

cc "Sneath, Henry" <hsneath@psmn.com>, "Clougherty, Shannon" <sclougherty@psmn.com>, jzele@morganlewis.com

bcc

Subject RE: UPitt v. Varian: Source Code Inspection

| History: | 🔩 This message has been forwarded. |
|---|---|

Rita:

We anticipate being able to make code available for review by you and your experts next week or thereafter. It will be made available as follows:

(1) Source code for current and past versions of the accused products will be made available at Orrick's office. My understanding is that the files are marked in such a way that it will be easy for you to distinguish one version from another. Varian has produced documents that describe the changes from one version to the next. We will need at least 48 hours notice before you come to our office to view the source code.

(2) To view the executable code associated with the most current version of the software, we will make arrangements for you to inspect equipment at Varian's demo room in Palo Alto. Available dates include June 25 and 29 and July 3 and 5. We will need to know your preferred date as soon as possible, as continued availability cannot be guaranteed. Varian intends to permit such an inspection of its equipment on only one occasion during this litigation. Although executables for prior versions will be available at Orrick, we do not intend to recreate the hardware/software environment needed to run them. Doing so would be unduly burdensome and/or impossible.

Please let me know your preferred dates asap. If the above dates do not work for you, let me know and I will check availability on later dates.

- Matt

-----Original Message-----
From: rtautkus@morganlewis.com [mailto:rtautkus@morganlewis.com]
Sent: Monday, June 18, 2007 9:52 AM
To: Poppe, Matt
Cc: Sneath, Henry; Clougherty, Shannon; jzele@morganlewis.com
Subject: UPitt v. Varian: Source Code Inspection

Matt,

This follows up our June 5 meet and confer regarding inspection of the Varian source code. The time has run for objections to UPitt's June 1 disclosure of individuals at the Johnson-Laird firm. Therefore, they are now allowed access to information, including source code, under the protective order.
Please advise regarding status of the logistics, including production of all versions, discussed at the June 5 meet and confer so that we may schedule the inspection. Thank you, Rita

Rita E. Tautkus

Morgan, Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, CA  94105-1126
Direct Dial: (415) 442-1357
Fax: (415) 442-1001
rtautkus@morganlewis.com

DISCLAIMER
This e-mail message is intended only for the personal use of the
recipient(s) named above. This message may be an attorney-client
communication and as such privileged and confidential.  If you are not
an intended recipient, you may not review, copy or distribute this
message. If you have received this communication in error, please notify
us immediately by e-mail and delete the original message.


====================================================================

IRS Circular 230 disclosure:
To ensure compliance with requirements imposed by the IRS, we inform you that
any tax advice contained in this communication, unless expressly stated
otherwise, was not intended or written to be used, and cannot be used, for the
purpose of (i) avoiding tax-related penalties under the Internal Revenue Code
or (ii) promoting, marketing or recommending to another party any tax-related
matter(s) addressed herein.

====================================================================

NOTICE TO RECIPIENT:  THIS E-MAIL IS  MEANT FOR ONLY THE INTENDED RECIPIENT OF
THE TRANSMISSION, AND MAY BE A COMMUNICATION PRIVILEGED BY LAW.  IF YOU
RECEIVED THIS E-MAIL IN ERROR, ANY REVIEW, USE, DISSEMINATION, DISTRIBUTION,
OR COPYING OF THIS E-MAIL IS STRICTLY PROHIBITED.  PLEASE NOTIFY US
IMMEDIATELY OF THE ERROR BY RETURN E-MAIL AND PLEASE DELETE THIS MESSAGE FROM
YOUR SYSTEM. THANK YOU IN ADVANCE FOR YOUR COOPERATION.
For more information about Orrick, please visit http://www.orrick.com/

# EXHIBIT 29

LEXSEE 1996 U.S. DIST. LEXIS 22675

**ACCELINEAR SERVICE CO., LTD., Plaintiff, vs. VARIAN ASSOCIATES, INC., Defendant.**

**No. 3:96CV01275(WWE)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

*1996 U.S. Dist. LEXIS 22675*

**October 15, 1996, Decided**
**October 16, 1996, Filed**

**DISPOSITION:**     [*1] Defendant Varian Associate, Inc.'s Motion to Transfer (Doc. # 8) this action to the Northern District of California GRANTED. Motion to Dismiss or Stay (Doc. # 8) DENIED without prejudice.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** This matter was before the court on defendant's motion to transfer plaintiff's action to the Northern District of California. Plaintiff's complaint alleges violations of the Sherman Act, *15 U.S.C.S. §§ 1, 2*; the Clayton Act, *15 U.S.C.S. § 14*; the Connecticut Antitrust Act, *Conn. Gen. Stat. Ann. § 35-24 et seq.*; and tortious interference with business relations.

**OVERVIEW:** Plaintiff serviced machines made by defendant and the nature of the machinery often required immediate service. Defendant had allowed plaintiff to purchase proprietary parts on an immediate, as-needed basis, but changed its policy to sell replacement parts only upon several days' notice. Because of the cost of the parts, plaintiff complained that it would be beyond its financial capability to maintain an adequate inventory of parts and threatened to sue for antitrust violations. Defendant then filed a declaratory judgment action in California, but erroneously named a company related to plaintiff. Plaintiff filed the instant action and defendant sought to transfer the case to California. The court found that the convenience of the parties was best served by transferring the case. It found that Connecticut was not the state of plaintiff's incorporation, but was only one of several states in which it did business, while California was defendant's headquarters. Further, a transfer best served the interests of justice, as there was a related case

pending in California and the transfer would enable the California court to consider consolidation of the cases.

**OUTCOME:** The court granted defendant's motion to transfer the case to the Northern District of California.

**LexisNexis(R) Headnotes**

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN1] See *28 U.S.C.S. § 1404(a)*.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN2] Whether to transfer an action to another district is a decision committed to the sound discretion of the court to be exercised in light of all of the circumstances of the case. The burden of establishing that this action should be transferred is on the moving party.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN3] The "first-to-file" rule holds that where there are two competing lawsuits between the same parties and involving the same issues, the first should have priority, absent a showing that the balance of convenience or special circumstances weigh in favor of giving priority to the second.

*Civil Procedure > Venue > Federal Venue Transfers >*

1996 U.S. Dist. LEXIS 22675, *1

*General Overview*

[HN4] While ordinarily there is a strong presumption in favor of the first filed case, it is not a rule that should be applied mechanically. The "first-to-file" rule is based on the principle of fairness that the party who commenced the first suit should generally be the party who is given its choice of venue.

**COUNSEL:** For ACCELINEAR SVC CO, LTD, plaintiff: Daniel Shepro, Heidi C. McGee, Willinger, Shepro, Tower & Bucci, Bridgeport, CT.

For VARIAN ASSOC, INC, defendant: James Sicilian, Philip Smith Wellman, Day, Berry & Howard, Hartford, CT.

For VARIAN ASSOC, INC, defendant: Daniel M. Wall, Christopher B. Hockett, Vincent Colianni, McCutchen, Doyle, Brown & Enersen, San Francisco, CA.

**JUDGES:** WARREN W. EGINTON, Senior U.S. District Judge.

**OPINION BY:** WARREN W. EGINTON

**OPINION**

*RULING ON DEFENDANT'S MOTION TO DISMISS, TRANSFER, OR STAY ACTION*

Defendant Varian Associates, Inc., (hereinafter "Varian") has moved this court to transfer this action to the Northern District of California, where a related declaratory judgment action, *Varian Associates, Inc. v. Valencia Technical Services, Inc., et al.*, No. C-96-2337 DLJ, is pending. Although Varian has also styled this motion as a motion to dismiss or stay, the parties address only the issue of transfer. This court will do likewise and, accordingly, will deny without [*2] prejudice Varian's motion to dismiss or stay. As to Varian's motion to transfer, after consideration of the papers submitted and supporting affidavits, for the reasons set forth below, this court will grant the motion to transfer this action to the Northern District of California.

*I. BACKGROUND*

Varian is a Delaware corporation, headquartered in Palo Alto, California, that manufactures medical linear accelerators used in the treatment of cancer and other diseases by radiation therapy. Its machines are sold throughout the United States.

Plaintiff, Accelinear Service Co., Ltd., (hereinafter "Accelinear Service"), is an independent service organization ("ISO") that services Varian's machines, as well as those of other manufacturers, for end-users such as hospitals and private medical clinics. Its clients are located in Connecticut, the northeastern United States, and several foreign countries. Accelinear Service is a New Jersey corporation, with its principal place of business in Saddle Brook, New Jersey. In addition to the main office in New Jersey, Accelinear Service's vice president has an office in his home in Connecticut from which he conducts operations in Connecticut.

A [*3] number of other ISO's service Varian equipment throughout the United States, as well as Varian itself, which competes with the ISO's for the provision of services to end-users of Varian equipment. Because of the nature of the medical treatment for which these machines are used, the owners of the machines often require immediate service, 24 hours a day, seven days a week. Accelinear Service alleges that, in order to perform its contractual obligations to service its customers' machines, it must be able to purchase and obtain delivery of parts on an immediate, as-needed basis. The parts are often extremely expensive, and, traditionally Accelinear Service, like the other ISO's, has obtained "proprietary" parts from Varian on an overnight basis. "Proprietary" parts are those made by Varian for its machines or custom made to its specifications at its request.

In April of 1996, Varian announced a new policy that it would no longer sell replacement "proprietary" parts on a same-day or overnight basis, but would continue to sell them only upon 15-30 days notice. This policy was to have taken effect on July 1, 1996; its implementation, however, was delayed.

Accelinear Service, as well as [*4] four other ISO's, 1 complained to Varian that this change in policy would force them out of business because it would be beyond their financial capability to maintain an adequate inventory of parts to meet the needs of their customers. In the course of these discussions, they threatened to sue Varian for antitrust violations.

    1  The four other ISO's are Valencia Technical Services, Inc., a California corporation located in

1996 U.S. Dist. LEXIS 22675, *4

Southern California; Oncology Maintenance Services, a Texas corporation located in Plano, Texas; Technical Options of Georgia, Inc., a Georgia corporation, located in Smyrna, Georgia; and Accelectronics, Inc., a Pennsylvania corporation, located in Essex, Pennsylvania. As will be discussed later, these four corporations were sued by Varian in a declaratory judgment action filed in California.

On June 26, 1996, Varian filed a declaratory judgment action in the Northern District of California against the four ISO's as well as Accelinear Co., Ltd., asking the court to declare that its proposed [*5] proprietary parts policy did not violate the antitrust laws.

On July 9, 1996, Accelinear Service filed the instant action, asserting that this policy change was an effort by Varian to leverage its power in the market for the sale of its machines and its control of the supply of parts and services for the machines. Accelinear Service also challenged other practices of Varian not specifically related to the change in it proprietary parts policy. In its complaint, Accelinear Services alleges violations of the Sherman Act, *15 U.S.C. §§ 1, 2*, the Clayton Act, *15 U.S.C. § 14*, the Connecticut Antitrust Act, *Conn. Gen. Stat. Ann. §§ 35-24 et seq.*, and tortious interference with business relations.

A similar suit was filed against Varian by three of the ISO's in the United States District Court for the Eastern District of Texas, Texarkana Division. *Oncology Maintenance Services, Valencia Technical Services, Inc., and Accelectronics, Inc. v. Varian Associates, Inc.*, No. 5-96CV212 (E.D. Tex.).

In its declaratory judgment action, Varian did not initially name as a defendant Accelinear Service Co., Ltd., the plaintiff in the instant action. Instead, [*6] Accelinear Co., Ltd., a related corporation, was named. Later, after the instant action was filed, Varian amended its complaint to add Accelinear Service as a defendant. Accelinear Co., Ltd., is a New York corporation that allegedly has been defunct for the past several years.

In the California proceeding, Varian moved for a preliminary injunction, asking the court to enjoin this case, as well as the Texas case. The defendant ISO's moved to dismiss, stay or transfer. By Order dated August 26, 1996, the court (Jensen, J.) denied Varian's motion for preliminary injunction and denied without

prejudice defendants' motions. In its Order, the court noted as follows:

> The Court notes, however, that the separate actions brought by these parties have created a serious risk of duplicative litigation. In addition, the parties have demonstrated that there are problems in terms of the convenience of the fora. However, it is for the Connecticut and Texas courts to determine whether consolidation of these actions is appropriate and whether California is the more convenient forum. There is no good cause for this Court to usurp from those courts the power to handle their cases as they see fit. [*7]

*Varian Associates, Inc. v. Valencia Technical Services, Inc.*, No. C-96-2337 DLJ, at 11 (N.D. Cal. Order of Aug. 26, 1996). Thus, the question of whether to transfer this action to the Northern District of California must now be resolved by this court.

## II. DISCUSSION

Section *1404(a)* of Title 28 governs change of venue requests, and provides as follows:

> [HN1] For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

[HN2] Whether to transfer an action to another district is a decision committed to the sound discretion of this court to be exercised in light of all of the circumstances of the case. The burden of establishing that this action should be transferred is on Varian, as the moving party. 1A-Pt.2 James W. Moore *et al.*, *Moore's Federal Practice* P 0.345[5] (2d ed. 1996).

### The Convenience of the Parties and Witnesses

In support of its motion, Varian argues that California is the locus of the operative facts, relevant witnesses and documents, and, therefore, the convenience of the parties and witnesses is best served [*8] by a transfer. Varian asserts that its new policy, which is being challenged by Accelinear Service, was formulated in

California; the parts implicated by the new policy are invoiced and shipped from California; and any injunctive relief afforded Accelinear Service would have to be enforced in California where Varian is located. Moreover, Varian argues that all of its employee-witnesses are in California, as well as the largest number of end-users of its machines, who will purportedly rebut Accelinear Service's claims of an illegal conspiracy. Similarly, Varian's documents, as well as most of the end-user's documents are in California.

Not unexpectedly, Accelinear Service counters that Connecticut is the more convenient forum in that it has an office here (the vice president's home office); Connecticut is the "true geographic center" of the injuries that it has sustained; and its action focuses on the Connecticut market and, thus, most of its witnesses as well as documents are in Connecticut. It also disputes Varian's assertion that all of the parts and related documents are in California. Accelinear Service states that the parts are managed by a Michigan entity, Bellair, which is [*9] under contract with Varian to warehouse and ship the parts from depots located throughout the United States. Finally, Accelinear Service cites to its small size (14 employees) and the profound hardship that litigating this action would place upon it, in contrast to that of Varian, which has over 3,000 employees.

After weighing all of the facts presented by the parties, this court finds that the convenience of the parties and witnesses is best served by transferring this action to California. Although Connecticut was the forum chosen by plaintiff Accelinear Service, it is not the state of its incorporation or its principal place of business, and is only one of several states in which it does business. Indeed, neither party to this action has its principal place of business in Connecticut, whereas Varian is headquartered in California, as is one of the ISO's. Further, Varian's change in policy would affect its ISO's nationwide and would affect Accelinear Service not only in Connecticut, but in all states in which it does business. It appears that a majority of the witnesses and documents are located in California, and a significant amount of discovery will have to take place there regardless [*10] of whether this case is transferred. Finally, while this court is sympathetic to the financial hardship that litigating this case in California will place on Accelinear Service, Accelinear overlooks the fact that there is already one case pending in California to which it is a party, and, regardless of whether or not this case is

transferred, it will be litigating in California. Judge Jensen denied its motion to dismiss, stay or transfer.

*The Interest of Justice*

Additionally, this court finds that the interests of justice are best served by a transfer. There is a related case pending in California that raises many of the same issues presented in this case. While there are additional claims in this case, such as the Connecticut Antitrust Act count, the California court may exercise supplemental jurisdiction over these claims in the same manner as this court could have done. Transferring this case will avoid duplicative and piecemeal litigation, a factor to which this court gives great weight. *See Continental Grain Co. v. The Barge FBL-585, 364 U.S. 19, 26, 80 S. Ct. 1470, 4 L. Ed. 2d 1540 (1960).* Additionally, transfer will enable the California court to consider consolidation of the cases [*11] for whatever purposes it may deem appropriate, if it so chooses.

In so ruling, this court has not overlooked the "first-to-file" rule, argued by both parties. [HN3] The "first-to-file" rule, which is well-recognized in this Circuit, holds that where there are two competing lawsuits between the same parties and involving the same issues, the first should have priority, absent a showing that the balance of convenience or special circumstances weigh in favor of giving priority to the second. *First City National Bank & Trust Co. V. Simmons, 878 F.2d 76, 79 (2d Cir. 1989).* Varian contends that its California action was the first filed, and that Accelinear Service's action should have been filed as a counterclaim to its declaratory judgment action. Accelinear Service correctly points out, however, that it was not originally named as a defendant in the California case (although a related corporation was named) and that its action against Varian was filed in Connecticut before it was added as a party to the California action.

[HN4] While ordinarily there is a strong presumption in favor of the first filed case, as Judge Jensen noted in his ruling in the California case, it is not a [*12] rule that should be applied mechanically. *Varian v. Valencia, supra.* at 7. Under the somewhat unusual circumstances presented here, this court finds that the "first-to-file" rule should not operate in favor of either party. The "first-to-file" rule is based on the principle of fairness that the party who commenced the first suit should generally be the party who is given its choice of venue. *Ontel Products, Inc. v. Project Strategies Corp., 899 F. Supp.*

1996 U.S. Dist. LEXIS 22675, *12

*1144, 1151 (S.D.N.Y. 1995)*. It also embodies considerations of judicial administration and conservation of resources. *First City National Bank, supra, 878 F.2d at 80*.

Here, as found by Judge Jensen, Varian did not technically beat Accelinear Service to the courthouse, since it named a different, albeit related, entity, Accelinear Co., Ltd. Varian now accuses Accelinear Service of a "corporate shell game;" Accelinear Service claims that Varian had more than adequate notice of the proper corporate entity. Additionally, Accelinear Service raises concerns about Varian's good faith in rushing to the courthouse in light of ongoing negotiations that were taking place between the parties. *See Ontel Products, supra, 899 F. Supp. at 1151-52*. [*13] Judge Jensen, in his ruling, also suggests that Varian's filing was premature in that its policy had not taken final form as of the date of its filing its declaratory judgment action. *Varian v. Valencia, supra*, at 11. Whether Accelinear Service Co., Ltd., or Accelinear., Ltd., is the real party in interest, and who beat whom to the courthouse are issues this court need not resolve at this juncture. This court does not find the "first-to-file" rule to be dispositive of the transfer issue in this case. Rather, this court holds that the interests of justice and the convenience of the parties and witnesses are the factors that should predominate in deciding whether to transfer this particular case and finds in favor of transfer to California.

### III. CONCLUSION

For the foregoing reasons, this court GRANTS defendant Varian Associate, Inc.'s Motion to Transfer (Doc. # 8) this action to the Northern District of California. This court DENIES without prejudice the Motion to Dismiss or Stay (Doc. # 8).

Date: October 15, 1996.

Bridgeport, Connecticut.

WARREN W. EGINTON

Senior U.S. District Judge