1    WILLIAM L. ANTHONY, JR.  (State Bar No. 106908)
     wanthony@orrick.com
2    MATTHEW H. POPPE  (State Bar No. 177854)
     mpoppe@orrick.com
3    ZHENG LIU  (State Bar No. 229311)
     jenliu@orrick.com
4    ORRICK, HERRINGTON & SUTCLIFFE LLP
     1000 Marsh Road
5    Menlo Park, California 94025
     Telephone:    +1-650-614-7400
6    Facsimile:    +1-650-614-7401

7    Attorneys for Defendant
     VARIAN MEDICAL SYSTEMS, INC.
8
                    UNITED STATES DISTRICT COURT
9
                  NORTHERN DISTRICT OF CALIFORNIA
10
                      SAN FRANCISCO DIVISION
11

12

13   UNIVERSITY OF PITTSBURGH OF THE          Case No.  CV 08-02973 MMC
     COMMONWEALTH SYSTEM OF HIGHER
14   EDUCATION d/b/a UNIVERSITY OF            **DEFENDANT'S SUBMISSION OF
     PITTSBURGH, a Pennsylvania non-profit    EXHIBITS A-Q AND T-V TO THE
15   corporation (educational),               PREVIOUSLY-FILED "SEALED
                                              DECLARATION OF MATTHEW H.
16                     Plaintiff,             POPPE" IN SUPPORT OF MOTION
                                              TO TRANSFER, PER THE COURT'S
17          v.                                ORDER OF AUGUST 19, 2008 (DOC.
                                              NO. 62)**
18   VARIAN MEDICAL SYSTEMS, INC., a
     Delaware corporation,                    Date:        September 5, 2008
19                                            Time:        9:00 a.m.
                       Defendant.             Courtroom:   7, 19th Floor
20

21

22

23

24

25

26

27

28

1    Pursuant to the Court's Order Granting in Part and Denying in Part Defendant's

2    Administrative Motion to File Exhibits Under Seal, dated August 19, 2008 (Document No. 62),

3    Defendant Varian Medical Systems, Inc. ("Varian") hereby submits for the public record Exhibits

4    A through Q and T through V that were previously attached as exhibits to the Sealed Declaration

5    of Matthew H. Poppe in Support of Varian's Motion to Transfer Action to U.S. District Court for

6    Western District of Pennsylvania, filed on July 2, 2008 (Document No. 23).

7    I, Matthew H. Poppe, declare:

8    1.    I am a partner in the law firm of Orrick, Herrington & Sutcliffe LLP ("Orrick"),

9    counsel of record for Varian in this action and in *University of Pittsburgh v. Varian Medical*

10    *Systems, Inc.*, Case No. 2:07-cv-00491-AJS, in the Western District of Pennsylvania (the "Penn.

11    Case").  I am licensed to practice law in the State of California.  I have personal knowledge of the

12    facts stated herein, except where otherwise stated, and I could and would testify to those facts if

13    called as a witness.

14    2.    Attached hereto as Exhibit A is a true and correct copy of excerpts from the

15    deposition of Karun Shimoga, taken on August 31, 2007 in the Penn. Case.

16    3.    Attached hereto as Exhibit B is a true and correct copy of excerpts from the

17    deposition of Joel Greenberger, taken on September 21, 2007 in the Penn. Case.

18    4.    Attached hereto as Exhibit C is a true and correct copy of excerpts from the

19    deposition of Andre Kalend, taken on October 5, 2007 in the Penn. Case.

20    5.    Attached hereto as Exhibit D is a true and correct copy of excerpts from the

21    deposition of Takeo Kanade, taken on September 19, 2007 in the Penn. Case.

22    6.    Attached hereto as Exhibit E is a true and correct copy of excerpts from the

23    deposition of Robert Wooldridge, taken on September 26, 2007 in the Penn. Case.

24    7.    Attached hereto as Exhibit F is a true and correct copy of excerpts from the

25    deposition of Richard Westerhoff, taken on October 3, 2007 in the Penn. Case.

26    8.    Attached hereto as Exhibit G is a true and correct copy of excerpts from the

27    deposition of Marc Malandro, taken on October 2, 2007 in the Penn. Case.

28

Δ'S SUBMISSION OF EXHIBITS A-Q AND T-V TO
PREVIOUSLY-FILED "SEALED POPPE DECL."
(Case No. CV 08-02973 MMC)

9.      Attached hereto as Exhibit H is a true and correct copy of a document produced in the Penn. Case by Carnegie Mellon University ("CMU") pursuant to subpoena with Bates Nos. CMU 0279 to CMU 0283 and marked as Exhibit 7 at Mr. Wooldridge's deposition on September 26, 2007.  The same document (though with different Bates numbers) was marked as Exhibit 1 at Mr. Malandro's deposition on October 2, 2007.

10.     Attached hereto as Exhibit I is a true and correct copy of a document produced in the Penn. Case by CMU pursuant to subpoena with Bates Nos. CMU 0274 to CMU 0278 and marked as Exhibit 9 at Mr. Wooldridge's deposition on September 26, 2007.  The same document was marked as Exhibit 10 at Mr. Malandro's deposition on October 2, 2007.

11.     Attached hereto as Exhibit J is a true and correct copy of a document produced in the Penn. Case by CMU pursuant to subpoena with Bates Nos. CMU 0227 to CMU 0236 and marked as Exhibit 24 at Mr. Wooldridge's deposition on September 26, 2007.

12.     Attached hereto as Exhibit K is a true and correct copy of a document produced in the Penn. Case by CMU pursuant to subpoena with Bates No. CMU 0237 and marked as Exhibit 25 at Mr. Wooldridge's deposition on September 26, 2007.

13.     Attached hereto as Exhibit L is a true and correct copy of a document produced in the Penn. Case by CMU pursuant to subpoena with Bates Nos. CMU 0238 to CMU 0248 and marked as Exhibit 26 at Mr. Wooldridge's deposition on September 26, 2007.

14.     Attached hereto as Exhibit M is a true and correct copy of a document produced in the Penn. Case by CMU pursuant to subpoena with Bates Nos. CMU 0256 to CMU 0257 and marked as Exhibit 29 at Mr. Wooldridge's deposition on September 26, 2007.

15.     Attached hereto as Exhibit N is a true and correct copy of a document produced in the Penn. Case by CMU pursuant to subpoena with Bates No. CMU 0258 and marked as Exhibit 30 at Mr. Wooldridge's deposition on September 26, 2007.

16.     Attached hereto as Exhibit O is a true and correct copy of a document produced in the Penn. Case by CMU pursuant to subpoena with Bates No. CMU 0259 and marked as Exhibit 31 at Mr. Wooldridge's deposition on September 26, 2007.

17.    Attached hereto as Exhibit P is a true and correct copy of a document produced in the Penn. Case by CMU pursuant to subpoena with Bates No. CMU 0260 and marked as Exhibit 32 at Mr. Wooldridge's deposition on September 26, 2007.

18.    Attached hereto as Exhibit Q is a true and correct copy of a document produced in the Penn. Case by CMU pursuant to subpoena with Bates No. CMU 0262 and marked as Exhibit 34 at Mr. Wooldridge's deposition on September 26, 2007.

19.    Attached hereto as Exhibit T is a true and correct copy of excerpts from the deposition of  Joel Greenberger, taken on October 24, 2007 in the Penn. Case.

20.    Attached hereto as Exhibit U is a true and correct copy of excerpts from the deposition of Alexander Ciocca, taken on October 3, 2007 in the Penn. Case.

21.    Attached hereto as Exhibit V is a true and correct copy of excerpts from the deposition of Jeffrey Shogan, taken on October 3, 2007 in the Penn. Case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed in Menlo Park, California on August 20, 2008.


_____/s/ _Matthew H. Poppe_____
Matthew H. Poppe

Δ'S SUBMISSION OF EXHIBITS A-Q AND T-V TO
PREVIOUSLY-FILED "SEALED POPPE DECL."
(Case No. CV 08-02973 MMC)

1

## **CERTIFICATE OF SERVICE**

2

3          I hereby certify that a true and correct copy of the DEFENDANT'S SUBMISSION OF

4     EXHIBITS A-Q AND T-V TO THE PREVIOUSLY-FILED "SEALED DECLARATION OF

5     MATTHEW H. POPPE" IN SUPPORT OF MOTION TO TRANSFER, PER THE COURT'S

6     ORDER OF AUGUST 19, 2008 (DOC. NO. 62) was served upon the University of Pittsburgh,

7     through its counsel, via:

8

9          _____          Hand-Delivery

10         _____          Facsimile

11         _____          First Class, US Mail, Postage Prepaid

12         _____          Certified Mail-Return Receipt Requested

13         _____X_____          ECF Electronic Service

14         _____          Overnight Delivery

15

16          at the following addresses:

17                                      Rita E. Tautkus
                                    Morgan Lewis & Bockius, LLP
18                                  One Market – Spear Street Tower
                                    San Francisco, CA   94105
19                                  rtautkus@morganlewis.com

20

21     Dated:  August 20, 2008                    _____/s/ Matthew H. Poppe_____
                                                        Matthew H. Poppe

22

23

24

25

26     OHS West:260496078.2

27

28

- 4 -

# EXHIBIT A

IN THE UNITED STATES DISTRICT

NORTHERN DISTRICT OF CALIFORNIA


UNIVERSITY OF PITTSBURGH,　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff　　　　)
　　　　　　　　　　　　　　　　) Case No.
vs.　　　　　　　　　　　　　　)07-CV-0791(AJS)
　　　　　　　　　　　　　　　　)
VARIAN MEDICAL SYSTEMS,　　　 )Western District of
　　　　　　　　　　　　　　　　)Pennsylvania
　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　)
_____)

**CERTIFIED COPY**


HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF KARUN B. SHIMOGA, PhD

August 31, 2007


Reported by:

Rick Posner

CSR No. 5040

**U.S. LEGAL**
*Support*

Certified Electronic Reporters

182 Montgomery Street, Suite 1150
San Francisco, CA 94104

888-575-3376 • Fax 858-866-3376
www.uslegalsupport.com

1    IN THE UNITED STATES DISTRICT

2    NORTHERN DISTRICT OF CALIFORNIA

3

4  UNIVERSITY OF PITTSBURGH,        )
                                    )
5          Plaintiff               )
                                    ) Case No.
6  vs.                              )07-CV-0791(AJS)
                                    )
7  VARIAN MEDICAL SYSTEMS,          )Western District of
                                    )Pennsylvania
8                                   )
           Defendant.               )
9  _____)

10

11

12      Deposition of KARUN B. SHIMOGA, PhD

13      taken on behalf of the Defendant at

14      1000 Marsh Road, Menlo Park, CA

15      beginning at 8:57 a.m. and ending at

16      6:02 p.m. on Friday, August 31, 2007

17      before Rick Posner, CSR No. 5040.

18

19

20

21

22

23

24

25

2

**U.S. Legal Support**

```
1                              APPEARANCES

2

3    Representing:  Plaintiff

4             Morgan, Lewis & Brockius, LLP

5             Rita E. Tautkus, Esq.

6             One Market, Spear Street Tower

7             San Francisco, CA 94105

8             415/442-1357

9             rtautkus@morganlewis.com

10

11   Representing:  Defendant

12             Orrick, Herrington & Sutcliffe

13             Matthew H. Poppe, Esq.

14             1000 Marsh Road

15             Menlo Park, CA 94025

16             650/614-7431

17             mpoppe@orrick.com

18

19             ALSO PRESENT:  Ramon Peraza, Videographer

20

21

22

23

24

25
                                                              3
```

1                 KARUN B. SHIMOGA, PhD,

2   Having been first duly sworn, was examined and

3   testified as follows:

4

5         THE VIDEOGRAPHER:  Good morning.  Here

6   begins the deposition of Dr. Karun Shimoga in the

7   matter of University of Pittsburgh versus Varian

8   Medical Systems, Inc.  This case is filed in the

9   United States District Court for the Western

10   District of Pennsylvania.  And the case number is     8:57:38AM

11   2:07-CV-00491-AJS.  Today's date is August 31st,

12   2007, and the time is 8:57 a.m.

13        This deposition is taking place at the law

14   offices of Orrick, Herrington & Sutcliffe, LLP,

15   located at 1000 Marsh Road, Menlo Park, California,   8:58:02AM

16   94025, and is being taken on behalf of the

17   defendants.  The videographer is Ramon Peraza

18   appearing on behalf of US Legal Support.  The court

19   reporter is Rick Posner, also appearing on behalf of

20   US Legal Support.                        8:58:20AM

21        Will counsel present please identify

22   yourselves for the record and state whom you

23   represent.

24        MR. POPPE:  Matthew Poppe with Orrick on

25   behalf of Varian Medical Systems.           8:58:27AM

                                                      7

1          MS. TAUTKUS:  Rita Tautkus with Morgan          8:58:29AM

2     Lewis and Brockius on behalf of Dr. Karun Shimoga

3     and plaintiff University of Pittsburgh.

4          THE VIDEOGRAPHER:  The court reporter may

5     now swear in the witness.                            8:58:37AM

6                    (Witness sworn.)

7

8                    EXAMINATION

9     BY MR. POPPE:

10         Q    Good morning, Dr. Shimoga.  How are you?   8:58:50AM

11         A    Fine.  Pretty good.  Thank you.

12         Q    As I just mentioned my name is Matt Poppe

13    and I'm an attorney for Varian Medical Systems.  And

14    you understand that Varian Medical Systems has been

15    sued for patent infringement by the University of    8:59:02AM

16    Pittsburgh?  Can you please say yes or no?

17         A    Yes.

18         Q    Thank you.

19              I understand you got caught in a little

20    traffic today and just arrived a couple minutes ago, 8:59:11AM

21    is that correct?

22         A    Yes.

23         Q    It's not a problem at all.  We appreciate

24    you being here.

25         A    Thank you.                                 8:59:18AM

                                                                    8

```
 1    that seems to be correct.                      9:42:28AM

 2         Q    And the development work on the inventions

 3    that were described in those patents had started a

 4    couple years before that, is that correct?

 5              MS. TAUTKUS:  Objection, vague.        9:42:40AM

 6              THE WITNESS:  Yeah.  If I recall it was

 7    somewhere, much earlier, yeah.

 8    BY MR. POPPE:

 9         Q    Much earlier than 1996?

10         A    Correct.                              9:42:53AM

11         Q    And during that period of the invention

12    development prior to the filing of the patent

13    applications, were you an employee of Carnegie

14    Mellon University during that whole time?

15              MS. TAUTKUS:  Objection, vague.        9:43:06AM

16              THE WITNESS:  Yes.

17    BY MR. POPPE:

18         Q    You were a professor?

19         A    I was a scientist.

20         Q    And what's the distinction between     9:43:19AM

21    scientist and professor?

22         A    The professor teaches and a scientist does

23    research.

24         Q    So you were purely doing research?

25         A    Correct, research and development.     9:43:31AM
```

                                                          40

1     Q    And that was during the entire period of     9:43:33AM

2    the development of the inventions?

3              MS. TAUTKUS:  Objection, vague.

4              THE WITNESS:  Yes.

5    BY MR. POPPE:                                          9:43:42AM

6     Q    And was that true during your entire

7    period of employment with Carnegie Mellon that you

8    were a scientist, not a professor?

9     A    Correct.

10     Q    Did you have the same -- did you have a       9:43:57AM

11    title other than scientist?

12     A    Yes.

13     Q    What was your title?

14     A    Project scientist.

15     Q    And was your title the same during your       9:44:06AM

16    entire time with Carnegie Mellon?

17     A    It changed.  The initial employment

18    started as what is called a research associate, and

19    then changed to project scientist.

20     Q    And it was project scientist when you left    9:44:22AM

21    the University?

22     A    Correct.

23     Q    When did you start at Carnegie Mellon?

24     A    Early '93.

25     Q    And who did you report to at that time?       9:44:32AM

41

**U.S. Legal Support**

1    local research community and the presence of            9:53:32AM

2    hospitals spurred interest in radiation oncology.

3         Q    Were any of those -- strike that.

4              And so it was after joining Carnegie

5    Mellon that you first began to study the procedures    9:54:12AM

6    related to radiation therapy to better understand

7    how robotics applications might be used in that

8    context?

9              MS. TAUTKUS:   Objection, vague.

10             THE WITNESS:   Yes, in a more serious         9:54:36AM

11   sense.

12   BY MR. POPPE:

13        Q    In a more serious sense you said?

14        A    Yes.

15        Q    When was it that you left Carnegie Mellon,    9:54:43AM

16   left your employment with Carnegie Mellon?

17        A    It is little interesting.  At the end of

18   1999 I got leave of absence to work at a Carnegie

19   Mellon spin off company for a short while.

20        Q    What was the name of that company?           9:55:16AM

21        A    It is called Quant Point.

22        Q    Spell that.

23        A    Q-u-a-n-t, P-o-i-n-t.  Quant Point.  It

24   was also a robotics related company, but nothing to

25   do with the medical application.  But they needed      9:55:27AM

                                                            48

1    somebody with my expertise.  And I partially worked        9:55:32AM

2    on -- worked at that company for a couple of months.

3    And while the projects at Carnegie Mellon were still

4    going on, since I was a faculty on sabbatical, I

5    still, as a matter of professional interest, I was        9:55:53AM

6    supporting projects at Carnegie Mellon and also the

7    projects at UPMC.

8            As you understand, the projects at UPMC

9    were supported by Carnegie Mellon, and when the

10   project was about to be completed at Quant Point,        9:56:15AM

11   there were some shuffling of positions at UPMC which

12   called for somebody with my expertise to be there

13   full-time, again as my partial support through

14   Carnegie Mellon.

15           And at that time instead of returning back        9:56:36AM

16   to return to Carnegie Mellon, I continued the leave

17   of absence and joined University of Pittsburgh.  I

18   do not recall when I terminated the leave of absence

19   status.

20           MS. TAUTKUS:  Matt, we've been going for        9:57:11AM

21   about an hour.  Maybe it's an appropriate time for a

22   break.

23           MR. POPPE:  We can break now if you like.

24           MS. TAUTKUS:  Very well.

25           THE VIDEOGRAPHER:  We are off the record        9:57:18AM

                                                                    49

**U.S. Legal Support**

```
1    calls for speculation.                            10:37:07AM

2         THE WITNESS:  I do not recall any other

3    work with the radiation oncology.

4    BY MR. POPPE:

5         Q    How did you like working with Dr. Kanade?  10:37:22AM

6         A    He's a nice person.

7         Q    And I take it you respect him as a

8    professional in his field?

9         A    Absolutely.  A lot of people would love to

10   associate themselves with him.                   10:37:34AM

11        Q    How did you first meet Mr. Athanassiou?

12        A    Mr. Athanassiou was a graduate student in

13   the Robotics Institute.

14        Q    Was he already there when you started at

15   Carnegie Mellon?                                 10:37:54AM

16        A    I do not know the exact answer to that,

17   whether he joined first or I joined first, but

18   somewhere along the line we came to know each other.

19        Q    And I believe you referred to him as

20   Harry?                                           10:38:15AM

21        A    Correct.

22        Q    That was the name that he used generally?

23        A    Correct.

24        Q    And still does, I assume?

25        A    Yes.                                    10:38:24AM
```

                                                        65

**U.S. Legal Support**

1      Q   Had you known him prior to or outside --      10:38:25AM

2   had you known him prior to starting work at Carnegie

3   Mellon?

4      A   No.

5      Q   Did you work with him on projects other      10:38:39AM

6   than the collaboration with University of Pittsburgh

7   that led to these patents?

8      A   No.

9      Q   Did he work on other projects that you're

10  aware of other than that this one --      10:38:51AM

11      MS. TAUTKUS:  Objection, vague.

12  BY MR. POPPE:

13      Q   -- through the Robotics Institute?

14      MS. TAUTKUS:  Objection, vague, calls for

15  speculation.      10:38:57AM

16      THE WITNESS:  Yes.

17  BY MR. POPPE:

18      Q   Do you know whether he had any particular

19  background in radiation oncology?

20      MS. TAUTKUS:  Objection, vague.      10:39:09AM

21      THE WITNESS:  I do not know.  From my

22  understanding the previous projects were not related

23  to radiation oncology.

24  BY MR. POPPE:

25      Q   And on the joint project with the      10:39:22AM

66

1    University of Pittsburgh, what was his role in          10:39:26AM

2    connection with that project?

3        A    He was the project engineer.  He's an

4    expert software developer, and also he has a very

5    good knowledge of the software architecture.          10:39:42AM

6        Q    And what do you mean when you say software

7    architecture?

8        A    It means as to -- for a system to work

9    what should be where in terms of the software

10   components, and where are the pitfalls, what you         10:40:01AM

11   should watch out for, where the software can fail,

12   and how it should be tested and so on.

13       Q    Do you have any of that type of expertise?

14       A    I do to some extent.  But he's trained in

15   that area, so he was a significant contributor in       10:40:21AM

16   that aspect.

17       Q    So back in that time period when that

18   project was going on can you describe what your

19   training or background was in the general area of

20   software development?                                    10:40:39AM

21           MS. TAUTKUS:  Objection, vague.

22           THE WITNESS:  I was and am able to write

23   software and do all of those things that I

24   mentioned, but not to the extent of somebody who is

25   specially trained to do that.  My strong points are     10:40:53AM

                                                             67

1    more towards conceptualization and finding drawbacks    10:41:00AM

2    and contrasting, comparing different concepts in

3    terms of their applicability, and knowing new

4    technologies and how it should be implemented.

5          My role on the project was primarily    10:41:20AM

6    project management.  From the title I was

7    responsible for organizing what is required for the

8    project in order to be implemented once the concept

9    was formulated.

10   BY MR. POPPE:    10:41:40AM

11      Q   As of the mid-1990s, what software

12   languages did you know how to program in?

13      A   C, C++.

14      Q   Just those two?

15      A   Yes.  I have programmed in other languages    10:41:52AM

16   before, but those were the primary languages that we

17   were using for the project in question.

18      Q   And those are very common software

19   languages that were used at that period, correct?

20      A   Correct.    10:42:06AM

21      Q   In connection with this joint project were

22   you responsible for managing the work of

23   Mr. Athanassiou?

24      A   In a technical sense.

25      Q   Can you explain?    10:42:25AM

68

**U.S. Legal Support**

```
 1        A    In terms of what the mathematics is and      10:42:26AM

 2   how it should go and how it should be implemented,

 3   how the mathematical problem has to be solved, and

 4   once the solution is arrived he was good at

 5   implementing it.                                        10:42:42AM

 6            He also has similar kind of background as

 7   I do, however, we kind of complemented each other.

 8   My larger weight is on the mathematics and the

 9   theory side, while his strong points were towards

10   the implementation of the software.                    10:43:06AM

11        Q    And in the area that you've described as

12   his strengths, what was your general opinion of his

13   competence and ability in those areas?

14            MS. TAUTKUS:  Objection, vague.

15            THE WITNESS:  He's pretty good.  He falls     10:43:34AM

16   about 75 percentile.  I would rate him somewhere

17   close to 80 -- 80, 85.

18   BY MR. POPPE:

19        Q    And I take it given the fact that you've

20   stayed in contact with him, you've enjoyed working     10:43:49AM

21   with him as a person?

22        A    Yes.

23        Q    How did you first get in contact or become

24   acquainted with Dr. Greenberger?

25        A    When Dr. Kanade suggested me of this         10:44:11AM
```

69

**U.S. Legal Support**

1    In one of the initial meetings we were given a tour    11:25:37AM

2    of the hospital where the treatment was being done

3    and so on.  That is when I came to know that the

4    University of Pittsburgh Medical Center has linear

5    accelerators that are being used for treating    11:25:53AM

6    radiation -- treating cancer patients.  But I do not

7    recall when we discussed topics such as where it

8    will be implemented at UPMC.

9    BY MR. POPPE:

10        Q   At some time in 1994 over the course of    11:26:14AM

11   your actual research work did you begin to work with

12   a Varian linear accelerator in connection with the

13   research that you were doing jointly?

14            MS. TAUTKUS:  Objection, vague.

15            THE WITNESS:  You say in 1994?    11:26:31AM

16            MR. POPPE:  Yes.

17            THE WITNESS:  I do not recall what is

18   exact date, but 1994 to my recollection would be a

19   little bit early to have had -- to having at the

20   point of doing anything at UPMC.  I don't know when    11:26:51AM

21   we transferred that, but to my best recollection,

22   1994 we were working on still, working on the proof

23   of concept which was all at Carnegie Mellon.

24   BY MR. POPPE:

25        Q   Let me broaden the question to the 1994 to    11:27:08AM

96

**U.S. Legal Support**

1    1996 period preceding the filing of the patent        11:27:12AM

2    applications.  At some point during that period did

3    you begin doing -- you meaning you personally in

4    conjunction with other members of this joint

5    research group -- working on a Varian linear        11:27:27AM

6    accelerator in connection with the research?

7            MS. TAUTKUS:  Objection, vague, lacks

8    foundation.

9            THE WITNESS:  Yes.  We set up a system in

10   a room that had the Varian.  I believe it was Varian    11:27:43AM

11   linear accelerator.  It was one of the linear

12   accelerators.  But to the exact date, I do not

13   recall.  It was sometime around the time of filing

14   our -- I don't know what was the relationship

15   between the filing of the patent date to the        11:28:09AM

16   approximate time frame of when the system was set up

17   at University of Pittsburgh Medical Center.

18   BY MR. POPPE:

19       Q    During that pre-patent application filing

20   period, was there only a single linear accelerator    11:28:26AM

21   that your group worked on in connection with the

22   joint research project?

23           MS. TAUTKUS:  Objection, vague.

24           THE WITNESS:  Once again, whether it was

25   prior to patent filing or -- as I said, I do not        11:28:39AM

                                                                97

**U.S. Legal Support**

```
 1    have a relative sense of whether our effort of         11:28:45AM
 2    moving the system to there was before or after the
 3    filing of the patent was.  Yes, it was all in one
 4    room.
 5    BY MR. POPPE:                                           11:29:04AM
 6         Q    Can you describe for me what the proof of
 7    concept was that you developed --
 8              MS. TAUTKUS:  Objection, vague.
 9    BY MR. POPPE:
10         Q    -- that you've referred to in your prior      11:29:14AM
11    testimony?
12         A    The proof of concept, finally we chose to
13    focus on three aspects of the radiation oncology
14    solution which culminated in three patents.  And as
15    far as the patient positioning is concerned we -- in    11:29:35AM
16    terms of the patient positioning is concerned, we --
17    a table, a writing desk was used as a treatment
18    couch.  We bought an inexpensive -- these mannequins
19    from some clothing stores that display clothes as a
20    patient.                                                11:30:09AM
21              And we attached several markers to make
22    the skin marks that we eventually refined.  And we
23    attached some kind of sensors to the walls in our
24    laboratory and a camera on the false roof, the false
25    ceiling, and some kind of black curtain to color or    11:30:35AM
```

98

1    to prevent the extra light coming in, and a computer    11:30:38AM

2    connected to the desk.

3            And it was a pretty crude proof of

4    concept, but the idea was to show that we can do it.

5        Q    And that happened at Carnegie Mellon?    11:30:55AM

6        A    Correct.

7        Q    And it was just you and Dr. Kanade

8    preparing that proof of concept?

9        A    Later Harry also joined.

10       Q    And this was using the existing light    11:31:12AM

11   surface mapping technology that Dr. Kanade had

12   previously developed?

13           MS. TAUTKUS:  Objection, vague, assumes

14   facts.

15           THE WITNESS:  It was used for -- as I    11:31:30AM

16   said, it was used for an exploratory experiment.

17   However, later we started to more refined technique,

18   which I don't believe involved light stripe surface

19   matching and the initial concept was using cameras,

20   just the regular light projected, and laser    11:32:03AM

21   alignment markers and computer.

22   BY MR. POPPE:

23       Q    What do you mean by the regular light

24   projected?

25       A    It means an ordinary table lamp attached    11:32:14AM

99

1    your practice to retain them such as in a file          12:49:38PM

2    somewhere, or would you discard them?

3            MS. TAUTKUS:  Objection, vague.

4            THE WITNESS:  Both yes or no.  If the

5    article was interesting enough, or if the article        12:49:50PM

6    had the content that I would like to refer back

7    again, my primary focus was the concept, the

8    mathematics or anything related to images, image

9    processing and automation of some of these things.

10           And if the article was more focused on           12:50:09PM

11   that part of it, then probably I would have either

12   copied part of it or all of it for my own reference

13   later.  But if it was something else I would just

14   read it and pass it on and absorb whatever was

15   necessary.  So in that sense, yes, I did both.           12:50:26PM

16   BY MR. POPPE:

17      Q   Going back for a moment to the proof of

18   concept, in connection with the aspect that involved

19   determining patient movement from the movement of

20   fiducials on the patient's skin, what was the system     12:50:44PM

21   output that you were -- that you wanted the system

22   to generate that you would then review to see if it

23   was working properly or not?

24           MS. TAUTKUS:  Objection, vague.

25           THE WITNESS:  I don't recollect exactly          12:51:06PM

                                                                     138

1   what the numerical outputs were and how it was                    12:51:07PM

2   implemented properly unless I spend a couple of days

3   going through the software and things like that.

4   But conceptually, the image of the markers was

5   processed in order to extract the markers and then                12:51:24PM

6   compare with where they were in the previous time

7   instance.

8          And if it is larger than -- if it is

9   smaller than certain limit, then we declare that the

10  patient has not moved.  And if it's larger than this              12:51:39PM

11  limit and another higher limit, then we warn the

12  medical staff that the patient has moved but not

13  significantly, then the medical staff has to decide

14  whether they want to continue or not at a conceptual

15  level.  And then it if goes beyond the second limit,             12:52:00PM

16  then we immediately warn the medical staff to stop

17  the radiation and the patient has moved beyond

18  limit.  That's our thing.

19         How it was presented, it was presented

20  through graphical user interface.  A kind of a side              12:52:18PM

21  bar, I think there is a kind of a schematic in one

22  of the patients.  A schematic, a vertical bar on the

23  side with three partitions, and the bottom one three

24  partitions, and as soon as the patient -- when the

25  patient treatment goes on, one of those partitions               12:52:40PM

                                                                     139

1    will always be green, it means go ahead.  And when     12:52:44PM

2    the patient moves to a second level of disturbance

3    from its correct position, it turns on the next

4    block which turns yellow, then we have both green

5    and yellow, and the next one becomes red when he     12:52:59PM

6    goes beyond that.

7           And for the first one we also provided

8    some auditory feedback, some kind of little ringing

9    from the computer itself, and then when it goes to

10   red the volume increases to alert the medical staff.   12:53:14PM

11   BY MR. POPPE:

12      Q   Was the graphical user interface something

13   that your team developed itself?

14           MS. TAUTKUS:  Objection, vague.

15           THE WITNESS:  Correct.                   12:53:28PM

16   BY MR. POPPE:

17      Q   Was it built on any type of commercial

18   graphical user interface, or was it built from

19   scratch?

20      A   It was C.  C language has a couple of       12:53:38PM

21   tools that you can use to generate such visual

22   interfaces.

23      Q   Were there any records that your team

24   generated to record the progress of the development

25   to either document what experiments had been        12:54:05PM

                                                                140

**U.S. Legal Support**

```
 1    conducted, or what the results of the experiments       12:54:08PM

 2    were, or what further development was necessary,

 3    things of that nature?

 4              MS. TAUTKUS:  Objection, vague, compound.

 5              THE WITNESS:  Whatever the charts, graphs,      12:54:19PM

 6    tables that we produced, and also the summaries that

 7    we wrote, we all used to -- UPMC was -- we used to

 8    send them to UPMC.  And whatever the material that

 9    we made and preserved, they should all be in the

10    collection that I left at UPMC.  Whatever, the CDs       12:54:41PM

11    and the videos that we did for fundraising and so

12    on.

13    BY MR. POPPE:

14       Q    How about the software itself that your

15    team developed, was that at UPMC?                        12:55:02PM

16       A    Correct.

17       Q    And to your knowledge nothing was left

18    behind at Carnegie Mellon in terms of the

19    documentation or the software or videos that you

20    just mentioned?                                          12:55:15PM

21       A    I don't believe we left anything.  And

22    eventually whatever the version we had at Carnegie

23    Mellon was the base version that we built on when we

24    moved onto UPMC.  So either we copied it and

25    transferred it to the new computer, the new UPMC, or     12:55:34PM
```

                                                                  141

**U.S. Legal Support**

1    we moved the hard drive, or we maintained the same          12:55:40PM

2    box with a new monitor.  I mean, probably a

3    combination of the three.

4         Q    Was there a particular file room or

5    library at UPMC that you knew about where this type          12:55:58PM

6    of material was kept as of the time that you left?

7         A    Actually when I became an employee of the

8    University of Pittsburgh most of material used to be

9    in my office, and my office and the room where we

10   were -- we had the setup made, some of the hardware         12:56:20PM

11   things were all there.  Then the computer on a

12   stretcher so that we can move things around easily

13   and so on.  But when I left I placed all of them in

14   a box and returned it.

15        Q    To Dr. Greenberger?                                12:56:39PM

16        A    Yes.

17        Q    And it all fit in a single box?

18        A    The documents I'm talking about, the

19   documents and the videos, the CDs and so on.  And

20   the computer that we used were also left in the             12:56:54PM

21   laboratory where we were doing the final

22   experiments.  And I think the computer was also

23   placed in a known place, and Dr. Greenberger was

24   informed about the presence of the computer there,

25   but I do not know where that would be right now.            12:57:15PM

1     Q    Did the laboratory you just referred to     12:57:19PM

2  where you had been working have a particular name?

3     A    I don't think there is any name for it.

4  We just used to call it the lab.

5     Q    What facility was it in, a particular     12:57:37PM

6  hospital?

7     A    It was in Monti Fiore University Hospital.

8     Q    Can you spell that?

9     A    M-o-n-t-i, F-i-o-r-e, Monti Fiore

10  Hospital.  Monti Fiore University Hospital.  It's a     12:57:53PM

11  building where the radiation oncology department is,

12  Dr. Greenberger's office is, Dr. Kalend's office

13  was, and my office was, and laboratory.  It's a

14  place where the patients are treated, and also there

15  are laboratories where they do some of these other     12:58:10PM

16  experiments, biological-related --

17     Q    Just going back for a moment to something

18  that we were talking about before, for each of the

19  aspects of this project that you were working on,

20  the ultimate output was a computer display to the     12:58:46PM

21  user, is that correct?

22          MS. TAUTKUS:  Objection, vague.

23          THE WITNESS:  Yes, in some sense.  That is

24  the mode of feedback to the humans.  The monitor is

25  the feedback to the human.  And then what we humans     12:59:09PM

143

1    let's use them, and then since you have the in-house    2:43:53PM

2    expertise here, we will set up the initial proof of

3    concept test here and so on.

4        Q   So for the phase of development up through

5    the filing of the patent applications, what was the    2:44:24PM

6    source of funding?

7            MS. TAUTKUS:  Objection, vague.

8            THE WITNESS:  I do not recall the exact

9    demarcation, however, we were initially Carnegie

10   Mellon was supporting my time and Dr. Kanade's time    2:44:41PM

11   and also Harry Athanassiou's time, and of course

12   both Harry and my salaries were coming from Carnegie

13   Mellon.  And how our time was divided depends on the

14   superior that we reported to, and in that sense

15   Carnegie Mellon paid for our time, and André Kalend    2:45:05PM

16   and Joel Greenberger's time was paid by University

17   of Pittsburgh.

18   BY MR. POPPE:

19       Q   And where did funding for equipment that

20   you used on the project come from?    2:45:16PM

21           MS. TAUTKUS:  Objection, vague.

22           THE WITNESS:  The equipment we initially

23   used as I shared in one of my previous discussions

24   were computers, since some of these were unwanted

25   from other projects.  And primarily whatever we    2:45:34PM

                                                      168

1  STATE OF CALIFORNIA        )

2  : ss

3  COUNTY OF SAN FRANCISCO  )

4

5          I, the undersigned, a Certified Shorthand

6  Reporter of the State of California, do hereby certify:

7          That the foregoing proceedings were taken before

8  me at the time and place herein set forth; that any

9  witnesses in the foregoing proceedings, prior to

10 testifying, were placed under oath; that a verbatim record

11 of the proceedings was made by me using machine shorthand

12 which was thereafter transcribed under my direction;

13 further, that the foregoing is an accurate transcription

14 thereof.

15         I further certify that I am neither financially

16 interested in the action nor a relative or employee of any

17 attorney of any of the parties.  IN WITNESS WHEREOF, I

18 have this date subscribed my name.

19         Dated: *August 31, 2007*

20

21         _____

22         RICK POSNER CSR No. 5040

23

24

25

                                                        283

# EXHIBIT B

1

## FOR ATTORNEYS' EYES ONLY

1    IN THE UNITED STATES DISTRICT COURT FOR THE
2              WESTERN DISTRICT OF PENNSYLVANIA

3                        - - - -

UNIVERSITY OF PITTSBURGH,        )
4                                )
                                 )
5              Plaintiff,        )
6                                )              Case No.
     -vs-                        )    07-CV-0791 (AJS)
7                                )
                                 )
8    VARIAN MEDICAL SYSTEMS, INC., )
                                 )
9              Defendant.        )       ORIGINAL
10

11                        - - - -

12         CONFIDENTIAL - ATTORNEYS' EYES ONLY
13
                          - - - -
14
15    VIDEOTAPE DEPOSITION OF:  JOEL GREENBERGER, M.D.

16                        - - - -

17              DATE:    September 21, 2007
                         Friday, 9:05 a.m.
18

19              LOCATION:  PICADIO SNEATH
                           MILLER & NORTON
20                         4710 U.S. Steel Tower
                           600 Grant Street
21                         Pittsburgh, PA  15219

22
                TAKEN BY:  Defendant
23

24              REPORTED BY:  Heidi H. Willis, RPR, CRR
                              Notary Public
25                            AKF Reference No. HW03100



2

```
 1        VIDEOTAPE DEPOSITION OF JOEL GREENBERGER, M.D.,
       a witness, called by the Defendant for examination,
 2     in accordance with the Federal Rules of Civil
       Procedure, taken by and before Heidi H. Willis, RPR,
 3     CRR, a Court Reporter and Notary Public in and for
       the Commonwealth of Pennsylvania, at the offices of
 4     Picadio Sneath Miller & Norton, 4710 U.S. Steel
       Tower, Pittsburgh, Pennsylvania, on Friday, September
 5     21, 2007, commencing at 9:05 a.m.


 6
                            - - - -
 7


 8     APPEARANCES:

 9          FOR THE PLAINTIFF:
       John D. Zele, Esq.
10     MORGAN LEWIS & BOCKIUS, LLP
       1111 Pennsylvania Avenue, NW
11     Washington, D.C.   20004
       P 202-739-5418
12     F 202-739-3001
       jzele@morganlewis.com
13
       - and -
14
       Laura R. Hillock, Esq.
15     UNIVERSITY OF PITTSBURGH
       1710 Cathedral of Learning
16     Pittsburgh, PA   15260-6404
       P 412-624-0216
17     F 412-624-9165
       thillock@pitt.edu
18

19          FOR THE DEFENDANT:
       Matthew H. Poppe, Esq.
20     ORRICK HERRINGTON & SUTCLIFFE, LLP
       1000 Marsh Road
21     Menlo Park, CA   94025
       P 650-614-7400
22     F 650-614-7401
       mpoppe@orrick.com
23

24          ALSO PRESENT:
       Tnaya Witmer, Videographer
25
```



4

```
 1                    - - - -

 2                 PROCEEDINGS

 3                    - - - -

 4            THE VIDEOGRAPHER:  Good morning.  My

 5       name is Tnaya Witmer.  I'm the videographer on

 6       behalf of AKF Court Reporters located at 436

 7       Boulevard of the Allies, Pittsburgh,

 8       Pennsylvania.

 9            Today is September 21st, 2007.  This

10       is the deposition of Dr. Joel Greenberger in

11       the case of the University of Pittsburgh versus

12       Varian Medical Systems, Inc.

13            The time is 9:06 a.m.  If the court

14       reporter would please swear in the witness, we

15       may begin the deposition.

16  -------------------------------------------------

17            JOEL GREENBERGER, M.D.,

18            being first duly sworn,

19         was examined and testified as follows:

20                    - - - -

21            MR. POPPE:  And before we begin,

22       John, do you want to note what you noted to me

23       right before we started?

24            MR. ZELE:  Yes.  Today is Yom Kippur,

25       starts at sundown tonight.  Dr. Greenberger has
```

1    to leave today at 5 p.m., and to the extent

2    that there's any time remaining for the seven

3    hours for the deposition, Dr. Greenberger will

4    come back for that remaining time.

5              MR. POPPE:  Okay.

6              - - - -

7              EXAMINATION

8              - - - -

9    BY MR. POPPE:

10   Q.   Dr. Greenberger, my name is Matt Poppe.  I'm an

11        attorney for Varian Medical Systems.  Thank you

12        for being here today.

13             Have you ever been deposed before?

14   A.   Yes.

15   Q.   On how many occasions?

16   A.   I can't give you an exact answer.  Approximate?

17   Q.   Approximate is fine.

18   A.   15.

19   Q.   Have -- what was the most recent time before

20        today?

21   A.   Two to three years ago.

22   Q.   Have any of those instances been in your

23        capacity as a retained expert for a party in

24        litigation?

25   A.   Yes.



```
 1          source code in connection with the development
 2          of the device associated with the patents in
 3          this case?
 4                    MR. ZELE:  Objection, vague, assumes
 5          facts not in evidence.
 6    A.    Did I write the source code, could you just
 7          clarify what you mean by that?  Was I -- you
 8          are asking me if I was at the computer typing
 9          in?
10    Q.    Right.
11    A.    I'm sorry, I don't understand.
12    Q.    That's what I mean.
13    A.    No.
14    Q.    To your knowledge were any of the inventors,
15          meaning Dr. Kalend, Shimoga, Kanade and
16          Mr. Athanassiou -- sorry, let me restate that.
17                    To your knowledge did any of those
18          inventors personally write source code for the
19          device associated with the patents in this
20          case?
21                    MR. ZELE:  Objection, vague, assumes
22          facts not in evidence.
23    A.    Yes.
24    Q.    Which of them?
25    A.    Any and potentially all of them.
```



36

```
1   Q.    Did you personally supervise any computer
2         programmers other than those four inventors in
3         the development of source code for the project
4         associated with the patents?
5              MR. ZELE:  Objection, vague,
6         misstates testimony, assumes facts not in
7         evidence.
8   A.    No.
9   Q.    To your knowledge did any of the other
10        inventors directly supervise any such computer
11        programmers?
12             MR. ZELE:  Objection, vague.
13  A.    No.
14  Q.    Are you aware of anyone other than five named
15        inventors writing any source code for the
16        project associated with the patents in this
17        case?
18             MR. ZELE:  Objection, vague.
19  A.    No.
20  Q.    Do you know if any of the source code written
21        for the device associated with the patents in
22        this case still exists?
23             MR. ZELE:  Objection, vague,
24        misstates testimony, assumes facts not in
25        evidence.
```

37

1   A.    You are asking me if I'm aware that it still

2         exists; is that correct?

3   Q.    Correct.

4   A.    I believe it still exists.  I have no knowledge

5         that would suggest that it does not exist.

6   Q.    Do you have a belief as to where that source

7         code is stored?

8   A.    No.

9   Q.    Was there ever a time when you knew where that

10        source code was stored?

11              MR. ZELE:  Objection, vague.

12  A.    During the time the experiments were being

13        performed, the inventors doing the experiments

14        are collecting the data and storing it at the

15        Robotics Institute at CMU or in the offices of

16        the physicists at Presbyterian University

17        Hospital or in the linear accelerator room in

18        which the experiments were being carried out

19        with the equipment.  So during the period up to

20        and including submission of the patents, that's

21        where it was.

22              During the time after submission and

23        allowance of the patents and during the time

24        more data was being collected, I expect it was

25        still in those places.

38

```
 1   Q.    Earlier you mentioned a box of material that
 2         was provided to you by Dr. Shimoga; is that
 3         correct?
 4   A.    Yes.
 5   Q.    What was the occasion that prompted him to give
 6         you that box?
 7   A.    He was leaving Pittsburgh.
 8   Q.    He was an employee of the University of
 9         Pittsburgh at that time?
10               MR. ZELE:  Objection, calls for legal
11         conclusion and vague.
12   A.    It's a complicated answer because as you define
13         employee, it involves his capacity as a faculty
14         member at Carnegie Mellon University working on
15         a contract funded by a contract from, at that
16         time, Elekta Oncology Systems, which was
17         running through University of Pittsburgh.
18               I am not aware of whether his
19         paycheck was a CMU or University of Pittsburgh
20         paycheck.  I'm also not aware of whether he
21         considered himself a CMU employee being
22         contracted to the University of Pittsburgh or,
23         in fact, a University of Pittsburgh employee.
24         So I can't give you an honest, succinct answer.
25   Q.    Are you aware of a sequence of events in which
```

40

1         gave you that box of materials?

2  A.   No.

3  Q.   At that point in time, do you know where the

4         source code we were discussing earlier was

5         located?

6  A.   No.

7  Q.   Did Dr. Shimoga tell you when he left

8         Pittsburgh where the source code was located?

9               MR. ZELE:  Objection, vague.

10  A.   I don't recall.

11  Q.   Are you currently employed by the University of

12         Pittsburgh?

13  A.   Yes.

14  Q.   Are you currently employed by UPMC?

15  A.   Yes.

16  Q.   Do you currently have any other employers?

17  A.   I'm trying to answer precisely and

18         specifically, and with regard to my income tax

19         return, I am required to list sources of

20         income.  As such, those people are employers,

21         so to give you a fair answer, I should include

22         all of those.  Do you want to hear all of

23         those?  I'm sorry to ask you a question.

24  Q.   I'd like to know the list of employers for whom

25         you regularly perform work on a day-to-day

41

| | | |
|---|---|---|
| 1 | | basis in exchange for compensation? |
| 2 | | MR. ZELE:  Objection, vague. |
| 3 | A. | Please define compensation. |
| 4 | Q. | Money. |
| 5 | A. | That would be limited to, as defined by you, on |
| 6 | | a day-to-day basis, University of Pittsburgh |
| 7 | | and University of Pittsburgh Medical Center. |
| 8 | Q. | Is there a particular department within the |
| 9 | | University of Pittsburgh in which you are |
| 10 | | employed? |
| 11 | A. | Yes. |
| 12 | Q. | What is that? |
| 13 | A. | The department of radiation oncology. |
| 14 | Q. | Do you have a title in your job with that |
| 15 | | department? |
| 16 | A. | Yes. |
| 17 | Q. | What is that title? |
| 18 | A. | Professor and chairman of the department of |
| 19 | | radiation oncology at the University of |
| 20 | | Pittsburgh Medical Center and Claude, |
| 21 | | C-L-A-U-D-E, Worthington, |
| 22 | | W-O-R-T-H-I-N-G-T-O-N, Benedum, B-E-N-E-D-U-M, |
| 23 | | professor of radiation oncology. |
| 24 | Q. | How long have you had those titles? |
| 25 | A. | Since 1993. |



61

1                (The witness reviewed the Exhibit.)

2                        - - - -

3    A.    Yes, I recognize it.

4    Q.    And is this one of the three patents that you

5          and the other inventors obtained in connection

6          with a general project that is associated with

7          this case?

8    A.    Yes.

9                        - - - -

10     (Exhibit Nos. 3 and 4 marked for identification.)

11                       - - - -

12              MR. ZELE:  What's that one, the '554?

13          No.3, okay.

14   BY MR. POPPE:

15   Q.    Dr. Greenberger, do you now have in front of

16         you an exhibit marked Exhibit 3?

17   A.    Yes.

18   Q.    What is the patent number on that exhibit?

19   A.    5,727,554.

20   Q.    And do you also have a document labeled Exhibit

21         4 in front of you?

22   A.    Yes.

23   Q.    And is that U.S. Patent No. 5,784,431?

24   A.    Yes.

25   Q.    Please take a moment to briefly review Exhibits



62

1      3 and 4, as I'm going to ask you the same

2      questions I did for Exhibit 2.

3                  - - - -

4          (The witness reviewed the Exhibits.)

5                  - - - -

6   Q.  Are you familiar with -- I'm sorry, have you

7       had a chance now to review briefly Exhibits 3

8       and 4?

9   A.  Yes.

10  Q.  Do you recognize them?

11  A.  Yes.

12  Q.  And are these the other two patents associated

13      with the project that's related to this case?

14              MR. ZELE:  Objection, vague.

15  A.  Please define the project.

16  Q.  Well, is there a project that you would

17      identify in any particular way in your own mind

18      pursuant to which you obtained the three

19      patents labeled Exhibits 2, 3 and 4?

20  A.  Yes.

21              MR. ZELE:  Objection.

22  A.  Yes.

23  Q.  And is there a term or a phrase that you would

24      use to describe that project?

25  A.  This is --

63

```
 1            MR. ZELE:  Objection, calls for
 2       speculation.
 3  A.   These three patents represent three pieces of a
 4       program in development of dynamic conformal
 5       radiotherapy.  Those were the words we used at
 6       the time, and these three patents represent
 7       milestones, achievements along that pathway.
 8  Q.   What did you mean when you used the word
 9       "program?"  You said represent three pieces of
10       a program in the development of dynamic and
11       formal -- conformal radiotherapy?
12  A.   I think we need to be very clear about words
13       and language, because it is now year 2007, and
14       the words we used in 1993 through 1998 meant
15       different things than they mean today with
16       respect to radiotherapy, radiotherapy physics.
17            So program to me means a collection
18       of scientists physicists, robotics engineers,
19       software engineers and physicians, in my case,
20       me, physician, who were dedicated to working
21       toward a common goal, which was at that time
22       developing what we termed dynamic conformal
23       radiotherapy, and those words in 1993, dynamic
24       conformal radiotherapy, do not mean what they
25       mean in 2007.  So I hope I answered your
```



64

1        question.

2   Q.   Just to find a shorthand way of referring to

3        the body of research that you and the other

4        inventors did leading up to the three patents,

5        can I refer to that as the dynamic conformal

6        radiotherapy project?

7                MR. ZELE:  Objection, vague.

8   A.   The dynamic conformal radiotherapy program as

9        it existed from the time I met Andre Kalend,

10       extending forward and including the time that I

11       met Takeo Kanade, Karun Shimoga and

12       Dr. Athanassiou and leading up to these

13       patents, we referred to that as the dynamic

14       conformal radiotherapy program.

15               MR. ZELE:  We've been going an hour

16       again.  We can take a break.

17               THE VIDEOGRAPHER:  We've been going

18       34 minutes.

19               MR. ZELE:  34 minutes on your tape,

20       but we were going before that.

21               THE VIDEOGRAPHER:  The time is 11:12

22       a.m.  We are off the record.

23                        - - - -

24       (There was a recess in the proceedings.)

25                        - - - -

71

1          associate this assignment with the patent, '554

2          patent that's been marked Exhibit 3?

3                  MR. ZELE:  Objection, vague.

4  A.    Yes.

5  Q.    And by signing this document, is it correct

6          that you intended to assign your rights in the

7          patent application associated with the '554

8          patent and the related invention to the

9          University of Pittsburgh of the Commonwealth

10         System of Higher Education?

11              MR. ZELE:  Objection, calls for legal

12         conclusion.

13  A.    At this time, August 28th, 1996, to the best of

14         my recollection, University of Pittsburgh and

15         Carnegie Mellon University had a joint research

16         agreement in place, and we agreed, the

17         inventors from Pitt and the inventors from CMU

18         agreed to use the Pitt assignment sheet.  So to

19         the best of my recollection, this is what we

20         decided to do.

21  Q.    So I'm not clear then whether it was your

22         intent when you signed this agreement to assign

23         your rights to the patent application and

24         invention to the University of Pittsburgh.

25         I'll ask you to clarify, please.

142

```
 1              recall his involvement in either of the two

 2              previously mentioned interactions with Varian.

 3     Q.       Are you familiar with the name Reed McManigle?

 4     A.       Yes.

 5     Q.       Do you know if he was involved in

 6              communications with Varian on behalf of the

 7              University of Pittsburgh regarding the patents

 8              on either of the two occasions that you

 9              mentioned?

10     A.       Reed McManigle left the University of

11              Pittsburgh several years ago.  He was the

12              attorney in the technology transfer office who

13              helped with the negotiation for licensing of

14              these patents early on, and we are at 1998,

15              1996 through 1998.  I don't recall his

16              involvement in the first occasion.  That would

17              have been the only one.  The second was after

18              he had left.

19     Q.       On the first of those two occasions, do you

20              know which party, and I'm referring to either

21              Varian or the University of Pittsburgh,

22              initiated the discussions between Varian and

23              the University of Pittsburgh regarding the

24              patents?

25     A.       I do not.
```

171

1        1994 in some animal laboratory research, but he

2        chose to go into full-time clinical practice,

3        went out to our facility in Kittanning,

4        Pennsylvania, very quickly.

5               Edward Mullen left the department

6        within months of the time this memo was

7        written, went into private practice in eastern

8        Pennsylvania where he still practices.

9    Q.  And you listed them in this document because

10       you expected them to be involved solely in the

11       second approach listed in this document?

12              MR. ZELE:  Objection, vague.

13   A.  No.

14   Q.  So there was a point in time at which you did

15       anticipate that one or both of them would be

16       involved in the dynamic conformal radiation

17       therapy program?

18   A.  No.

19              MR. ZELE:  Objection, misstates the

20       testimony.

21   A.  I'm sorry, I said no.

22   Q.  Why were they identified in the last paragraph

23       as co-investigators on this project?

24   A.  At the time the memo was written, I was putting

25       together a program with multiple projects, a



172

1        lung cancer program, and I was trying to enlist

2        the help of the radiation oncologists who were

3        then in Pittsburgh practicing at Presbyterian

4        University Hospital where we would be building

5        the dynamic conformal radiation therapy

6        program.

7                Drs. Kalend and Mullen expressed

8        interest, and so I wrote their names on the

9        paper to give them support as potential

10       collaborators.  Unfortunately neither of them

11       involved themselves in any way with the dynamic

12       conformal radiation therapy program, and as I

13       mentioned, Dr. Rosenstein briefly expressed

14       interest and did some work in the gene therapy

15       program but then requested to move into

16       full-time practice.

17   Q.  In your earlier answer you referred to

18       Dr. Kalend and Mullen.  Did you mean Dr. Mullen

19       and Dr. Rosenstein?

20   A.  In my answer I referred to Dr. Mullen and

21       Dr. Rosenstein.  Of course Dr. Kalend stayed

22       and became active long term in the department.

23                    - - - -

24       (Exhibit No. 15 marked for identification.)

25                    - - - -

176

```
 1    Q.    You've been handed Exhibit 17, two-page
 2          document produced by the University of
 3          Pittsburgh in this case, Bates Nos. PITT 1879
 4          to 1880.  Take a moment to review and let me
 5          know if you recognize this document.
 6                      -  -  -  -
 7          (The witness reviewed the Exhibit.)
 8                      -  -  -  -
 9    A.    Yes.
10    Q.    This is a memorandum from you to Dr. Kalend;
11          correct?
12    A.    Yes.
13    Q.    And it's dated July 15th, 1993?
14    A.    Yes.
15    Q.    And you have initialed the document next to
16          your name in the from line; correct?
17    A.    Yes.
18    Q.    Do you see where it refers to applying for
19          matching funds from Westinghouse Corporation in
20          the first paragraph?
21    A.    Yes.
22    Q.    Did you, in fact, submit such an application?
23    A.    No.
24    Q.    Why not?
25    A.    At this stage I was searching for money to fund
```



177

1      our research, and I cast the net very wide.  I

2      was following up every lead, and I was

3      documenting as many leads as I could in memos

4      like this.

5          At the same time I was putting

6      together the team which ultimately resulted in

7      the inventors on these patents.  In the early

8      phases, I was looking at multiple

9      opportunities.

10     I remember this whole process because

11    Ken McCarty was present at a poster session

12    which Dr. Kalend and I gave at the Pittsburgh

13    Cancer Institute retreat, which is referred to

14    on the second page, second paragraph from the

15    bottom, at the PCI regional advisory committee

16    retreat; and Dr. Kalend and I disclosed to Ken

17    McCarty at the poster session what we were

18    planning to do, and shortly after or maybe even

19    before this memo, I don't remember exactly,

20    disclosures of the idea, the invention, the

21    creation of the idea were sent to the

22    technology transfer office of the University of

23    Pittsburgh, and I believe Dr. McCarty, Ken

24    McCarty was one of the people cited, person to

25    whom the invention was first disclosed.

178

1                During the course of the disclosure

2        to him, what we were doing or planning to do,

3        our conception, our invention, he reported to

4        me his work with Westinghouse; and, in fact,

5        one of the beautiful things about Pittsburgh in

6        1993 and still today is the tremendous number

7        of private companies and enterprises that are

8        interested in collaborating with the

9        university.  So this was one of the ones I

10       thought we could pursue.  It just didn't work

11       out.

12   Q.  Is Dr. McCarty still at the University of

13       Pittsburgh?

14   A.  I believe he is.

15               MR. ZELE:  Objection, calls for

16       speculation.

17   A.  I don't know for sure.  I believe he is.

18               - - - -

19       (Exhibit No. 18 marked for identification.)

20               - - - -

21   Q.  You've been handed Greenberger Exhibit 18,

22       which is a document produced by Dr. Kanade

23       pursuant to a subpoena in this case with Bates

24       Nos. KAN 19 through 42.

25               Is this a document written by you and

193

```
 1              was your first contact with Dr. Kanade?

 2                   MR. ZELE:  Objection, calls for

 3              speculation.

 4    A.        Not necessarily.  While I customarily

 5              documented meetings shortly around the time of

 6              the meeting, other times documentation was a

 7              bit delayed.  I don't know for sure.

 8    Q.        This document refers to, in the last paragraph

 9              on the first page, a collaborative arrangement

10              with Varian Corporation.  Do you see that?

11    A.        Yes.

12    Q.        What is that referring to?

13    A.        During this period -- and please understand by

14              "this period" I mean late 1993, early 1994 --

15              we were exploring the addition to our team of a

16              corporate partner, and since our technology

17              that we were developing was going to be a

18              retrofit technology, by that I mean we were not

19              going to be building a new linear accelerator,

20              we were not going to take the strategy that

21              Acura took by designing a machine on a robot

22              arm, rather we were going to use existing

23              linear accelerator structure, we were looking

24              for a corporate -- a vendor, partner.

25                   And during this time period I was
```

194

1           speaking to members of Varian Corporation,

2           letting them know what we wanted to do and

3           then, under confidentiality, sharing with them

4           in greater detail what we were planning to do.

5                At the time this letter was written

6           and at the time that Dr. Kalend and I were

7           speaking with Dr. Kanade, we were hoping that

8           our partner in this could be Varian.

9    Q.    Why Varian?

10   A.    Number of reasons.  One was that I was most

11          familiar and comfortable with Varian.  I had

12          trained on their equipment as a resident.  I

13          like the structure of the equipment.  I like

14          the company.  I like the service.  I like the

15          people I've met.  That's one reason.

16               Another reason was we were designing

17          something that was revolutionary, that no one

18          else was doing.  We wanted a partner who could

19          get that fast tracked and commercialized

20          quickly, because as the pieces were coming

21          together and as we assembled our team, we knew

22          that the resources we had in Pittsburgh and the

23          people would allow us to move quickly.

24               And since Varian at that time in 1993

25          had the dominant share of radiation oncology

195

1           facilities, Varian was selling more machines,

2           more equipment in the United States than either

3           Siemens or Phillips or Sagittaire or any of the

4           others at the time, we thought this would be an

5           ideal partnership.

6                   Another reason was they expressed

7           interest and what I thought to be at the time

8           to be a genuine, honest, collegial interest,

9           friendly, collaborative, cooperative interest.

10   Q.   When you said what you thought to be at the

11       time, did that view change?

12             MR. ZELE:  Objection, vague.

13   A.   To some extent.

14   Q.   In what way?

15   A.   Collegial, cooperative partner did not

16       materialize.

17   Q.   In what way did you want them to be a partner,

18       "them" being Varian?

19             MR. ZELE:  Objection, vague.

20   A.   We were looking for a corporate partner, a

21       partner that manufactured and delivered

22       state-of-the art linear accelerators and a

23       partner that wanted to share our vision of how

24       such research should be carried out, namely the

25       research and development would be at the

196

1    University of Pittsburgh, and then what

2    materialized was CMU and the University of

3    Pittsburgh.

4         We wanted a partner who would come in

5    and recognize that the intellectual property

6    was ours, that the invention was ours, that the

7    reduction to practice, while being carried out

8    using in some capacity their equipment, would

9    be recognized as being collaborative and shared

10   technology.

11        We wanted a partner who would fund a

12   major part of the research, meaning salaries --

13   funding meaning equipment salaries, support,

14   materials, and fund with the understanding that

15   the intellectual property coming out of that

16   collaboration would be collaborative and

17   jointly owned.

18        MR. ZELE:  I just want to point out

19   that by my clock it's about 5:00, and

20   Dr. Greenberger, as we pointed out before, has

21   a religious obligation.

22        If you are about done, Matt, I don't

23   know if you are or not but -- not done by a

24   long shot, huh?  All right.  But I think

25   Dr. Greenberger is going to have to go to

198

```
 1    COMMONWEALTH OF PENNSYLVANIA )      CERTIFICATE

 2    COUNTY OF ALLEGHENY           )      SS:

 3         I, Heidi H. Willis, RPR, CRR, a Court Reporter

 4    and Notary Public in and for the Commonwealth of

 5    Pennsylvania, do hereby certify that the witness,

 6    JOEL GREENBERGER, M.D., was by me first duly sworn to

 7    testify to the truth; that the foregoing deposition

 8    was taken at the time and place stated herein; and

 9    that the said deposition was recorded

10    stenographically by me and then reduced to printing

11    under my direction, and constitutes a true record of

12    the testimony given by said witness.

13         I further certify that the inspection, reading

14    and signing of said deposition were NOT waived by

15    counsel for the respective parties and by the

16    witness.

17         I further certify that I am not a relative or

18    employee of any of the parties, or a relative or

19    employee of either counsel, and that I am in no way

20    interested directly or indirectly in this action.

21         IN WITNESS WHEREOF, I have hereunto set my hand

22    and affixed my seal of office this 1st day of

23    October, 2007.

24    _____

25                    Notary Public
```

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Heidi H. Willis, Notary Public
City Of Pittsburgh, Allegheny County
My Commission Expires July 8, 2008
Member, Pennsylvania Association Of Notaries

# EXHIBIT C

1

1    IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA
2
- - - -
3
UNIVERSITY OF PITTSBURGH,        )
4                                 )
                                  )
5         Plaintiff,              )
                                  )
6                                 )        Case No.
                                  )   07-CV-0791 (AJS)
7      -vs-                       )
                                  )
8    VARIAN MEDICAL SYSTEMS, INC.,)
                                  )
9         Defendant.              )
                                  )
10
                              ORIGINAL
11

12
                      - - - -
13
     VIDEOTAPE DEPOSITION OF:  ANDRE KALEND, Ph.D.
14
                      - - - -
15

16              DATE:    October 5, 2007
                         Friday, 9:02 a.m.
17

18              LOCATION:  LAKEVIEW RESORT
                           One Lakeview Drive
19                         Morgantown, WV  26508

20
                TAKEN BY:  Defendant
21

22              REPORTED BY:  Heidi H. Willis, RPR, CRR
                              Notary Public
23                            AKF Reference No. HW03549

24

25



2

1   VIDEOTAPE DEPOSITION OF ANDRE KALEND, Ph.D.,
a witness, called by the Defendant for examination,

2 in accordance with the Federal Rules of Civil
Procedure, taken by and before Heidi H. Willis, RPR,

3 CRR, a Court Reporter and Notary Public in and for
the Commonwealth of Pennsylvania, at the Lakeview

4 Resort, One Lakeview Drive, Morgantown, West
Virginia, on Friday, October 5, 2007, commencing at

5 9:02 a.m.

6

        - - - -

7

8 APPEARANCES:

9    FOR THE PLAINTIFF:
John D. Zele, Esq.

10 MORGAN LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, NW

11 Washington, D.C.  20004
P 202-739-5418

12 F 202-739-3001
jzele@morganlewis.com

13

14

    FOR THE DEFENDANT:

15 William Anthony, Esq.
M. Brendan Smith, Esq.

16 ORRICK HERRINGTON & SUTCLIFFE, LLP
666 Fifth Avenue

17 New York, NY  10103-0001
212-506-5298

18 mbsmith@orrick.com

19

20   ALSO PRESENT:
Geoff Broz, Videographer

21

22

23

24

25

4

```
 1                        - - - -

 2                     PROCEEDINGS

 3                        - - - -

 4             THE VIDEOGRAPHER:  Good morning.  My

 5      name is Geoff Broz.  I am the videographer on

 6      behalf of AKF.  Today is Friday, October 5th,

 7      2007.  The time is now 9:02 a.m.

 8             We are here at the Lakeview Golf

 9      Resort to take the deposition of Dr. Andre

10      Kalend in the case of University of Pittsburgh

11      versus Varian Medical Systems, Inc., in the

12      United States District Court of the Western

13      District of Pennsylvania, Case No. 07-CV-0791

14      (AJS).

15             If the court reporter would swear in

16      the witness, we can begin the deposition.

17      ------------------------------------------------------

18             ANDRE KALEND, Ph.D.,

19            being first duly sworn,

20      was examined and testified as follows:

21                        - - - -

22                     EXAMINATION

23                        - - - -

24   BY MR. ANTHONY:

25   Q.    Good morning, Dr. Kalend.
```

1    A.    Good morning, sir.

2    Q.    Have you ever had your deposition taken before?

3    A.    No, sir.

4    Q.    Has counsel for University of Pittsburgh

5          explained to you the process?

6    A.    Yes.

7    Q.    I'll be asking you --

8                MR. ZELE:  I just want to note for

9          the record, this is John Zele of Morgan Lewis &

10         Bockius, and I'm representing Dr. Kalend today.

11   Q.    And you are being represented by Mr. Zele here?

12   A.    Yes.

13   Q.    Now, I'll be asking you questions, Doctor, and

14         you should give me answers unless you are

15         instructed otherwise by your counsel.  He may

16         object from time to time; that's his job.  If

17         he doesn't tell you not to answer, you should

18         go ahead and answer.

19               Do you understand that?

20   A.    Yes.

21               MR. ZELE:  You should look at the

22         camera.  It's going to be hard, but you are

23         going to have to look at the camera so --

24               THE WITNESS:  I wish he was sitting

25         over there.  That would be easier for me.

1          please?

2    A.    Yes, I will.

3    Q.    And would you agree it's fair that if you do

4          answer a question, we can assume that you

5          understood the question?

6    A.    That's correct, yes.

7               MR. ZELE:  He had his own

8          understanding of the question but --

9    Q.    In the proceeding today, you are the most

10         important person in this room.  If you need a

11         break for any reason, just let us know, we'll

12         take the break.  If you need anything for any

13         reason, let us know, we'll accommodate you.  Is

14         that fair enough?

15   A.    Yes.

16   Q.    Could you give us your home address, full name

17         and home address, please?

18   A.    My name is Dr. Andre Kalend, and I live on 4500

19         Laurel Ridge Lane, Morgantown, West Virginia.

20   Q.    Dr. Kalend, are you currently employed?

21   A.    Yes, I'm on faculty at West Virginia

22         University.

23   Q.    Okay.  And what is your position on the faculty

24         at West Virginia University?

25   A.    I'm a full professor of radiology.

```
 1              radiation oncology.

 2     Q.     And how long were you at Stony Brook?

 3     A.     I was at Stony Brook until '88, and then I was

 4              offered a position at the University of

 5              Pittsburgh Presbyterian Hospital.

 6     Q.     And how long were you at the University of

 7              Pittsburgh?

 8     A.     From late '88, '89 till 2000, 2001.

 9     Q.     And you've been at the West Virginia University

10              since then?

11     A.     Yes, sir.

12     Q.     Have you received any awards for your work in

13              oncology, radiation oncology?

14     A.     The NSF -- no, the NIH fellowship was an award,

15              was awarded to those who were capable and

16              excellent to be able to conduct both research

17              and clinical research.

18                   I've had small grant from the

19              American Cancer Society.  I had large grant

20              from the Whittaker Foundation.  I had small

21              grant from Siemens.  That's with the -- with a

22              senior investigator at Tufts.  I've had part of

23              the overall larger grant be a investigator

24              under the Benedum grant at Pitt for boron

25              neutron contratherapy.
```

```
 1   COMMONWEALTH OF PENNSYLVANIA )      CERTIFICATE

 2   COUNTY OF ALLEGHENY          )      SS:

 3        I, Heidi H. Willis, RPR, CRR, a Court Reporter

 4   and Notary Public in and for the Commonwealth of

 5   Pennsylvania, do hereby certify that the witness,

 6   ANDRE KALEND, Ph.D., was by me first duly sworn to

 7   testify to the truth; that the foregoing deposition

 8   was taken at the time and place stated herein; and

 9   that the said deposition was recorded

10   stenographically by me and then reduced to printing

11   under my direction, and constitutes a true record of

12   the testimony given by said witness.

13        I further certify that the inspection, reading

14   and signing of said deposition were NOT waived by

15   counsel for the respective parties and by the

16   witness.

17        I further certify that I am not a relative or

18   employee of any of the parties, or a relative or

19   employee of either counsel, and that I am in no way

20   interested directly or indirectly in this action.

21        IN WITNESS WHEREOF, I have hereunto set my hand

22   and affixed my seal of office this 15th day of

23   October, 2007.

24

25
```

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Heidi H. Willis, Notary Public
City Of Pittsburgh, Allegheny County
My Commission Expires July 8, 2008
Member, Pennsylvania Association Of Notaries

# EXHIBIT D

1

## FOR ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

- - - -

| | |
|---|---|
| UNIVERSITY OF PITTSBURGH,     ) | |
| ) | |
| ) | |
| Plaintiff,     ) | |
| ) | |
| )     Case No. | |
| -vs-     )   07-CV-0791 (AJS) | |
| ) | |
| ) | |
| VARIAN MEDICAL SYSTEMS, INC., ) | |
| ) | |
| ) | |
| Defendant.     ) | |

ORIGINAL

- - - -

CONFIDENTIAL - ATTORNEYS' EYES ONLY

- - - -

DEPOSITION OF:  TAKEO KANADE, Ph.D.

- - - -

| | |
|---|---|
| DATE: | September 19, 2007 |
| | Wednesday, 9:11 a.m. |
| | |
| LOCATION: | PICADIO SNEATH |
| | MILLER & NORTON |
| | 4710 U.S. Steel Tower |
| | 600 Grant Street |
| | Pittsburgh, PA  15219 |
| | |
| TAKEN BY: | Defendant |
| | |
| REPORTED BY: | Heidi H. Willis, RPR, CRR |
| | Notary Public |
| | AKF Reference No. HW03098 |

1            DEPOSITION OF TAKEO KANADE, Ph.D.,
    a witness, called by the Defendant for examination,
2    in accordance with the Federal Rules of Civil
    Procedure, taken by and before Heidi H. Willis, RPR,
3    CRR, a Court Reporter and Notary Public in and for
    the Commonwealth of Pennsylvania, at the offices of
4    Picadio Sneath Miller & Norton, 4710 U.S. Steel
    Tower, Pittsburgh, Pennsylvania, on Wednesday,
5    September 19, 2007, commencing at 9:11 a.m.

6                    -  -  -  -

7    APPEARANCES:

8            FOR THE PLAINTIFF:
    John D. Zele, Esq.
9    MORGAN LEWIS & BOCKIUS, LLP
    1111 Pennsylvania Avenue, NW
10    Washington, D.C.   20004
    P 202-739-5418
11    F 202-739-3001
    jzele@morganlewis.com
12    - and -
    Laura R. Hillock, Esq.
13    UNIVERSITY OF PITTSBURGH
    1710 Cathedral of Learning
14    Pittsburgh, PA   15260
    P 412-624-0216
15    F 412-624-9165
    thillock@pitt.edu
16
            FOR CARNEGIE MELLON UNIVERSITY:
17    Jacqueline A. Koscelnik, Esq.
    DeFOREST KOSCELNIK YOKITIS & KAPLAN
18    Koppers Building, 30th Floor
    436 Seventh Avenue
19    Pittsburgh, PA   15219
    P 412-227-3110
20    F 412-227-3130
    koscelnik@dkyk.com
21
            FOR THE DEFENDANT:
22    Matthew H. Poppe, Esq.
    ORRICK HERRINGTON & SUTCLIFFE, LLP
23    1000 Marsh Road
    Menlo Park, CA   94025
24    P 650-614-7400
    F 650-614-7401
25    mpoppe@orrick.com



4

```
 1                    TAKEO KANADE, Ph.D.,

 2                having been duly sworn,

 3          was examined and testified as follows:

 4                        - - - -

 5                      EXAMINATION

 6                        - - - -

 7    BY MR. POPPE:

 8    Q.    Good morning, Dr. Kanade.

 9    A.    Good morning.

10    Q.    Thank you for being here today.  My name is

11          Matt Poppe, and I'm one of the attorneys for

12          Varian Medical Systems.  You understand that

13          they've been sued by the University of

14          Pittsburgh for patent infringement?

15    A.    Yes.

16    Q.    Have you ever had your deposition taken before?

17    A.    Once.

18    Q.    When was that?

19    A.    I recall beginning of 2005.

20    Q.    And did that have anything to do with patents?

21    A.    Yes.

22    Q.    What was the case, if you know?  Who were the

23          parties?

24    A.    As I recall, AT&T, Gateway, Microsoft and Dell.

25    Q.    Who was the patent owner, if you know?
```



1       years.

2   Q.  Who were you working for at the time that the

3       collaboration began?  Who was your employer?

4           MR. ZELE:  Objection, assumes facts

5       not in evidence, compound.

6   A.  Carnegie Mellon University.

7   Q.  How long had you been working for Carnegie

8       Mellon at that?

9   A.  At that time?

10  Q.  Yes.

11  A.  I started 1980; therefore, it should be 12, 13,

12      14 years.

13  Q.  And were you working for a particular

14      department at Carnegie Mellon from the time

15      period '92 through '94?

16          MR. ZELE:  Objection, vague.

17  A.  Robotics Institute and Computer Science

18      Institute.

19  Q.  Have you been employed by Carnegie Mellon

20      continuously from that point in time until

21      today?

22          MR. ZELE:  Objection, vague.

23  A.  Correct.

24  Q.  And always by the Robotics Institute?

25  A.  Correct.

```
 1              strike that.

 2                     Was it your understanding that you

 3              would work alone on those problems?

 4    A.        Alone means only myself?

 5    Q.        Yes.

 6    A.        No.

 7    Q.        So your understanding was that you would work

 8              with other people?

 9    A.        Yes.

10    Q.        Which other people?

11    A.        I don't think I gave particular name to him at

12              that meeting.

13    Q.        Was the understanding that you and a group of

14              other people affiliated with Carnegie Mellon

15              University would work alone on the solution?

16    A.        Together with Dr. Kalend and Dr. Greenberger.

17    Q.        So the understanding was that a group of

18              Carnegie Mellon people would work with

19              Dr. Greenberger and Dr. Kalend on a solution?

20    A.        That's right.

21    Q.        And who did you ultimately get involved in

22              working with you on that project?

23    A.        On CMU side?

24    Q.        Yes.

25    A.        Karun Shimoga first, after a second point, and
```



1          then Harry Athanassiou the second.  I don't

2          know at which point Harry began to get

3          involved.

4    Q.    And was anybody else also involved with you at

5          Carnegie Mellon?

6                    MR. ZELE:  Objection, vague.

7    A.    Not -- later, relatively later stage, as I

8          recall, I used two programmers to program, to

9          do programming task, not necessarily generating

10         the solution.

11   Q.    What were their names?

12   A.    If my recollection is correct, Raju Patil,

13         either Wei Hua or -- I forgot his name.  There

14         were two Chinese students from University of

15         Pittsburgh who were working with me, and it was

16         toward the end of the research, their research,

17         and I -- I believe I encouraged one of them to

18         do the task.

19   Q.    To do what task?

20   A.    Programming task.

21   Q.    And what were the names of those two students?

22   A.    Okay.  So it should be one of the two, I forgot

23         which one.  One is Wei Hua.  The other one

24         is -- I think his name is was something like

25         Wu, W-u -- let's see, Y-u-t-e, Yute Wu.

```
 1   COMMONWEALTH OF PENNSYLVANIA )        CERTIFICATE

 2   COUNTY OF ALLEGHENY          )        SS:

 3        I, Heidi H. Willis, RPR, CRR, a Court Reporter

 4   and Notary Public in and for the Commonwealth of

 5   Pennsylvania, do hereby certify that the witness,

 6   TAKEO KANADE, Ph.D., was by me first duly sworn to

 7   testify to the truth; that the foregoing deposition

 8   was taken at the time and place stated herein; and

 9   that the said deposition was recorded

10   stenographically by me and then reduced to printing

11   under my direction, and constitutes a true record of

12   the testimony given by said witness.

13        I further certify that the inspection, reading

14   and signing of said deposition were NOT waived by

15   counsel for the respective parties and by the

16   witness.

17        I further certify that I am not a relative or

18   employee of any of the parties, or a relative or

19   employee of either counsel, and that I am in no way

20   interested directly or indirectly in this action.

21        IN WITNESS WHEREOF, I have hereunto set my hand

22   and affixed my seal of office this 1st day of

23   October, 2007.

24
                                _____
25                              Notary
```

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Heidi H. Willis, Notary Public
City Of Pittsburgh, Allegheny County
My Commission Expires July 8, 2008
Member, Pennsylvania Association Of Notaries



# EXHIBIT E

1

FOR ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

- - - -

UNIVERSITY OF PITTSBURGH,          )
                                   )
                                   )
        Plaintiff,                 )
                                   )
                                   )          Case No.
    -vs-                           )     07-CV-0791 (AJS)
                                   )
                                   )
VARIAN MEDICAL SYSTEMS, INC.,      )
                                   )
                                   )
        Defendant.                 )

ORIGINAL

- - - -

CONFIDENTIAL - ATTORNEYS' EYES ONLY

- - - -

DEPOSITION OF:  ROBERT WOOLDRIDGE

- - - -

        DATE:      September 26, 2007
                   Wednesday, 9:08 a.m.

        LOCATION:  PICADIO SNEATH
                   MILLER & NORTON
                   4710 U.S. Steel Tower
                   600 Grant Street
                   Pittsburgh, PA  15219

        TAKEN BY:  Defendant

        REPORTED BY:  Heidi H. Willis, RPR, CRR
                      Notary Public
                      AKF Reference No. HW03223



2

```
 1              DEPOSITION OF ROBERT WOOLDRIDGE,
      a witness, called by the Defendant for examination,
 2    in accordance with the Federal Rules of Civil
      Procedure, taken by and before Heidi H. Willis, RPR,
 3    CRR, a Court Reporter and Notary Public in and for
      the Commonwealth of Pennsylvania, at the offices of
 4    Picadio Sneath Miller & Norton, 4710 U.S. Steel
      Tower, Pittsburgh, Pennsylvania, on Wednesday,
 5    September 26, 2007, commencing at 9:08 a.m.

 6
                       - - - -
 7

 8    APPEARANCES:

 9          FOR THE PLAINTIFF:
      Rita E. Tautkus, Esq.
10    MORGAN LEWIS & BOCKIUS, LLP
      One Market, Spear Street Tower
11    San Francisco, CA  94105
      P 415-442-1357
12    F 415-442-1001
      rtautkus@morganlewis.com
13

14          FOR CARNEGIE MELLON UNIVERSITY:
      Jacqueline A. Koscelnik, Esq.
15    DeFOREST KOSCELNIK YOKITIS & KAPLAN
      Koppers Building, 30th Floor
16    436 Seventh Avenue
      Pittsburgh, PA  15219
17    P 412-227-3110
      F 412-227-3130
18    koscelnik@dkyk.com

19
            FOR THE DEFENDANT:
20    Henry Sneath, Esq.
      Shannon Clougherty, Esq.
21    PICADIO SNEATH MILLER & NORTON
      4710 U.S. Steel Tower
22    600 Grant Street
      Pittsburgh, PA  15219
23    412-288-4000
      hsneath@psmn.com
24

25
```



1                     ROBERT WOOLDRIDGE,

2                 being first duly sworn,

3           was examined and testified as follows:

4                         - - - -

5                       EXAMINATION

6                         - - - -

7    BY MR. SNEATH:

8    Q.    Good morning.  My name is Henry Sneath, and we

9          are here for the purposes of taking your

10         deposition today.  I'm going to talk to you a

11         little bit about the rules that govern

12         depositions, although I'm sure your counsel

13         probably has already.  Forgive me if I repeat

14         anything that she's told you.

15              I represent the Defendant, Varian

16         Medical Systems, Incorporated.  They are the

17         Defendant in the suit brought by the University

18         of Pittsburgh here in the Western District of

19         Pennsylvania.

20              This is a suit regarding patent

21         infringement, and today I'm going to be asking

22         you questions primarily about documents that

23         have been produced by Carnegie Mellon

24         University.

25   A.    Yes, sir.

1    A.    Yes, sir.

2    Q.    If you need a personal break for whatever

3          reason, please let me know that as well and

4          I'll be happy to accommodate you.

5    A.    Thank you.

6    Q.    Please state your full name.

7    A.    Robert A. Wooldridge.

8    Q.    How do you spell your last name?

9    A.    W-O-O-L-D-R-I-D-G-E.

10   Q.    And what is your current home address?

11   A.    843 North Meadowcroft, M-E-A-D-O-W-C-R-O-F-T,

12         Avenue, Pittsburgh, PA 15216.

13               MR. SNEATH:  Off the record.

14                     - - - -

15         (There was a discussion off the record.)

16                     - - - -

17   BY MR. SNEATH:

18   Q.    Mr. Wooldridge, what's your current employment

19         situation?

20   A.    I am the director of the Center for Technology

21         Transfer and Enterprise Creation at Carnegie

22         Mellon University.

23   Q.    And how long have you been in that position?

24   A.    I have been the director for approximately -- I

25         want to say five and a half years.  I have been

| | | |
|---|---|---|
| 1 | | in the Center for Tech Transfer for ten. |
| 2 | Q. | Okay.  And what was your position prior to |
| 3 | | that? |
| 4 | A. | I started as a licensing officer in 1997.  I |
| 5 | | progressed to a senior licensing officer |
| 6 | | approximately two years thereafter, deputy |
| 7 | | director maybe a year and a half thereafter and |
| 8 | | then my present position, so essentially the |
| 9 | | same role. |
| 10 | Q. | And your current title is director of |
| 11 | | technology transfer?  Did I get that right? |
| 12 | A. | Director, Center for Technology Transfer and |
| 13 | | Enterprise Creation. |
| 14 | Q. | Okay.  Are you an officer at the university? |
| 15 | A. | No, sir. |
| 16 | Q. | And your employer is Carnegie Mellon |
| 17 | | University? |
| 18 | A. | That's correct. |
| 19 | Q. | And is it fair to state that you have been |
| 20 | | designated today pursuant to a Notice of |
| 21 | | Deposition that we served on CMU as the witness |
| 22 | | to respond to the categories in that notice? |
| 23 | A. | Yes, sir. |
| 24 | Q. | We'll get back into that in just a moment. |
| 25 | | Just, if you would, briefly summarize your |



1    BY MR. SNEATH:

2    Q.    In preparation for this deposition, did you

3          review the documents that were Bates stamped

4          CMU?

5    A.    Yes, sir.

6    Q.    Did you review them substantively as in reading

7          them thoroughly, or did you just glance at them

8          to identify them?  What did you do?

9    A.    I believe I read them substantively.

10   Q.    All right.  How about with regards to documents

11         that were marked KAN that were Kanade

12         production?

13   A.    I did not.

14   Q.    Did you look at them at all?

15   A.    No, sir.

16             MR. SNEATH:  So Dr. Kanade was not

17         identified as a 30(b)(6) deponent pursuant to

18         our deposition notice, nor was anyone other

19         than Mr. Wooldridge.

20             MS. KOSCELNIK:  Are you asking that

21         of me?

22             MR. SNEATH:  I'm asking it

23         collectively, but whoever can answer is fine

24         with me.

25             MS. KOSCELNIK:  Obviously I can



1    answer it.  I mean Dr. Kanade was here a week

2    ago all day, and he was deposed, and he was

3    asked a lot of these questions.  I realize you

4    weren't here, Mr. Sneath, but he was asked all

5    these questions.  So in my considered opinion,

6    Mr. Wooldridge is the appropriate person to

7    respond to this 30(b)(6).

8         MR. SNEATH:  It was not asked in the

9    form of a complaint.  It was asked in the form

10   of a simple question.

11        MS. KOSCELNIK:  Sure.

12        MR. SNEATH:  I want to make sure we

13   understand that in terms of responding to the

14   30(b)(6), the only witness that has been

15   designated is Mr. Wooldridge.

16        MS. KOSCELNIK:  Sure.

17        MR. SNEATH:  All right.  Mr. Kanade

18   was independently noticed for deposition in his

19   own name by Varian, and that deposition was

20   taken, and I agree with that.  Everybody agrees

21   with that?

22        MS. KOSCELNIK:  I don't think anybody

23   could disagree with that.

24        MR. SNEATH:  Great.  Well, I like to

25   make various obvious statements and then ask

1            MR. SNEATH:  Well, that's the way
2       life works though because somebody decided that
3       these were the four people that were going to
4       look for documents; right?  I mean that didn't
5       happen all on its own.  Somebody made that
6       decision; right?  They decided it's going to be
7       these four or it's not going to be six or eight
8       or ten or we are not going to send out a
9       broadcast e-mail to everybody at CMU saying
10      look for documents.  Somebody obviously decided
11      that, so I'm assuming that was a decision.
12           MS. KOSCELNIK:  You are assuming it
13      was someone other than counsel.
14           MR. SNEATH:  Well, I don't know.  I
15      just want to ask him if he made the decision.
16      I mean that's not a difficult question.
17 BY MR. SNEATH:
18 Q.   Did you make a decision that --
19 A.   Did I make a personal decision that those were
20      the departments, I would say no.
21           MS. KOSCELNIK:  Okay.  That's good.
22 Q.   All right.  If we could, let's take a look at
23      Exhibit 45, and that would be the subpoena and
24      Notice of Deposition that resulted in you being
25      here today.  Do you agree with that?

1    A.    Yes, sir.

2    Q.    Did you review the deposition topics listed on

3          pages 3, 4 and 5?

4    A.    Yes, sir.

5    Q.    Were there any of those deposition topics on

6          which you felt you would not be able to provide

7          testimony?

8                And you can take your time and

9          identify any ones, and if you can't identify

10         any ones, then I'm going to assume you are here

11         on all of them.  So that's where we are.  If

12         you could take your time and do that, I'd

13         appreciate it.

14               If you need to consult with counsel,

15         if you guys want to go out in the hallway, you

16         can do that.  I don't want to place an undue

17         burden on you, but I do need to know which ones

18         you are not here to talk about today.

19   A.    No, I understand.

20   Q.    And that will streamline the deposition.

21   A.    I don't believe I can talk about No. 1.

22   Q.    Okay.

23   A.    Similar to the prior conversation, I don't

24         believe I can talk about No. 2.  I believe I

25         can address 3.  I believe I can address 4, 5.

1        I believe I can address 6.  I can address 7.  I

2        suspect I can address 8, 9 --

3  Q.  With regard to 8, you say you suspect.  Is it

4      you don't understand it perhaps or --

5  A.  I'm not sure exactly what assignments executed

6      by named inventors are, but if you can pull

7      those out I certainly --

8  Q.  Okay.  No. 9?

9  A.  Yes, I can address No. 9.  I believe I can

10     address No. 10.  I can answer questions about

11     11, 12, 13, 14 -- it's answer questions about;

12     correct, sir?

13          MS. KOSCELNIK:  Correct.

14  Q.  Yes.

15  A.  I can address -- I think we stopped at 14, No.

16     15.

17  Q.  And by answer questions, the answer wouldn't be

18     to all of them I don't know?

19  A.  No, sir.

20  Q.  I mean can you provide some testimony on the

21     topic?

22  A.  CMU's valuation of the patented inventions, I

23     can tell you we did not do a separate

24     valuation, so that's what I'm saying.  It's not

25     a no, it's a finance or substance.

1    Q.    16?

2    A.    I have no knowledge of 16.  I don't believe I

3          can say all discussions related to, No. 17, all

4          discussions related to the lawsuit.  Some of

5          those were between counsel.

6    Q.    But would there be some information in 17 you

7          could discuss?

8                    MS. KOSCELNIK:  You mean is there

9          anything that's not privileged?

10                   MR. SNEATH:  Well, with all of this

11         it assumes we are talking about nonprivileged.

12   A.    If there is nonprivileged information there,

13         yeah.

14   Q.    Okay.  18?

15   A.    To the extent that there have been those

16         conversations that are not privileged.

17   Q.    So the answer to 18 is a yes if it's not

18         privileged?

19   A.    Yes, sir, and then 19.

20   Q.    19's a yes?

21   A.    Yes, sir, I believe so.

22   Q.    Have you given depositions before?

23   A.    One.

24   Q.    And how long ago was that?

25   A.    Eight to ten months.



1  A.  Are you saying how it applies to Dr. Kanade?

2  Q.  Well, we know that at the time that the

3      inventions were patented, applied for and

4      patented, that more than just Dr. Kanade were

5      employed by CMU; right?

6  A.  Yes, sir.

7  Q.  Do you know, sitting here today -- and I can

8      show you a patent, at least I'll give you the

9      '554 patent, the front page, looking at the

10     named inventors -- which ones were employed by

11     CMU at the time of the application for that

12     patent in '96?  Do you know?

13 A.  At the time it was would have been Karun

14     Shimoga, Takeo Kanade, and I'm never going to

15     pronounce the other one.

16 Q.  Athanassiou?

17 A.  Athanassiou, as I recall.

18 Q.  And with regard to the others, do you know

19     where they were employed?

20 A.  I could not -- I could not say whether they

21     were University of Pittsburgh or UPMC at the

22     time.  In part that's because I don't know if

23     those two were together at that time or

24     separate.  I just don't know.

25 Q.  But the others had an affiliation, as far as



1        to that.

2    BY MR. SNEATH:

3    Q.    Okay.  Well, I asked a number of preparatory

4          questions, and I told you to assume that when I

5          ask you if you have any basis on which you can

6          testify to the document, you can take a look at

7          it, you can see whether you were the author,

8          because it may be you authored a document that

9          only Dr. Kanade had a copy of for some reason

10         and maybe he produced it, so maybe you would

11         have a basis to shed some light on what the

12         document is and what it means and so on.  So

13         that's implicit in my question.

14             I assume that for Exhibit 2 you have

15         no such knowledge because you've never seen it

16         before in any way; is that correct?

17   A.    I have no such knowledge.

18   Q.    Okay.  Let's look at No. 3.  Okay.  This is a

19         document from the production of University of

20         Pittsburgh because it has PITT down at the

21         bottom, see that?

22   A.    Yes, sir.

23   Q.    However it was addressed to Reed McManigle.

24         Can you identify Reed McManigle?

25   A.    Reed McManigle is a current employee of



1          Carnegie Mellon Center for Technology Transfer.

2          He has been there for one year approximately.

3    Q.   Okay.  Do you know who Andre Kalend is?  He is

4          CC'd at the bottom.

5    A.   It's a gentleman that I associated with either

6          the University of Pittsburgh or UPMC.

7               MS. TAUTKUS:  First I'd like to note

8          for the record that the document is an

9          attorneys' eyes only document.  Have we put CMU

10         on the protective order in this case?

11              MS. KOSCELNIK:  We have signed

12         nothing.  There was a protective order that

13         came along with one of the subpoenas I believe.

14              MS. TAUTKUS:  CMU is not a party to

15         the protective order, so I assume until we

16         agree to that, any questioning or provision of

17         documents to the witness --

18              MR. SNEATH:  Right, I think it was

19         probably because Mr. McManigle was on here, but

20         you are saying he was not employed by CMU back

21         then; right?

22              THE WITNESS:  No, sir.

23              MR. SNEATH:  Okay.  You can just pass

24         that along, put it in the stack right there.

25              Let's take a break real quick.



```
 1              prior to the application dates; isn't that
 2              right?
 3   A.         Correct.
 4   Q.         Okay.  I'm going to show you Exhibit 7.
 5              Obviously today we are going to be skipping
 6              some numbers based on our earlier discussions,
 7              but we are not going to renumber things.  They
 8              have all been prenumbered, and it's of no
 9              consequence.
10                        This is CMU 7, and this is a document
11              produced by CMU with Bates stamp Nos. 279 to
12              283.  Do you see that?
13   A.         Yes, sir.
14   Q.         Okay.  Can you identify this document?
15                        MS. KOSCELNIK:  Look through the
16              whole thing.
17   A.         I'm sorry.  279 to 283, correct.
18   Q.         Can you identify what the document is?
19   A.         These are the Policy Guidelines - Intellectual
20              Property Rights and Technology Transfer
21              Procedures in Collaborative Projects of the
22              University of Pittsburgh and Carnegie Mellon
23              University dated September 21, 1994.
24   Q.         And it also says just under the heading you
25              read Final Version --
```



| 1 | A. | Yes, sir, sorry. |
| 2 | Q. | -- written on September 21, 1994.  Did I read |
| 3 | | that right? |
| 4 | A. | Yes, sir. |
| 5 | Q. | And this was signed by representatives of both |
| 6 | | the University of Pittsburgh and CMU, was it |
| 7 | | not? |
| 8 | A. | Yes, sir. |
| 9 | Q. | And those signatures are dated for the |
| 10 | | University of Pittsburgh October 4, 1994; is |
| 11 | | that correct? |
| 12 | A. | Yes, sir. |
| 13 | Q. | Can you read the name of the signator? |
| 14 | A. | I cannot. |
| 15 | Q. | Looks like Ben somebody.  Does that ring a |
| 16 | | bell, Ben anybody? |
| 17 | A. | I do not recognize the name. |
| 18 | Q. | In any event, identified as senior vice |
| 19 | | chancellor for the University of Pittsburgh; |
| 20 | | right? |
| 21 | A. | Yes, sir. |
| 22 | Q. | And for CMU, can you identify that person? |
| 23 | A. | That is Susan Dunkle, D-U-N-K-L-E. |
| 24 | Q. | Identified as associate provost, and her |
| 25 | | signature was placed on here October 13, '94. |

1         Do you agree with that?

2    A.   Yes, sir.

3    Q.   Is she still employed by the university?

4    A.   Yes, sir.  She is Susan Burkette.

5    Q.   Okay.  So her current name is Susan Burkette?

6    A.   That's correct.

7    Q.   This was signed before your tenure at CMU?

8    A.   Yes, sir.

9    Q.   Are you nonetheless familiar with it because

10        you've had to use it over the years, refer to

11        it over the years?

12   A.   Yes, sir.

13   Q.   And would it be true that you have referred to

14        it, used it in the regular course of your

15        business as opposed to just looking at it for

16        this deposition?

17   A.   Yes, sir.

18   Q.   Does this agreement govern the two

19        patents-in-suit?

20   A.   I believe it would.

21             MS. TAUTKUS:  Objection to the extent

22        it calls for a legal conclusion.

23   Q.   And so there's no misunderstanding, when I use

24        the word "govern," I meant that in the broad

25        sense, and I'd ask you if you want to change

74

1   your testimony, fine, or ask it in a different

2   way, do you believe that this agreement that

3   we've marked CMU 7 is applicable to the two

4   patents-in-suit?

5      MS. TAUTKUS:  I have the same

6   objection.

7  Q. You can answer.  I mean did you understand what

8   I mean by governed?  Is it applicable to the

9   two patents?

10 A. This is the rule set.

11      THE REPORTER:  I'm sorry, this is the

12   what?

13      THE WITNESS:  The rule set.

14 Q. So your answer is yes?  It does relate to and

15   govern these particular patents with regard to

16   the relationship between Pitt and CMU?

17      MS. TAUTKUS:  Objection to the extent

18   it calls for a legal conclusion.

19 A. My opinion would be either this one or the

20   renewal.

21 Q. Okay.  Fair enough.  And let's go right to

22   that.  I think I have it, and then we can ask

23   about both of them and the time frames, so CMU

24   9.  Why don't we just, as a preparatory matter,

25   identify this, it bears Bates stamp Nos. CMU

| | | |
|---|---|---|
| 1 | | 274 to 278 and is entitled the same thing, it |
| 2 | | just has a different date under the title of |
| 3 | | June 6th, 1997.  Do you agree with that? |
| 4 | A. | Say that again, sir? |
| 5 | Q. | Well, I identified the Bates stamp numbers, 274 |
| 6 | | to 278. |
| 7 | A. | I heard that. |
| 8 | Q. | It bears the same title as the previous one we |
| 9 | | just looked at -- |
| 10 | A. | Oh, yes, sir. |
| 11 | Q. | -- but it bears a different date of June 6th, |
| 12 | | 1997? |
| 13 | A. | That's correct. |
| 14 | Q. | And was this the revision you were talking |
| 15 | | about? |
| 16 | A. | Yes, sir. |
| 17 | Q. | And, again, this one was signed by |
| 18 | | representatives of both universities in June of |
| 19 | | '97? |
| 20 | A. | Yes, sir. |
| 21 | Q. | The University of Pittsburgh person, can you |
| 22 | | identify him?  James? |
| 23 | A. | James V. Maher, M-A-H-E-R. |
| 24 | Q. | Do you know what his title is or was?  It's not |
| 25 | | stated on here. |

1    A.    He is a vice chancellor or senior vice

2          chancellor of the University of Pittsburgh.

3    Q.    His signature is dated June 18th, 1997;

4          correct?

5    A.    Correct.

6    Q.    And, again, is that Susan Burkette's signature?

7    A.    That's correct.

8    Q.    And it's dated June the 6th of '97?

9    A.    Yes, sir.

10   Q.    Do you know what her title was in June of '97?

11   A.    Associate provost.

12   Q.    And this agreement, is this the one that's

13         currently in operation or --

14   A.    No, sir.  This is another three-year agreement.

15   Q.    So the first one was a three-year term?

16   A.    Correct.

17   Q.    Exhibit 7?

18   A.    Correct.

19   Q.    It was renewed for three years in Exhibit 9?

20   A.    Yes, sir.

21   Q.    And I confess I forget whether we have other

22         renewals, but do you know whether it has been

23         renewed in subsequent periods after --

24   A.    It was not renewed in this form.

25   Q.    All right.  Was Exhibit 9, was that agreement

```
 1            carried out for a full three years?

 2   A.      Yes, sir.

 3   Q.      And was that the last time that this particular

 4           version of the agreement was renewed?

 5   A.      Yes, sir.

 6   Q.      So following then I presume June of 2000 -- you

 7           can correct me if I'm wrong -- was there a new

 8           agreement between CMU and Pitt?

 9   A.      Not in this form.

10   Q.      Okay.  Well, in what general form?  Tell me

11           what you mean by that.

12                  MS. KOSCELNIK:  Can we just clarify

13           that you are calling these agreements and it

14           says policy guidelines?  I just want to clarify

15           for the record that that's what we are talking

16           about, the policy guidelines.

17                  MR. SNEATH:  Fair enough.

18   BY MR. SNEATH:

19   Q.      Where I have used the word "agreement," I was

20           referring to these two documents, Exhibit 7 and

21           9, which are entitled Policy Guidelines.  Okay?

22           Do you understand that?

23   A.      Yes.

24   Q.      You knew what I was talking about; right?

25   A.      Yes.
```



1    Q.    All right.  Now, after June of 2000, upon the

2          expiration of Exhibit 9, what new agreement, if

3          any, or new policy guidelines, whatever you

4          want to call it, was enacted between the two

5          universities that would govern intellectual

6          property rights?

7    A.    The change could be summarized as going from a

8          blanket policy guideline to discrete agreements

9          associated with individual technologies.

10   Q.    Okay.  Now, with regard to the two

11         patents-in-suit, given that they were applied

12         for in '96 and granted in '98, did either of

13         these two agreements or both relate to those?

14         I think we said the first one did, we agreed

15         with that; right?

16   A.    No.

17   Q.    No?

18   A.    You said did I agree with the first one --

19   Q.    Yes.

20   A.    -- and I said the first or the second --

21   Q.    Got you.

22   A.    -- based on the timing.

23   Q.    Fine.  You tell me which one, if either,

24         applied to the two patents-in-suit.

25                   MS. KOSCELNIK:  Objection.



1              MS. TAUTKUS:  I'm going to object

2         again to the extent it calls for a legal

3         conclusion.

4    Q.   Go ahead.

5    A.   I don't know that there is a substantive

6         difference between the two.

7    Q.   All right, fine.

8    A.   Other than the dates.

9    Q.   So would these agreements be triggered by an

10        application for a patent?  What would trigger

11        the application of these agreements in your

12        understanding?

13   A.   A disclosure.  These agreements or these

14        guidelines start with the disclosure.

15   Q.   Okay.  So if we would say hypothetically that a

16        CMU professor disclosed to the university an

17        invention in progress or a thought or an

18        idea --

19   A.   Yes, sir.

20   Q.   -- would that mere disclosure to the university

21        trigger this agreement?

22              MS. KOSCELNIK:  Objection to the

23        form.

24   Q.   Go ahead.

25   A.   Are you limiting that, are you -- to clarify,

1          with multiple parties or --

2    Q.    I know where you are going.  You are right.  I

3          gave a bad hypothetical.

4                Let's say hypothetically an employee

5          of CMU and an employee of Pitt disclosed that

6          they had a joint venture project of some kind

7          to develop a certain technology.

8    A.    To my office?

9    Q.    To your office.

10   A.    Yes, sir.

11   Q.    Are you saying that that disclosure would

12         potentially trigger the application of these

13         policy guidelines?

14   A.    Yes, sir.

15   Q.    And are all of the employees of at least CMU,

16         to the best of your knowledge, informed that

17         they need to make such disclosures to the

18         university so that these policy guidelines can

19         be put into effect?

20   A.    They are informed.

21   Q.    And is that because they are given Exhibit 1

22         that we talked about earlier, Exhibit 1 was the

23         intellectual property policy at CMU, that is

24         widely disseminated to faculty employees, for

25         example, at the university, isn't it?



```
 1   A.   It should be distributed both online and

 2        faculty handbooks, in multiple ways.

 3   Q.   All right.  So just in theory, people are

 4        supposed to be on notice that if you are

 5        working on some invention or joint venture, you

 6        are to disclose it to your office; correct?

 7   A.   Yes, sir.

 8   Q.   And that disclosure the, I am using the word

 9        "trigger," but would bring into effect then

10        these policy guidelines if it were a joint

11        project between the two universities; correct?

12             MS. KOSCELNIK:  Objection to the

13        form.

14             MS. TAUTKUS:  Object, calls for a

15        legal conclusion.

16   Q.   You can answer.

17             MS. KOSCELNIK:  And are you talking

18        about at the time that these were applicable?

19             MR. SNEATH:  Yes, of course.

20   Q.   Go ahead.

21   A.   Yes, sir.

22   Q.   Now, given your testimony that following the

23        expiration of the three-year period in Exhibit

24        9 the two universities went to a different

25        system that was more an ad hoc, project by
```

1    disclosed.

2              MR. SNEATH:  How would one ask

3    that -- because it's making no assumptions,

4    because the witness is free to say, he's a very

5    smart guy, it was never disclosed, see.

6              So there is no real way to clean that

7    question up.  Human beings only have a certain

8    way to express questions.  It is not presuming

9    anything.  It's not leading.  It's not

10   suggesting anything.  It's saying when --

11             MS. KOSCELNIK:  I would disagree with

12   you on all of those points that you just said.

13             MR. SNEATH:  So you want me to be the

14   literalist.  All right, we'll take it the

15   literal way to make it easier for everybody,

16   okay.

17   BY MR. SNEATH:

18   Q.   Was the invention described in the '554 patent

19        ever disclosed to CMU?

20             MS. TAUTKUS:  I'm going to object to

21        the extent it calls for a legal conclusion.

22             MS. KOSCELNIK:  And are you talking

23        about a legal disclosure as opposed to the

24        everyday use of the word "disclose"?

25   Q.   You used the word "disclosure" earlier, what

 1       did you mean?

 2  A.   A disclosure of invention, a written

 3       description of invention that is typically

 4       submitted by an inventor which may or may not

 5       contain patentable or copyrightable material.

 6  Q.   And it's given to your department so your

 7       department can react accordingly; is that

 8       right?

 9  A.   That's correct.

10  Q.   So that you can track it, follow it, decide

11       whether anything needs to be done from a legal

12       standpoint, all those things are done by your

13       department; right?

14  A.   Yes, sir.

15  Q.   So that's what you meant by a disclosure;

16       right?

17  A.   Disclosure of invention, yes.

18  Q.   And that's what I understood you to mean, and

19       that's what I've been asking you about all

20       along here is that your department is notified

21       about inventions and potential inventions so

22       that your department can do its job; right?

23  A.   Yes.

24            MS. KOSCELNIK:  Objection to form.

25  Q.   Okay.  So given that that's our understanding



1         of disclosure, do you have any knowledge as to

2         whether or not the invention described in the

3         '554 patent was in that sense disclosed to the

4         tech transfer department at CMU?

5    A.   We received it in -- a cover sheet of an

6         invention disclosure in, I'm going to say

7         absent looking at the documents, March of 1998.

8    Q.   So your answer would be yes, it was disclosed

9         to you --

10            MS. KOSCELNIK:  Object to the form.

11   Q.   It was disclosed to your department?

12   A.   We received an invention disclosure in

13        approximately March of 1998.

14   Q.   Is that different than saying it was disclosed

15        to your department?

16   A.   Well, I don't know.  You guys are talking about

17        the difference between disclosure and invention

18        disclosure, and I'm just trying to --

19   Q.   No, she is.  I want to make sure you and I

20        agree.

21            MS. KOSCELNIK:  Objection.

22   Q.   When I say was it disclosed to your department,

23        do you not understand what I'm talking about?

24   A.   If you are talking about notification?

25   Q.   Yes.



```
 1    A.    Then we were notified.

 2    Q.    And we may come to a document like that, but

 3          that's your recollection sitting here today?

 4    A.    Ballpark, in terms of date.

 5    Q.    All right.  Now, you think that came in '98?

 6    A.    I believe it was early '98.

 7    Q.    So can you then look at Exhibits 7 and 9, two

 8          policy guidelines --

 9    A.    Yes, sir.

10    Q.    -- and tell me whether or not one or the other

11          of them, given that date in your mind, would

12          have been triggered by or applicable to that

13          disclosure?

14              MS. KOSCELNIK:  Objection to the

15          form.

16              MS. TAUTKUS:  Objection, calls for a

17          legal conclusion.

18    A.    So my answer is one or the other would apply.

19    Q.    Okay.

20    A.    Because there's disclosure to the University of

21          Pittsburgh, there's disclosure to CMU, and they

22          crossed time frames.

23    Q.    And they what?

24    A.    And they appeared to have happened at different

25          times.
```



1    Q.    But in your mind it's one or the other?

2    A.    Yes, sir.

3    Q.    And there's no doubt that it's one of them?

4    A.    That's my conclusion.

5    Q.    Okay.  So how does that work then with regard

6          to this disclosure issue given that there are

7          two universities involved in these two

8          scenarios that we are talking about?  Do you

9          have an understanding of how that's done at

10         Pitt?  Do you have any knowledge of how that's

11         done?  Is there a similar process to what's

12         done at CMU?

13                   MS. KOSCELNIK:  Objection to the

14         form.

15   A.    I don't know of Pitt's internal procedures.

16   Q.    No one's ever discussed it with you?

17   A.    Not to my knowledge, sir.

18                   MS. KOSCELNIK:  What time frame are

19         you talking about, Mr. Sneath?

20   Q.    So when this disclosure was presented to your

21         department at CMU, do you recall whether the

22         disclosure indicated that it was a joint

23         project between the two universities?

24   A.    Within that pile is a copy of the cover sheets

25         from the disclosures that listed CMU inventors

1          and University of Pittsburgh inventors.

2  Q.   So when your department gets a disclosure like

3        that that indicates there are inventors from

4        both universities, is it your practice then to

5        look to these policies -- was it your practice

6        back then to look to these policy guidelines to

7        govern the relationship between those

8        universities?

9            MS. TAUTKUS:  Objection, incomplete

10       hypothetical.

11  A.   These would be the policy guidelines.

12  Q.   In other words, they would come into play when

13       you learned, your department learns that it was

14       a joint venture between the two universities;

15       right?  I mean that's the purpose of these

16       guidelines?

17  A.   That's the purpose, yes.

18  Q.   You were in this department, in your current

19       department, tech transfer, at some point in '97

20       was it?

21  A.   9/1/97 I began full-time.

22  Q.   And you had done some work for them prior to

23       that time?

24  A.   Yes, sir.

25  Q.   So were you personally involved in responding

1         to or reacting to the disclosure of these

2         particular patents?  Do you have a recollection

3         of being personally involved back then?

4    A.   I was assigned to this docket.

5    Q.   Okay.  Did you engage in any discussions at

6         that time with the University of Pittsburgh

7         regarding these policy guidelines and how they

8         might apply to that docket?

9    A.   I don't know if the conversation was limited to

10        that topic, but once we received the invention

11        disclosure, the notification, we started

12        talking.

13   Q.   And do you remember with whom you talked?

14   A.   Oddly enough it was with Reed McManigle.

15   Q.   Would those discussions have included then a

16        discussion of the application of the policy

17        guidelines that we've been talking about in

18        Exhibit 9?

19             MS. TAUTKUS:  Objection, vague.

20   Q.   Go ahead.

21   A.   Broadly, yes, these would have been the

22        guidelines in how we were going to move

23        forward.

24   Q.   And you remember specifically then how you

25        addressed this particular disclosure that



| | | |
|---|---|---|
| 1 | | there was no discrete interinstitutional |
| 2 | | agreement entered on this. |
| 3 | Q. | Right, and this would be -- |
| 4 | A. | That's correct. |
| 5 | Q. | -- referring to that same topic? |
| 6 | A. | That's right. |
| 7 | Q. | And this was a discussion about a potential |
| 8 | | discrete interinstitutional agreement relating |
| 9 | | to certain technology? |
| 10 | A. | And I previously said I'm not sure that was |
| 11 | | necessary in my personal belief in this case. |
| 12 | Q. | Okay. |
| 13 | A. | But I do understand that that's what this is |
| 14 | | referencing. |
| 15 | Q. | Okay. |
| 16 | A. | I should point out to you that in this time |
| 17 | | frame, as you recall when I started to talk |
| 18 | | about my history, that I became director in |
| 19 | | 2002, so I would not have had day-to-day |
| 20 | | responsibility as I had in the past. |
| 21 | Q. | All right. |
| 22 | A. | So just for context, for 98049. |
| 23 | Q. | Okay.  Look at Exhibit 24.  This is an |
| 24 | | e-mail -- well, these are documents CMU 227 |
| 25 | | through 236.  I have put them together, you can |

1    tell me if that's not correct, but it appears

2    to be an e-mail with an attachment, and you

3    produced them consecutively, so I'm assuming

4    this is the --

5 A.  I would have put them together.

6 Q.  All right.  Was this indeed a proposed

7    interinstitutional agreement regarding the

8    subject patents and the third patent, all of

9    which were your docket 49?

10 A.  Can you repeat that or read it back?

11 Q.  Yeah.  Was this a proposed discrete agreement

12    that related to the subject patents and the

13    third patent that was part of your document?

14 A.  It appears to be one proposed by Reed McManigle

15    of the University of Pittsburgh to Carl Mahler

16    or Carnegie Mellon, just so the direction is

17    clear.

18 Q.  Now, in the middle of the e-mail, it references

19    or it says, Recently we were talking with

20    another radiation therapy company, Varian,

21    about another technology developed at Pitt by

22    Don Sashin for positioning the patient's head,

23    so on and so forth.

24     Were you ever made aware about

25    discussions with Varian?

1                   MS. TAUTKUS:  Objection, vague.

2                   MS. KOSCELNIK:  I assume you mean

3        these discussions, Mr. Sneath?

4    Q.   Yes, the discussions that are being referenced

5        here.  Was that ever brought to your attention?

6    A.   It's possible that it was brought to my

7        attention, but I do not recall the specifics.

8    Q.   The same thing with the CMU Exhibit 25.  It's

9        document 237, e-mail from McManigle to various

10       people dated May 31, 2002.  Again, this

11       discusses alleged interest by Varian --

12   A.   Yes, sir.

13   Q.   -- in licensing patented technologies.  Do you

14       see that?

15   A.   Yes, sir.

16   Q.   Again, your answer would be the same -- you can

17       take the time to read it -- but you recall this

18       vaguely being brought up to you, but you don't

19       recall any of the specifics?

20   A.   Yes, sir.

21   Q.   And does anything in reading this e-mail

22       refresh your recollection about any of the

23       specifics?  Other than just you reading it,

24       which we can all do, does it actually jog your

25       memory in any way?

```
 1   A.   No, but it does correspond to other documents

 2        in my pocket which have the -- there are three

 3        cover sheets from invention disclosures with

 4        the 20 percent.

 5   Q.   Yes.  Because at this stage they were trying to

 6        get everybody to sign off on a distribution or

 7        an allocation; right?

 8   A.   That's right.

 9   Q.   Being getting all the inventors to sign off on

10        that allocation which at this point had not

11        been done according to the e-mail?

12   A.   That's right, and I will say that that

13        surprised me that it had not been done.

14   Q.   All right.  Look at CMU 238, which is document

15        or Exhibit 26, with CMU 238 through 248.  You

16        are mentioned in here, although I don't think

17        you are copied.  They were talking about you

18        behind your back.

19   A.   Happens all the time.

20   Q.   Take a look at this and see if this refreshes

21        your recollection about what was going on in

22        May of 2002, vis-a-vis this proposed agreement.

23             Let me see if I can make a suggestion

24        and see if we can short-circuit this because I

25        really want to get through all this.  It would
```

```
 1           appear here that this was follow-up to the
 2           proposed agreement, and Carl is responding that
 3           there are really three sticking points that
 4           have been holding up not only this agreement,
 5           but other interinstitutional agreements as well
 6           and that these general issues need to be
 7           resolved before the specifics can be dealt
 8           with.  Is that a fair summary?
 9    A.     That's exactly what I was going to point out to
10           you, that there were -- we talked about the
11           change of the form from a blanket policy
12           guideline to discrete, and this is really less
13           a discussion of particulars and more of a
14           discussion of the formal going forward
15           generally.
16    Q.     Okay.  And at this point we are clear that no
17           such agreement was entered into between CMU and
18           Pitt regarding the subject analogy, at the
19           point of this in 2002 was still in discussion?
20    A.     Yes, sir.
21    Q.     Were you ultimately advised that all the
22           inventors had agreed to a 20 percent split
23           across the board?  Do you recall that?
24    A.     I don't recall that, but there's no -- it's a
25           detail that wouldn't necessarily come up to the
```



1          director's attention.  It would just be entered

2          into our records.

3  Q.    All right.  Let's show you Exhibits 29, 30, 31,

4          32.  Actually just through 31 at the moment,

5          those three relate to the same topic:  29, 30,

6          31.  These are CMU documents 256, that's

7          Exhibit 29; Exhibit 30 is 258; Exhibit 31 is

8          259, CMU Bates stamp numbers.

9  A.    And where are you starting, sir?

10 Q.    Start with Exhibit 29.

11 A.    Okay.

12 Q.    It's a June 5th, 2002 e-mail from Reed

13         McManigle to Carl Mahler.

14 A.    Mm-hmm.

15 Q.    And is it fair to state that he reports that

16         Pitt would be looking to a 60/40 split of

17         proceeds between Pitt and CMU based on the

18         respective contributions of the inventors?

19              MS. KOSCELNIK:  Object --

20 Q.    Just very broad terms but I mean is that --

21              MS. KOSCELNIK:  Henry, if I could

22         just say I don't think it says based on the

23         respective contributions, it says because --

24              MR. SNEATH:  Well, it says as three

25         of the inventors were at Pitt, three out of



1       five.

2   A.  That's what it says but it's incorrect.

3   Q.  I think later it might have been reversed.

4   A.  Okay.

5   Q.  If you look at the next e-mail -- I gave you

6       all three.  I didn't mean to hold back on you

7       there -- I think one of the next two e-mails,

8       somewhere along the way they agreed to a

9       reversal?

10  A.  Corrects Dr. Shimoga, yeah.

11  Q.  So on June the 6th, an e-mail from McManigle to

12      everybody says, Therefore the split between the

13      two universities would be reversed from what I

14      indicated earlier, 60 percent for CMU, 40

15      percent for Pitt?

16  A.  That's correct.

17  Q.  And was that agreement memorialized in some way

18      other than this e-mail?

19  A.  Again, in my files I don't recall getting a

20      copy of an executed split agreement of any

21      kind.

22  Q.  All right.  But did you all go forward then on

23      the assumption that this was the agreement,

24      that there would be a 60/40 split?

25          MS. TAUTKUS:  Objection, assumes



1   facts, vague.

2   Q.   I'm not assuming anything.  I'm asking you a

3        question, Mr. Wooldridge.

4             Did you go forward on an assumption

5        that there was a 60/40 split agreed to by

6        virtue of these e-mails?

7   A.   By virtue of the inventorship being three from

8        CMU and two from Pitt, yes, and the fact that

9        they had agreed to -- the inventors themselves

10       had agreed to 20 percent, assuming this e-mail

11       is correct that they all, in fact, got that,

12       but it's not memorialized that I've seen.

13  Q.   Now, when we talk about a 60/40 split in the

14       context of these discussions, would that be a

15       60/40 split of any proceeds relating to the

16       commercialization of the invention?  Is that

17       what the discussion was about?

18  A.   Yes.  Well, not just proceeds, but it could be

19       costs as well.

20  Q.   Okay.  So both revenue and expenses that would

21       be generated by the process of

22       commercialization of these inventions if they

23       came to fruition?

24            MS. KOSCELNIK:  I mean there is a

25       license we are talking about.  Just when you is

1         a say they came to fruition, I'm not sure what

2         you mean by that.

3   Q.  Well, what were those e-mails discussing?

4         Splitting what and under what circumstances?

5   A.  Well, working from memory of the policy

6         guidelines, it is both a sharing of expenses

7         until licensing, so patent expenses -- well,

8         actually I don't think it goes beyond patent

9         expenses, so if I use $10,000 worth of outside

10        counsel time and they use 3, we wouldn't split

11        that.  This is limited, largely limited to

12        patent expenses.

13  Q.  Okay.

14  A.  We'll reimburse each other for time, and then

15        it would normally be if there is a license that

16        does, in fact, pay royalties, it would be a

17        recoupment of cost and then a split of proceeds

18        along those lines.  I think that's consistent

19        with those policy guidelines, and even the

20        discrete form.

21  Q.  With regard to the patents-in-suit, was there

22        any such sharing of expenses in anything?

23  A.  I don't know if I can say at any time.

24  Q.  Just because you don't recall or what's --

25  A.  The reason being is that Elekta Oncology did



1       reimburse the University of Pittsburgh and,

2       hence, CMU didn't have to under that sponsored

3       research agreement or option that was in that.

4    Q.   All right.

5    A.   So I can't say for certain if there is

6       something of an annuity that was paid last

7       year, whether or not that was split.  I don't

8       know.

9    Q.   Is CMU participating in any of the litigation

10      expenses for this litigation?

11           MS. KOSCELNIK:  Objection, that

12      question was asked and answered.

13           MR. SNEATH:  I did?

14           MS. KOSCELNIK:  I thought you did.

15           MR. SNEATH:  I don't think so.

16   Q.   But anyway, indulge me if I did.

17           MS. KOSCELNIK:  You can answer.

18   Q.   Is CMU paying any of the litigation expenses

19      for this patent infringement litigation, or

20      does it have an agreement to do so?

21   A.   Can you be more distinct?

22   Q.   Sure.  That's fine.

23   A.   I'm sure we are paying Jackie on an hourly

24      rate.

25   Q.   That was the 10,000 you were talking about



```
 1                earlier for an hour of her time.

 2    A.    And I don't think we are getting reimbursed by

 3          anyone for that.

 4    Q.    That's not what I meant.

 5    A.    I come at a much lower rate.

 6    Q.    No, what I was getting at is the litigation

 7          that's been filed by the University of

 8          Pittsburgh against Varian claiming infringement

 9          of the subject patents --

10    A.    Yes, sir.

11    Q.    -- has CMU contributed any funds to the

12          litigation of that case or does it have any

13          agreement to pay any of those litigation

14          expenses, legal fees, costs, so on?

15                    MS. TAUTKUS:  Objection.

16                    MS. KOSCELNIK:  Objection to form.

17                    MS. TAUTKUS:  Asked and answered.

18    A.    To the best of my knowledge, but I may not have

19          complete knowledge, the answer is no.

20    Q.    And no on both counts, that it has not paid any

21          moneys and, no, it has no agreement to do so?

22    A.    Yes, no agreement to do so, not paid any

23          expenses, to the best of my knowledge.

24    Q.    Has the University of Pittsburgh requested CMU

25          to make any such payments?
```

1    A.    I do not know.  I was not part of those

2          conversations.  It would have been between

3          counsel, if any.

4    Q.    And we are going back then to the beginning of

5          your testimony.  We've been talking about this

6          60/40 split business.  Would that 60/40 split

7          contemplate a 60/40 split of a recovery in any

8          lawsuit seeking to enforce the intellectual

9          property rights that are at issue?

10                   MS. TAUTKUS:  Objection.

11                   MS. KOSCELNIK:  Objection.

12                   MS. TAUTKUS:  Calls for legal

13         conclusion.

14   Q.    You can answer.

15   A.    Again, I do not know the details.

16   Q.    Why don't you look at 32, 33, 34.  These all

17         appear to mention discussions with my client,

18         Varian.  I don't think you are distinctly

19         copied on any of these e-mails.  I may be

20         wrong.  No, I don't think so, but in any event,

21         were you advised about any of the discussions

22         with Varian that are referred to in these

23         e-mails other than just recently reading about

24         them in reviewing these documents?

25   A.    I honestly do not recall being apprised of this



1        in 2002.

2   Q.   Okay.  And similarly, I'll represent to you

3       that there were ongoing discussions between the

4       University of Pittsburgh and Varian that are

5       referenced in some of the documents that you've

6       seen.

7           Other than having looked at the

8       documents recently in preparation for this

9       deposition, were you ever advised about the

10      substance of those discussions, the content of

11      those discussions between Pitt and Varian?

12  A.   No, sir.

13  Q.   Okay.  And is that because you had risen up to

14      a level where you wouldn't have been involved

15      in those kind of day-to-day things, or it

16      wasn't your department, or you don't know why?

17  A.   I would say it's more the former than the

18      latter.  It would still be handled in my

19      department, it's just this was a discrete

20      matter, not --

21  Q.   All right.  Can you look at CMU 35, Exhibit 35.

22      Can you just identify what that document is?

23      It says CMU 849 Bates stamp.

24  A.   This is an accounts receivable log which I

25      assume is from Carnegie Mellon based on the

1    COMMONWEALTH OF PENNSYLVANIA )      CERTIFICATE

2    COUNTY OF ALLEGHENY           )      SS:

3         I, Heidi H. Willis, RPR, CRR, a Court Reporter

4    and Notary Public in and for the Commonwealth of

5    Pennsylvania, do hereby certify that the witness,

6    ROBERT WOOLDRIDGE, was by me first duly sworn to

7    testify to the truth; that the foregoing deposition

8    was taken at the time and place stated herein; and

9    that the said deposition was recorded

10   stenographically by me and then reduced to printing

11   under my direction, and constitutes a true record of

12   the testimony given by said witness.

13        I further certify that the inspection, reading

14   and signing of said deposition were NOT waived by

15   counsel for the respective parties and by the

16   witness.

17        I further certify that I am not a relative or

18   employee of any of the parties, or a relative or

19   employee of either counsel, and that I am in no way

20   interested directly or indirectly in this action.

21        IN WITNESS WHEREOF, I have hereunto set my hand

22   and affixed my seal of office this 8th day of

23   October, 2007.

24

25        Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Heidi H. Willis, Notary Public
City Of Pittsburgh, Allegheny County
My Commission Expires July 8, 2008
Member, Pennsylvania Association Of Notaries

# EXHIBIT F

1

FOR ATTORNEYS' EYES ONLY

1    IN THE UNITED STATES DISTRICT COURT FOR THE
2              WESTERN DISTRICT OF PENNSYLVANIA

3                         - - - -

4    UNIVERSITY OF PITTSBURGH,        )
                                      )
5              Plaintiff,             )
                                      )
6                                     )        Case No.
        -vs-                          )    07-CV-0791 (AJS)
7                                     )
                                      )
8    VARIAN MEDICAL SYSTEMS, INC.,    )
                                      )
9              Defendant.             )    ORIGINAL
10

11

12                       - - - -

13        CONFIDENTIAL - ATTORNEYS' EYES ONLY

14                       - - - -

15    DEPOSITION OF:  RICHARD V. WESTERHOFF

16                       - - - -

17             DATE:     October 3, 2007
                         Wednesday, 9:00 a.m.
18
               LOCATION:  PICADIO SNEATH
19                        MILLER & NORTON
                          4710 U.S. Steel Tower
20                        600 Grant Street
                          Pittsburgh, PA  15219
21
               TAKEN BY:  Defendant
22
               REPORTED BY:  JoAnn M. Brown, RMR, CRR
23                           Notary Public
                             AKF Reference No. JB03477
24

25

1          DEPOSITION OF RICHARD V. WESTERHOFF,
    a witness, called by the Defendant for examination,
2   in accordance with the Federal Rules of Civil
    Procedure, taken by and before JoAnn M. Brown, RMR,
3   CRR, a Court Reporter and Notary Public in and for
    the Commonwealth of Pennsylvania, at the offices of
4   Picadio Sneath Miller & Norton, 4710 U.S. Steel
    Tower, Pittsburgh, Pennsylvania, on Wednesday,
5   October 3, 2007, commencing at 9:14 a.m.

6
                        - - - -
7

8   APPEARANCES:

9        FOR THE PLAINTIFF:
    John D. Zele, Esq.
10  MORGAN LEWIS & BOCKIUS, LLP
    1111 Pennsylvania Avenue, NW
11  Washington, D.C.  20004
    P 202-739-5418
12  F 202-739-3001
    jzele@morganlewis.com
13
         - and -
14
    Laura R. Hillock, Esq.
15  UNIVERSITY OF PITTSBURGH
    1710 Cathedral of Learning
16  Pittsburgh, PA  15260-6404
    P 412-624-0216
17  F 412-624-9165
    thillock@pitt.edu
18

19       FOR THE DEFENDANT:
    William L. Anthony, Jr., Esq.
20  M. Brendan Smith, Esq.
    ORRICK HERRINGTON & SUTCLIFFE, LLP
21  1000 Marsh Road
    Menlo Park, CA  94025
22  P 650-614-7453
    F 650-614-7401
23  wanthony@orrick.com
    mbsmith@orrick.com
24

25

1   APPEARANCES (CONTINUED):

2       FOR ECKERT SEAMANS CHERIN & MELLOTT, LLC:
    William B. Mallin, Esq.
3   ECKERT SEAMANS CHERIN & MELLOTT
    44th Floor, U.S. Steel Tower
4   Pittsburgh, PA  15219
    P 412-566-6000
5   F 412-566-6090
    wmallin@eckertseamans.com

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                              - - - -

2                    RICHARD V. WESTERHOFF,

3                    being first duly sworn,

4              was examined and testified as follows:

5                              - - - -

6                    MR. ANTHONY:  Good morning,

7         Mr. Westerhoff.

8                    THE WITNESS:  Good morning.

9                    MR. ANTHONY:  This morning, we were

10        set up for video feed.  I received an objection

11        from counsel to videotaping the deposition.

12        The objection was based on a lack of notice of

13        videotaping the deposition.  I looked at the

14        Notice, and I do not see that this had been

15        noticed for videotaping.  I offered to

16        videotape it in any event and register the

17        objection.  I also offered to have the

18        videographer hold the video until this issue

19        can be resolved, and, as I understand it,

20        counsel for the witness has refused to go

21        forward as long as it's videotaped; is that

22        correct?

23                    MR. MALLIN:  Yeah.  We ought to say

24        some things in the beginning and make clear the

25        nature of this deposition.

1       This is a deposition of Eckert

2    Seamans, Cherin & Mellott, LLC, a law firm

3    which prosecuted the patents-in-suit.  I am

4    general counsel of that law firm and authorized

5    to represent it here.  Eckert Seamans has

6    designated Richard V. Westerhoff as a witness

7    to testify on the topics set forth in the

8    Notice of Deposition to the extent that those

9    topics relate to the patents-in-suit.  To the

10   extent that those topics go beyond the

11   patents-in-suit, Eckert Seamans objects to

12   those topics or any questions beyond those

13   topics.

14       Eckert Seamans also -- since the

15   client has not waived privilege, Eckert Seamans

16   must be duty-bound to follow the privilege and

17   will follow instructions or itself make

18   objections based on privilege as they come up,

19   if they come up.

20       Finally, I note that pursuant to --

21   finally, I note that there was a Subpoena Duces

22   Tecum served on Eckert Seamans which was

23   quashed by the court.  Nonetheless, Eckert

24   Seamans has produced documents which are

25   described in the transmittal letters and a

```
 1   Q.   Can you state your full name and home address
 2        for the record, please.
 3   A.   Richard V. Westerhoff, 219 Eaton Road,
 4        Pittsburgh, Pennsylvania.
 5   Q.   And, Mr. Westerhoff, would you outline your
 6        education after high school, please.
 7   A.   Yes.  I attended the Massachusetts Institution
 8        of Technology.  I received a bachelor of
 9        science degree in electrical engineering.
10        Further education was received at the
11        University of Pittsburgh where I received a
12        J.D. degree.
13   Q.   So you're a lawyer in the State of
14        Pennsylvania?
15   A.   Yes.
16   Q.   In any other state?
17   A.   No.
18                 MR. ANTHONY:  Okay.  Now, let me mark
19        as -- I guess we'll mark them ESCM -- yeah,
20        ESCM Exhibit 1, a copy of a Subpoena for Eckert
21        Seamans.
22                      -  -  -  -
23        (Exhibit 1 marked for identification.)
24                      -  -  -  -
25                 MR. ANTHONY:  Off the record.
```



14

```
 1        instructions of the University of Pittsburgh,

 2        and I'll instruct him not to answer the

 3        question.

 4   BY MR. ANTHONY:

 5   Q.   Was your recollection refreshed as to any fact

 6        or event as a result of your conversations with

 7        Mr. Zele?

 8             MR. ZELE:  Objection, vague.

 9   A.   No.

10   Q.   Are you presently employed, sir?

11   A.   I am of counsel with the firm.  Basically, I'm

12        retired.

13   Q.   How long have you been associated with Eckert

14        Seamans?

15   A.   Since October 1985.

16   Q.   Were you a partner there?

17   A.   Yes.

18   Q.   And from what period?

19   A.   From the start, I was a partner.

20   Q.   And your current position, I saw some place,

21        was of counsel or senior counsel?

22   A.   Well, that card might say.  I don't know what

23        the card says.

24   Q.   It doesn't.

25   A.   Oh, it doesn't?  Okay.
```



```
 1                    My status now is of counsel.

 2   Q.   When did you become of counsel?

 3   A.   About two years ago.

 4   Q.   And before that, you were a partner?

 5   A.   Well, before that, I was of special counsel.

 6   Q.   Okay.  And for how long were you of special

 7        counsel?

 8   A.   From 2000 -- I semi-retired in 2000 and went

 9        on, sort of, a part-time status, and that's

10        when I became of special counsel, and that was

11        about 2000.

12   Q.   And from 1985 to approximately 2000, you were a

13        partner?

14   A.   Yes.

15             MR. ANTHONY:  Let me have marked as

16        Exhibit 3 the University of Pittsburgh's Second

17        Supplemental Privilege Log.

18                       - - - -

19        (Exhibit 3 marked for identification.)

20                       - - - -

21   BY MR. ANTHONY:

22   Q.   Would you look at Exhibit 3, please.

23             Sir, did you play any role in

24        preparing this privilege log?

25   A.   No.
```

 1              MR. ANTHONY:  Let me mark as Exhibit

 2      3A -- let's mark it as Exhibit 4, a letter from

 3      Mr. Mallin to Shannon Clougherty of October 1,

 4      2007, with a Privilege Log of Non-Party Eckert

 5      Seamans.

 6                    - - - -

 7      (Exhibit 4 marked for identification.)

 8                    - - - -

 9   BY MR. ANTHONY:

10   Q.    Sir, did you -- why don't you look at Exhibit 4

11         and tell me if you've seen it before?

12   A.    No.

13   Q.    Okay.  Look at the last two pages, the list

14         there, and review the items there and see if

15         you looked at any of those in preparation for

16         your testimony today, as best as you can given

17         the descriptions?

18   A.    No.

19   Q.    No?

20               Did you play any role in selecting

21         documents to be withheld on privilege?

22   A.    No.

23   Q.    So as you sit here today, you do not know one

24         way or the other whether the documents that

25         were withheld were, in fact, attorney-client



1        privilege?

2    A.    True.

3    Q.    In the documents you reviewed from the Eckert

4        Seamans' files, were there any documents that

5        had not been shared with the United States

6        Patent and Trademark Office in those files?

7    A.    Yes.

8    Q.    Can you recall what those documents were?  Any

9        of them?

10    A.    Yes.

11    Q.    Please do, sir.

12    A.    Well, there were -- in the files, there were

13        three classes of documents:  There were

14        documents that were cited to the patent office,

15        there were documents that were not prior art

16        and were not cited to the patent office, and as

17        I recall, there was one document that was --

18        would have been prior -- it was prior art, but

19        it was not material at all.  It was out in left

20        field.

21    Q.    Excuse me, I didn't get the last part.

22    A.    It was out in left field.

23    Q.    Out in left field.

24            Do you recall what that document was,

25        sir?

1    A.    I think the author is Kessler.

2    Q.    Do you remember the title?

3    A.    Yeah, because it was so out in left field.  It

4          was a graphic simulator.

5    Q.    And that was an article?

6    A.    Yes.

7                MR. ANTHONY:  Counsel, do you know if

8          the document production from Eckert Seamans is

9          now complete?

10               MR. MALLIN:  Is complete?

11               MR. ANTHONY:  Yes.

12               MR. MALLIN:  Yes.

13               MR. ANTHONY:  This is complete?

14               And that word counsel is ambiguous,

15         but I was referring to Mr. Mallin.

16               And that would be true that all

17         privileged -- it would be true, Mr. Mallin,

18         that all privileged documents are now listed on

19         the log?

20               MR. MALLIN:  On the two logs.

21               MR. ANTHONY:  Between the two logs?

22               MR. MALLIN:  Yeah, between the two

23         logs, to the best of my information and belief.

24               Actually, another lawyer in the

25         office took the liberty of doing that.  He's on

1          vacation this week, but that was what we were

2          intending to do.

3                    I should note that, as I mentioned

4          before, the Subpoena was quashed, and there was

5          areas in the Subpoena that we objected to

6          producing, so --

7                    MR. ANTHONY:  And those documents

8          have not been produced?

9                    MR. MALLIN:  And those documents have

10         not been produced.  I'm not sure that

11         everything we objected to wasn't produced

12         because there was some discussions, as the

13         judge indicated, but there were documents that

14         were not produced because of objections other

15         than the objection of a privilege.

16                   MR. ANTHONY:  Okay.  Thank you, sir.

17    BY MR. ANTHONY:

18    Q.   When did you become a member of the Bar of the

19         State of Pennsylvania, sir?

20    A.   Actually, I graduated from law school and

21         started working as an attorney in '66, but I

22         think I actually became a member of the Bar in

23         '67.

24    Q.   Have you ever been disciplined as a lawyer?

25    A.   No.



1   Q.   Apart from practicing at Eckert Seamans, where

2        else have you practiced law, sir?

3   A.   I began my practice in the patent department of

4        Westinghouse Electric Corporation.

5   Q.   And what years were you there?

6   A.   From 1966 to 1971.

7   Q.   And what was your -- what did you do in 1971?

8   A.   I joined a patent firm here in the City of

9        Pittsburgh.

10   Q.   Excuse me?

11   A.   I joined a patent firm here in the City of

12        Pittsburgh.

13   Q.   Oh, and what was that firm, sir?

14   A.   I believe at the time it was called Parmalee,

15        Usler & Welsh.

16   Q.   And how long were you with that firm?

17   A.   Till 1985.

18   Q.   At which time you joined Eckert Seamans?

19   A.   Yes.

20   Q.   Since you began practicing, how would you

21        describe any emphasis of your practice?

22               MR. ZELE:  Objection, vague.

23   A.   I don't understand the question.

24   Q.   Sure.

25             Are you -- did you spend time as a

1       patent prosecutor?

2    A.    Oh, yes.

3    Q.    Okay.  And throughout your career, what portion

4          of your practice was patent prosecution,

5          roughly?

6    A.    Probably 75 to -- 75 percent or somewhere in

7          that area.

8    Q.    And did you also have any litigation practice?

9    A.    A little bit.

10   Q.    What percentage, roughly?

11   A.    That would be -- well, first of all, we have to

12         define litigation practice.

13               When I was with the Parmalee firm, I

14         was involved in some of the litigation there,

15         and some of that was commercial litigation

16         actually, too, because we did patent work and

17         we did some other -- it was a trade -- you

18         know, some trade secret things, and I ended up

19         involved in those things, and since I've been

20         at Eckert Seamans, I have not been a litigator,

21         although I've participated in litigation in

22         consultation on patent issues, analyzing the

23         art, that sort of thing.

24   Q.    What experience do you have with medical

25         imaging systems?



```
 1   A.    I've done a few patents on medical imaging

 2         systems.

 3   Q.    Apart from the two in issue here?

 4   A.    Yes.

 5   Q.    For what clients did you work on medical

 6         imaging systems?

 7   A.    Well, the University of Pittsburgh and also

 8         Vanderbilt University.

 9   Q.    Any others come to mind?

10   A.    No.

11   Q.    Have you ever represented Carnegie Mellon

12         University?

13   A.    I don't believe so.

14               MR. ANTHONY:  As ESCM 5, we'll mark a

15         copy of Patent 5,727,554.

16                      - - - -

17         (Exhibit 5 marked for identification.)

18                      - - - -

19               MR. ANTHONY:  And as 6, a copy of

20         Patent 5,784,431.

21                      - - - -

22         (Exhibit 6 marked for identification.)

23                      - - - -

24   BY MR. ANTHONY:

25   Q.    Mr. Westerhoff, do you recognize Exhibits 5 and
```



1      6?

2   A.   Yes.

3   Q.   And are these patents on which you were the

4        prosecuting patent attorney?

5   A.   Yes.

6             Excuse me, I notice that -- I was

7        looking for the Certificate of Correction.

8   Q.   Okay.  Can you tell us how you became involved

9        in doing the prosecution on these two patents?

10  A.   I was asked by Arnold Silverman of our office

11       to handle these patent applications.

12  Q.   Who is Arnold Silverman?

13  A.   He is a partner in the firm and, at the time,

14       was the chairman, the head of the intellectual

15       property department.

16  Q.   Prior to that time, had you done any work for

17       the University of Pittsburgh?

18  A.   Yes.

19  Q.   And what type of work had you done prior to the

20       time you were asked to work on the applications

21       that matured as Exhibits 5 and 6?

22  A.   I had done some other patent applications for

23       them.

24  Q.   Was there a principal contact between Eckert

25       Seamans and the University of Pittsburgh with



150

1    COMMONWEALTH OF PENNSYLVANIA )      CERTIFICATE

2    COUNTY OF ALLEGHENY           )      SS:

3        I, JoAnn M. Brown, RMR, CRR, a Court Reporter

4    and Notary Public in and for the Commonwealth of

5    Pennsylvania, do hereby certify that the witness,

6    ROBERT V. WESTERHOFF, was by me first duly sworn to

7    testify to the truth; that the foregoing deposition

8    was taken at the time and place stated herein; and

9    that the said deposition was recorded

10   stenographically by me and then reduced to printing

11   under my direction, and constitutes a true record of

12   the testimony given by said witness.

13       I further certify that the inspection, reading

14   and signing of said deposition were NOT waived by

15   counsel for the respective parties and by the

16   witness.

17       I further certify that I am not a relative or

18   employee of any of the parties, or a relative or

19   employee of either counsel, and that I am in no way

20   interested directly or indirectly in this action.

21       IN WITNESS WHEREOF, I have hereunto set my hand

22   and affixed my seal of office this 23rd day of

23   October, 2007.

24   _____

25

NOTARIAL SEAL
JOANN M. BROWN
Notary Public
CITY OF PITTSBURGH, ALLEGHENY COUNTY
My Commission Expires Apr 22, 2008

# EXHIBIT G

1          IN THE UNITED STATES DISTRICT COURT FOR THE
               WESTERN DISTRICT OF PENNSYLVANIA
2

3                          - - - -

UNIVERSITY OF PITTSBURGH,         )
4                                 )
                                  )
5          Plaintiff,             )
                                  )
6                                 )          Case No.
           -vs-                   )    07-CV-0791 (AJS)
7                                 )
                                  )
8    VARIAN MEDICAL SYSTEMS, INC.,)
                                  )
9                                 )
           Defendant.             )
10

11

12                         - - - -

13          CONFIDENTIAL - ATTORNEYS' EYES ONLY

14                         - - - -

15    DEPOSITION OF:  MARC S. MALANDRO, Ph.D.

16                         - - - -

17

18               DATE:    October 2, 2007
                          Tuesday, 9:10 a.m.
19

20           LOCATION:    PICADIO SNEATH
                          MILLER & NORTON
21                        4710 U.S. Steel Tower
                          600 Grant Street
22                        Pittsburgh, PA  15219

23           TAKEN BY:    Defendant

24

25        REPORTED BY:    Heidi H. Willis, RPR, CRR
                          Notary Public
                          AKF Reference No. HW03476



2

```
 1              DEPOSITION OF MARC S. MALANDRO, Ph.D.,
      a witness, called by the Defendant for examination,
 2    in accordance with the Federal Rules of Civil
      Procedure, taken by and before Heidi H. Willis, RPR,
 3    CRR, a Court Reporter and Notary Public in and for
      the Commonwealth of Pennsylvania, at the offices of
 4    Picadio Sneath Miller & Norton, 4710 U.S. Steel
      Tower, Pittsburgh, Pennsylvania, on Tuesday, October
 5    2, 2007, commencing at 9:10 a.m.

 6
                          -  -  -  -
 7


 8    APPEARANCES:

 9              FOR THE PLAINTIFF:
      Rita E. Tautkus, Esq.
10    MORGAN LEWIS & BOCKIUS, LLP
      One Market, Spear Street Tower
11    San Francisco, CA  94105
      P 415-442-1357
12    F 415-442-1001
      rtautkus@morganlewis.com
13
      - and -
14
      Laura R. Hillock, Esq.
15    UNIVERSITY OF PITTSBURGH
      1710 Cathedral of Learning
16    Pittsburgh, PA  15260
      P 412-624-0216
17    F 412-624-9165
      thillock@pitt.edu
18


19
                FOR THE DEFENDANT:
20    Henry Sneath, Esq.
      Shannon Clougherty, Esq.
21    PICADIO SNEATH MILLER & NORTON
      4710 U.S. Steel Tower
22    600 Grant Street
      Pittsburgh, PA  15219
23    412-288-4000
      hsneath@psmn.com
24

25
```

5

1          MARC S. MALANDRO, Ph.D.,

2            being first duly sworn,

3        was examined and testified as follows:

4                - - - -

5                EXAMINATION

6                - - - -

7    BY MR. SNEATH:

8    Q.    Mr. Malandro.  My name is Henry Sneath.  I

9          represent Varian Medical Systems in a lawsuit

10         that's been brought by the University of

11         Pittsburgh here in the Western District of

12         Pennsylvania.

13              I'm going to be asking you questions

14         today regarding claims in that case and issues

15         related to those claims, and there's just a few

16         basic ground rules that I would ask that we try

17         to follow and rights that you have that you

18         should feel free to exercise.

19              Number one, you are entitled to

20         understand each and every question that I ask,

21         and if you don't understand my question, please

22         ask me to rephrase it or ask it again, I'll be

23         happy to do that.

24              If you are confused by the

25         proceedings in any way, you should feel free to

 1        your answers before I begin my next question,

 2        and if you'll extend me the same courtesy and

 3        allow me to finish my questions before you

 4        answer for the benefit of the court reporter.

 5        Okay?

 6   A.   I understand.

 7   Q.   Please state your full name.

 8   A.   Marc Shane Malandro.

 9   Q.   What's your current home address?

10   A.   1064 South Lake Drive, Gibsonia, Pennsylvania

11        15044.

12   Q.   And by whom are you employed?

13   A.   University of Pittsburgh.

14   Q.   And what is your current job title?

15   A.   Associate vice chancellor for technology

16        management, commercialization.

17   Q.   And how long have you had that position?

18   A.   That current title since October of 2006.

19   Q.   I'm sorry, 2006?

20   A.   2006.

21   Q.   And what was your job before that?

22   A.   I started in 2004 as a licensing manager, in

23        2005 took over as interim director and then

24        director, and then in 2006 associate vice

25        chancellor.

Pittsburgh, PA
412-261-2323  /  Greensburg, PA
724-853-7700  /  Erie, PA
814-453-5700

AKF

8

1   Q.   So your first time of employment with Pitt was
2        what date?
3   A.   February 2004.
4   Q.   And where were you employed prior to that time?
5   A.   Company called Sagres Discovery, S-a-g-r-e-s,
6        in Davis, California.
7   Q.   Are you a native to the Pittsburgh area?
8   A.   No.
9   Q.   Where are you from originally?
10  A.   Youngstown, Ohio.
11  Q.   And your work with Sagres, what did you do
12       there?
13  A.   I was co-founder and vice president of
14       strategic alliances.
15  Q.   And what was the business of Sagres?
16  A.   It was a biotechnology company identifying
17       cancer genes.
18  Q.   Cancer?
19  A.   Genes.
20  Q.   Did your work with them involve any
21       collaboration with the University of Pittsburgh
22       or UPMC?
23  A.   No.
24  Q.   And how long were you with Sagres?
25  A.   Four years.

1  Q.   So that would take us back to, what, about
2       2000?
3  A.   About 2000, November of 2000 that takes us.
4  Q.   And where were you employed prior to that?
5  A.   Celera Genomics, C-E-L-E-R-A.
6  Q.   And where were you located with them?
7  A.   Still in Davis with home office in Rockville,
8       Maryland.
9  Q.   With that company, did you do any collaborative
10      work with the University of Pittsburgh or UPMC?
11 A.   No.
12 Q.   Did you ever give any deposition before?
13 A.   Yes.
14 Q.   How many times?
15 A.   Twice.
16 Q.   Did they involve issues relating to your work,
17      or were they personal?
18 A.   Issues related to work.
19 Q.   Is this for the University of Pittsburgh, or
20      one of your prior employments?
21 A.   University of Pittsburgh.
22 Q.   And were those two depositions part of a
23      lawsuit proceeding?
24 A.   Yes.
25 Q.   Were they lawsuits filed here in Western

1              Pennsylvania?

2    A.       I'm not sure where they were filed.

3    Q.       Okay.  Were they patent cases?

4    A.       Yes.

5    Q.       Were they in any way involved with any of the

6             inventors who are listed in the patents-in-suit

7             in this case?

8    A.       No.

9    Q.       Anything related to the technology that's at

10            issue in this case, in either of those suits?

11   A.       No.

12   Q.       Do you happen to remember the names of any of

13            the parties in those lawsuits?

14   A.       Siemens and CTI Molecular Imaging.

15   Q.       Was Siemens the plaintiff or defendant in that

16            suit?

17   A.       Defendant.

18   Q.       And was University of Pittsburgh the plaintiff?

19   A.       Yes.

20   Q.       And the other one, I'm sorry?

21   A.       CTI Molecular Imaging was acquired by Siemens.

22   Q.       Was that one and the same lawsuit that you were

23            referring to?

24   A.       Yes.

25   Q.       And did you do two depositions in one case, or

1    was there another deposition in another case?

2 A. Two depositions in one case.

3 Q. Do you remember the lawyers who took your

4    deposition, what law firm?

5 A. I don't.  They were an out-of-town firm.  I

6    don't remember the name.

7 Q. Can you tell me your current job

8    responsibilities just in a general way?

9 A. I oversee the office of technology management.

10    I oversee the office of enterprise development,

11    and on both of those manage the intellectual

12    property and the commercialization of the

13    research efforts at the university, also an

14    associate adjunct professor of medicine.

15 Q. Of medicine?

16 A. Yes.

17 Q. Tell me about your educational background,

18    undergrad, graduate school.

19 A. Undergraduate Youngstown State University in

20    biology, master's degree from Youngstown State

21    University in biology, Ph.D. in biochemistry

22    and molecular biology, University of Florida

23    College of Medicine, and postdoctoral work Case

24    Western Reserve University in human molecular

25    genetics.

12

| | | |
|---|---|---|
| 1 | Q. | And what do you teach as an adjunct professor? |
| 2 | A. | I teach bench top to bedside, it's a |
| 3 | | commercialization course for faculty. |
| 4 | Q. | And to whom do you report at the university? |
| 5 | A. | I report both to the provost and to the dean of |
| 6 | | the medical school and senior vice chancellor |
| 7 | | for health sciences. The provost is Jim Maher, |
| 8 | | senior vice chancellor is Art Levine. |
| 9 | Q. | Okay. You have been designated today as a |
| 10 | | witness pursuant to the Notice of Deposition |
| 11 | | that was served on the university. Would you |
| 12 | | agree with that? |
| 13 | A. | Yes. |
| 14 | Q. | Could you tell me the process by which you were |
| 15 | | involved in deciding what topics you'd be able |
| 16 | | to address in a deposition? |
| 17 | | MS. TAUTKUS: I'm going to object to |
| 18 | | the extent to caution the witness not to |
| 19 | | respond to the extent it involves any |
| 20 | | attorney-client communications, but anything |
| 21 | | other than attorney-client communications you |
| 22 | | may answer. |
| 23 | A. | I read the -- I don't know what it's exactly |
| 24 | | called, the Notice of Deposition that has the |
| 25 | | points laid out? |

1    Q.    Why don't we show you what we marked Exhibit

2          94.   The exhibits today will have a designation

3          of PITT and then number.

4    A.    I read this, had discussions with the general

5          counsel internally, had discussions with our

6          outside counsel, and we came to an agreement on

7          those which I think I can testify on.

8    Q.    Did you, without the advice or benefit of

9          counsel, did you personally go through them and

10         decide which ones you felt that you could

11         address?

12   A.    I guess I'm -- I don't understand the question.

13   Q.    Okay.  Prior to any discussions with counsel,

14         did you look at the list of topics and decide

15         on your own which topics you felt you could

16         testify to?

17   A.    I looked at the list of topics and had a

18         general idea of what I was able to testify on.

19   Q.    Were you involved in the production of

20         documents in this case?

21   A.    Yes.

22   Q.    Were you primarily responsible for working with

23         counsel in producing the documents that Pitt

24         produced?

25   A.    No.

20

```
 1   Q.   Well, this document is an initial disclosure in

 2        which the parties are each required to exchange

 3        certain information early in the lawsuit.  It

 4        says here in heading A, Individuals likely to

 5        have discoverable information; B is, Documents

 6        and things related to disputed facts, so on and

 7        so forth.

 8             Were you involved in generating

 9        information that you believe ended up in these

10        initial disclosures?

11             MS. TAUTKUS:  I'm going to object,

12        and, again, caution the witness to the extent

13        that there were discussions with counsel, I'll

14        instruct the witness not to answer, but if

15        there were discussions apart from counsel, you

16        can go ahead and answer.

17   A.   What we were just talking about, I believe if

18        those -- if that information made it into here,

19        then the answer would be yes.  Alex, in

20        reporting to me, was the most direct contact

21        for most of the information from our office.

22   Q.   All right.  Now, if you'd go back and take a

23        look at Exhibit 94 again, that's the deposition

24        notice.

25             My understanding is -- and if counsel
```



1          needs to show you the e-mail that she sent --

2          that you have been designated for certain

3          topics.  You are aware of that?

4     A.   Yes.

5     Q.   And I'd like to read them off, and, Counsel,

6          you can follow along with me, see if we agree.

7          My understanding is you've been specifically

8          designated under Rule 30(b)(6) for deposition

9          topics 9, 10 -- just stop me if I'm wrong

10         anywhere along the way -- 9, 10 as I said, 11,

11         13 --

12              MS. TAUTKUS:  We have one caveat with

13         respect to 13, and that is he would only be

14         designated with respect to discussion of rights

15         between UPMC and the University of Pittsburgh.

16              MR. SNEATH:  All right.  Well, we'll

17         be coming back to that, but we'll note a

18         limitation on 13.

19              13, 14, 15, 16, 19, 21, 23 through --

20         no, I'm sorry, 22, 24, 25.  Everybody agree

21         with that?  Counsel?

22              MS. TAUTKUS:  I agree with that.

23              THE WITNESS:  Mm-hmm.

24    BY MR. SNEATH:

25    Q.   And, Mr. Malandro, you have no different

1       understanding than what we just recited; is

2       that correct?

3  A.   I don't believe so.

4  Q.   Now, deposition topic No. 1, by way of example

5       of a number that have this response, my

6       understanding is the University of Pittsburgh

7       is not designating any witness under Rule

8       30(b)(6) to address deposition topic No. 1.  Is

9       that your understanding?

10  A.   I don't know.

11          MR. SNEATH:  Counsel, can we agree on

12       that, first of all, before I proceed, that

13       deposition topic No. 1 is a designation of no

14       witness?

15          MS. TAUTKUS:  I don't believe that's

16       the case.  I'll have to consult with my notes,

17       if you want to do that off the record.

18          MR. SNEATH:  Yeah, why don't we go

19       off the record for a moment.

20           - - - -

21       (There was a discussion off the record.)

22           - - - -

23          MR. SNEATH:  All right.  We are back

24       on the record.  I was asking about deposition

25       topic 1, but based on our discussion off the



1  Q.  Do you know whether or not the inventors listed

2      in the patents-in-suit had ever created a

3      working prototype of the technology described

4      in those patents?

5  A.  I don't know.

6  Q.  How about today?  Do you know?

7  A.  I don't know.

8  Q.  I'd like to show you Exhibit 1.  We are going

9      to finally start at the beginning.  You can

10     just keep turning those over in that pile

11     there, and we can make a decision at the end

12     what we are going to do with them all.

13         This is Pitt production document 2240

14     through 2244.  Can you identify this document?

15 A.  This is a discussion of how collaborative

16     projects are handled between Pitt and

17     university dated '94.

18 Q.  Okay.  Between Pitt and CMU; right?

19 A.  I'm sorry, Pitt and CMU.

20 Q.  And you said it's a discussion.  Would you

21     agree it's a signed document called Policy

22     Guidelines?

23 A.  Yes.

24 Q.  And appears to have been signed in October of

25     '94, and on the front page it says, Final

```
 1              version written September 1, '94?

 2   A.    Yes.

 3   Q.    You know that this was the policy that was in

 4         place between Pitt and CMU beginning at or

 5         about those dates?

 6   A.    I believe it was.

 7   Q.    I'll show you Exhibit 2.  This is document

 8         2253.  Can you identify this?

 9   A.    It appears to be a letter between Drs. Kanade

10         and Shimoga, to them from Kalend and

11         Greenberger.

12   Q.    They relate or refer in the letter to dynamic

13         treatment tracking module, DTTM.  Do you know

14         what that is?

15   A.    I don't understand -- I don't know the acronym,

16         no.

17   Q.    So you are not familiar with whatever that

18         project or product was?

19   A.    Not specifically that.

20   Q.    What distinction are you making?  You have some

21         familiarity with -- forget the acronym part.

22   A.    Well, I'm familiar with the technology in the

23         patent.  So inasmuch as that technology relates

24         to the acronym, I don't know.  So I don't know

25         if there was limited in scope or greater in
```

61

1       scope.

2   Q.  Looking back for a moment, if you would, in

3       Exhibit 1, it's the one we just looked at

4       before this, again, the policy guidelines, do

5       you have an understanding that during the time

6       period in which this policy was in effect that

7       the two universities would share ownership of

8       intellectual property if that intellectual

9       property was developed during collaboration

10      between employees of the two universities?  And

11      specifically I'm looking at D4 on the second

12      page.

13  A.  Can you repeat your question, please?

14  Q.  Do you have an understanding that during the

15      term of this agreement or these policy

16      guidelines between the universities that if

17      intellectual property was jointly developed

18      during collaboration by employees of the two

19      universities, that the intellectual property

20      would be owned jointly pursuant to this

21      agreement?

22          MS. TAUTKUS:  Objection, calls for

23      legal conclusion.

24  A.  It says IP developed jointly shall be owned

25      jointly.

1   Q.   So you agree that was the policy at least

2         during the term of this agreement?

3   A.   During the -- correct.

4   Q.   Why don't we look at Exhibit 3, if we could.

5         Exhibit 3 is 7801 through 7803, Pitt

6         production.

7             Have you seen this document before

8         today?

9   A.   I haven't seen this document.

10   Q.   There are CCs down there.  Do you know who Jodi

11        Buntain is?

12   A.   I don't.

13   Q.   How about either of the other two, Joyce Yasko

14        or Melvin Deutsch?

15   A.   I don't.

16   Q.   Take a look at the topics that are referenced

17        there in the letter, tell me if any of that

18        looks familiar with regard to the Sun computer,

19        the Sun-5 and so on.

20             Are any of those issues in which you

21        have any familiarity?

22   A.   No.

23   Q.   Look at the assignment document that's on the

24        next two pages.  Do you know what that document

25        is?

Pittsburgh, PA
412-261-2323  /  Greensburg, PA
724-853-7700  /  Erie, PA
814-453-5700                         AKF

1    though for the deposition, so we make the

2    record of what your position is regarding the

3    deposition topics so that we can then take them

4    up with the Court.  The Court is not going to

5    want to hear about our off-line discussion

6    during a break.

7              MS. TAUTKUS:  I've already made my

8    position on the record.

9  BY MR. SNEATH:

10   Q.   Okay.  So let's take a look at Exhibit 10, if

11        we could.  Would you agree that this is the

12        follow-up policy guideline document to the one

13        that we looked at earlier, this one being

14        effective June 6th, 1997?

15   A.   I believe so, yes.

16   Q.   And this is the policy guideline document

17        between Pitt and CMU effective at or about that

18        time; is that right?

19   A.   I believe so, yes.

20   Q.   And signed by both universities?

21   A.   Yes.

22   Q.   Do you know whose handwriting appears on this

23        document?

24   A.   The signatures?

25   Q.   Yeah, you know, I shouldn't even ask you.  It's



1    an unfair question because I think we've had

2    testimony.  This is a CMU document.  I don't

3    believe it was produced by Pitt, but it was

4    produced by CMU.  We already know that the

5    writing on here was Mr. Wooldridge's writing,

6    and his testimony, I think I'll state this

7    fairly, is that that writing did not constitute

8    part of the agreement, it was simply the typed

9    part of this.  So in fairness to you, I'm just

10    advising you of that.

11         Do you know whether or not the

12    university has a copy of this in its possession

13    and was, in fact, operating under this document

14    for the term of the agreement, Pitt?

15  A.   I would assume because we have the provost's

16    signature on it that we would have a copy of

17    it.

18  Q.   You have no reason to disagree that this

19    agreement was an agreement between the

20    universities that became effective June of '97?

21  A.   Yeah, I don't disagree.

22  Q.   All right.  Sure, again, trying to do this more

23    or less chronologically, Exhibit 82.  Take a

24    look.  This is a package of documents that runs

25    from 2564 through 2581.  Tell me whether or not

1  COMMONWEALTH OF PENNSYLVANIA )        CERTIFICATE

2  COUNTY OF ALLEGHENY          )        SS:

3      I, Heidi H. Willis, RPR, CRR, a Court Reporter

4  and Notary Public in and for the Commonwealth of

5  Pennsylvania, do hereby certify that the witness,

6  MARC S. MALANDRO, Ph.D., was by me first duly sworn

7  to testify to the truth; that the foregoing

8  deposition was taken at the time and place stated

9  herein; and that the said deposition was recorded

10 stenographically by me and then reduced to printing

11 under my direction, and constitutes a true record of

12 the testimony given by said witness.

13     I further certify that the inspection, reading

14 and signing of said deposition were NOT waived by

15 counsel for the respective parties and by the

16 witness.

17     I further certify that I am not a relative or

18 employee of any of the parties, or a relative or

19 employee of either counsel, and that I am in no way

20 interested directly or indirectly in this action.

21     IN WITNESS WHEREOF, I have hereunto set my hand

22 and affixed my seal of office this 10th day of

23 October, 2007.

24                              _____

25                              Notary Public

# EXHIBIT H

## Policy Guidelines --

## Intellectual Property Rights and Technology Transfer Procedures
### in Collaborative Projects
## of the University of Pittsburgh and Carnegie Mellon University.

Final Version -- written on September 21, 1994

### A. Objectives.

The objectives of these Guidelines are -

1. to encourage collaboration between members of Carnegie Mellon University ("CMU") and the University of Pittsburgh ("Pitt"), for the benefit of all participants, both universities, the community, and society in general;

2. to provide clear policy guidelines on intellectual property ("IP") rights developed in Collaborative Projects ("CP's");

3. to facilitate the subsequent commercialization of IP rights.

### B. Principles

These Guidelines are built on the following principles :

1. Each participant's basic IP rights will be governed by the IP policies of that university in which the participant has his/her primary appointment -- ("Pitt Participant", "CMU Participant").

2. Invention disclosures will be the key vehicles for administering CP IP rights and commercialization projects.

3. **The basic allocation between the two universities of ownership rights, expenses and proceeds ("University Allocation") will be calculated in accordance with the Relative Contributions toward each invention by the Participants from the two universities (see Section E.2), and the other provisions of these Guidelines.**

4. **The commercialization work for of each invention disclosure will be handled by the Technology Transfer Offices of one of the two universities, in accordance with the provisions of Section F.** No new organization structures will be created.

### SPECIFICS

### C. Definition of Collaborative Projects

Prior to the formal beginning of a CP, the participating collaborators will, using their normal practices and procedures, define and agree to the following points : Definition of the CP, objectives, scope, principal investigators, expected funding, expected duration, and other dimensions of the project. Each such agreement will include mutual, blanket confidentiality agreements, as appropriate for each case.



DEFENDANT'S
EXHIBIT

CMU 7

FRNGA0 000-531-6989

CMU 0279

Policy Guidelines -- Intellectual Property Rights and TT Procedures in Collaborative Projects, Sept. 21, 1994, page 2

The allocation of ownership of IP among the participants and universities which may result from a CP will normally not be defined at this stage but will be determined later when specific Invention Disclosures are created.

### D.  Creation of IP Rights in CP's.

1. Mere **discussion of a problem** during collaboration between participants in a CP, without creating solutions to the problem, will not create any rights to ownership of patents, copyrights, trade secrets, or any other IP rights.

2. **IP developed solely by Pitt Participants** during collaboration will be owned entirely by Pitt, including title, interest, and IP rights.

3. **IP developed solely by CMU Participants** during collaboration will be owned entirely by CMU, including title, interest, and IP rights.

4. All IP developed **jointly** by CMU Participants and Pitt Participants during collaboration shall be owned jointly by Pitt and CMU and shall be administered in accordance with these Guidelines.

### E.  Invention Disclosures, Allocation of Proceeds.

1. It is recognized that different innovations made within the same CP are likely to have different characteristics; for example, they may involve different participants, may result in different university decisions regarding university commitment to commercialization, and may require different approaches to commercialization. The primary vehicle for managing IP and commercialization of innovations resulting from a CP will therefore be **individual invention disclosures ("Disclosures").**

2. With each Disclosure, the Participants must also define the **"Relative Contribution"** toward **the invention made by each Participant.** A Participant's Relative Contribution in a particular Disclosure may range from zero to 100 percent (for sole inventors).

   The steps of reaching a definitive agreement on the Relative Contribution of all Participants will be as follows :

   a. The Participants in a Disclosure will aim to reach agreement with one another and will then propose a schedule of the Relative Contribution of each Participant. If no such agreement can readily be reached, the Participants will seek the advice and counsel of relevant department heads, program leaders, and one or both of the Technology Transfer Offices in order to reach such agreement. All such discussions, agreements, and resolutions of differences are to be dealt with in the same manner which is customary for "normal" for invention disclosures within each university.

CMU 0280

Policy Guidelines – Intellectual Property Rights and TT Procedures in Collaborative Projects, Sept. 21, 1994, page 3

   b.  The Technology Transfer Offices at both Universities must concur with each such proposal.

   c.  If no agreement can be reached, the two Technology Transfer Offices will, as a last resort and according to the rules of the American Arbitration Association, select an Arbitrator to determine Relative Contributions of the Participants in a Disclosure.

3.  a.  The **"University Allocation"** of expenses and proceeds will be proportionate to the sum of the Relative Contributions by the individual Participants from the two universities.

*For example, if two Pitt Participants made at total of 60% and three CMU Participants 40% of the Relative Contribution toward the invention, then 60% of total distributions will go to Pitt and 40% to CMU, for each university's respective further allocation of proceeds.*

   b.  The further allocation of each university's share of proceeds among its Participants, Participants' departments, and other units will be calculated **in accordance with the IP Policies of each university.**

In order to clarify and record all details of the resulting allocation of proceeds, a specific **Allocation Agreement** will be developed for each Disclosure, with individual allocations to be calculated in accordance with the combination of principles defined under 3.a and 3.b above; the Allocation Agreement will define the percentage of Net Proceeds to be received by each of the two universities and, in accordance with each university's policies, by each of the Participants and any other qualified units.

Third party interests, if any, which may be involved in any CP and/or Disclosure will be noted in each Allocation Agreement and will be taken into account in calculating Relative Contributions.

### F.  Designated / Responsible Technology Transfer Office.

1.  The Participants in a Disclosure will propose which of the two **Technology Transfer Offices** (**"TT Office"**, at Pitt or CMU) they prefer to handle the potential commercialization of their Disclosure.

The Participants may make their proposal without regard to the Relative Contribution of the Participants from the two Universities. If the Participants' decision is not unanimous, the TT Office of the University whose participants made more than 50% Relative Contributions will be automatically proposed.

This Participants' proposal will be developed with the participation of the two TT Offices and will require their concurrence.

The TT Office thus chosen shall be called **"Designated TT Office"**.

CMU 0281

Policy Guidelines -- Intellectual Property Rights and TT Procedures in Collaborative Projects, Sept. 21, 1994, page 4

2. The Designated TT Office will have the sole responsibility for the commercialization of the IP disclosures resulting from CP's. The normal policies and practices used by the Designated TT Office will apply, including the decision process of whether or not the university wishes -

   (a) to pursue the commercialization of a particular Disclosure, and in what manner, or
   (b) to turn it back to the inventors.

   The Designated TT Office will, however, include at least one faculty member of the other university in completing the evaluation process of each Disclosure.

   If the Designated TT Office wishes to turn back a Disclosure to the inventors, the other, "Non-Designated" TT Office will then have the option of taking responsibility for pursuing that Disclosure. In that case, all other provisions of these Guidelines will remain in effect except that, contrary to Section G.2 below, this Non-Designated TT Office must also assume full responsibility for all Docket Expenses incurred in pursuit of the commercialization of that Disclosure.

   The TT Office which emerges with the responsibility for the commercialization of a Disclosure will be called the "Responsible TT Office".

3. The Responsible TT Office will work closely with the Participants in planning and executing commercialization of that Disclosure. It will keep the Participants and the other TT Office well informed on its activities and plans, will be sensitive and responsive to any special circumstances (for examples, special regulatory requirements) of the other university, and will consult with the other TT Office on such issues.

## G. Sharing of Proceeds and Expenses.

1. Pitt and CMU will share the Net Proceeds from the commercialization of a Disclosure in proportion to the University Ownership Allocation for each Disclosure.

   "Net Proceeds" are defined as -

   - **All gross proceeds received by the participating universities due to the commercialization of an IP,** such as license fees, license income, and ownership in a related business entity (including realized capital gains),

   - **minus all allowable docket expenses for that Invention Disclosure ("Docket Expenses")** which are incurred by the Responsible TT Office .

   Docket Expenses may include all expenses incurred directly in the pursuit of the commercialization of an Invention Disclosure (Docket), including

   a. Patenting and other IP expenses, including related attorneys fees;

   b. Other legal expenses related that Docket, including negotiating and litigation expenses;

   c. Direct selling and marketing expenses related to the Docket, such as the cost of "selling trips", customer entertainment, promotion and advertising;

CMU 0282

d. The time spent by professionals in the Responsible TT Office in handling the Docket, charged at the hourly "billing rates" which are customarily used by that office; each TT Office will advise the other of the annual schedule of such rates at the beginning of each fiscal year.

e. Consulting expenses related to the Docket.

In the case of planned material expenditures for a Docket which are unusual either in type or magnitude, the Responsible TT Office will advise the other of its plans in advance of incurring the commitment for such expenditures.

2. Docket Expenses will be shared and paid for by the two universities in proportion to the University Allocation of each Disclosure -- i.e. in all cases where the Designated TT Office is actually proceeding with the handling of a Disclosure.

The Designated TT Office will submit invoices to the other TT Office after the end of each calendar quarter for the other university's portion of Docket Expenses; such charges will be paid by that university within 30 days.

3. Net Proceeds will become available for Distribution once the Proceeds received for a Disclosure exceed Docket Expenses. Net Proceeds will be distributed by the Responsible TT Office to all Participants in accordance with the Allocation Agreement.

Distributions will be made as promptly as practical, with consideration of such factors as the status of the commercialization of each IP, the balance of expected future proceeds versus expected future expenses, and the normal accounting procedures of the TT Office, but at least once a year within 90 days from the end of the fiscal year of the Responsible TT Office.

4. Ownership participation in business entities related to a Disclosure (such as shares in the equity of start-up corporation) will be assigned to the two universities in accordance with each relevant Allocation Agreement; each university will handle any further assignments and/or distributions of ownership certificates and/or related cash proceeds in accordance with its own Policies.

**II. Approval.**

These Guidelines are approved for a three-year trial period ending 6/30/1997, and can be extended and/or amended by mutual agreement.

University of Pittsburgh :

Name : *Ben Nudin*

Title : *Sr. Vice Chancellor*

Date : *Oct 4, 1994*

Carnegie Mellon University :

Name : *Susan B Dunkle*

Title : *ASSOCIATE PROVOST*

Date : *Oct 13, 1994*

file =c:\data\word_d\tl_c_wd\guideline\cm_p_lp7.doc, 09/22/94 3:14 pm

CMU 0283

# EXHIBIT I

Policy Guidelines --

**ORIGINAL**

**Intellectual Property Rights and Technology Transfer Procedures**
**in Collaborative Projects**
**of the University of Pittsburgh and Carnegie Mellon University.**

June 6, 1997

## A. Objectives.

The objectives of these Guidelines are -

1. to encourage collaboration between members of Carnegie Mellon University ("CMU") and the University of Pittsburgh ("Pitt"), for the benefit of all participants, both universities, the community, and society in general;

2. to provide clear policy guidelines on intellectual property ("IP") rights developed in Collaborative Projects ("CP's");

3. to facilitate the subsequent commercialization of IP rights.

## B. Principles

These Guidelines are built on the following principles :

1. Each participant's basic IP rights will be governed by the IP policies of that university in which the participant has his/her primary appointment -- (**"Pitt Participant"**, **"CMU Participant"**).

2. Invention disclosures will be the key vehicles for administering CP IP rights and commercialization projects.

3. The basic allocation between the two universities of ownership rights, expenses and proceeds (**"University Allocation"**) will be calculated in accordance with the Relative Contributions toward each invention by the Participants from the two universities (see Section E.2), and the other provisions of these Guidelines.

4. The commercialization work for of each invention disclosure will be handled by the **Technology Transfer Offices of one of the two universities**, in accordance with the provisions of Section F. No new organization structures will be created.

## SPECIFICS

### C. Definition of Collaborative Projects

Prior to the formal beginning of a CP, the participating collaborators will, using their normal practices and procedures, define and agree to the following points : Definition of the CP, objectives, scope, principal investigators, expected funding, expected duration, and other dimensions of the project. Each such agreement will include mutual, blanket confidentiality agreements, as appropriate for each case.



DEFENDANT'S
EXHIBIT
CMU 9
PENGAD 800-631-6989

CMU 0274

The allocation of ownership of IP among the participants and universities which may result from a CP will normally **not** be defined at this stage but will be determined later when specific Invention Disclosures are created.

### D.  Creation of IP Rights in CP's.

1.  Mere **discussion of a problem** during collaboration between participants in a CP, without creating solutions to the problem, will **not** create any rights to ownership of patents, copyrights, trade secrets, or any other IP rights.

2.  **IP developed solely by Pitt Participants** during collaboration will be owned entirely by Pitt, including title, interest, and IP rights.

3.  **IP developed solely by CMU Participants** during collaboration will be owned entirely by CMU, including title, interest, and IP rights.

4.  All **IP developed jointly** by CMU Participants and Pitt Participants during collaboration shall be owned jointly by Pitt and CMU and shall be administered in accordance with these Guidelines.

### E.  Invention Disclosures, Allocation of Proceeds.

1.  It is recognized that different innovations made within the same CP are likely to have different characteristics;  for example, they may involve different participants, may result in different university decisions regarding university commitment to commercialization, and may require different approaches to commercialization. The primary vehicle for managing IP and commercialization of innovations resulting from a CP will therefore be **individual invention disclosures ("Disclosures")**.

2.  With each Disclosure, the Participants must also define the **"Relative Contribution"** toward **the invention made by each Participant.** A Participant's Relative Contribution in a particular Disclosure may range from zero to 100 percent (for sole inventors). *~~to be understood but important~~ in Collaboration* The steps of reaching a definitive agreement on the Relative Contribution of all Participants will be as follows :

    a.  The Participants in a Disclosure will aim to reach agreement with one another and will then propose a schedule of the Relative Contribution of each Participant. If no such agreement can readily be reached, the Participants will seek the advice and counsel of relevant department heads, program leaders, and one or both of the Technology Transfer Offices in order to reach such agreement. All such discussions, agreements, and resolutions of differences are to be dealt with in the same manner which is customary for "normal" for invention disclosures within each university.

CMU 0275

Policy Guidelines -- Intellectual Property Rights and TT Procedures in Collaborative Projects, Sept. 21, 1994, page 3

b. The Technology Transfer Offices at both Universities must concur with each such proposal.

c. If no agreement can be reached, the two Technology Transfer Offices will, as a last resort and according to the rules of the American Arbitration Association, select an Arbitrator to determine Relative Contributions of the Participants in a Disclosure.

3. a. The "**University Allocation**" of expenses and proceeds will be proportionate to the sum of the Relative Contributions by the individual Participants from the two universities.

   *For example, if two Pitt Participants made at total of 60% and three CMU Participants 40% of the Relative Contribution toward the invention, then 60% of total distributions will go to Pitt and 40% to CMU, for each university's respective further allocation of proceeds.*

   b. The further allocation of each university's share of proceeds among its Participants, Participants' departments, and other units will be calculated **in accordance with the IP Policies of each university.**

In order to clarify and record all details of the resulting allocation of proceeds, a specific **Allocation Agreement** will be developed for each Disclosure, with individual allocations to be calculated in accordance with the combination of principles defined under 3.a and 3.b above; the Allocation Agreement will define the percentage of Net Proceeds to be received by each of the two universities and, in accordance with each university's policies, by each of the Participants and any other qualified units.

Third party interests, if any, which may be involved in any CP and/or Disclosure will be noted in each Allocation Agreement and will be taken into account in calculating Relative Contributions.

## F. Designated / Responsible Technology Transfer Office.

1. The Participants in a Disclosure will propose which of the two **Technology Transfer Offices** ("**TT Office**", at Pitt or CMU) they prefer to handle the potential commercialization of their Disclosure.

   The Participants may make their proposal without regard to the Relative Contribution of the Participants from the two Universities. If the Participants' decision is not unanimous, the TT Office of the University whose participants made more than 50% Relative Contributions will be automatically proposed.

   This Participants' proposal will be developed with the participation of the two TT Offices and will require their concurrence.

   The TT Office thus chosen shall be called "**Designated TT Office**".

CMU 0276

Policy Guidelines – Intellectual Property Rights and TT Procedures in Collaborative Projects, Sept. 21, 1994, page 4

2. The Designated TT Office will have the sole responsibility for the commercialization of the IP disclosures resulting from CP's. **The normal policies and practices used by the Designated TT Office will apply**, including the decision process of whether or not the university wishes -

   (a) to pursue the commercialization of a particular Disclosure, and in what manner, or
   (b) to turn it back to the inventors.

   The Designated TT Office will, however, include at least one faculty member of the other university in completing the evaluation process of each Disclosure.

   If the Designated TT Office wishes to turn back a Disclosure to the inventors, the other, "Non-Designated" TT Office will then have the option of taking responsibility for pursuing that Disclosure. In that case, all other provisions of these Guidelines will remain in effect except that, contrary to Section G.2 below, this Non-Designated TT Office must also assume full responsibility for all Docket Expenses incurred in pursuit of the commercialization of that Disclosure.

   The TT Office which emerges with the responsibility for the commercialization of a Disclosure will be called the **"Responsible TT Office"**.

3. The Responsible TT Office will work closely with the Participants in planning and executing commercialization of that Disclosure. It will keep the Participants and the other TT Office well informed on its activities and plans, will be sensitive and responsive to any special circumstances (for examples, special regulatory requirements) of the other university, and will consult with the other TT Office on such issues.

### G. Sharing of Proceeds and Expenses.

1. Pitt and CMU will share the **Net Proceeds** from the commercialization of a Disclosure in proportion to the University Ownership Allocation for each Disclosure.

   **"Net Proceeds"** are defined as -

   - **All gross proceeds** received by the participating universities due to the commercialization of an IP, such as license fees, license income, and ownership in a related business entity (including realized capital gains),

   - **minus all allowable docket expenses** for that Invention Disclosure ("Docket Expenses") which are incurred by the Responsible TT Office .

   Docket Expenses may include all expenses incurred directly in the pursuit of the commercialization of an Invention Disclosure (Docket), including

   a. Patenting and other IP expenses, including related attorneys fees;

   b. Other legal expenses related that Docket, including negotiating and litigation expenses;

   c. Direct selling and marketing expenses related to the Docket, such as the cost of "selling trips", customer entertainment, promotion and advertising;

CMU 0277

Policy Guidelines – Intellectual Property Rights and TT Procedures in Collaborative Projects, Sept. 21, 1994, page 5

    d. The time spent by professionals in the Responsible TT Office in handling the Docket, charged at the hourly "billing rates" which are customarily used by that office; each TT Office will advise the other of the annual schedule of such rates at the beginning of each fiscal year.

    e. Consulting expenses related to the Docket.

In the case of planned material expenditures for a Docket which are unusual either in type or magnitude, the Responsible TTOffice will advise the other of its plans in advance of incurring the commitment for such expenditures.

2. **Docket Expenses** will be shared and paid for by the two universities in proportion to the University Allocation of each Disclosure – i.e. in all cases where the Designated TT Office is actually proceeding with the handling of a Disclosure.

The Designated TT Office will submit invoices to the other TT Office after the end of each calendar quarter for the other university's portion of Docket Expenses; such charges will be paid by that university within 30 days.

3. **Net Proceeds** will become available for **Distribution** once the Proceeds received for a Disclosure exceed Docket Expenses. Net Proceeds will be distributed by the Responsible TT Office to all Participants in accordance with the Allocation Agreement.

Distributions will be made as promptly as practical, with consideration of such factors as the status of the commercialization of each IP, the balance of expected future proceeds versus expected future expenses, and the normal accounting procedures of the TT Office, but at least once a year within 90 days from the end of the fiscal year of the Responsible TT Office.

4. **Ownership participation** in business entities related to a Disclosure (such as shares in the equity of start-up corporation) will be assigned to the two universities in accordance with each relevant Allocation Agreement; each university will handle any further assignments and/or distributions of ownership certificates and/or related cash proceeds in accordance with its own Policies.

**H. Approval.**

These Guidelines are approved for a three-year period ending 6/30/2000, and can be extended and/or amended by mutual agreement.

**Univeristy of Pittsburgh :**

Name : _James V. Maher_

Title : _____

Date : _6/18/97_

**Carnegie Mellon University :**

Name : _____

Title : _____

Date : _6/4/97_

CMU 0278

# EXHIBIT J

## Carl Mahler

| | |
|---|---|
| **From:** | Reed McManigle [reedmcm@otm.tt.pitt.edu] |
| **Sent:** | Friday, May 31, 2002 11:40 AM |
| **To:** | Mahler Carl (E-mail) |
| **Cc:** | Chris Capelli; Colecchia Theresa (E-mail) |
| **Subject:** | new interinstitutional |

**Attachments:** Inter-Inst Agr #1 5-31-02.doc



Inter-Inst Agr #1
5-31-02.doc ...

Carl,

We need to do another interinstitutional agreement for three patented technologies that involved Takeo Kanade in the Robotics Institute, Charalambos Athanassiou, who was (is?) a visiting scientist in the Robotics Institute, working with Joel Greenberger, Andre Kalend and Karun Shimoga in our school of medicine. The technologies are for positioning patients during radiation therapy. The were developed with funding from Elekta, a manufacturer of radiation therapy equipment. The relationship with Elekta fell apart (with legal action underway to recoup unpaid research dollars).
Elekta had paid for patent expenses during the term of the research agreement, which were filed in the US and internationally. We've been
covering patent expenses since the Elekta relationship fell apart.  We have
three issued US patents: 5,823,192; 5,784,431; and 5,727,554

Recently, we were talking with another radiation therapy company, Varian, about another technology developed at Pitt by Don Sashin for positioning the patient's head (as distinguished from the other three technologies which related to whole body positioning). While I was talking to them about the Sashin technology, I asked if they might also want to take a look at the whole body positioning patents. They have been looking at them over the past few months, reviewing the patents, talking with the researchers, etc. and now have indicated that they want to license all four of the technologies.

My recollection is that we never had the inventors tell us their relative contribution to the inventions, so we'll have to get that information before we can fill in the split between Pitt and CMU.  I'll email the inventors to get this rolling (I don't have contact information for Athanassiou, but I'm hoping that Kanade will).  In the meantime, I've drafted an IIA based on the Stetten IIA for your review.

Reed

<<Inter-Inst Agr #1 5-31-02.doc>>

200 GSCC
Thackeray and O'Hara Street
Pittsburgh, PA 15260
412-624-8787
412-648-8525 (f)
reedmcm@pitt.edu

1



DEFENDANT'S EXHIBIT
CMU 24

CMU 0227

# INTER-INSTITUTIONAL AGREEMENT

THIS INTER-INSTITUTIONAL AGREEMENT ("AGREEMENT") is made effective as of this ____ day of _____, 2002, ("EFFECTIVE DATE") by and between CARNEGIE MELLON UNIVERSITY, a Pennsylvania non-profit corporation, located at 5000 Forbes Avenue, Pittsburgh, PA  15213 ("CMU"), and UNIVERSITY OF PITTSBURGH - OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION, a Pennsylvania non-profit corporation, with an office at 200 Gardner Steel Conference Center, Thackeray and O'Hara Streets, Pittsburgh, Pennsylvania 15260 ("PITTSBURGH").

## RECITALS

WHEREAS, Andre Kalend, Joel Greenberger and Karun Shimoga of PITTSBURGH and Takeo Kanade and Charalambos Athanassiou of CMU have collaborated in the research and development of three inventions titled "Apparatus responsive to movement of a patient during treatment/diagnosis;" "Apparatus for matching X-ray images with reference images;" and "Apparatus for automatically positioning a patient for treatment/diagnosis" (the "INVENTIONS"); and

WHEREAS, PITTSBURGH has filed U.S. and international patent applications on the INVENTIONS, and has been awarded U.S. patents 5,727,554, 5,784,431, and 5,823,192 and additional international patents; and

WHEREAS, CMU and PITTSBURGH wish to agree on the disposition of the INVENTIONS as defined hereafter and described above;  the allocation of patenting and other expenses; and on the allocation of revenues from the commercialization of the INVENTIONS.

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein, and intending to be legally bound hereby, the parties hereto agree to the following terms and conditions:

1

CMU 0228

## ARTICLE 1 - DEFINITIONS

1.1 INVENTORS

"INVENTORS" means Andre Kalend, Joel Greenberger and Karun Shimoga of PITTSBURGH and Takeo Kanade and Charalambos Athanassiou of CMU.

1.2 PATENT

" PATENT" means those issues patents, any pending patents applications and any future United States and foreign application or patent covering the INVENTIONS or any part thereof.

1.3 LICENSE REVENUES

"LICENSE REVENUES" means the proceeds received by the parties from any licensing arrangement and includes license initiation fees, up-front fees, minimum royalties or milestone payments, sublicense initiation fees or any other fixed sum payments received from the licensing or other disposition of the PATENT(S) and all earned or running royalties on the sales of products covered under any claim of the PATENT(S), less fifteen percent (15%) of such revenues which shall be paid to PITTSBURGH for administrative overhead.

## ARTICLE 2 – PATENTS AND EXPENSES

2.1 MANAGEMENT OF PATENT(S)

CMU and PITTSBURGH agree that PITTSBURGH shall be responsible for managing the prosecution and maintenance of the PATENT(S). PITTSBURGH shall consult with CMU on a timely basis on all significant matters relating to the prosecution and maintenance of the PATENT(S). PITTSBURGH shall promptly, upon request, provide CMU all serial numbers and filing dates, together with copies of all patent applications for the INVENTIONS, including copies of all office actions, responses and all other Patent Office communications and relevant correspondence.

2

CMU 0229

2.2    UNITED STATES AND FOREIGN PATENT EXPENSES

Except as provided in Section 2.3 below, CMU and PITTSBURGH agree to share equally all reasonable United States and foreign patent expenses (including legal fees, filing, prosecution, and maintenance fees or other governmental charges) incurred in connection with PATENT(S). CMU's share of the past patent expenses, as of the execution date of this Agreement, shall be deducted from the LICENSE REVENUES prior to distribution. Future patent expenses, if any, will be subject to the provisions that follow. Payment of all fees and costs relating to the filing, prosecution, and maintenance of the PATENT(S) shall be paid initially by PITTSBURGH. PITTSBURGH shall give CMU quarterly notices along with documentation evidencing costs incurred (including copies of patent attorney invoices for which such payments have been made) and CMU shall reimburse PITTSBURGH within thirty (30) days after receipt of such quarterly notices for one-half (1/2) of such costs.

2.3    JURISDICTION AND NON-PAYMENT

The parties, in consultation with any licensees, if appropriate, shall mutually determine the countries or jurisdictions where patent applications for the PATENT(S) will be filed, prosecuted and maintained. If either party declines to pay its share of United States or foreign patent expenses for the prosecution or maintenance of a PATENT(S) in any country or jurisdiction, the other party may pay all such United States or foreign patent expenses but thereafter the paying party shall have sole authority over licensing and patent prosecution of the PATENT(S) in any such country or jurisdiction. The party who has such sole authority in a country shall not be under any obligation pursuant to Section 3.2 to share LICENSE REVENUES from such a country or jurisdiction with the other party.

### ARTICLE 3 – LICENSING

3.1    LICENSING OF PATENT(S)

The parties agree that PITTSBURGH shall have the exclusive responsibility and authority:    (a) to promote and market the    PATENT(S) for licensing and

3

CMU 0230

commercialization; (b) to identify and negotiate with appropriate parties interested in such licensing and commercialization rights for the PATENT(S); (c) to enter into binding license agreements or binding option agreements for the granting of an exclusive license including the right to grant sublicenses or non-exclusive licenses or commercialization rights for the PATENT(S); and (d) to manage any such license or option agreements for the PATENT(S). PITTSBURGH agrees to consult with CMU on the licensing strategy, commercialization efforts and the licensing terms. PITTSBURGH will provide CMU promptly, upon execution, with a copy of all option or license agreements for PATENT(S) entered into under this AGREEMENT. PITTSBURGH will not enter into any fully paid-up license agreements without the prior written consent of CMU. Pittsburgh will assure that all licenses and sublicenses thereunder shall contain the following provisions: a disclaimer of all warranties with respect to the INVENTIONS, indemnification by the Licensee of both PITTSBURGH and CMU for any third party claims resulting from Licensee's use of the INVENTIONS, a requirement that Licensee maintain insurance to meet its indemnification obligation in an amount no less than a one million dollar comprehensive general liability policy and a three million dollar umbrella policy, and an arbitration provision requiring arbitration of any disputes (except for infringement actions).

3.2    LICENSE REVENUES

The parties agree to share all LICENSE REVENUES received from any joint licensing arrangement for the PATENT(S) entered into under this AGREEMENT, except as provided in Section 2.3, in accordance with the following allocation: _____% PITTSBURGH; _____% CMU. After receipt by PITTSBURGH of the first such LICENSE REVENUES, PITTSBURGH will make quarterly payments to CMU within sixty (60) days after each March 31, June 30, September 30 and December 31 of each year, of CMU's share of such LICENSE REVENUES.

3.3    RETURN OF LICENSE

In the event that the PATENT(S) are licensed to an entity (or entities), and such entity subsequently returns or otherwise abandons the PATENT(S), or such license to the

4

CMU 0231

PATENT(S) is terminated, resulting in no outstanding licenses, then following such return, abandonment or termination, the responsibility and authority for the licensing and commercialization of the PATENT(S) shall remain with PITTSBURGH for an additional period of two (2) years from the date of termination of such license. If at the conclusion of such additional two-year period, PITTSBURGH has been unsuccessful in licensing or commercializing the PATENT(S), then the parties agree to consult each other and decide together on the best commercialization strategy (and the responsibilities of the parties relating thereto) at that time.

## ARTICLE 4 -- PATENT INFRINGEMENT

In the event the PATENT(S) are infringed by a third party, CMU and PITTSBURGH, and, if appropriate, the exclusive licensee, shall determine a mutually beneficial course of action and division of expenses and recoveries at the time such infringement is discovered, consistent with the terms of any exclusive license then in effect. Both parties shall use all reasonable efforts to cooperate with each other in any action brought by or against the parties relating to the PATENT(S).

## ARTICLE 5 -- TERM

This AGREEMENT shall be in force from the EFFECTIVE DATE and shall remain in effect for the life of the last patent to expire under PATENT(S), unless otherwise terminated by operation of law or by acts of the parties in accordance with the terms of this AGREEMENT.

## ARTICLE 6 -- TERMINATION

6.1    Provided that a license agreement is not then in effect, CMU or PITTSBURGH may terminate this AGREEMENT for any reason upon at least sixty (60) days advance written notice to the other party, but in any event not less than sixty (60) days prior to the date on which any pending Patent Office actions need to be taken to preserve patent rights for the benefit of the parties hereto.

CMU 0232

6.2    Termination of this AGREEMENT shall not relieve either party of any obligation or liability accrued hereunder prior to such termination, or rescind any payment due prior to the time such termination becomes effective.

6.3    In the event neither CMU nor PITTSBURGH wishes to retain PATENT(S) upon termination of this AGREEMENT, the parties shall consult each other and agree on how to dispose of PATENT(S).

## ARTICLE 7 – CONFIDENTIAL INFORMATION

7.1    Both parties shall safeguard unpublished data, patent prosecution materials and option or license agreements relating to PATENT(S) (hereinafter referred to as "CONFIDENTIAL INFORMATION") against disclosure to third parties with the same degree of care as it exercises with its own data and proprietary agreements of a similar nature.

7.2    CMU and PITTSBURGH agree not to disclose CONFIDENTIAL INFORMATION to others (except to their employees, agents or consultants who are bound by a like obligation of confidentiality), except that the parties shall not be prevented from using or disclosing any CONFIDENTIAL INFORMATION:

(a)    which is now, or becomes in the future, public knowledge other than through acts or omissions of receiving party;

(b)    which is lawfully obtained by the receiving party without a confidentiality restriction and without breach of this Agreement from a source other than a party hereto; or

(c)    which the receiving party can demonstrate was independently developed by employees of the receiving party having no knowledge of the CONFIDENTIAL INFORMATION.

6

CMU 0233

7.3    PITTSBURGH shall disclose CONFIDENTIAL INFORMATION to potential licensees only under the protection of a confidentiality agreement for the sole purpose of evaluation of the PATENT(S) for commercial development in accordance with this AGREEMENT.

7.4    Upon termination of this AGREEMENT, both parties shall safeguard CONFIDENTIAL INFORMATION for two (2) years from the effective date of termination pursuant to Section 6.1.

## ARTICLE 8 – REPORTS AND RECORDS

8.1    PITTSBURGH shall keep full, true and accurate books of account containing all particulars that may be necessary to show the amount paid by PITTSBURGH for patent application prosecution as aforesaid. Such books of account shall be kept at PITTSBURGH's principal place of business. Such books and the supporting data shall be open at reasonable times, upon advance request, for two (2) years following the end of the calendar year to which they pertain, for the inspection by CMU and/or an independent certified public accountant retained by CMU for the purpose of verifying patent prosecution expenses or compliance in other respects with this AGREEMENT.

8.2    PITTSBURGH, within ninety (90) days after each March 31, June 30, September 30 and December 31 of each year during the term of this Agreement, shall deliver to CMU true and accurate reports, giving such particulars of the business conducted by licensee(s) and sublicensee(s) of PATENT(S) during the preceding quarter as shall be pertinent to a royalty accounting hereunder. PITTSBURGH'S obligation to furnish such reports shall not commence until after receipt by PITTSBURGH of LICENSE REVENUES from a license for the PATENT(S). If no LICENSE REVENUES shall have been received, PITTSBURGH shall so report in writing. PITTSBURGH will keep accurate accounts of all LICENSE REVENUES received and will permit CMU to employ representatives to examine its books and records at reasonable times, upon advance request and no more than once per year, in

7

CMU 0234

order to verify the payments due and owing under this AGREEMENT. The fees and expenses of such representatives shall be borne by CMU.

## ARTICLE 9 – MISCELLANEOUS

9.1    RIGHTS OF GOVERNMENTS

Nothing in this AGREEMENT shall be construed to limit in any way the rights of the United States Government or other state or local governmental organization(s) under applicable federal, state or local regulations, rules or laws. Each party shall be separately responsible for complying with all reporting and other requirements of any federal or governmental entity with an interest in the INVENTIONS or the PATENT(S).

9.2    NOTICES, PAYMENTS AND OTHER COMMUNICATIONS

Any notice or payment made under this AGREEMENT shall be sufficiently given if sent in writing by first class mail, postage prepaid, or registered mail, return receipt requested, or by overnight courier service, with proof of service by receipt, addressed as follows:

If a notice, invoice or payment to Carnegie Mellon University:

Carnegie Mellon University

5000 Forbes Avenue
Pittsburgh, PA 15213
ATTN:_____

If a notice, invoice or payment to PITTSBURGH:

Office of Technology Management
University of Pittsburgh
200 Gardner Steel Conference Center
Thackeray and O'Hara Streets
Pittsburgh, PA 15260
ATTN: Director

8

CMU 0235

with copies of notices to:

> Office of General Counsel
> University of Pittsburgh
> 1710 Cathedral of Learning
> Pittsburgh, PA 15260-9165
> ATTN: General Counsel

9.3  ENTIRE AGREEMENT AND CHANGES

This AGREEMENT embodies the entire understanding between the parties relating to the subject matter hereof and supersedes all prior understandings and agreements, whether written or oral. This AGREEMENT may not be varied or modified except by a written document signed by duly authorized representatives of both parties.

9.4  SURVIVING PROVISIONS

The provisions of Articles 2, 4, 7 and 9 shall survive termination of this AGREEMENT.

IN WITNESS WHEREOF, the duly authorized representatives of the parties have executed this Agreement as of the day and year first above written.

UNIVERSITY OF PITTSBURGH – OF THE
COMMONWEALTH SYSTEM OF HIGHER
EDUCATION

By:_____
    Jerome Cochran
    Executive Vice Chancellor

CARNEGIE MELLON UNIVERSITY

By:_____

9

CMU 0236

# EXHIBIT K

**Carl Mahler**

| | |
|---|---|
| **From:** | Reed McManigle [reedmcm@otm.tt.pitt.edu] |
| **Sent:** | Friday, May 31, 2002 11:54 AM |
| **To:** | Greenberger, Joel (E-mail); Kanade Takeo (E-mail); Kalend Andre (E-mail) |
| **Cc:** | Mahler Carl (E-mail) |
| **Subject:** | patient positioning patents |

Gentlemen,

per my emails yesterday, Varian has expressed interest in licensing the three patented technologies for patient positioning. As part of this licensing process, we'll need to reach some agreement between Pitt and CMU about how proceeds will be distributed, which is driven by the respective contributions of their inventors. I've searched my files, and conferred with Dr. Greenberger, but I can't find any indication of an agreement between the five inventors about their respective contributions. I did find a draft of an agreement from 1998 that indicated an equal split of 20% each, but I didn't find a signed agreement and Dr. Greenberger confirmed that there wasn't one.

So can we get some agreement on the relative contribution to inventorship?
And do you know how to get in touch with the other two inventors--Charalambos Athanassiou and Karun Shimoga--we'll need to get them and you to sign some agreement on the allocation of proceeds--and hopefully to send all of you some checks, if the licensing negotiations go well!

Thanks.

Reed

200 GSCC
Thackeray and O'Hara Street
Pittsburgh, PA 15260
412-624-8787
412-648-8525 (f)
reedmcm@pitt.edu

1



DEFENDANT'S
EXHIBIT
CMU 25
PENGAD 800-631-6989

CMU 0237

# EXHIBIT L

**Carl Mahler**

| | |
|---|---|
| From: | Carl Mahler [cmahler@andrew.cmu.edu] |
| Sent: | Friday, May 31, 2002 12:43 PM |
| To: | Reed McManigle |
| Subject: | Re: new interinstitutional |

Attachments:    Inter-Inst Agr #1 5-31-02.doc



Inter-Inst Agr #1
5-31-02.doc ...    Reed,

Thank you for the information and the draft IIA. As you probably recall, there are
several other IIA's whose execution is currently stalled over three issues that are
important to CMU, namely
(1) approval of all licenses by CMU prior to execution on its behalf,
(2) capping out-of-pocket patent expenses (at a level currently proposed to be $25,000
which would be divided between both parties), and
(3) removal of any obligation of CMU to support expenses of national phase prosecution of
patents.

Section 2.3 of the agreement arguably addresses item number (3) above in that it indicates
that a party can drop its support of patent applications on a country-by-country basis,
but the other two issues are still very much alive.

My understanding is that Bob Wooldridge is currently in discussions with Chris Capelli on
these issues and that both sides hope to have a broad agreement that would resolve these
issues once and for all. However, until this is resolved I think that CMU is unlikely to
sign off on any of these IIA's.

I am copying Bob on this e-mail so that he is aware that there are more technologies being
affected by this.

Sincerely,
Carl

--On Friday, May 31, 2002 11:39 AM -0400 Reed McManigle <reedmcm@otm.tt.pitt.edu> wrote:

> Carl,
>
> We need to do another interinstitutional agreement for three patented
> technologies that involved Takeo Kanade in the Robotics Institute,
> Charalambos Athanassiou, who was (is?) a visiting scientist in the
> Robotics Institute, working with Joel Greenberger, Andre Kalend and
> Karun Shimoga in our school of medicine. The technologies are for
> positioning patients during radiation therapy. The were developed
> with funding from Elekta, a manufacturer of radiation therapy
> equipment. The relationship with Elekta fell apart (with legal action
> underway to recoup unpaid research dollars). Elekta had paid for
> patent expenses during the term of the research agreement, which were filed in the US
> and internationally.
> We've been covering patent expenses since the Elekta relationship fell
> apart. We have three issued US patents: 5,823,192; 5,784,431; and
> 5,727,554
>
> Recently, we were talking with another radiation therapy company,
> Varian, about another technology developed at Pitt by Don Sashin for
> positioning the patient's head (as distinguished from the other three
> technologies which related to whole body positioning). While I was
> talking to them about the Sashin technology, I asked if they might

1



DEFENDANT'S
EXHIBIT
CMU 2.6

PENGAD 800-631-6989

> also want to take a look at the whole body positioning patents.  They
> have been looking at them over the past few months, reviewing the
> patents, talking with the researchers, etc. and now have indicated
> that they want to license all four of the technologies.
>
> My recollection is that we never had the inventors tell us their
> relative contribution to the inventions, so we'll have to get that
> information before we can fill in the split between Pitt and CMU.
> I'll email the inventors to get this rolling (I don't have contact
> information for Athanassiou, but I'm hoping that Kanade will).  In the
> meantime, I've drafted an IIA based on the Stetten IIA for your review.
>
> Reed
>
>  <<Inter-Inst Agr #1 5-31-02.doc>>
>
> 200 GSCC
> Thackeray and O'Hara Street
> Pittsburgh, PA 15260
> 412-624-8787
> 412-648-8525 (f)
> reedmcm@pitt.edu
>

2

CMU 0239

## INTER-INSTITUTIONAL AGREEMENT

THIS INTER-INSTITUTIONAL AGREEMENT ("AGREEMENT") is made effective as of this _____ day of _____, 2002, ("EFFECTIVE DATE") by and between CARNEGIE MELLON UNIVERSITY, a Pennsylvania non-profit corporation, located at 5000 Forbes Avenue, Pittsburgh, PA 15213 ("CMU"), and UNIVERSITY OF PITTSBURGH - OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION, a Pennsylvania non-profit corporation, with an office at 200 Gardner Steel Conference Center, Thackeray and O'Hara Streets, Pittsburgh, Pennsylvania 15260 ("PITTSBURGH").

## RECITALS

WHEREAS, Andre Kalend, Joel Greenberger and Karun Shimoga of PITTSBURGH and Takeo Kanade and Charalambos Athanassiou of CMU have collaborated in the research and development of three inventions titled "Apparatus responsive to movement of a patient during treatment/diagnosis;" "Apparatus for matching X-ray images with reference images;" and "Apparatus for automatically positioning a patient for treatment/diagnosis" (the "INVENTIONS"); and

WHEREAS, PITTSBURGH has filed U.S. and international patent applications on the INVENTIONS, and has been awarded U.S. patents 5,727,554, 5,784,431, and 5,823,192 and additional international patents; and

WHEREAS, CMU and PITTSBURGH wish to agree on the disposition of the INVENTIONS as defined hereafter and described above; the allocation of patenting and other expenses; and on the allocation of revenues from the commercialization of the INVENTIONS.

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein, and intending to be legally bound hereby, the parties hereto agree to the following terms and conditions:

1

CMU 0240

## ARTICLE 1 - DEFINITIONS

1.1  <u>INVENTORS</u>

"INVENTORS" means Andre Kalend, Joel Greenberger and Karun Shimoga of PITTSBURGH and Takeo Kanade and Charalambos Athanassiou of CMU.

1.2  <u>PATENT</u>

" PATENT" means those issues patents, any pending patents applications and any future United States and foreign application or patent covering the INVENTIONS or any part thereof.

1.3  <u>LICENSE REVENUES</u>

"LICENSE REVENUES" means the proceeds received by the parties from any licensing arrangement and includes license initiation fees, up-front fees, minimum royalties or milestone payments, sublicense initiation fees or any other fixed sum payments received from the licensing or other disposition of the PATENT(S) and all earned or running royalties on the sales of products covered under any claim of the PATENT(S), less fifteen percent (15%) of such revenues which shall be paid to PITTSBURGH for administrative overhead.

## ARTICLE 2 – PATENTS AND EXPENSES

2.1  <u>MANAGEMENT OF PATENT(S)</u>

CMU and PITTSBURGH agree that PITTSBURGH shall be responsible for managing the prosecution and maintenance of the PATENT(S). PITTSBURGH shall consult with CMU on a timely basis on all significant matters relating to the prosecution and maintenance of the PATENT(S). PITTSBURGH shall promptly, upon request, provide CMU all serial numbers and filing dates, together with copies of all patent applications for the INVENTIONS, including copies of all office actions, responses and all other Patent Office communications and relevant correspondence.

CMU 0241

2.2   UNITED STATES AND FOREIGN PATENT EXPENSES

Except as provided in Section 2.3 below,  CMU and PITTSBURGH agree to share equally all reasonable United States and foreign patent expenses (including legal fees, filing, prosecution, and maintenance fees or other governmental charges) incurred in connection with PATENT(S).  CMU's share of the past patent expenses, as of the execution date of this Agreement, shall be deducted from the LICENSE REVENUES prior to distribution. Future patent expenses, if any, will be subject to the provisions that follow. Payment of all fees and costs relating to the filing, prosecution, and maintenance of the PATENT(S) shall be paid initially by PITTSBURGH. PITTSBURGH shall give CMU quarterly notices along with documentation evidencing costs incurred (including copies of patent attorney invoices for which such payments have been made) and CMU shall reimburse PITTSBURGH within thirty (30) days after receipt of such quarterly notices for one-half (1/2) of such costs.

2.3   JURISDICTION AND NON-PAYMENT

The parties, in consultation with any licensees, if appropriate, shall mutually determine the countries or jurisdictions where patent applications for the PATENT(S) will be filed, prosecuted and maintained.  If either party declines to pay its share of United States or foreign patent expenses for the prosecution or maintenance of a  PATENT(S) in any country or jurisdiction, the other party may pay all such United States or foreign patent expenses but thereafter the paying party shall have sole authority over licensing and patent prosecution of the PATENT(S) in any such country or jurisdiction. The party who has such sole authority in a country shall not be under any obligation pursuant to Section 3.2 to share LICENSE REVENUES from such a country or jurisdiction with the other party.

**ARTICLE 3 – LICENSING**

3.1   LICENSING OF PATENT(S)

The parties agree that PITTSBURGH shall have the exclusive responsibility and authority:    (a) to promote and market the    PATENT(S) for licensing and

3

CMU 0242

commercialization; (b) to identify and negotiate with appropriate parties interested in such licensing and commercialization rights for the PATENT(S); (c) to enter into binding license agreements or binding option agreements for the granting of an exclusive license including the right to grant sublicenses or non-exclusive licenses or commercialization rights for the PATENT(S); and (d) to manage any such license or option agreements for the PATENT(S). PITTSBURGH agrees to consult with CMU on the licensing strategy, commercialization efforts and the licensing terms. PITTSBURGH will provide CMU promptly, upon execution, with a copy of all option or license agreements for PATENT(S) entered into under this AGREEMENT. PITTSBURGH will not enter into any fully paid-up license agreements without the prior written consent of CMU. Pittsburgh will assure that all licenses and sublicenses thereunder shall contain the following provisions: a disclaimer of all warranties with respect to the INVENTIONS, indemnification by the Licensee of both PITTSBURGH and CMU for any third party claims resulting from Licensee's use of the INVENTIONS, a requirement that Licensee maintain insurance to meet its indemnification obligation in an amount no less than a one million dollar comprehensive general liability policy and a three million dollar umbrella policy, and an arbitration provision requiring arbitration of any disputes (except for infringement actions).

3.2    LICENSE REVENUES

The parties agree to share all LICENSE REVENUES received from any joint licensing arrangement for the PATENT(S) entered into under this AGREEMENT, except as provided in Section 2.3, in accordance with the following allocation: _____% PITTSBURGH; _____% CMU. After receipt by PITTSBURGH of the first such LICENSE REVENUES, PITTSBURGH will make quarterly payments to CMU within sixty (60) days after each March 31, June 30, September 30 and December 31 of each year, of CMU's share of such LICENSE REVENUES.

3.3    RETURN OF LICENSE

In the event that the PATENT(S) are licensed to an entity (or entities), and such entity subsequently returns or otherwise abandons the PATENT(S), or such license to the

4

CMU 0243

PATENT(S) is terminated, resulting in no outstanding licenses, then following such return, abandonment or termination, the responsibility and authority for the licensing and commercialization of the PATENT(S) shall remain with PITTSBURGH for an additional period of two (2) years from the date of termination of such license. If at the conclusion of such additional two-year period, PITTSBURGH has been unsuccessful in licensing or commercializing the PATENT(S), then the parties agree to consult each other and decide together on the best commercialization strategy (and the responsibilities of the parties relating thereto) at that time.

## ARTICLE 4 – PATENT INFRINGEMENT

In the event the PATENT(S) are infringed by a third party, CMU and PITTSBURGH, and, if appropriate, the exclusive licensee, shall determine a mutually beneficial course of action and division of expenses and recoveries at the time such infringement is discovered, consistent with the terms of any exclusive license then in effect. Both parties shall use all reasonable efforts to cooperate with each other in any action brought by or against the parties relating to the PATENT(S).

## ARTICLE 5 – TERM

This AGREEMENT shall be in force from the EFFECTIVE DATE and shall remain in effect for the life of the last patent to expire under PATENT(S), unless otherwise terminated by operation of law or by acts of the parties in accordance with the terms of this AGREEMENT.

## ARTICLE 6 – TERMINATION

6.1   Provided that a license agreement is not then in effect, CMU or PITTSBURGH may terminate this AGREEMENT for any reason upon at least sixty (60) days advance written notice to the other party, but in any event not less than sixty (60) days prior to the date on which any pending Patent Office actions need to be taken to preserve patent rights for the benefit of the parties hereto.

CMU 0244

6.2    Termination of this AGREEMENT shall not relieve either party of any obligation or liability accrued hereunder prior to such termination, or rescind any payment due prior to the time such termination becomes effective.

6.3    In the event neither CMU nor PITTSBURGH wishes to retain PATENT(S) upon termination of this AGREEMENT, the parties shall consult each other and agree on how to dispose of PATENT(S).

## ARTICLE 7 – CONFIDENTIAL INFORMATION

7.1    Both parties shall safeguard unpublished data, patent prosecution materials and option or license agreements relating to PATENT(S) (hereinafter referred to as "CONFIDENTIAL INFORMATION") against disclosure to third parties with the same degree of care as it exercises with its own data and proprietary agreements of a similar nature.

7.2    CMU and PITTSBURGH agree not to disclose CONFIDENTIAL INFORMATION to others (except to their employees, agents or consultants who are bound by a like obligation of confidentiality), except that the parties shall not be prevented from using or disclosing any CONFIDENTIAL INFORMATION:

(a)    which is now, or becomes in the future, public knowledge other than through acts or omissions of receiving party;

(b)    which is lawfully obtained by the receiving party without a confidentiality restriction and without breach of this Agreement from a source other than a party hereto; or

(c)    which the receiving party can demonstrate was independently developed by employees of the receiving party having no knowledge of the CONFIDENTIAL INFORMATION.

6

CMU 0245

7.3    PITTSBURGH shall disclose CONFIDENTIAL INFORMATION to potential licensees only under the protection of a confidentiality agreement for the sole purpose of evaluation of the PATENT(S) for commercial development in accordance with this AGREEMENT.

7.4    Upon termination of this AGREEMENT, both parties shall safeguard CONFIDENTIAL INFORMATION for two (2) years from the effective date of termination pursuant to Section 6.1.

## ARTICLE 8 – REPORTS AND RECORDS

8.1    PITTSBURGH shall keep full, true and accurate books of account containing all particulars that may be necessary to show the amount paid by PITTSBURGH for patent application prosecution as aforesaid. Such books of account shall be kept at PITTSBURGH's principal place of business. Such books and the supporting data shall be open at reasonable times, upon advance request, for two (2) years following the end of the calendar year to which they pertain, for the inspection by CMU and/or an independent certified public accountant retained by CMU for the purpose of verifying patent prosecution expenses or compliance in other respects with this AGREEMENT.

8.2 PITTSBURGH, within ninety (90) days after each March 31, June 30, September 30 and December 31 of each year during the term of this Agreement, shall deliver to CMU true and accurate reports, giving such particulars of the business conducted by licensee(s) and sublicensee(s) of PATENT(S) during the preceding quarter as shall be pertinent to a royalty accounting hereunder. PITTSBURGH'S obligation to furnish such reports shall not commence until after receipt by PITTSBURGH of LICENSE REVENUES from a license for the PATENT(S). If no LICENSE REVENUES shall have been received, PITTSBURGH shall so report in writing. PITTSBURGH will keep accurate accounts of all LICENSE REVENUES received and will permit CMU to employ representatives to examine its books and records at reasonable times, upon advance request and no more than once per year, in

7

CMU 0246

order to verify the payments due and owing under this AGREEMENT. The fees and expenses of such representatives shall be borne by CMU.

## ARTICLE 9 – MISCELLANEOUS

9.1     RIGHTS OF GOVERNMENTS

Nothing in this AGREEMENT shall be construed to limit in any way the rights of the United States Government or other state or local governmental organization(s) under applicable federal, state or local regulations, rules or laws. Each party shall be separately responsible for complying with all reporting and other requirements of any federal or governmental entity with an interest in the INVENTIONS or the PATENT(S).

9.2     NOTICES, PAYMENTS AND OTHER COMMUNICATIONS

Any notice or payment made under this AGREEMENT shall be sufficiently given if sent in writing by first class mail, postage prepaid, or registered mail, return receipt requested, or by overnight courier service, with proof of service by receipt, addressed as follows:

If a notice, invoice or payment to Carnegie Mellon University:

Carnegie Mellon University
_____
5000 Forbes Avenue
Pittsburgh, PA 15213
ATTN:_____

If a notice, invoice or payment to PITTSBURGH:

Office of Technology Management
University of Pittsburgh
200 Gardner Steel Conference Center
Thackeray and O'Hara Streets
Pittsburgh, PA 15260
ATTN: Director

8

CMU 0247

with copies of notices to:

> Office of General Counsel
> University of Pittsburgh
> 1710 Cathedral of Learning
> Pittsburgh, PA 15260-9165
> ATTN: General Counsel

9.3   ENTIRE AGREEMENT AND CHANGES

This AGREEMENT embodies the entire understanding between the parties relating to the subject matter hereof and supersedes all prior understandings and agreements, whether written or oral. This AGREEMENT may not be varied or modified except by a written document signed by duly authorized representatives of both parties.

9.4   SURVIVING PROVISIONS

The provisions of Articles 2, 4, 7 and 9 shall survive termination of this AGREEMENT.

IN WITNESS WHEREOF, the duly authorized representatives of the parties have executed this Agreement as of the day and year first above written.

UNIVERSITY OF PITTSBURGH – OF THE
COMMONWEALTH SYSTEM OF HIGHER
EDUCATION

By:_____
        Jerome Cochran
        Executive Vice Chancellor

CARNEGIE MELLON UNIVERSITY

By:_____

9

CMU 0248

# EXHIBIT M

**Carl Mahler**

| | |
|---|---|
| From: | Reed McManigle [reedmcm@otm.tt.pitt.edu] |
| Sent: | Wednesday, June 05, 2002 3:12 PM |
| To: | Carl Mahler |
| Subject: | RE: new interinstitutional--patient positioning |

Carl,

I just wanted to give you an update that I've heard from four out of the five inventors on this and so far all are ok with an even split.  I have my fingers crossed on the fifth one, but if anyone might think they had a larger role, it could be him.  At any rate, if this even split among inventors holds up, we'd be looking at a 60/40 split of proceeds between Pitt and CMU as three of the inventors were at Pitt.

I wanted to clarify one other issue in the hopes that we can free this case up from the broader discussions about joint IP--and that is the issue of patent expenses.  We're expecting that there really won't be any exposure here.  Elekta paid for the patent expenses during the time that they were involved, and we intend to bill Varian for any expenses that weren't covered by Elekta.  So at least those issues on this IIA should be moot.

So the remaining issue is whether CMU approves the licensing terms prior to execution.  We see having the control of the negotiations as one of the main benefits of doing an interinstitutional, to facilitate rapid closure of deals.  We sign many IIA's each year which give the lead institution authority to negotiate and complete the deal.  This is how the Stetten/Nowatzyk IIA was structured between Pitt and CMU last November.  So I hope that you and Bob can let this IIA go ahead, even if the larger issue continues to be studied by the powers that be, so we can be responsive to this potential licensee.

Reed

-----Original Message-----
From: Carl Mahler [mailto:cmahler@andrew.cmu.edu]
Sent: Friday, May 31, 2002 12:43 PM
To: Reed McManigle
Subject: Re: new interinstitutional

Reed,

Thank you for the information and the draft IIA.  As you probably recall, there are several other IIA's whose execution is currently stalled over three issues that are important to CMU, namely
(1) approval of all licenses by CMU prior to execution on its behalf,
(2) capping out-of-pocket patent expenses (at a level currently proposed to be $25,000 which would be divided between both parties), and
(3) removal of any obligation of CMU to support expenses of national phase prosecution of patents.

Section 2.3 of the agreement arguably addresses item number (3) above in that it indicates that a party can drop its support of patent applications on a country-by-country basis, but the other two issues are still very much alive.

My understanding is that Bob Wooldridge is currently in discussions with Chris Capelli on these issues and that both sides hope to have a broad agreement that would resolve these issues once and for all.  However, until this is resolved I think that CMU is unlikely to sign off on any of these IIA's.

I am copying Bob on this e-mail so that he is aware that there are more technologies being affected by this.

Sincerely,
Carl

1



DEFENDANT'S EXHIBIT
CMU 29
PENGAD 800-631-6989

# EXHIBIT N

**Carl Mahler**

| | |
|---|---|
| **From:** | Reed McManigle [reedmcm@otm.tt.pitt.edu] |
| **Sent:** | Thursday, June 06, 2002 9:03 AM |
| **To:** | Takeo Kanade; Greenberger, Joel (E-mail); Kanade Takeo (E-mail); Kalend Andre (E-mail); Shimoga Karun (E-mail); Athanassiou Haralabos (E-mail) |
| **Cc:** | Mahler Carl (E-mail); Chris Capelli |
| **Subject:** | RE: patient positioning patents |

Gentlemen,

I've now heard from all five inventors and all are ok with the even split. This means that the interinstitutional agreement between Pitt and CMU will provide for 60% of the proceeds to go to Pitt, and 40% to CMU, as there are three inventors from Pitt and two from CMU.  Distributions to inventors within each university will follow that university's intellectual property policies.

I'll keep you posted as the discussions with Varian proceed.

Reed

1

DEFENDANT'S
EXHIBIT
CMU 30

CMU 0258

# EXHIBIT O

**Carl Mahler**

| | |
|---|---|
| **From:** | Reed McManigle [reedmcm@otm.tt.pitt.edu] |
| **Sent:** | Thursday, June 06, 2002 10:28 AM |
| **To:** | Takeo Kanade; Greenberger, Joel (E-mail); Kalend Andre (E-mail); Shimoga Karun (E-mail); Athanassiou Haralabos (E-mail) |
| **Cc:** | Mahler Carl (E-mail); Chris Capelli |
| **Subject:** | RE: patient positioning patents |

Per the email below, Joel has let me know that Karun was a CMU employee at the time of the invention and only became a Pitt employee later.  Therefore the split between the two universities would be reversed from what I had indicated earlier--60% for CMU, 40% for Pitt.

Thanks for the clarification Joel.

Reed
------
Reed,
At the time these patents were submitted Shimoga was a CMU employee, only "based" at Pitt to work with Kalend and me. Remember we only hired Shimoga after Elekta granted us the money and that was after the patents had issued.
Kalend and Greenberger are the only Pitt employees. Please correct this .
Thanks, Joel

-----Original Message-----
From: Reed McManigle
Sent: Thursday, June 06, 2002 9:03 AM
To: 'Takeo Kanade'; 'Greenberger, Joel (E-mail)'; 'Kanade Takeo (E-mail)'; 'Kalend Andre (E-mail)'; 'Shimoga Karun (E-mail)'; 'Athanassiou Haralabos (E-mail)'
Cc: 'Mahler Carl (E-mail)'; Chris Capelli
Subject: RE: patient positioning patents


Gentlemen,

I've now heard from all five inventors and all are ok with the even split.
This means that the interinstitutional agreement between Pitt and CMU will
provide for 60% of the proceeds to go to Pitt, and 40% to CMU, as there are
three inventors from Pitt and two from CMU.  Distributions to inventors
within each university will follow that university's intellectual property
policies.

I'll keep you posted as the discussions with Varian proceed.

Reed

1



DEFENDANT'S
EXHIBIT
CMU 31

CMU 0259

# EXHIBIT P

**Carl Mahler**

| | |
|---|---|
| **From:** | Reed McManigle [reedmcm@otm.tt.pitt.edu] |
| **Sent:** | Tuesday, June 18, 2002 9:17 AM |
| **To:** | Carl Mahler |
| **Subject:** | RE: Patient Positioning Patents |

Hi Carl,

Thanks for your movement on this.  I haven't made a proposal to Varian yet, because we hadn't worked out something that would give Pitt negotiating authority--I didn't want to go out on the limb by making a proposal to Varian, with the chance of finding out later that CMU had an issue with that, and that I'd then have to rescind the proposal.  So now based on your email, and the expectation of a forthcoming IIA, I'll go ahead and discuss a deal proposal with Chris and will get it out to Varian.

I'll keep you posted on how things progress.

Reed

-----Original Message-----
From: Carl Mahler [mailto:cmahler@andrew.cmu.edu]
Sent: Tuesday, June 18, 2002 8:20 AM
To: Reed McManigle
Subject: Patient Positioning Patents

Hi Reed,

Sorry that I've been so uncommunicative.  Is Varian still interested in the patient positioning technology?  If so, I think we've found a way to move forward on this IIA. Since the patent costs are not an issue it looks like there are only two problems left; (1) control of the licensing process and
(2) exceptions to CMU's IP policy.  I think that we can probably give on point (1) in this case, although we really don't want it to count a setting a precedent, and we can probably handle point (2) by getting the CMU inventors to agree to this deviation from policy by signing a separate letter.

I hope that my delay hasn't caused problems.  Please let me know how things stand and if the licensing potential is still alive, I'll try to resolve the situation in the next few days.

Thanks,
Carl

1



DEFENDANT'S
EXHIBIT
CMU 32

CMU 0260

# EXHIBIT Q

**Carl Mahler**

| | |
|---|---|
| **From:** | Reed McManigle [reedmcm@otm.tt.pitt.edu] |
| **Sent:** | Tuesday, September 10, 2002 9:13 AM |
| **To:** | Greenberger, Joel (Greenberger, Joel); kalenda@rcbhsc.wvu.edu; tk@cs.cmu.edu; kshimoga@automatedcell.com; athanassiou+@automatedcell.com; Sashin, Don (Sashin, Don) |
| **Cc:** | cmahler@cmu.edu; Chris Capelli |
| **Subject:** | Varian |

```
-----Original Message-----
From: Lester Boeh [mailto:lester.boeh@varian.com]
Sent: Monday, September 09, 2002 4:45 PM
To: Reed McManigle
Cc: 'Morse Richard (E-mail)'
Subject: RE: Checking in

Hi Reed,
I'll let Richard comment on the Sashin patent since he will be in Pittsburgh.  With regard
to the Greenberger, et al patents, I don't see us being able to pursue them at this time
from my perspective.  Perhaps Richard has a comment here as well.
Thanks and Best Regards,
Lester Boeh

-----Original Message-----
From: Reed McManigle [mailto:reedmcm@otm.tt.pitt.edu]
Sent: Thursday, September 05, 2002 7:57 AM
To: 'lester.boeh@varian.com'
Cc: Morse Richard (E-mail)
Subject: RE: Checking in


Hi Lester and Richard,

I'm checking in again to find out where you are at with regard to the various technologies
at Pitt (and CMU).  Don Sashin has told me that Richard will be coming to Pittsburgh on
September 18 and Drs. Kalnicki and Wu will visit Palo Alto in November.  Could you give me
a sense of the breadth of these discussions--e.g. will you be looking at/discussing the
Sashin/Lopresti head positioning system, as well as the Greenberger/Kalend/Kanade body
positioning system?

Your last communication gave me the impression that you would not be looking at the
Greenberger/Kalend/Kanade during the visit that had been scheduled in August.  Does this
imply that you are no longer considering that technology?
We have some patent expenses coming up on those patents (i.e. in Korea) that we are
unlikely to make if either you are not interested in that patent portfolio, or not
interested in patent coverage in Korea.

At any rate, I would appreciate an update and some more detailed sense of where you see
this all going, and what the timeline will be for a definitive decision on licensing.
Thanks.

Reed
```

1



DEFENDANT'S EXHIBIT

CMU 34

PENGAD 800-631-6989

CMU 0262

# EXHIBIT T

201

## FOR ATTORNEYS' EYES ONLY

1    IN THE UNITED STATES DISTRICT COURT FOR THE
        WESTERN DISTRICT OF PENNSYLVANIA

2
                        - - - -

3
UNIVERSITY OF PITTSBURGH,              )

4                                      )
                                       )
5        Plaintiff,                    )
                                       )
6                                      )
     -vs-                              ) Case No.
7                                      ) 07-CV-00491 (AJS)
                                       )
8    VARIAN MEDICAL SYSTEMS, INC.,     )
                                       )
9                                      )
         Defendant.                    )

10                                         ORIGINAL

11                      - - - -

12        CONFIDENTIAL - ATTORNEYS' EYES ONLY

13                      - - - -

14    VIDEOTAPE DEPOSITION OF:  JOEL GREENBERGER, M.D.
                        VOLUME II

15                      - - - -

16

17          DATE:     October 24, 2007
                      Wednesday, 9:16 a.m.
18

19          LOCATION:  PICADIO SNEATH
                       MILLER & NORTON
20                     4710 U.S. Steel Tower
                       600 Grant Street
21                     Pittsburgh, PA  15219

22
            TAKEN BY:  Defendant
23

24          REPORTED BY:  Heidi H. Willis, RPR, CRR
                          Notary Public
25                        AKF Reference No. HW03678

1          VIDEOTAPE DEPOSITION OF JOEL GREENBERGER, M.D.,
     a witness, called by the Defendant for examination,
2     in accordance with the Federal Rules of Civil
     Procedure, taken by and before Heidi H. Willis, RPR,
3     CRR, a Court Reporter and Notary Public in and for
     the Commonwealth of Pennsylvania, at the offices of
4     Picadio Sneath Miller & Norton, 4710 U.S. Steel
     Tower, 600 Grant Street, Pittsburgh, Pennsylvania,
5     on Wednesday, October 24, 2007, commencing at
     9:16 a.m.

6
                         -  -  -  -
7

     APPEARANCES:
8
          FOR THE PLAINTIFF:
9     Daniel Johnson, Jr.
     djjohnson@morganlewis.com
10    MORGAN LEWIS & BOCKIUS, LLP
     One Market, Spear Street Tower
11    San Francisco, CA   94105
     P 415-442-1000
12    F 415-442-1001

13    - and -

14    Laura R. Hillock, Esq.
     UNIVERSITY OF PITTSBURGH
15    1710 Cathedral of Learning
     Pittsburgh, PA   15260
16    P 412-624-1604
     F 412-624-1606

17

18
          FOR THE DEFENDANT:
19    Matthew H. Poppe, Esq.
     mpoppe@orrick.com
20    Bridgette Ahn, Esq.
     bahn@orrick.com
21    ORRICK HERRINGTON & SUTCLIFFE, LLP
     1000 Marsh Road
22    Menlo Park, CA   94025
     P 650-614-7400
23    F 650-614-7401

24
          ALSO PRESENT:
25    Matthew Martin, Videographer

206

```
1                    - - - -

2       (Deposition Exhibit Nos. 21 through 44 marked for

3                       identification.)

4                    - - - -

5                    PROCEEDINGS

6                    - - - -

7               THE VIDEOGRAPHER:  Good morning.  My

8       name is Matthew Martin.  I'm here from AKF

9       Reporting and VideoTech Services.  I am the

10      videographer.

11              Today's date is Wednesday, October

12      24th, 2007.  The time right now is 9:17 a.m.

13      and that's indicated on the screen.

14              We are hear to take the video

15      deposition of Dr. Joel Greenberger in the case

16      university of Pittsburgh versus Varian Medical

17      Systems.

18              We are at 600 Grant Street,

19      Pittsburgh, Pennsylvania 15219, and we are at

20      the offices of Picadio Sneath,

21      Miller & Norton, and this case is being heard

22      in the U.S. District Court of Western

23      Pennsylvania, Civil Action No. 2:07 CV-00491.

24              If the court reporter may swear in

25      the witness, we may proceed.
```

207

- - - -

JOEL GREENBERGER, M.D.,

having been duly sworn,

was examined and testified as follow:

- - - -

MR. POPPE:  Good morning,

Dr. Greenberger.

THE WITNESS:  Good morning.

MR. POPPE:  Dan, I'll note that --

well, this is obviously the resumed deposition

Of Dr. Greenberger.  At the previous

deposition there were 20 exhibits marked, so

we'll just resume with Exhibit 21.  Do you

have any problem with that?

MR. JOHNSON:  Not at all.

- - - -

EXAMINATION

- - - -

BY MR. POPPE:

Q.    Dr. Greenberger, let me show you what's been

Marked Exhibit 21, a copy for your counsel.

My question is whether you can identify this

document after taking the time you need to

review it.

- - - -

257

1          or model numbers, can you describe the

2          technology -- strike that.

3              Did you describe the technology to your

4          tech transfer office that was generating

5          concerns in your mind about possible

6          infringement by Varian?

7    A.    I sent them some documentation, and I have

8          given to counsel and sent it to them over the

9          years in various forms.

10   Q.    And was your concern in the '99 to 2002 time

11         frame related to possible infringement of your

12         image matching patent or your respiratory

13         gating patent or both?

14   A.    Certainly both and -- yes, both.

15   Q.    And you expressed that concern to your tech

16         transfer office during the '99 to 2000 time

17         period?

18   A.    I don't know if I stated it just the way you

19         stated it, but I know I said I'm concerned

20         about the things that Varian is talking about

21         selling sound to me like the things we

22         developed in our patents and are contained in

23         our patents.

24   Q.    What was the Varian technology, again, putting

25         aside the specific product or model names, in

258

1          the '99 to 2002 time period that in your mind

2          implicated possible infringement of the

3          respiratory gating patent, if any?

4     A.   Well, the best way to answer that is during

5          the early stages of the development, the

6          Varian people were in Pittsburgh negotiating

7          with us to partner, and as part of that

8          process, under confidentiality we showed them

9          what we were doing.

10              And I believe at the end of the

11         deposition last time, near the end of the

12         deposition, you were asking me about what I

13         had hoped the relationship would be, and then

14         you asked me why it didn't stay positive, and

15         I believe I answered you that early on I

16         expected a collegial, professional

17         collaborative arrangement, and reason it went

18         sour is that I felt that Varian people were

19         dismissing us and did not want to work with us

20         except as customers to purchase equipment,

21         and, therefore, I expected in good faith that

22         even though we wouldn't be partners, we would

23         respect each other.

24              As part of that, I fulfilled what I

25         thought was a respectful relationship by

282

1    A.    Yes.

2    Q.    So to go back to the prior question, based on

3          Exhibit 33, do you believe that this meeting

4          referenced here that was going to take place

5          in November of 1993 actually did occur given

6          that that would be prior to the date of the

7          confidential disclosure agreement?

8    A.    I don't remember the date of the trip.  I

9          don't remember if we went in November or we

10         went later.

11   Q.    How many trips did you have in the '93, '94

12         time frame to Varian related to the program?

13   A.    I don't recall.  I recall one.

14   Q.    Referring still to Exhibit 33, it says, This

15         meeting is for research collaboration.  Do you

16         see that?

17   A.    Yes.

18   Q.    What did you mean by research collaboration?

19   A.    I was being very careful to separate what I

20         anticipated would be a research sponsor

21         agreement from an agreement to purchase

22         equipment, and I was being careful at this

23         time in our negotiations with Varian just as I

24         testified earlier that I was being careful in

25         our negotiations about Elekta.

283

1          When this planned partnership with Varian

2     fell through and we moved toward with Elekta,

3     you recall I indicated that my attorney, Al

4     Ciocca, working on UPMC, then University of

5     Pittsburgh hospitals, which would be

6     Presbyterian University Hospital, Magee-Womens

7     Hospital, his actions negotiating the purchase

8     agreement I wanted to keep separate from the

9     negotiations with my other attorney, Reed

10    McManigle, representing the tech transfer

11    office.

12          What I was indicating here -- this memo

13    is to Jodi Ruey, who was the then academic

14    administrator for the department of radiation

15    oncology who handled all of my budgets,

16    school, hospital research grants, and Eva

17    Bednar, who was the department accountant, and

18    to put this in context, back in 1993

19    University Radiotherapy Associates was a

20    separate practice plan for just radiation

21    oncology.  We had some discretionary moneys.

22    We wanted to be sure that we separated

23    expenditure of those moneys for research

24    purposes from any expenditure to purchase

25    equipment.

284

1   Q.   Still referring to Exhibit 33, is that your

2         handwritten initials next to your name on the

3         from line?

4   A.   Yes.

5   Q.   Do you recall when you first spoke to a Varian

6         employee related to your dynamic conformal

7         radiotherapy program?

8   A.   It was shortly after my arrival in Pittsburgh,

9         shortly after March 1993.

10   Q.   Who did you talk to at Varian at that time?

11   A.   The main issue --

12              MR. JOHNSON:  He asked you who you

13         talked to.

14   A.   Who, I'm sorry, Bud Poston, is that his name,

15         salesperson, Jack Coats, salesperson, and

16         Martin Kandes.

17   Q.   How did you first make contact with them or

18         vice versa related to the program?

19   A.   We, Dr. Kalend and myself, put together the

20         dynamic conformal radiotherapy program very

21         early, March 1993, and for the months

22         thereafter.  As we were, on one hand, putting

23         together the Pittsburgh group, the meetings I

24         described with Contraves, with the Carnegie

25         Group, with CMU faculty, as that was going on,

285

```
 1              the hospital was also contemplating purchase

 2              of equipment for Magee-Womens Hospital and for

 3              an upgrade of equipment at Presbyterian

 4              University Hospital.

 5                   So salespeople were coming through

 6              meeting with Joyce Yasko, who we referenced

 7              earlier, and Keith Noll, who we referenced

 8              earlier.  In the course of those meetings,

 9              they were introduced to me.

10   Q.    And those salespeople were the persons you

11         referenced earlier?

12   A.    Bud Poston, Jack Coats, C-O-A-T-E-S, I believe

13         that's how he spells his name.

14   Q.    And Martin Kandes or no?

15   A.    Martin Kandes very shortly thereafter.

16   Q.    And what did you tell them about your program

17         at that time?

18   A.    Very early on with them, as well as

19         representatives from Siemens and Elekta, who

20         also were negotiating to sell equipment,

21         Dr. Kalend and I informed them, as did Joyce

22         Yasko, that we would not be simply purchasing

23         equipment, that the rules had changed.  We now

24         had a chairman of radiation oncology and the

25         director of medical physics who were
```

286

1          inventors, and that the vendor who wanted to

2          sell us equipment needed to know that we were

3          developing a novel technology for what we call

4          dynamic conformal radiotherapy.

5              My recollection is very early on, Bud

6          Poston and Jack Coats got Martin Kandes

7          involved.

8   Q.     What do you mean when you say that the rules

9          have changed?

10  A.     In the past, purchase of equipment for Magee-

11         Womens Hospital, Presbyterian University

12         Hospital had been simply vendor-customer

13         interactions:  give us the best price, give us

14         the best service contract, give us the photon

15         and the electron energies we need, give us

16         your latest upgrades, work with us to

17         facilitate minimum downtime, classic customer-

18         vendor interactions.

19             What I mean by the rules have changed is

20         we were committed to implementing our new

21         inventions, and we wanted to purchase

22         equipment from a vendor who would also be our

23         partner in development of the inventions.  We

24         explained that very clearly to Varian, to

25         Siemens and Elekta.

287

1              Varian jumped on the opportunity, and as

2        I said the last time I was here, the initial

3        interactions were very positive, very

4        collegial and very optimistic.

5   Q.   Was an element of the changing rules that you

6        expected the vendor from whom you purchased

7        equipment to fund your research as a condition

8        for the purchase of equipment?

9   A.   No, not necessarily.  That's part of how the

10       rules were changing.  The old paradigm, the

11       old way of doing business always included some

12       funding of research, but it was done in the

13       form of grants or support for a physics

14       postdoctoral fellow.  It was done in the form

15       of some modest cash payment to the physics

16       division for research support which would of

17       course benefit the university, but would

18       primarily benefit the vendor because such

19       research would be in the form of cash

20       delivered with usually some strings attached

21       in the sense that in some arrangements

22       anything invented would be right of first

23       refusal or the property of the vendor or such

24       publications would have to be vetted by the

25       vendor.  It was a one-sided kind of

288

1      relationship, in my mind all benefiting a

2      vendor.

3           The rules change that I described is one

4      in which the scientists and the vendor would

5      collaborate by writing joint research grants

6      or by putting their own independent funding

7      into a pool for joint venture, which would be

8      one of development and would have joint

9      ownership.

10  Q.   I'm handing you Exhibit 34.  Exhibit 34 is a

11      document that Varian has produced in this

12      case, Bates No. VAR 00313545, appears to be a

13      letter from you to Martin Kandes at Varian

14      dated December 3rd, 1993.

15           Is this a letter that you wrote?

16  A.   Yes.

17  Q.   You signed it?

18  A.   Yes.

19  Q.   And sent it to Varian on or about December

20      3rd, '93?

21  A.   Yes.

22  Q.   The first sentence refers to Martin Kandes,

23      Tom Vogel and Jack Coats of Varian coming to

24      meet with you, Dr. Kalend and Mr. McManigle at

25      UPMC; is that correct?

289

1    A.    University of Pittsburgh Medical Center, yes.

2    Q.    And do you recall that meeting?

3    A.    There were many meetings.  I don't recall the

4          specific one.

5    Q.    There were many in-person meetings?

6    A.    Yes.

7    Q.    How many in-person meetings between you and

8          Varian do you recall in '93 and '94 prior to

9          the -- let's say the rejection of the NIST ATP

10         submission?

11   A.    Difficult for me to put a number on that

12         because of the large numbers of phone calls

13         and communications, drafts of grants going

14         back and forth.  I had the feeling that during

15         late December 1993 and early 1994, well, late

16         1993 not just December, and early 1994, that

17         Varian, their scientists and their

18         collaborators, and the salespeople were, as I

19         would describe it, they were the main event in

20         my academic life.

21   Q.    There is a sentence in the first paragraph of

22         Exhibit 34 that says, We are delighted that

23         the proposed collaboration between UPMC and

24         Varian Corporation appears to be taking

25         shape.  Do you see that?

1    be perfectly positioned to be marketed,

2    commercialized by Varian.

3         So this agreement was one step along that

4    way, and as I testified previously, it

5    incorporated some of the concepts that I

6    described as a partnership because we were

7    cooperating in applying for a grant.  We

8    weren't accepting money from Varian to do the

9    research.  I think that's the essence of the

10    partnership.

11  Q.  What confidential information did you provide

12    to Varian pursuant to this agreement?

13  A.  We gave them access to everything, from March

14    of 1993 when Dr. Kalend and I began to

15    envision the overall dynamic conformal

16    radiotherapy program, began to generate

17    documents, including that poster presentation

18    at Nemacolin.  We shared all of that with

19    Martin Kandes.

20  Q.  Shared meaning what?

21  A.  Let him read it, let him see it, explained it

22    to him, brought him to Pittsburgh, showed him

23    how we would do it, explained to him how the

24    Kanade cameras worked and how they would be

25    adapted to monitor patient movement and

307

1       positioning, explained to him how we were

2       going to do the matching for tracking the

3       position of the tumor target relative to a

4       point in time of the treatment and how that

5       matched to the simulation, and essentially

6       shared with him the entire vision of the

7       program.

8   Q.   Did you provide Mr. Kandes with any written

9       materials containing information for him to

10      retain that you -- that contained information

11      you considered to be confidential?

12  A.   Absolutely.

13  Q.   What were those written materials?

14  A.   The grant application, early drafts, it

15      proposes the specific aims in that application

16      were very much the essence of our conception

17      of the inventions.

18  Q.   Anything else other than those particular

19      materials that you just identified?

20  A.   Many of the figures and photographic materials

21      showing him the way we would set it up,

22      demonstrations of how we were going to do it.

23      I'm recalling those times where I was

24      present.  He spent significant time with

25      Dr. Kalend as well and --

343

1    COMMONWEALTH OF PENNSYLVANIA

2    COUNTY OF ALLEGHENY

3        I, Heidi H. Willis, RPR, CRR, a Court Reporter

4    and Notary Public in and for the Commonwealth of

5    Pennsylvania, do hereby certify that the witness,

6    JOEL GREENBERGER, M.D., was by me first duly sworn

7    to testify to the truth; that the foregoing

8    deposition was taken at the time and place stated

9    herein; and that the said deposition was recorded

10   stenographically by me and then reduced to printing

11   under my direction, and constitutes a true record of

12   the testimony given by said witness.

13       I further certify that the inspection, reading

14   and signing of said deposition were NOT waived by

15   counsel for the respective parties and by the

16   witness.

17       I further certify that I am not a relative or

18   employee of any of the parties, or a relative or

19   employee of either counsel, and that I am in no way

20   interested directly or indirectly in this action.

21       IN WITNESS WHEREOF, I have hereunto set my hand

22   and affixed my seal of office this 8th day of

23   November, 2007.

24

> COMMONWEALTH OF PENNSYLVANIA
> Notarial Seal
> Heidi H. Willis, Notary Public
> City Of Pittsburgh, Allegheny County
> My Commission Expires July 8, 2008
> Member, Pennsylvania Association Of Notaries

25                    _____
                      Notary Public

# EXHIBIT U

1

# CONFIDENTIAL

1    IN THE UNITED STATES DISTRICT COURT FOR THE
         WESTERN DISTRICT OF PENNSYLVANIA

2

3                      - - - -

UNIVERSITY OF PITTSBURGH,         )

4                                 )
                                  )
5          Plaintiff,             )
                                  )
6                                 )      Case No.
        -vs-                      )      07-CV-0791 (AJS)
7                                 )
                                  )
8    VARIAN MEDICAL SYSTEMS, INC.,)
                                  )
9                                 )
           Defendant.             )

10

11                                      *ORIGINAL*

12                     - - - -

13                 CONFIDENTIAL

14                     - - - -

15    DEPOSITION OF:  ALEXANDER J. CIOCCA, ESQ.

16                     - - - -

17

                DATE:    October 3, 2007
18                       Wednesday, 9:23 a.m.

19

            LOCATION:    UPMC Shadyside Hospital
20                       Medical Office Building
                         5150 Centre Avenue
21                       Fifth Floor Conference Room
                         Pittsburgh, PA  15213

22

23          TAKEN BY:    Defendant

24

         REPORTED BY:    Heidi H. Willis, RPR, CRR
25                       Notary Public
                         AKF Reference No. HW03565



2

1          DEPOSITION OF ALEXANDER J. CIOCCA, ESQ.,
a witness, called by the Defendant for examination,
2  in accordance with the Federal Rules of Civil
Procedure, taken by and before Heidi H. Willis, RPR,
3  CRR, a Court Reporter and Notary Public in and for
the Commonwealth of Pennsylvania, at the UPMC
4  Shadyside Medical Office Building, 5150 Centre
Avenue, Fifth Floor Conference Room, Pittsburgh,
5  Pennsylvania, on Wednesday, October 3, 2007,
commencing at 9:23 a.m.

6

7                 - - - -

8

APPEARANCES:

9

      FOR THE PLAINTIFF:
10  Rita E. Tautkus, Esq.
MORGAN LEWIS & BOCKIUS, LLP
11  One Market, Spear Street Tower
San Francisco, CA  94105
12  P 415-442-1357
F 415-442-1001
13  rtautkus@morganlewis.com

14

15      FOR THE DEFENDANT:
Henry Sneath, Esq.
16  PICADIO SNEATH MILLER & NORTON
4710 U.S. Steel Tower
17  600 Grant Street
Pittsburgh, PA  15219
18  412-288-4000
hsneath@psmn.com

19

20

21

22

23

24

25

4

```
 1              ALEXANDER J. CIOCCA, ESQ.,

 2                being first duly sworn,

 3         was examined and testified as follows:

 4                    - - - -

 5                  EXAMINATION

 6                    - - - -

 7  BY MR. SNEATH:

 8  Q.    Mr. Ciocca, Al, may I call you Al today?

 9  A.    Yes, please.

10  Q.    Al, my name is Henry Sneath, as you know.  I

11        represent Varian Medical Systems in a lawsuit

12        that's been filed by the University of

13        Pittsburgh in the Western District of

14        Pennsylvania.

15              I know you are familiar with this

16        process, you being an attorney, but I'll just

17        remind you of a couple things.  I'm going to

18        ask you questions today pursuant to a subpoena

19        and Notice of Deposition, and if you don't

20        understand my question, please exercise your

21        right to ask me to rephrase it or ask it again,

22        I'll be happy to do so.  If you need to take a

23        break, just let me know.

24              Are you representing yourself, or are

25        you unrepresented?  In what capacity are you
```

1           appearing today as a witness, if any?

2   A.   Just as a witness for this deposition.

3   Q.   All right.  And have you been designated by

4           UPMC as a corporate representative pursuant to

5           that Notice of Deposition?

6   A.   Yes.

7   Q.   Al, state your full name, please.

8   A.   It's Alexander J. C-I-O-C-C-A.

9   Q.   And what's your current home address?

10   A.   Current home address is 4011 Chelstead,

11          C-H-E-L-S-T-E-A-D, Way, Murrysville, PA 15668.

12   Q.   In an effort to shorten this up today, I asked

13          you to send me your CV, and we've marked it as

14          Exhibit 26.  All of the exhibits today are

15          going to bear the Bates stamp UPMC and then a

16          sequential number beginning with 1.

17               Is this your current curriculum

18          vitae?

19   A.   Yes.

20   Q.   And does it accurately represent your

21          employment, your education, your professional

22          activities and your presentations and

23          publications roughly up-to-date?

24   A.   Yes.

25   Q.   What is your current employment position with

6

1          UPMC?

2    A.    My current title is associate counsel in the

3          UPMC corporate legal department.  I'm one of

4          the senior attorneys.

5    Q.    And give me a brief description of your job

6          responsibilities in that capacity.

7    A.    I am legal counsel for several hospitals within

8          the UPMC system, namely UPMC South Side, UPMC

9          St. Margaret, Western Psychiatric Institute And

10         Clinic, and a few programs that are within the

11         UPMC Presbyterian Shadyside corporation that's

12         kind of shared among several colleagues.

13              I'm also responsible as the chief

14         counsel for the graduate medical education

15         program of UPMC and the UPMC clinical trials

16         office that handles human subject research.

17         I'm the chief counsel for many of the aspects

18         of the UPMC Cancer Centers as well.  I think

19         that would cover most of it.  There are other

20         corporate areas and projects that are assigned

21         by the general counsel from time to time.

22   Q.    Thank you.  There was a time I believe when you

23         were on the staff at the University of

24         Pittsburgh, the legal counsel staff there; is

25         that correct?

```
 1   A.   Yes and no.  I was not part of the Pitt general
 2        counsel office, but I was part of the
 3        management and legal counsel for Pitt when
 4        Western Psychiatric Institute And Clinic was a
 5        part of the university and managed by the
 6        university, as well as legal counsel for the
 7        school of medicine and the other schools of the
 8        health sciences.
 9   Q.   And was your employer the University of
10        Pittsburgh at the time?
11   A.   Yes.
12   Q.   And when did that employment circumstance
13        change?
14   A.   I think I was actually cut over to the UPMC
15        Presby payroll October 1st, 1986.
16   Q.   1986?
17   A.   '86 -- I'm sorry, '96, 1996.
18   Q.   Was that at or about the time that UPMC was set
19        aside as a separate corporation?
20   A.   It actually preceded that.  The history of it
21        is that I started there in January of '86, and
22        at that time Western Psych was part of the
23        university, an unincorporated program.  In
24        1991, I believe, we merged the hospital
25        operations part of Western Psychiatric to make
```

1   A.   I'm aware of none.

2   Q.   Okay.  When you were at Pitt, was Fran Connell

3        there?

4   A.   Fran Connell, yes, yes.

5   Q.   Did you have any involvement at the time in

6        licensing issues and patent assignment issues,

7        those kinds of things?

8   A.   At one time I did, prior to Ms. Connell taking

9        over as the director of the technology transfer

10       office.  I don't know what year that would have

11       been, sometime in probably the early '90s, and

12       subsequently to that I would have some

13       involvement at her request where matters

14       related to the school of medicine or schools of

15       health sciences, but not any involvement with

16       the rest of the campus that were outside of the

17       schools of health sciences.

18  Q.   But she would be the principal person to ask

19       about those issues --

20  A.   Yes.

21  Q.   -- back at that time?

22  A.   Yes, yeah, she was the director of the office.

23       She took it over after the prior director,

24       fellow named John Thompson retired, and I

25       consulted and assisted her whenever she asked

30

| | | |
|---|---|---|
| 1 | | me to, but it was her operation. |
| 2 | Q. | And 10, 11 and 12 would all relate to the same |
| 3 | | set of issues if you take a look at those? |
| 4 | A. | Yes. |
| 5 | Q. | Would you think she would be a person who would |
| 6 | | be most likely to have information on those |
| 7 | | issues? |
| 8 | A. | Yeah, I would think so.  If you are looking at |
| 9 | | the time frame of the mid-'90s to the filing of |
| 10 | | the patents and so forth, I would think so. |
| 11 | | The current Office of Technology Management |
| 12 | | director Marc Malandro wouldn't have been there |
| 13 | | at that time.  Depends what time frame you are |
| 14 | | talking about because there was a reassignment |
| 15 | | of job duties and reporting and so forth when |
| 16 | | actually there was another director before |
| 17 | | Marc, but he is the current director. |
| 18 | | So depends what time frame.  Mid-'90s |
| 19 | | or around that time, yes, that would be Fran |
| 20 | | Connell. |
| 21 | Q. | All right.  And she's still employed at the |
| 22 | | University of Pittsburgh? |
| 23 | A. | No.  She retired last year I think. |
| 24 | Q. | Do you know if she's still in the area? |
| 25 | A. | She's in Philadelphia. |

```
 1   Q.    Philadelphia.  Do you know the circumstances
 2         under which she left Pitt?  Did she just
 3         retire, or do you have any knowledge?
 4   A.    It was a voluntary retirement and that she
 5         initiated.
 6   Q.    As far as you know, left on good terms?
 7   A.    Yes.  Yeah, they had a nice party for her and,
 8         you know, she had been there for quite some
 9         time, actually started out in the general
10         counsel offices as one of the associate general
11         counsels.
12   Q.    Okay.  So for 10, 11 and 12, I think we just
13         covered those.  13 we have listed for
14         Dr. Shogan.  Do you have any knowledge though
15         on 13?
16   A.    No, I don't have any personal knowledge of
17         anything on 13 or 14.
18   Q.    Same with 14?
19   A.    Yes.
20   Q.    15?
21   A.    I wasn't quite sure what you were trying to get
22         at there.  Can you clarify?
23   Q.    I think.  Well, we may have already talked
24         about this.  UPMC you said has recently
25         developed an IP policy, and prior to that time
```

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Same for 19? |
| 3 | A. | Same for 19. |
| 4 | Q. | No. 20, UPMC's acquisition, possession, |
| 5 | | ownership and use of any of the Varian products |
| 6 | | that are listed in that request.  Do you have |
| 7 | | some knowledge regarding that? |
| 8 | A. | I do. |
| 9 | Q. | All right.  Why don't you just generally tell |
| 10 | | me what you know. |
| 11 | A. | Okay.  I wasn't quite sure again what you were |
| 12 | | trying to get to there, but I think I discussed |
| 13 | | this with you and with Matt, that UPMC did |
| 14 | | enter into a customer-vendor relationship with |
| 15 | | Varian several years ago when the UPMC Cancer |
| 16 | | Centers' idea was spawned and several -- group |
| 17 | | of senior managers cutting across various |
| 18 | | departments and divisions made a decision that |
| 19 | | Varian systems and equipment were the ones that |
| 20 | | they wanted to get for use in the different |
| 21 | | cancer facilities within UPMC and as we have |
| 22 | | expanded it since then. |
| 23 | | I was not part of any of those |
| 24 | | discussions or the negotiations which were done |
| 25 | | through the UPMC purchasing department, now |

1      called supply chain management.

2               I did produce to you a spreadsheet of

3      all of the purchases that our department was

4      able to give me back to 2000 because of their

5      record retention/destruction policy.  That

6      would not have told you where those systems and

7      equipment are located.

8               So thinking that that's what you were

9      looking for, I asked one of the senior

10     administrators for the cancer centers to let me

11     know what of that list of equipment had been

12     purchased and installed at various UPMC

13     locations, and this document was what I

14     received late yesterday (handing).  If you want

15     to mark that as an exhibit, we can talk about

16     it.

17  Q.  All right.  Well, let's do one other thing

18     first.  Why don't I show you Exhibit 1, if you

19     could first identify that.

20  A.  That is the document that contains description

21     of UPMC purchases of various items from Varian

22     per the prior subpoena that you had served on

23     us going back, as I said, to I believe the year

24     2000, because they only keep the documents for

25     seven years in the purchasing department.  That

1          gives a summary of each item that was purchased

2          and the price that was paid.

3     Q.   You said there was a committee that made this

4          determination or you said senior managers, I

5          forget the term you used, that made the

6          decision to purchase this product?

7     A.   Yes.

8     Q.   Who was that?

9     A.   I don't know who all was involved with that.  I

10         believe Dr. Shogan was involved with that, so

11         that might be fair game for you to ask him.

12    Q.   Do you know if Dr. Greenberger was?

13    A.   I don't know.

14    Q.   And was there any involvement by the legal

15         department in the process of those decisions to

16         make these purchases?

17    A.   There would probably have been review by --

18         there could have been review by somebody in our

19         department.  It was not me.  I don't know who

20         was involved.

21    Q.   And do you know whether the determination was

22         made to purchase from Varian as opposed to

23         others, or if there was some determination that

24         they were the only supplier?  Do you have any

25         knowledge about that?

```
 1    COMMONWEALTH OF PENNSYLVANIA )      CERTIFICATE

 2    COUNTY OF ALLEGHENY          )      SS:

 3         I, Heidi H. Willis, RPR, CRR, a Court Reporter

 4    and Notary Public in and for the Commonwealth of

 5    Pennsylvania, do hereby certify that the witness

 6    ALEXANDER J. CIOCCA, ESQ., was by me first duly sworn

 7    to testify to the truth; that the foregoing

 8    deposition was taken at the time and place stated

 9    herein; and that the said deposition was recorded

10    stenographically by me and then reduced to printing

11    under my direction, and constitutes a true record of

12    the testimony given by said witness.

13         I further certify that the inspection, reading

14    and signing of said deposition were NOT waived by

15    counsel for the respective parties and by the

16    witness.

17         I further certify that I am not a relative or

18    employee of any of the parties, or a relative or

19    employee of either counsel, and that I am in no way

20    interested directly or indirectly in this action.

21         IN WITNESS WHEREOF, I have hereunto set my hand

22    and affixed my seal of office this 10th day of

23    October, 2007.

24

25
```

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Notary H. Willis, Notary Public
City Of Pittsburgh, Allegheny County
My Commission Expires July 8, 2008
Member, Pennsylvania Association Of Notaries



# EXHIBIT V

# CONFIDENTIAL

1  IN THE UNITED STATES DISTRICT COURT FOR THE
2         WESTERN DISTRICT OF PENNSYLVANIA

3                    - - - -

4  UNIVERSITY OF PITTSBURGH,        )
                                    )
5            Plaintiff,             )
                                    )
6                                   )       Case No.
       -vs-                         )   07-CV-0791 (AJS)
7                                   )
                                    )
8  VARIAN MEDICAL SYSTEMS, INC.,    )
                                    )
9            Defendant.             )
10

11

12                    - - - -

13                 CONFIDENTIAL

14                    - - - -

15  DEPOSITION OF:  JEFFREY E. SHOGAN, M.D.

16                    - - - -

17
              DATE:    October 3, 2007
18                     Wednesday, 11:58 p.m.

19
              LOCATION:  UPMC Shadyside Hospital
20                       Medical Office Building
                         5150 Centre Avenue
21                       Fifth Floor Conference Room
                         Pittsburgh, PA  15213
22

23            TAKEN BY:   Defendant

24
              REPORTED BY:  Heidi H. Willis, RPR, CRR
25                          Notary Public
                            AKF Reference No. HW03565



1          DEPOSITION OF JEFFREY E. SHOGAN, M.D.,
a witness, called by the Defendant for examination,
2  in accordance with the Federal Rules of Civil
Procedure, taken by and before Heidi H. Willis, RPR,
3  CRR, a Court Reporter and Notary Public in and for
the Commonwealth of Pennsylvania, at the UPMC
4  Shadyside Medical Office Building, 5150 Centre
Avenue, Fifth Floor Conference Room, Pittsburgh,
5  Pennsylvania, on Wednesday, October 3, 2007,
commencing at 11:58 p.m.

6

7                        - - - -

8

APPEARANCES:
9

          FOR THE PLAINTIFF:
10  Rita E. Tautkus, Esq.
MORGAN LEWIS & BOCKIUS, LLP
11  One Market, Spear Street Tower
San Francisco, CA  94105
12  P 415-442-1357
F 415-442-1001
13  rtautkus@morganlewis.com

14

15          FOR THE DEFENDANT:
Henry Sneath, Esq.
16  PICADIO SNEATH MILLER & NORTON
4710 U.S. Steel Tower
17  600 Grant Street
Pittsburgh, PA  15219
18  412-288-4000
hsneath@psmn.com

19

20          FOR THE WITNESS:
21  Alexander J. Ciocca, Esq.
UPMC, Corporate Legal Department
22  U.S. Steel Tower, 28th Floor
600 Grant Street
23  Pittsburgh, PA  15219
412-647-8478
24  cioccaaj@upmc.edu

25

4

1          JEFFREY E. SHOGAN, M.D.,

2             being first duly sworn,

3        was examined and testified as follows:

4                   - - - -

5                 EXAMINATION

6                   - - - -

7    BY MR. SNEATH:

8    Q.    Dr. Shogan, my name is Henry Sneath.  I

9          represent Varian Medical Systems, Incorporated.

10         Varian is a Defendant in a lawsuit filed by the

11         University of Pittsburgh.  It's a suit for

12         patent infringement.  It's filed in the United

13         States District Court for the Western District

14         of Pennsylvania.

15             I'm going to ask you some questions

16         today relating to a subpoena we served on you

17         and UPMC asking that documents be produced and

18         a witness be designated for certain deposition

19         topics that we forwarded to counsel.

20             My understanding is you are

21         represented by Mr. Ciocca today; is that

22         correct?

23   A.    That's correct.

24   Q.    Please state your full name.

25   A.    Jeffrey Edward Shogan.

5

```
 1   Q.   And, Dr. Shogan, what's your current employment

 2        here at the university?

 3   A.   I'm employed by the University of Pittsburgh

 4        Cancer Centers, UPMC Cancer Centers.

 5   Q.   And what is your position?

 6   A.   I'm one of the directors, chief business

 7        officer, director of business, strategic

 8        planning.

 9   Q.   Okay.  And how long have you been here?

10   A.   It was 2001 I believe, end of 2000, beginning

11        of 2001.

12   Q.   I've put in front of you what I believe to be

13        your current CV.  It's marked as Exhibit 25.

14        Would you agree with me that that is your at

15        least relatively current CV?

16   A.   Yes.

17   Q.   And do you stand by the representations that

18        are in there so I don't need to ask you

19        questions about them?

20   A.   Yes.

21   Q.   All right.  Thank you.  You were designated by

22        UPMC to testify regarding certain issues, so

23        I'm going to try to limit these questions the

24        best I can to that.

25             Tell me what your experience is with
```

1   COMMONWEALTH OF PENNSYLVANIA )   CERTIFICATE

2   COUNTY OF ALLEGHENY       )   SS:

3      I, Heidi H. Willis, RPR, CRR, a Court Reporter

4   and Notary Public in and for the Commonwealth of

5   Pennsylvania, do hereby certify that the witness

6   JEFFREY E. SHOGAN, M.D., was by me first duly sworn

7   to testify to the truth; that the foregoing

8   deposition was taken at the time and place stated

9   herein; and that the said deposition was recorded

10   stenographically by me and then reduced to printing

11   under my direction, and constitutes a true record of

12   the testimony given by said witness.

13      I further certify that the inspection, reading

14   and signing of said deposition were NOT waived by

15   counsel for the respective parties and by the

16   witness.

17      I further certify that I am not a relative or

18   employee of any of the parties, or a relative or

19   employee of either counsel, and that I am in no way

20   interested directly or indirectly in this action.

21      IN WITNESS WHEREOF, I have hereunto set my hand

22   and affixed my seal of office this 11th day of

23   October, 2007.

24                COMMONWEALTH OF PENNSYLVANIA
                          Notarial Seal
                          Heidi H. Willis, Notary Public

25           Notary    City Of Pittsburgh, Allegheny County
                          My Commission Expires July 8, 2008
                   Member, Pennsylvania Association Of Notaries